UNITED STATES of America, Plaintiff,

v.

**BOARD OF EDUCATION OF the CITY OF CHICAGO, Defendant.**

No. 80 C 5124.

United States District Court, N.D. Illinois, E.D.

Oct. 15, 1985.

Neil H. Koslowe, Sp. Litigation Counsel, Washington, D.C. for plaintiff.

Robert C. Howard/Robert M. Weissbourd/James Bradtke, Hartunian, Futterman & Howard, Chtd., Hugh R. McCombs, Jr./David Narefsky/Denise L. Jarrard, Isham, Lincoln & Beale, Chicago, Ill., for defendant.

## PRELIMINARY MEMORANDUM OPINION

ASPEN, District Judge:

### INTRODUCTION

The dispute over the Consent Decree in this unique desegregation case returns to the district court for the third time. The case is here, assigned to a new judge, following the Seventh Circuit's second opinion in the case. *See United States v. Board of Education of Chicago,* 744 F.2d 1300 (7th Cir.1984) ("Second Opinion"), *cert. denied,* — U.S. —, 105 S.Ct. 2358, 86 L.Ed.2d 259 (1985). Although the United States won the appeal, the Court of Appeals concluded its opinion with an admonition to the United States that its conduct in connection with the case had been less than honorable:

In the circumstances of this case, we deem it important to note that the actions of the Executive Branch described above and reflected in the hearings below could be interpreted to contravene

the spirit of the Decree. Such actions, while perhaps within constitutional limits, cannot enhance the respect to which this Decree is entitled and do not befit a signatory of the stature of the United States Department of Justice. The Executive Branch initiated this critical litigation and bears a continuing shared and special responsibility for its eventual outcome, regardless of changes in personnel and ideology that will inevitably accompany the passage of time.

744 F.2d at 1308. Such conduct continues. The United States continues its hard line approach to its obligations under ¶ 15.1 of the Consent Decree, which provides:

> Each party is obligated to make every good faith effort to find and provide every available form of financial resources adequate for implementation of the desegregation plan.

Rather than make this "good faith effort," the government has made and continues to make every possible effort to minimize its obligations under ¶ 15.1, even as narrowed by the Second Opinion. In this opinion, we hold that the United States has violated the letter, as well as the spirit, of the Decree.

■ A consent decree is both an enforceable contract and an order of the court.[1] It quickly became clear to this Court that the United States has had little respect for ¶ 15.1, whether viewed as contractual promise or judicial command. As the Court of Appeals implicitly recognized, 744 F.2d at 1308, changes in administration and philosophy since 1980, when the decree was signed, have been largely responsible for generating the conflict in this case. This change in philosophy apparently includes the belief that promises made by previous administrations need not be honored and that court orders need not be followed if they contradict prevailing ideology. If

such a belief exists, it will not prevail, as this opinion will explain.

Since receiving the case, the Court has had to quickly learn the complex history of the case, and resolve pre-trial disputes, see 610 F.Supp. 695 (1985); 610 F.Supp. 702 (1985), as the parties feverishly worked to prepare evidence and supporting material for this merits opinion. We appreciate the hard work of the parties and their briefs, which were very long—totalling about 450 pages, not counting the thousands of pages of appendices—but very helpful.

Remarkably, the parties devoted well over 150 pages of their briefs to arguments over what the Court of Appeals meant in the Second Opinion, which itself spanned just nine published pages. Obviously, much of this case hinges on our interpretation of the Second Opinion. Accordingly, before entering our Findings of Fact and Conclusions of Law concerning the evidence submitted by the parties, we set forth first an extensive preliminary opinion, which interprets the Second Opinion, thereby defining the context shaping the Findings and Conclusions which follow.

Technically, pending before the Court is the Board's motion for declaratory and injunctive relief, which essentially alleges that the United States violated ¶ 15.1 of the Consent Decree in many ways in 1984 and earlier years. For the reasons stated in the Preliminary Opinion and the Findings and Conclusions that follow, that motion is granted in large part.

## PART I: ANALYZING THE SECOND COURT OF APPEALS OPINION

### 1. *Background*

The focus of this remand proceeding is the meaning of the United States' obligation under ¶ 15.1 of the Consent Decree,

---

1. In light of the government's continued obstinance, we feel compelled to remind the United States of some basic principles written by District Judge Milton I. Shadur in this case last year:

> Section 15.1 is part of a consent decree. Like every consent decree, it has a twofold aspect. It is of course a *contract*—and as a contract, it is enforceable to require the contracting parties to perform their voluntarily undertaken duties. Because unlike most contracts the parties have chosen to submit it for the stamp of court approval, it is also a *court order*—and as such, it is enforceable like any other court order, by contempt if need be. 588 F.Supp. at 139–40 (emphasis in original).

which is quoted above at 1. In this preliminary chapter of the opinion, we resolve the continuing dispute over which federal funds were "available" to the Board under ¶ 15.1; in the concluding chapters we decide whether the United States has made "every good faith effort to find and provide" these funds, with particular scrutiny on fiscal year 1984.

The Consent Decree embodying the unique funding provision was entered and approved by the Court on September 24, 1980, the same day that the United States sued the Board for allegedly operating racially segregated schools in violation of the Fourteenth Amendment and Titles IV and VI of the Civil Rights Act of 1964. The history surrounding the Consent Decree is detailed at length in previous opinions and repeated in part in Chapter I of our extensive Findings of Fact below. For present purposes, we need only repeat the undisputed proposition that the desegregation plan envisioned by the Decree and the funding provisions of the Decree were unique and pioneering. The Plan ultimately developed by the Board, endorsed by the United States and approved by the District Court, *see United States v. Bd. of Education of Chicago,* 554 F.Supp. 912 (N.D. Ill.1983), created a broad range of costly educational programs designed to remedy the effects of past segregation on Chicago's black and Hispanic students. The Plan eschewed forced desegregation methods, e.g. busing, in favor of voluntary desegregation made possible by the Plan's educational programs. The Plan recognized that Chicago's demographics made complete and lasting desegregation impossible. Thus, the Plan as approved by the Court created compensatory educational programs targeted to those schools which would remain segregated. These programs are intended to remedy the past and continuing effects of segregation. *See, e.g.,* Findings of Fact ("Findings") 106–107.

Frustrated by what it considered the United States' unwillingness to help fund the Plan, the Board petitioned the District Court on May 31, 1983, for an order enforcing the funding obligations of the United States under ¶ 15.1. The United States contended that the Decree did not constrain its discretion in the funding process, and that to honor the decree it need only help the Board apply for funds. The Court rejected this argument, embracing the Board's position, which was that ¶ 15.1 unambiguously required the United States to provide available funds to the Board. 567 F.Supp. 272, 282. The Court held that the United States violated ¶ 15.1 by failing to take affirmative steps to find and provide available funds, as well as by working to make funds unavailable to the Board. *Id.* at 283–85. The United States was obligated, said the Court, to provide presently available funds, to find other available funds, to support certain legislative initiatives and to seek appropriations which could be used to aid the Board's Plan. The Court enjoined the United States from spending certain Department of Education funds until the Board's entitlement to them could be finally determined. *Id.* at 289.

On appeal, the United States continued to assert that it had no funding obligations under ¶ 15.1. The Court rejected this assertion. Although disagreeing with the District Court's conclusion that ¶ 15.1 was unambiguous on that issue, it affirmed the District Court's alternative holding that the extrinsic evidence supports the conclusion that ¶ 15.1 requires the United States to "go beyond assisting the Board in locating and applying for federal funds, and ... imposes a substantial obligation on the government to provide available funds to the Board." 717 F.2d 378, 383. However, the Court questioned whether the District Court was correct in concluding that the United States had violated ¶ 15.1 by supporting broad legislative policy decisions which effectively reduced the pool of funds available to the Board. *Id.* It did not decide this question, though, but instead affirmed the District Court's finding of lack of good faith "on the narrower and more discernible ground" that the lower court had also found that the United States actually had funds available for the Board but had failed to provide them. Specifical-

ly the Court referred to the District Court's Findings of Fact 34–35 and 42–43, which had identified the Title IV fund and the "Discretionary Fund" as having available funds. *Id.* The Court also vacated the remedies ordered by the lower court, holding the "principles of comity" between the judicial and executive branches made it appropriate to let the United States have first crack at proposing how it would comply with its funding obligations, as well as remedy past non-compliance. *Id.* at 384.

On remand, the United States filed its November 10, 1983 "Plan for Supporting the Desegregation Plan of the Board" ("November 10 Plan"). Ostensibly a plan for complying with the Court of Appeals opinion, the November 10 Plan was essentially a legal brief arguing for dismissal of the Board's petition and accompanied a motion to dismiss. Among other things, the government argued that recent legislative activities rendered 1984 funds unavailable to the Board, except for $20 million dollars allocated as part of those activities.[2] However, the government finally and for the first time acknowledged that it was ready to give the Board some priority in dividing up desegregation funds. This promise was laden with conditions: The Plan stated that "in reviewing applications under any desegregation programs that provide operational support to local educational agencies, the Department [of Education] would give the Board a competitive priority under any criterion related to need, to the extent consistent with the statute and regulations." The United States calls this a "commitment," but this is difficult to understand, for it was made in the context of its concurrent arguments that no funds were then available to the Board, and that no desegregation programs provided operational support to local educational agencies. In fact, the

Plan did not include Title IV or the Discretionary Funds in the priority, despite the Court of Appeals' then-recent holding concerning those funds.

In March 1984, the District Court held an evidentiary hearing, and in June, issued a lengthy and comprehensive opinion. *See* 588 F.Supp. 132 (N.D.Ill.1984). It is not necessary to discuss that opinion in detail. In a nutshell, the Court reviewed the history of the proceedings, including the parties' understandings when they entered the Consent Decree. It found that most of the programs under the Board's desegregation plan materially aid the successful implementation of the Plan, and that their costs were reasonable.[3] The Court also found that the funding requirements of the Plan for the 1984–85 school year had climbed to about $170 million; that the Board had exerted its best efforts to fund the Plan, but fell some $104 million short of doing so; that the United States was bound under ¶ 15.1 to make good faith efforts to find and provide this balance of $104 million. The Court held that various actions and inactions of the United States constituted bad faith, including submission of the November 10, 1983 Plan, failing to provide funds to the Board, failing to ask Congress for money for the Board, failing to reprogram funds for use by the Board, deciding to curtail direct desegregation grants to local educational agencies, lobbying Congress specifically to make funds *un*available to the Board and redrafting regulations in the Discretionary Fund thereby rendering funds unavailable to the Board.

The Court ultimately entered a detailed remedial order, which was based on two independent grounds, first, as a matter of interpretation of ¶ 15.1 itself, and second, as a remedy for the United States' deliber-

---

**2.** The government was referring to legislative activities surrounding the so-called "Yates Bill," Pub.L. 98–107, 97 Stat. 733 § 111 (1983), and "Weicker Amendment," Pub.L. 98–139, 97 Stat. 871 § 309 (1983). The District Court discussed these enactments in detail in 1984, *see* 588 F.Supp. at 229–37, and the Court of Appeals discussed them as well. *See* 744 F.2d at 1305 & n. 3, 1307–08. Although the government re-

hashes this history in its Merits Brief, this history has little, if any, relevance to the present remand proceedings.

**3.** The government later conceded at oral argument on appeal that it found the Board's Plan reasonable. *See* Transcript of Oral Argument at 16.

ate bad faith. Both grounds required the United States, among other things, to lobby Congress for funds for the Board and to oppose contrary initiatives. In a later remedial order issued in August, 1984, the Court ruled that because of the government's bad faith, it had an unconditional obligation to pay the Board the $104 million needed for the Plan. It ruled that if the United States failed to do so, it would, as a remedial matter, have to obligate to the Board the $17 million restrained in the 1984 Discretionary Fund, and the approximately $12 million in the 1984 Title IV account, despite the fact that most of these funds were obligated to other grantees and purposes.

The United States appealed, and the Seventh Circuit vacated the District Court's 1984 opinion and its subsequent remedial order. At the outset we observe that the Court did not address most of the District Court's Findings of Fact and specifically reversed only its finding that as a matter of construction ¶ 15.1 required the Executive Branch to lobby in Congress and findings of bad faith which depended on this finding. Instead of examining the lengthy District Court Opinion in fine detail, the Court in a brief but broadly worded opinion altered the framework for approaching this case and remanded for application of this approach. Before embarking on its legal analysis, the Court set out the principal issues before it. First, it said it had to decide whether ¶ 15.1 required the Executive Branch "to engage in legislative activity, to make up the difference between the funds necessary for implementing the desegregation plan and the funds that the Board has budgeted for this purpose, and to award Title IV funds and Discretionary Funds to the Board without regard to other grantees." 744 F.2d at 1304. If it would have ruled for the Board on these issues, the Court said it would have had to decide whether the doctrine of separation of powers rendered the Decree unenforceable. The Court resolved the first set of questions in favor of the United States, so it never expressly addressed the constitutional issue. However, it is clear that the separation of powers doctrine lurked beneath the surface of the Court's opinion.

In Part II(A) of the opinion, the Court interpreted ¶ 15.1, as that section's heading states. It reaffirmed its 1983 holding that ¶ 15.1 imposes "a substantial obligation on the government to provide available funds to the Board." *Id.* at 1304. The Court then noted that on remand, the government had stated in its November 10, 1983 Plan that it was prepared to give the Board "priority in the distribution of desegregation funds under existing federal programs." *Id.* at 1305. At oral argument, the Court had asked government counsel what the government's priority meant. Counsel went beyond the literal terms of the Plan spelled above, and stated that under the system of priority, the Department of Education "will put the Board 'at the top of the list' for any program grants that can be applied to desegregation assistance and for which the Board is eligible." *Id.* This "top of the list priority" applied to Title IV, guaranteeing that the Board will receive its " 'equitable fair share' of funding under Title IV criteria," *id.,* and that this funding will be earmarked for Chicago and set apart from the usual block grant funding. Counsel also conceded that the priority applies to the Discretionary Fund.

The Court "considered" these representations and held that

> by guaranteeing the Board will be funded on a priority basis under existing school desegregation programs, the amount of which funding is determined by program criteria and is subject to the review of the district court, the government would comply with our interpretation of ¶ 15.1 and would fulfill its substantial obligation to provide available funds.

*Id.* at 1305–06. The Court added that ¶ 15.1 binds the Secretary of Education's discretion "with respect to funds that may be used for school desegregation pursuant to Congressional appropriation." *Id.* at 1306 n. 7. The Court also held that this ruling meant that, as a general rule, ¶ 15.1

does not force the government to try to make funds available through legislative activity. *Id.* at 1306. By so doing, the Court did not expressly address the alternative separation of powers arguments raised by the United States.

The Court concluded this section with its remand instructions. It remanded the case for this Court to determine whether "the Board is receiving the maximum level of funding that is available under the criteria of programs through which funds for desegregation can be disbursed." *Id.* at 1306. The Court added that so long as the Board has unmet needs, the government also has a continuing "duty to search" for "unencumbered funds [in the Department of Education and other federal agencies] that may be used to advance the Board's desegregation plan." *Id.* at 1306–07.

Thus, in Part II(A) the Court answered the "lobbying" question in favor of the government. It also ruled that ¶ 15.1 cannot guarantee the Board *all* funds made available by Congress. The Board deserves only an "equitable fair share" following "priority" consideration.

The Court in Section II(B), titled "Bad Faith," turned to the District Court's findings of bad faith, which had supported its remedial ruling that the United States had an unconditional obligation to pay $104 million to the Board for 1984–85. The Seventh Circuit vacated all the findings of bad faith but one. Working from its holding in Part II(A) that ¶ 15.1 does not require the government to lobby for desegregation funds, the Court held that it was not bad faith for the government to fail to take certain legislative actions, such as (1) failing to request Congressional appropriations for the Board, (2) failing to "reprogram"[4] funds for the Board, (3) administratively deciding not to provide direct grants for school desegregation, and (4)

redrafting administrative regulations limiting grants of Discretionary Funds. In support of points (3) and (4), the Court reasoned that the decisions were general and nationwide, and therefore did not indicate that the United States specifically intended to avoid ¶ 15.1. *Id.* at 1307 & nn. 9, 10. The Court did not reverse the lower court's "most significant finding of bad faith," concerning the government's lobbying activities which tried to make funds unavailable to the Board. The Court assumed that these activities constituted bad faith, but held that the District Court abused its discretion by ordering a $100 million remedy for this violation. This remedy would have rendered funding unavailable to other grantees and was thus held to be unreasonable. A civil contempt citation would have been the appropriate remedy, but the time for such action had passed. *Id.* at 1307–08. The Court concluded by scolding the Executive Branch for its activities, as noted above in our introduction. It remanded for proceedings under Section II(A) of the opinion and directed under Circuit Rule 18 that a new district judge take over the case. The case was reassigned by lot to this Court.

### 2. *Issues Raised by the Opinion*

The second Court of Appeals opinion ("Second Opinion") is clear about several things, which the Board does not dispute. As a general rule, ¶ 15.1 no longer affirmatively requires the Executive Branch to engage in legislative activity supporting the Board.[5] It does not require that the Board receive funds without any regard for other grantees. It also precludes the Court from finding that failure to lobby or reprogram amounts to bad faith *per se,* or that the mere act of creating a general policy which effectively limits the funds available to the Board amounts to bad faith (absent evi-

---

**4.** We discuss "reprogramming" extensively later. *See, e.g.,* Conclusions 4.11–4.20. For now it can briefly be defined as an informal process whereby the Executive asks a Congressional committee for permission to spend funds in a way different than contemplated by previous committee reports.

**5.** It does leave this Court some room to prohibit legislative activities specifically intended to harm the Board, 744 F.2d at 1307–08 (discussing proper remedies for "Yates-Weicker" lobbying activities, which Court assumed to be bad faith).

dence of intent to hurt the Board). The Board also concedes that, to a large extent, the Secretary is free to obligate portions of otherwise theoretically "available" funds to other purposes and grantees.

However, the parties bitterly disagree about much of the rest of the opinion. To paraphrase the Circuit Court, the process of dispute resolution continues to fail remarkably in this case. *See* 744 F.2d at 1304. The parties have raised several broad, but crucial, issues of interpretation of the Second Opinion. We must decide the dispute over what the Second Opinion means in order to know how to carry out its remand instructions. The nature of the Second Opinion explains why so many questions remain unanswered. The Court's purpose was to change the approach to the case, not to resolve the case. The unresolved dispute divides into three general, overlapping issues, which the Board has appropriately dubbed the "scope," the "pipeline" and the "share" issues. Resolution of these issues will give meaning to ¶ 15.1's words, "every *available* form of financial resources."

The "scope" question asks how broadly the ¶ 15.1 funding priority sweeps. In *which* Congressional programs are funds "available" for the Board's Plan and subject to priority treatment? The United States contends that the Second Opinion limits the "top of the list" priority (which it repeatedly demotes to a "competitive priority," a point we shall return to) only to programs specifically designated by Congress in whole or in part as a "desegregation" program. The Board argues that neither ¶ 15.1 nor the Second Opinion limits the government's duty to programs which carry an explicit "desegregation" label. Rather, the "scope" of the priority covers any program which can materially aid the Board's desegregation plan and for which the Board's own programs qualify under statutory criteria. In other words, according to the Board, a "desegregation" pro-

gram is that which is contained in the Board's "desegregation plan."[6]

While the scope issue cuts horizontally *across* various Congressional programs, the "pipeline" issue has both vertical and horizontal components *within* a given Congressional program. The "pipeline" question asks *when* the Secretary's discretion is bound and *how* it is bound. The "when" question is one of vertical priority: when during the administrative funding process—from the point where money enters the "pipeline," i.e., when Congress allocates funds, to where it exits the pipeline, i.e., when the Secretary writes checks to grantees—does the Consent Decree affect the Secretary's discretion? The United States argues that, until the last phase of the granting process, it is free to exercise its discretion with nary a glance at the Consent Decree; only *after* it passes regulations, sets priorities and refines program criteria must it take the Consent Decree into account. That is, only when the Board applies for funds in competition with other applicants does it get a priority, says the United States. The Board, of course, argues that the Secretary must consider the Consent Decree much earlier in the funding process. Although not specific about what particular steps the Secretary *must* take (it does detail steps the Secretary *could* take, *see* Board's Merits Memorandum at 46–72), the Board says that ¶ 15.1 binds executive discretion at the entrance of the pipeline, ensuring that the Board's needs are considered from that point on as a priority along with the myriad other priorities. In that sense, the pipeline issue is "horizontal," since the United States would have to balance the Board's priority against other priorities within the pipeline.

The "share" issue depends heavily on the outcome of the scope and pipeline issues. It asks what "share" of available funds, that is, the dollar or percentage amount, the Board should get because of the priority. This question is horizontal as between

---

**6.** In a short order concerning how to structure these remand proceedings, we tentatively indicated support for the Board's position. *See* Memorandum Order at 2 n. 1 (April 15, 1985). Below we reaffirm this position.

the Board and other grantees. Out of a pool of given funds, what does the Board get and what do the others get, after applying the priorities as defined by the "scope" and "pipeline" issues?

The scope and pipeline issues depend mostly upon the teachings of the Second Opinion and the meaning of ¶ 15.1. Therefore we address those questions next. The share issue essentially is the issue specified in the Court of Appeals remand instructions. We decide that in Chapter IX of this opinion, after entering our Findings of Fact and Conclusions of Law.

### 3. *The Scope Issue*

■ Unfortunately, the Second Opinion is not clear on its face as to the scope issue. The length of the parties' submissions on this issue alone underscores that point. Nevertheless, after carefully considering the Second Opinion in the context of the Consent Decree and its history and of the First Opinion, we hold that the Board's position on this issue is correct: The ¶ 15.1 priority extends to any statutory program which could materially further the Board's desegregation plan, so long as a project in that Plan may qualify for funding under relevant statutory criteria.

In reaching this result, we begin by considering the Second Opinion. Because of its broad, vision-shifting approach, the Court never explicitly addressed the scope issue now before us. Probably this explains the opinion's ambiguity on this point. As noted earlier, the Court said it was answering a different question, that is, whether ¶ 15.1 requires the Executive Branch to lobby Congress to make up the difference between what the Board has spent on its Plan and what the Plan needs. 744 F.2d at 1304. In answering "no" to this question, the Court several times used language which is relevant to the current scope question. Both sides argue that this language supports their positions. First, in summarizing the government's representations at oral argument, the Court said that the proposed priority system would put the Board " 'at the top of the list' for *any*

*program grants that can be applied to desegregation assistance* and for which the Board is eligible." 744 F.2d 1305 (emphasis added). It then discussed Title IV and the Discretionary Fund, both of which list desegregation as a statutory purpose. In its holding, the Court said that the Board must be "funded on a priority basis *under existing school desegregation programs,* the amount of which funding is determined by program criteria...." *Id.* (emphasis added). The Court added that ¶ 15.1 binds the Secretary's discretion "with respect to the funds that may be used for school desegregation pursuant to congressional appropriation." *Id.* at 1306 n. 7. In explicitly rejecting the District Court's findings that ¶ 15.1 required lobbying, the Court held that no evidence showed "that the parties had any federal funding sources in mind other than programs that could be used, consistent with the intent of Congress, to fund school desegregation efforts." *Id.* at 1306. Finally, in its remand instruction the Court ruled that this Court should determine whether the Board is receiving "the maximum level of funding that is available under the criteria of programs through which funds for desegregation can be disbursed." *Id.*

Each party vigorously contends that this language unambiguously supports its position. But because this language is facially ambiguous, we must disagree with both sides that the opinion's language is itself determinative. On the one hand, the Board argues quite reasonably that the language of the opinion supports a broad reading of the scope issue. Nowhere does the opinion explicitly limit ¶ 15.1 to desegregation-label programs. Rather, it speaks about *"any* program grants that *can be* applied to desegregation assistance"; about "funds that *may be* used for school desegregation pursuant to congressional appropriation"; about "programs through which funds for desegregation *can be* disbursed." (Emphasis added.) All of this language can be read to mean that the Board may receive funds to aid its desegregation plan (hence, receive "desegregation assistance") so long

as programs in its Plan qualify under statutory criteria.

On the other hand, the United States' position is plausible from the face of the opinion. The Court held that the priority applies to "existing school desegregation programs," *id.* at 1305, that is, "programs that could be used, consistent with the intent of Congress, to fund school desegregation efforts." *Id.* at 1306. As the government argues, this language could be read to mean that Congress must specifically intend that the money be spent for desegregation. The Court's specification of *only* Title IV and the Discretionary Fund—two desegregation-label programs—bolsters this reading. Yet this reading is not inevitable. The other language quoted earlier very much supports the Board's position. The word "existing" probably is there to underscore the Court's paramount concerns with lobbying rather than to impose a desegregation-label requirement. And the language, "consistent with the intent of Congress," could support the Board's reading. The Court used that language in the context of ruling that ¶ 15.1 does not, as a matter of construction, require lobbying. In the context of all the other quotations, it could plausibly be read to mean ¶ 15.1 does not require lobbying, but only covers "programs that could be used, *not inconsistent* with the intent of Congress, to fund the *Board's* desegregation efforts." This reading becomes much more plausible when one realizes that everyone, including the Court of Appeals, knew that the Board's unique Plan contained many "non-desegregation" programs in it.

In sum, the Court simply did not unequivocally answer the current scope question: in the unique context of this case, is a "school desegregation program" one that is labelled as such, or one that could aid the Board's desegregation plan? We conclude that the Board's position is correct, not

because the language of the opinion inevitably reads that way, but because that language, considered in the context of ¶ 15.1 and the extrinsic evidence, makes the Board's position the more logical and reasonable one.

■ The language of ¶ 15.1 itself plainly implies no limitation to programs which Congress has labelled "desegregation." Such an implication would actually run contrary to the thrust of the Consent Decree, which the parties agree was and is unique and pioneering.[7] Provisions of a Consent Decree must be read in the context of the whole agreement, *see, e.g. Alliance to End Repression v. City of Chicago,* 742 F.2d 1007, 1011 (7th Cir.1984) (en banc). The Decree contemplated a broad, system-wide plan. It anticipated the use of many educational programs, both to encourage voluntary desegregation and to compensate children in segregated schools for inevitable continued desegregation.[8] The vital funding provision for this Plan, ¶ 15.1, expressly incorporates no artificial limitation. It binds both parties "to make *every* good faith effort to find and provide *every available form* of financial resources adequate for implementation of the desegregation plan." This language does not reasonably suggest that the funding duty is limited to desegregation-label programs. Instead it is obviously broad and inclusive, suggesting no limitation of the kind offered by the United States. Indeed, the United States' reading flies in the face of this language. The comprehensive nature of the Board's Plan and the Consent Decree, *see* Findings 101–110, shows that the parties took an approach that cut away traditional labels and old ways of dealing with desegregation cases. The case involved a novel approach to desegregation, using many costly "non-desegregation" educational programs. It simply does not make any sense that ¶ 15.1, the lifeblood of this Plan, would silently

---

7. *See* Finding of Fact 108 for further detail.

8. Specifically ¶ 2.2 of the Consent Decree recognizes that Chicago's demographics would confine many minority children to segregated schools, requiring extensive compensatory edu-

cational remedies to alleviate the effects of past segregation. ¶ 7 details the wide range of programs contemplated by the Decree. The government has endorsed the Plan's educational programs.

draw a line between programs with and without desegregation labels when the rest of the Consent Decree draws no such line.

The extrinsic evidence surrounding the Consent Decree buttresses the Board's position on the scope issue. While the United States is correct that during the negotiations the Board was concerned about its previous difficulties in getting funding under desegregation-label programs,[9] these negotiations were unfruitful. After a new Board was appointed and new counsel retained, the parties' focus shifted to general principles rather than specific dollar values. As the United States has stipulated ("1984 Stipulation 104"), ¶ 15.1 was not designed to incorporate any specific discussions, but to establish a general and flexible obligation "which would be interpreted and applied as appropriate in whatever future circumstances might arise." Thus, Judge Shadur found in 1984 (a finding which we adopt below in Chapter I) that the extrinsic evidence does not support a reading that ¶ 15.1 was limited to the ESAA program or the historical amounts of that program. See Findings 101–110.

One piece of evidence, relied upon by the Seventh Circuit in the First Opinion, also supports the broader reading of the scope issue. Shortly after signing the Decree, the General Counsel of the Department of Education wrote in a memorandum that the Decree compelled the Department to "ensure that the Chicago School Board ... receives the maximum amount of financial and technical assistance that this Department can provide." 717 F.2d at 382 n. 7. This memorandum supported the Appeals Court's holding that ¶ 15.1 binds the Secretary to provide available resources. We also think it strengthens the conclusion that this "duty to provide" contains no

implicit limits concerning desegregation-label programs. See also Findings 110, 126. The words "maximum amount of ... assistance" imply no such limits [10] and neither do the Court of Appeals' two holdings that the United States' obligation under the Decree is "substantial."

In short, the broad language of the Consent Decree and extrinsic evidence concerning its history and the history of this case supports the Board's reading of the scope issue. If the Court of Appeals had meant to reject such a reading, it would have had to deal with the language of the Consent Decree, the extrinsic evidence and Judge Shadur's relevant factual findings. Its failure to do so confirms our belief that it was not addressing the current scope issue directly, which explains the ambiguity.

██ The United States concedes that ¶ 15.1 applies to programs which do not carry a desegregation label. It acknowledges that ¶ 15.1 imposes a duty to "find" (but not "provide") funds in "non-desegregation" programs. In fact, the government stipulated in 1984 that the discussions leading to ¶ 15.1 addressed "funding possibilities, relating not only to the Department of Education ... but also other federal agencies such as the Department of Justice, the Department of Transportation, and the Department of Housing and Urban Development." See 588 F.Supp. at 141 (Finding of Fact 104, based on 1984 Stipulation 104). Thus, while it admits that ¶ 15.1 in some form applies to such programs, it attempts to mitigate the significance of this admission by arguing ¶ 15.1 imposes only a "finding" duty to these programs. The government thereby attempts to bifurcate the phrase "find and provide" in ¶ 15.1. This does not wash.

---

**9.** In particular, the Board had been concerned about previous denials of funding under the now defunct Emergency School Aid Act, "ESAA" program.

**10.** We reject the government's attempt, see United States' Merits Brief at 16–17, 23–25, to relitigate Judge Shadur's findings that the Board's initial estimates of its needs suggest that its later, higher estimates are excessive (rather than

"adequate," as provided by ¶ 15.1). See 1984 Findings 116, 125–26, 588 F.Supp. at 145, 148–49. We also reject its attempts to relitigate the Findings that ¶ 15.1 was limited to the ESAA. Under the law of the case doctrine discussed below at ___, such relitigation is unwarranted. In any event, the government conceded these points on appeal. See n. 2 above.

In its "bifurcation theory," the government draws a new line in ¶ 15.1, arguing, in effect, that it should be read to mean:

> The United States has two obligations. First, it must make every good faith effort to *find* funds appropriated by Congress to programs which could materially aid the Board's desegregation Plan. It must help the Board apply for such funds, but it owes the Board no special treatment in *providing* such funds. Second, the United States will make every good faith effort to *provide* only funds appropriated to programs which Congress has labelled "desegregation."

This construction tortures the language of ¶ 15.1. As noted above, the plain language of ¶ 15.1 creates *one* duty concerning *one* pool of funds: "make every good faith effort to *find and provide every* available form of financial resources adequate for implementation of the desegregation plan." The language suggests no above bifurcated duty to find one sort of funds and provide another.[11] Rather, it suggests the opposite since the "Plan" includes many "non-desegregation" programs.

The United States suggested no such bifurcation in 1983 when it simply ignored the word "provide" and argued that it had a unitary duty only to help the Board "find" and apply for funds. The Court of Appeals suggested no such bifurcation in 1983 when it held that ¶ 15.1 imposes a substantial obligation on the United States to provide available funds.[12] The November 10, 1983 Plan suggests some sort of bifurcation, but at oral argument on appeal (during which the government went well beyond that Plan, as we discuss below) the government did not distinguish the duty to search from that to provide.[13]

Despite the unreasonableness of the bifurcation theory, the United States argues that certain language in the Second Opinion supports bifurcation. In its remand instruction the Court first declared that we must determine whether the Board has *received* "the maximum level of funding available under the criteria of programs through which funds for desegregation can be disbursed." 744 F.2d at 1306. The Court added:

> In the likely event that the Board has financial needs that are still unmet, we note that the government has admitted that it has a *"duty to search* among funds that Congress had indeed made ... available." Transcript of April 5, 1984, at 1416. The best proof that the government is fulfilling this duty would be the assignment of personnel to the task of periodically reviewing federal funding programs, in the Department of Education and in other federal agencies, for unencumbered funds that may be used to advance the Board's desegregation plan.

*Id.* at 1306–07 (emphasis added). We disagree with the government that this language supports its bifurcation theory. First, if the Court meant to adopt such an approach, it would have had to deal directly with the unitary language of the Consent Decree, the extrinsic evidence and the District Court's 1984 opinion, all of which strongly militate against the bifurcation theory. We do not believe the Court would ignore this history if it were to reach such a conclusion. It is incredible that the Court would casually bifurcate ¶ 15.1 without discussing its language or the extrinsic evidence. When the court *did* construe ¶ 15.1, it *did* explicitly discuss its language and

---

**11.** The extrinsic evidence discussed above at 17–18 also fails to suggest that any bifurcation was contemplated.

**12.** The Court affirmed the District Court's findings 34–35, 42–43, which had identified Title IV and the Discretionary Funds as having "available" funds. 717 F.2d at 383. Although these are "desegregation-label" programs, the lan-

guage of the opinion does not imply that these are to only programs which could contain "available" funds or that "available funds" must bear desegregation labels.

**13.** In any event, we hold below at 21–23 that the November 10 Plan is largely irrelevant to the present proceedings.

relevant extrinsic evidence. *See* 717 F.2d at 382–83; 744 F.2d at 1306.[14]

■ We agree with the Board that the Court in the "search" quotation was stating something much simpler and less controversial. The excerpt merely underscores the fact that the United States' obligation under ¶ 15.1 is a continuing one, which is not discharged even if this Court decides that the Board has in fact received "the maximum level of available funds" under a known program. For even under the Board's reading of the scope issue, it will have large "financial needs that are still unmet" even *after* receiving the "maximum" level of funding. So long as such a shortfall exists, the United States must continue to search diligently for "unencumbered" funds. This surely does not imply that it has no duty to "provide" such funds if "found," or that the funds will not be subject to priority treatment. What is the point in finding but not providing such funds? And such an implication is especially unreasonable in light of the Court's failure to discuss ¶ 15.1, the extrinsic evidence, or the bifurcation theory itself.

We therefore reject the United States' bifurcation theory. We must also reject the premise upon which it, as well as much of the government's case, is based, namely, that the Court of Appeals "endorsed" or "adopted" the priority system and bifurcation espoused in the November 10, 1983 Plan. The United States claims that its November Plan articulated its bifurcated duty, that the Assistant Attorney General simply "explained" the priority to the Appeals Court at oral argument, and that the Second Opinion merely endorsed the Plan as explained at oral argument. From these premises flow many of the government's arguments, including its bifurcation theory on the scope issue and its restrictive position on the pipeline issue. Thus, its claim that the Court of Appeals essentially incorporated the November 10 Plan as law merits close attention.

The government's argument uses the Court of Appeals opinion to replace the language and background of ¶ 15.1 with its own November 10 Plan, which was in actuality filed as an offer of how it was to *comply* with (not replace) ¶ 15.1 in light of the First Opinion. Consistent with this approach, the government diverts attention from the consent decree itself and the extrinsic evidence, arguing instead that what it says its own priority means is entitled to great deference.

The government's position is patently wrong. The Plan was just one step in of the United States' glacial move toward compliance with ¶ 15.1, not the standard by which to read ¶ 15.1. Before the First Opinion the government maintained that ¶ 15.1 imposed no special funding obligation. The Court of Appeals rejected this position, 717 F.2d at 381–82, and remanded to the United States to propose how it intended to comply with ¶ 15.1. The government thus filed its Plan, in which it repeated its position regarding "technical assistance," but also first promised a "competitive priority" which would apply only to "desegregation programs that provide operational support to local educational agencies." November 10, 1983 Plan, ¶ 3. However, this offered priority was hollow, since the government was also asserting that no such funds were available and that *there were no* desegregation programs providing operational support to local agencies. Moreover, the priority offered did *not* cover Title IV, which was discussed separately in the Plan, *see* ¶ 4, and the Plan did not even mention the Discretionary Fund. Nowhere does the Plan use phrases like "top of the list priority" or "equitable fair share." Indeed, it was not until March of 1984 that the United States indicated that its priority might extend to Title IV. *See* United States' Pre-Trial Memorandum

---

**14.** Indeed, as we have noted elsewhere, the appeal focussed on legislative activities and the "share" question of whether the Board can receive *all* funds in certain programs. The government's statement of the issues on appeal underscores these points. Nowhere does it mention or imply a bifurcation of ¶ 15.1. *See* 1984 Appellate Brief for the United States at 1–2.

(March 13, 1984) at 24.[15] Moreover, the United States concedes that phrases like "top of the list" were not developed until the Appeal. And the Discretionary Fund was not included until then. *See* Conclusion 518 below. In sum, the November 10 Plan is not even a distant cousin of the standard enunciated in the Second Opinion. Indeed, that opinion could not possibly have "endorsed" the priority offered in the Plan because the United States itself substantially changed its articulation of the priority by the time it walked into the Appeals Court.

The government's oral argument on appeal illustrates this point. The Assistant Attorney General did not even mention the Plan or use the Plan's phrase "competitive priority." Rather, he coined much more expansive phrases like "top of the list priority" and "equitable fair share." And he expressly extended this expanded priority to Title IV and the Discretionary Fund, while conceding that the Executive's discretion was subject to court review. Given this overhaul of the November 1983 Plan for purposes of appeal, the government now strains its own credibility by suggesting that the Court of Appeals "endorsed" the Plan.

If the Court of Appeals had meant to endorse the Plan it could have simply said so instead of bothering to write an opinion. But it did not, nor did it even quote from the Plan or analyze its terms. It mentioned that the Plan was the first time the government had offered the Board a priority, and that the District Court had rejected the Plan. 744 F.2d at 1305. It mentioned the Plan no more. Instead, it went on to summarize the description of the priority *made at oral argument,* one which, as we have seen, differs greatly from that contained in the Plan. Its holding and remand instructions do not instruct this Court to confirm that the government is fulfilling the narrowly defined promises of the Plan, but rather tell us to determine whether the

Board is receiving "the maximum level of funding available in desegregation programs under program criteria." In short, the November 10 Plan has no bearing on these remand proceedings. It surely is not the standard by which to interpret ¶ 15.1 or the Second Opinion. It merely represents one historical step that the government has taken in its begrudging march toward compliance with ¶ 15.1.

The representations made at oral argument, however, are another matter. Undoubtedly, the Court of Appeals relied heavily on these representations in reaching its holding in Section II(A) of the Second Opinion. Both parties quote extensively from the oral argument in their efforts to interpret that opinion. Thus, even the Board concedes that the statements are important. The United States goes further and essentially argues that the representations carry the weight of the opinion itself, since the Court smiled upon these statements in its opinion. While the oral statements are important, we obviously cannot accord them the force and effect of law. They simply provide some clues to what the Court of Appeals, which speaks law, meant. In our effort to discern what the Court of Appeals meant we must view the representations carefully, since they were made for the first time on appeal, in bitter litigation, were based on facts then outside of the record and were not then subject to evidentiary challenge. The representations are much more relevant to the pipeline issue than the scope issue. For now, we will discuss them only to the extent they relate to the scope issue.

The Court of Appeals quite clearly endorsed the government's position concerning the scope issue *then* before it, namely, how ¶ 15.1 affects the Executive in its dealings with Congress. Both the government and the Court of Appeals agreed that ¶ 15.1 does not affect what *Congress* says is "available" or how the Executive lobbies Congress. However, the Assistant Attor-

---

**15.** Even then, the priority did not include the more expansive descriptions used at oral argu-

ment on appeal.

ney General only briefly alluded to the scope issue *now* before us. As noted earlier, he never mentioned the bifurcation theory. Thus, his representations have little bearing on the scope issue. Nevertheless, we will briefly deal with what he did say. When he was describing the "top of the list" priority system, he said it applied to "funds ... that Congress has said are available for desegregation purposes." Transcript of Oral Argument at 4. The panel asked him to name these funds, and he first identified only Title IV. *Id.* The panel pressed him for other programs, and he identified the Discretionary Fund. The panel did not ask him to name other programs, and he, of course, volunteered none. All of this is not surprising, since, as we have noted, the current scope issue was not the focus on appeal. In the opinion the Court noted that the Assistant Attorney General had said that the priority applied to Title IV and the Discretionary Fund. 744 F.2d at 1305. But, although it could have easily done so, the Court did not itself limit the priority to these programs.[16] It spoke in general terms about "existing school desegregation programs" or "programs through which funds for desegregation can be disbursed." With such general language, the Court obviously left the door open to the possibility that other programs might qualify for the priority. And as we have discussed earlier, the Court never said that such programs must carry a desegregation label. The *government* may have suggested it in passing at oral argument, but the Court did not discuss or adopt this language. As we have noted earlier, we seriously doubt that the Court would read such a narrow limitation into ¶ 15.1 without explicitly considering its language, the extrinsic evidence and Judge Shadur's findings.

Indeed, the Court did not simply and mindlessly adopt *everything* the Assistant Attorney General said. It surely adopted

his general position on lobbying and his general, vague articulation of the priority, "top of the list" or "equitable fair share." But the judges did not simply sign their names to the transcript of oral argument. The Assistant Attorney General told the Court that some $400,000 in 1984 Title IV funds had been earmarked for the Board, twice as much as received by any other school district, and that the Board would "get what its projects called for" in applying for funds from the Discretionary Fund. Had the Court thought this alone sufficient, it could have simply said so, reversed and ordered this Court to confirm the oral representations. But it did not do so. It used its own general language, noted above, and went beyond the representations, ordering this Court to "determine" whether the Board is—in the Court's words—receiving "the *maximum* level of funding" available. As we have said, the Court was shifting the direction of the case, but not resolving all of the issues, like the scope issue. In sum, the Court of Appeals began by noting the November 1983 Plan; it then considered, relied upon and generally favored the new, oral representations of government counsel; and it concluded by articulating its own, broader general standard for the priority treatment due the Board. Because this was a new standard, it was general and somewhat open-ended, so that this Court could interpret it in the first instance in light of that opinion, ¶ 15.1, and existing programs. In sum, the representations at oral argument do not compel us to embrace the government's position on the scope issue.

Finally, before moving to the pipeline issue, we must briefly reject the government's remaining arguments concerning the scope issue. First, it is not relevant that Congress has historically used desegregation labels when it specifically intends that money be used to further desegregation. What is relevant is what the *parties*

---

16. Neither does the United States. It has belatedly discovered during these remand proceedings that the Bilingual Education program carries a desegregation label. So does the new Magnet Schools Act. It says it will apply its

version of the priority to these programs. Our resolution of the pipeline issue below will require it to apply a different version of the priority.

intended in ¶ 15.1 as funding sources for the Plan. The Executive could have easily pushed for such a restriction, but did not do so. Second, contrary to the government's worries, our construction does not open its coffers wide to the "voracious" Board. The government's obligation applies only to programs which "materially aid the success of the overall desegregation effort." 588 F.Supp. at 215, *citing Arthur v. Nyquist,* 712 F.2d 809 (2d Cir.1983), *cert. denied sub nom Griffin v. Board of Education,* 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984) *and Liddell v. Missouri,* 731 F.2d 1294 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984). As noted earlier, the government knew that the Board's Plan would contain extensive and expensive remedial educational components, *see* Consent Decree ¶ 7, yet ¶ 15.1 draws no literal distinction between types of programs subject to ¶ 15.1. And the government conceded at oral argument that the Board's Plan is reasonable. *See also* Findings 118–121 below. More significant, the Board's Plan is subject to the continuing review of this Court. We will not let the Board pack its Plan with irrelevant programs which turn the Plan into a black hole sucking up all unencumbered funds. Also, Congressional criteria limit the Board's entitlement. The Board cannot receive funds for any of its programs unless it qualifies under all relevant Congressional criteria. And our resolution of the "pipeline" issues and "share" below indicates that the Board cannot receive anything remotely approaching "all" funds in any program within the broad "scope" of ¶ 15.1. In sum, our resolution of the scope issue does not open up limitless funds to the Board. It simply interprets "available" to include a broad range of programs, not a large share of funds within those programs.

### 4. *The Pipeline Issue*

■ The issue here is at which point in the funding process, from Congressional appropriation to check-writing, are funds in a Congressional program which can aid the Board's Plan "available" such that ¶ 15.1

affects administrative discretion? We hold below that the Board's answer is correct. The language of ¶ 15.1, the representations made at oral argument, the Second Opinion itself and logic support the construction that ¶ 15.1 must affect administrative discretion at the beginning of the pipeline when Congress defines and passes "available" money into administrative hands.

As with the scope question, the Court of Appeals never squarely addressed the exact pipeline issue now before us. It instead ruled in Part II(A) in favor of the government's arguments that ¶ 15.1 does not require the Executive Branch to engage in legislative activity (a pre-pipeline question) or to give to the Board *all* funds appropriated to Title IV and the Discretionary Fund without regard to other grantees (a "share" question). Given this context, it is not surprising that at oral argument the government (which was appealing a contrary decision) emphasized several times that funds "available" under ¶ 15.1 are limited to those appropriated *by Congress,* but *not* those which the Executive could *ask* Congress to appropriate. In drawing this line at the appropriation stage, the government repeated that the Consent Decree binds the Secretary's discretion with respect to funds made "available" by *Congress,* but not his discretion concerning legislative activity. Thus, counsel said the following things, among others, to the Court (emphasis added):

a. [¶ 15.1] requires us to give the City of Chicago priority consideration with respect to the available funding under different Congressional appropriations and in the context of that priority consideration *to provide funds to Chicago that Congress has said are available* for desegregation purposes. (Transcript p. 3).

b. What Chicago gets, and I think what the Decree contemplates—is going to get its full equitable share of whatever funds are available to the grantees, based on the eligibility criteria that the Secretary has to work with...." (Transcript pp. 8–9).

c. The reason ... a small amount of money [is available in the Discretionary Fund], just like the reason ... a small amount of Title IV money [exists], *has nothing to do with the Secretary's activity*, it is the appropriation activity of Congress, and *Congress is the one that has the power* to make this kind of appropriation and *to say it is either going to be subject to discretion or not....* (Transcript p. 13).

d. The Consent Decree speaks to *available* funds, and as we all have agreed, that word pertains to what *Congress* has appropriated. (Transcript p. 10).

e. What this decree does is it, I think quite clearly, *binds the Secretary's discretion with respect to those funds that Congress has appropriated* and has said should be allocated pursuant to that discretion.... [W]hat Chicago has gotten by this consent decree is the ability to come back into Court ... to point to that Consent Decree, paragraph 15.1 and enforce the obligation that is there, that indeed, that *Chicago get its full equitable share of that particular amount of appropriation that is subject to the discretion of the Secretary....* (Transcript p. 44).

The quotations clearly indicate that the Assistant Attorney General was most concerned about drawing a line about which funds are available at the appropriation stage. But once the Secretary gets the money that *Congress* makes "available," his discretion is bound after appropriation. The government did not specify *at which point* after it receives the money the discretion is bound, probably because that was not the focus on appeal. But it clearly admitted in broad terms that its discretion was bound. And it concedes in its brief that as an initial matter *Congress* determines the availability of funds to which the

priority applies. United States' Merit Brief at 70.

The Court relied upon these concessions. As with the scope issue, it did not precisely address the pipeline issue now before us, but it did make some remarks which relate to the issue. First, it confirmed that ¶ 15.1 binds the Secretary's discretion subject to court review. 744 F.2d at 1306 n. 7. The Court also drew a bright line at the appropriation stage. But when it came to which post-appropriation events are subject to review, the Court was less specific, using the general phrase like "top of the list," "equitable fair share," "get what the project called for," and "maximum level of available funding," none of which specify exactly how or when after appropriation the Secretary's discretion is affected. The Court did refer to "Title IV criteria" or "program criteria," as controlling, but did not specify whether such criteria are merely Congressional criteria or include administrative criteria created without regard to ¶ 15.1. However, the heavy emphasis laid on *Congressional* intent by government counsel and the Court,[17] suggest that *Congress* is free to determine the criteria of "availability," but that the Secretary cannot freely do so.

This conclusion rests on our assumption that the Court of Appeals must have meant for ¶ 15.1 to bind the Executive's discretion in some *meaningful* way. As a corollary to this uncontroversial proposition, we must assume that the Court would not allow the Executive to exercise unfettered discretion such that it could effectively reduce the Board's share of funds to close to zero. However, the government's position would let the Executive do precisely that. It would gut any sensible meaning from footnote 7, as well as from its concessions at oral argument. It claims that all meaningful administrative decisions in programs covered by ¶ 15.1 can be made without considering ¶ 15.1 and without judicial review. Only *after* it makes all these decisions does its priority spring up. When the Board

17. The opinion is laced with such references. *See, e.g.,* 744 F.2d at 1306 n. 7 ("... pursuant to Congressional appropriation"), and at 1306

("programs that could be used, consistent with the intent of Congress, to fund school desegregation efforts.").

applies for funds along with everyone else, it goes to the "top of the list" of applicants. This position rests on a second bifurcation theory.[18] Even though it concedes that Congress determines "available" funds subject to the priority and that it is *able* to apply the priority early in the pipeline, the government claims it is not *obligated* to apply a priority until the very end of the pipeline. The government thereby divides *concededly* "available" funds into two categories, funds that Congress has made "available" and funds that the government alone decides to keep "available." This is Orwellian doublespeak. In one breath the government concedes that its discretion is bound as to "available" funds, and that *Congress* determines "availability," but in the next breath, it claims it has unbound discretion to redefine what is "available."[19] This strips all meaning from the expansive language of ¶ 15.1 and from the two Court of Appeals holdings that the government owes a "substantial obligation" to *provide* (not unreviewably *define* ) available funds.

■ Besides being grounded in common sense, our rejection of the government's position rests on traditional principles of contract construction. Consent decrees are to be construed like contracts. *See, e.g.,* First Opinion, 717 F.2d at 382. Contracts should not be read in a way that places one party at the will or mercy of another. *See, e.g., Padbloc Co. v. United States,* 161 Ct.Cl. 369, 376–77 (1963). In this regard, the Seventh Circuit recently emphasized that a certain reading of a contract becomes implausible if it creates a situation that "one of the parties assumed enormous risks and got nothing in return." *Alliance to End Repression v. City of Chicago,* 742 F.2d 1007, 1013 (7th Cir.1984) (en banc).[20]

The government's reading works just the sort of mischief that these construction principles argue against. Under the United States' reading, by signing the Decree the Board assumed enormous risks—it has been pouring tens of millions of dollars into its Desegregation Plan. And the United States persists in arguing that the Board must pour *more* of its money each year into the Plan. Yet despite the plain reciprocity of ¶ 15.1, the government claims it can exercise its discretion such that it can unilaterally define its risk nearly out of existence. Likewise, under the government's theory the Board is placed at the government's mercy. It can freely ignore the ¶ 15.1 priority in setting other ones and thereby freeze the Board out of previously and concededly "available" funds.

In short, we must reject the government's position on the pipeline issue and adopt the Board's. To have sense and meaning, words and concepts like "available," "reviewable discretion" and "substantial obligation" require that the Executive's discretion be bound and reviewable from the time it actually *receives* funds which are "available" by Congressional cri-

---

**18.** To the extent its position also rests on the theory that the Second Opinion "endorsed" the November 10 Plan, we reject it for the reasons expressed earlier.

**19.** The Discretionary Fund provides not only a hypothetical, but a real-life example of how the Secretary can ignore ¶ 15.1 (even absent intentional "bad faith") and set other priorities to substantially reduce the pool of "available" funds. *See* Findings of Fact 509–12, 532–44 below. Consider, for example, the $5.8 million which the Secretary concedes is "truly discretionary." Without considering ¶ 15.1, the Secretary allocated about $2.5 million to other priorities. The $3.38 million residue was allocated to the "Unsolicited Grants Competition." The Secretary decided to limit grants to $100,-000 each, and did not place desegregation as a

competitive preference. Thus, through this series of decisions, the Secretary limited the Board to $100,000, or a multiple if it had submitted more than one qualifying project. This reveals the extremely limited nature of the "priority" offered by the United States. Even in this desegregation-label program, where it had concededly wide discretion, the United States ignored ¶ 15.1 until it had defined about 98 percent of the funds as "unavailable" to the Board.

**20.** We are mindful, however, that we must hesitate to assume that in agreeing to ¶ 15.1 the government knowingly bartered away important public interests—such as much of its adminitrative *discretion*—merely *to avoid the expense of trial. Id.* We return to this point below at 29–30.

teria.[21] In no way does this mean that the Board must or will receive *all* such funds. The Second Opinion clearly forbids such a resolution of the "share" question. There is a reasonable middle position. All we are holding is that priority consideration *begins* when the Executive receives available funds from Congress. In making its various policy decisions down the pipeline, the ¶ 15.1 priority must be balanced along with competing priorities. The government clearly retains great discretion to meet other priorities and needs. But ¶ 15.1 must make the Board *one* of those priorities if it and the Second Opinion are to have any meaning at all. Ultimately, the "share" issue determines how that balancing translates into dollars. Thus, the Board does not get a "whole of the list" priority, as the government claims. It gets priority consideration as to *all* funds, but it actually *receives* nothing close to all funds.

■ Our holding does not suggest that "the government bartered away important public interests merely to avoid the expense of a trial." *Alliance to End Repression,* 742 F.2d at 1013. The government clearly retains substantial discretion to adjust national priorities and meet other

needs. By saying its discretion is bound, we by no means say that its discretion is tiny or that it has simply bargained most of it away. Moreover, in agreeing to consider the Board as a competing priority, the Executive achieved much more than "merely avoiding the expense of trial." It secured a pioneering, *voluntary*[22] school desegregation plan, one which might not have been achieved through litigation. It created a national, experimental alternative to the traditional and controversial busing remedy. It did so relatively quickly, bringing remedies to Chicago's children much sooner than could have been achieved through litigation. And it helped work toward vindicating the federal Constitution and the public interest by desegregating Chicago's massive school system.[23] Given the Board's massive financial deficits, these gains could not have been achieved unless the federal government agreed to share the financial burdens. The United States' financial commitment under ¶ 15.1 was the principal *quid pro quo* for the Board's willingness to forego litigation and develop its Plan. *See* Findings 108–110. In return, the United States achieved the above gains.[24]

---

**21.** We reject the government's argument that the Board's contrary position in its Petition for Certiorari amounts to an admission or estoppel. The Board's petition underscores what we have been saying all along that certain language in the Second Opinion *could be read* to support the government's position. Surely, in trying to secure discretionary certiorari review, the Board was obligated to portray the Court of Appeals' decision in the "worst" possible light. It could do so within the broad confines of Fed.R.Civ.P. 11 and the Code of Professional Responsibility. Because the opinion could be read either way on its face, the Board was faced with a dilemma. If an estoppel would apply, it might have to forego petitioning for certiorari in order to preserve contrary good faith arguments on remand. Where litigation proceeds in two forums at once, a zealous advocate may have to take different positions on unsettled legal issues. Principles of estoppel or admission should not cover such situations. *See Edwards v. Aetna Life Ins. Co.,* 690 F.2d 595, 598 (6th Cir.1982); *Konstantinidis v. Chen,* 626 F.2d 933, 937 (D.C. Cir.1980); *New Amsterdam Casualty Co. v. Waller,* 323 F.2d 20, 24–25 (4th Cir.1963), *cert. denied,* 376 U.S. 963, 84 S.Ct. 1124, 11 L.Ed.2d 981 (1964).

**22.** This Plan was "voluntary" in two senses. The Board voluntarily agreed to it, that is, without court order. And the Plan involves voluntary, rather than court imposed, transfers by students.

**23.** The government concedes these points. *See* United States' Merits Brief at 64.

**24.** The government contends such findings are unreasonable. We reject its attempt to relitigate these 1984 findings which were not specifically overturned on appeal. *See* below at 37–38. In any event, the government is incorrect. It emphasizes that the United States is *plaintiff,* and that it would have incurred *no* financial burden had it litigated, win or lose. Thus, it concludes that the Consent Decree cannot be construed to impose "limitless" obligations on the government because it decided *not* to litigate. First, we have emphasized that its obligations under ¶ 15.1 are not limitless. The "limitless" argument is a red herring. Second, the government's posture as plaintiff actually *favors* the Board's position. As noted in the text, as plaintiff the United States was working affirmatively to vindicate the Constitution and the public interest, and to provide remedies to Chicago's

Contrary to the claims of the government, this holding on the pipeline question is in full harmony with Part II(B) of the Second Opinion. As noted earlier, this case was remanded for "proceedings consistent with Part II(A)" of the Second Opinion. As its heading says, that section "interpreted" ¶ 15.1 defining in general terms the priority system and reading legislative activities outside of ¶ 15.1. Part II(B) addressed a separate question, the District Court's findings of bad faith which had supported its remedial order. It vacated the extraordinary remedy of $104 million because it found that the challenged government activities were not subjective bad faith attempts to flout ¶ 15.1. Some of these findings flowed from Part II(A). Its holding concerning legislative activities meant it was not bad faith to fail to ask Congress for appropriations or reprogramming of funds. The Court then made two findings that bear on the pipeline issue: neither the Secretary's decision not to provide direct grants for school desegregation nor his decision to redraft regulations limiting grants of Discretionary Funds constituted bad faith *per se*. 744 F.2d at 1307 & n. 10.

The Court reasoned that such general policy decisions of national scope did not by themselves indicate governmental intent to evade ¶ 15.1.

A first impression of this holding, especially footnote 10, could lead one to think that the Seventh Circuit endorsed the government's position on the pipeline issue.[25] However, careful consideration of the opinion, the First Opinion and the general context of the case show that this first impression is wrong.

It is one thing to say that it is not bad faith to make a *specific* policy decision of national scope which has the effect of reducing the pool of funds available to the Board. Such a decision does not *by itself* indicate subjective intent to harm the Board. Thus, such a decision does not support the extraordinary remedial order the government appealed from. But it is quite another thing to say that the Executive may therefore completely ignore ¶ 15.1 in making *all* policy decisions such that it reduces the pool of available funds to near zero.[26] A certain particular action may not be *prohibited per se* by ¶ 15.1, but ¶ 15.1

---

children as quickly as possible. It had incentives to seek new solutions to desegregation, especially given the long history of protracted desegregation litigation elsewhere. In this respect, the *Alliance to End Repression* case is most distinguishable. There the federal government had been a *defendant* and entered a consent decree. In interpreting the consent decree narrowly to favor the government, the Court relied on the fact that as a *defendant* the government would not have reasonably agreed to a standard of conduct *higher* than what the Constitution demands. In this respect, "the mere expense of trial" is not a reasonable *quid pro quo* for agreeing to this heightened duty since the government would have been ordered to do less had it litigated and lost. The analogy would apply here if the *United States* were arguing that the *Board,* as defendant, promised to implement a Plan which does more than the Constitution requires. But that is not the case. As *plaintiff,* the United States achieved what it *might not* have gotten through litigation. As plaintiff, crusading for the public interest and the Constitution, it quickly achieved a plan within the broad range of Constitutional acceptability. Because of this, it is not unreasonable to expect that it promised to help pay for the Plan. After all, the United States is the "adversary" of the Board but not of Chicago's children attend-

ing desegregated schools. The government is a "public" entity, presumably working for the public interest. In such a capacity, it sometimes will help pay to further that interest. We should not in this context view the government as a profit-maximizing private actor, acting only in its "selfish" interests.

**25.** At one point we had such a first impression. *See* 610 F.Supp. at 707 (our opinion denying motion to vacate restraint on funds). Our movement toward the Board's position illustrates exactly why it was prudent to continue the restraint on the funds.

**26.** We agree with the Board that such a conclusion rests on three false assumptions: It is not true (1) that if *particular* policy decisions considered alone do not violate ¶ 15.1, then a *total set* of such decisions necessarily does not violate the decree; (2) that the *objective* question of what satisfies the contractual requirement of "every good faith effort" equals the *subjective* question of whether certain conduct evidences intentional bad faith *per se*; and (3) that if *general* policy decisions not intended to evade the decree are proper, then it is also proper to always *apply* such standards to the Board without exception.

may *require* some affirmative conduct out of a whole range of possible actions such that the Board receives substantial funding.

This analysis leads exactly to the position we adopted earlier. Part II(B) teaches that the Executive is free to make many general policy decisions which have the effect of harming the Board, so long as it does not do so *intending* to harm the Board. This we stated before. But as also noted earlier, for Part II(A) to be meaningful, the Executive's discretion *as a whole* must be bound just after Congress defines the pool of available funds. The requirement of "priority" treatment does not preclude the government from weighing and setting other priorities, so long as it does not totally ignore the Board in setting those priorities.[27] In this way, Part II(B) harmonizes with Part II(A).

The United States would have Part II(B) vaporize Part II(A). Its position would have Part II(B) create an immunity for *all* general policy decisions such that footnote 7 of Part II(A) would be meaningless. It would have Part II(B) give the Executive unfettered discretion even though footnote 7 says this discretion is bound. It would render the "substantial obligation" of Part II(A) meaningless through a totality of unreviewable policy decisions. We will not construe Part II(B) to so contradict Part II(A). The Court of Appeals meant it when it said in Part II(A) that the government

owes a "substantial obligation" to give the Board "priority consideration." Our reading of Part II(B) preserves that meaning, yet leaves the Secretary much flexibility so that Part II(B) is meaningful as well. Our analysis in Chapters V, VI, VIII and IX of our Findings and Conclusions will show how Parts II(A) and (B) harmonize in practice.

### 5. *Summary*

▮▮▮▮ ¶ 15.1 requires the United States "to find and provide every available form of financial resources." According to the Seventh Circuit, this duty means that the Board must receive the maximum level of funding "on a priority basis under existing school desegregation programs, the amount of which funding is determined by program criteria and is subject to the review of the district court." 744 F.2d at 1305–06. Our resolution of the scope issue interprets "existing school desegregation programs" to mean any existing statutory program which can, under statutory "program criteria," fund projects in the Board's Desegregation Plan. Our resolution of the pipeline issue holds that Congress determines the pool of "available" funds, and that the Executive's discretion "is subject to the review of the district court" from the moment it receives such available funds.[28] Having so interpreted the Second Opinion and laid to rest disputes over its

---

27. The government's concessions about "earmarking" Title IV funds for the Board illustrates this point. *See* 744 F.2d at 1305. The government can make *general* decisions but make *exceptions* for the Board because of ¶ 15.1. Thus, it can decide to fund only regional desegregation centers, but make sure the Board gets a certain amount of such funds. Alternatively, as detailed later, it can fund on a regional level, but decide to make an exception for the Board, and fund it directly.

28. The import of this latter holding is that Judge Shadur's 1984 Conclusion of Law 39, which was not specifically addressed by the Court of Appeals, is still valid:

> 39. Funds are "available" to the United States within the meaning of the Consent Decree where Congress has appropriated them to the Executive Branch for purposes consistent with financing Board's desegregation ac-

tivities. To the extent Congress has given the Department of Education discretion to provide particular funds to Board, the Consent Decree requires that the Executive Branch consider these funds "available." Furthermore, to the extent consistent with its statutory authority, the Executive Branch is required [in some way] to interpret and conform its existing program regulations to meet its financial obligation to the Board under Section 15.1. *Citizens for a Better Government v. Gorsuch*, 718 F.2d 1117 (D.C.Cir. 1983), [*cert. denied sub nom Union Carbide v. NRDC*, [—— U.S. ——] 104 S.Ct. 2668 [81 L.Ed.2d 373] (1984) ]; *Gautreaux v. Pierce*, 690 F.2d 616 (7th Cir.1982); *Ferrell v. Pierce*, 560 F.Supp. 1344 (N.D.Ill.1983), [*aff'd*, 743 F.2d 454 (7th Cir.1984) ].

588 F.Supp. at 222.

meaning, we are ready to fulfill our remand instructions and determine whether the United States has been giving the Board "the maximum level of funding available" under program criteria.

### PART II: FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before setting forth our extensive Findings of Fact ("Findings") and Conclusions of Law ("Conclusions"), we must clear up a few preliminary matters.

1. *The Applicability of Judge Shadur's 1984 Findings and Conclusions*

The Findings fall into several "chapters" corresponding to various major areas of dispute. The first three chapters detail the history of this litigation. In large part, these sections restate the history as found by Judge Shadur in 1984. *See* 588 F.Supp. at 140–200. Although not everything in this history relates directly to the issues on remand, two reasons moved us to adopt these Findings. First, the Court of Appeals vacated Judge Shadur's whole opinion, although it did not discuss the great majority of his Findings. Thus, the status of these Findings was unsettled. Second, in its brief the United States seeks to relitigate some of these Findings, especially those in Chapter 1 concerning the history of the consent decree negotiations, and those in Chapter 3 concerning the Board's good faith. This factual history needs to be resolved once and for all.

 Judicial economy and public policy dictate that litigation should come to an end. *See, e.g., Devines v. Maier,* 728 F.2d 876, 880 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 130, 83 L.Ed.2d 71 (1984). Thus, district courts generally refuse to reconsider portions of an original

district court judgment unaddressed on appeal except "for convincing reasons." 1B, J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice,* ¶ 0.404[4.–1], [4.–3]. Of course, we must follow actual decisions of the appellate court. *See, e.g., Gertz v. Robt. Welch, Inc.,* 680 F.2d 527, 532–33 (7th Cir.1982), *cert. denied,* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983). However, we need not re-examine district court findings and conclusions which were not explicitly or by necessary inference addressed on appeal, if there is no compelling new evidence or reason to do so. *Id.; see also 1984 District Court Opinion,* 588 F.Supp. at 212–214. It is clear in this case that the government has presented no new, let alone compelling, evidence or reason warranting reconsideration of Judge Shadur's unreversed comprehensive Findings and Conclusions. We perceive no injustice in adopting several of those Findings, to the extent relevant and uncontradicted by the Second Opinion. Indeed, policies of finality and economy compel such approach.

We therefore reject the United States' various attempts to revise the history of this case. In particular, we decline to reconsider his findings concerning the Board's good faith efforts to date,[29] and the meaning of the extrinsic evidence surrounding the Consent Decree. In any event, Judge Shadur's findings on these and other issues appear correct to us, on the basis of our review of both resubmitted evidence and new evidence. Thus, whether grounded in "the law of the case" or in a fresh assessment of the evidence, Judge Shadur's relevant, unreversed findings in Chapters 1–3 stand. Of course, in adopting these historical findings, a few changes had to be made to reflect the passage of time. Also, a few marginally relevant find-

---

**29.** Several of the United States' allegations of bad faith themselves border on bad faith. To the extent that it argues that the Board did not spend enough of its block grant funds on the Plan, the government ignores Judge Shadur's finding 374, 588 F.Supp. at 197, *as well as its own concession on appeal* that "we do not [find fault with the Board's effort to fund its Plan]." Transcript of Oral Argument at 16. We strongly

reject this bold attempt to relitigate findings of fact and to silently withdraw a concession made to the Court of Appeals. To the extent the United States makes new allegations of bad faith regarding the Board's failure to formally apply for Discretionary Fund money or its conduct concerning Title IV, its allegations lack merit, as we hold in Conclusions 5.17–5.19, 6.17–6.17c, respectively.

ings have been deleted, and some new ones inserted.

The remaining Findings, Chapters 4 through 9, are generally new [30], and fulfill our initial mission on remand, determining whether the Board received "the maximum level of available funding" in fiscal year 1984. Each Chapter addresses a particular category of available funding. Chapter 4 focusses on the "Excess Funds," which are administrative funds left over at the end of the fiscal year, which would have lapsed into the Treasury if not for our restraining order. Chapters 5 and 6 address the two principal desegregation-label programs, the Discretionary Fund and Title IV. Chapter 7 deals with the United States' efforts to date in searching for other available funds. Chapter 8 addresses two other programs, the Chapter 2 block grant program and the Follow Through program. Each chapter contains its own Conclusions, which apply the Second Opinion (as explained above in the Preliminary Opinion) to that Chapter's facts. Following these chapters, we discuss the share issue and remedial issues.

### 2. Satellite Motions of the Parties

The Board has moved to strike some affidavits which the United States filed with its Merits Brief. The thrust of the motion is that the affidavits were submitted after the close of discovery, mostly by witnesses who were already deposed, so that the Board has not had a chance to cross-examine the witnesses as to new facts alleged in the affidavits. The Board also attacks the evidentiary basis of several specific allegations in these affidavits. The parties agree that Fed.R.Civ.P. 43(e) grants this Court broad discretion to strike these affidavits. After considering the contentions of both sides, we deny the Board's motion in general and consider the affidavits for what they are worth.[31] However, where the affidavits overlap and contradict

deposition testimony, we agree that the deposition testimony deserves greater weight. Also, the material in the affidavits is, for the most part, peripheral to the main issues. For example, the affidavits are irrelevant to the Government's fundamentally incorrect positions on the scope and pipeline issues. Nevertheless, where they do become relevant, we address specific allegations as necessary from time to time in making the various Findings below.

The United States' motion to strike various Board exhibits is likewise denied. These exhibits were submitted as a response to the United States' efforts to revise the history of the Consent Decree negotiations and the parties' early expectations concerning the Decree. In adopting Judge Shadur's findings above, we necessarily have rendered these Board exhibits unnecessary and the United States' motion to strike them moot. The rest of the Board's new exhibits bolster Judge Shadur's findings.

———————

Without further ado, then, this Court under Fed.R.Civ.P. 52 enters the following Findings and Conclusions. Given the complex nature of the case, many of these Findings and Conclusions are hybrid, containing both factual and legal elements. To the extent a "Finding," or portion thereof, has been improperly labelled a "Conclusion," and vice versa, it should be considered as if it were properly labelled.

### I. Background

#### A. Consent Decree Negotiations

101. The Chicago Board of Education operates the third largest public school system in the United States. In the 1980–81 school year, the Board operated 634 schools, including 495 elementary schools, 66 high schools, and 73 special needs

---

**30.** Some of thse Findings and Conclusions reiterate certain of the 1984 ones. Where relevant and not inconsistent with the Second Opinion, we have adopted these findings and conclusions, under both our own consideration and our application of the law of the case doctrine.

Generally, we cited the relevant 1984 finding or conclusion when we were relying on it.

**31.** By so ruling, we do not depreciate the Board's concern about cross-examination and the late submission of the affidavits.

schools of various types. In October of that school year, the Board had 458,497 students, whose racial/ethnic makeup was as follows:

| | | |
|---|---|---|
| White Non-Hispanic | 85,292 | 18.6% |
| Black Non-Hispanic | 278,726 | 60.8% |
| Hispanic | 84,226 | 18.4% |
| Asian/Indian | 10,253 | 2.2% |
| | 458,497 | |

At the same time, the Board employed approximately 43,000 persons, including 29,000 members of the Chicago Teachers Union. The Board is the largest employer in Chicago and the second largest in Illinois. (March, 1984 Stipulation No. 101).[32]

102. After protracted and complex negotiations, the United States and the Board of Education of the City of Chicago entered into a Consent Decree which was filed with and approved by this Court on September 24, 1980. (March, 1984 Stipulation No. 102).

103. After desegregation negotiations in 1979 between the former Department of Health Education and Welfare and the former representatives of the Board had proven unsuccessful, the United States Department of Justice notified former Interim Superintendent of Schools Caruso on April 21, 1980, that if further negotiations were not successful, the United States would initiate a desegregation lawsuit against the Board. (Government Exhibit 1, June 1983 hearing, Document 27 hereinafter "GX1–27"). Ensuing negotiating sessions between the Department of Justice and former Board representatives primarily addressed whether the parties could agree on specific racial percentages for a student assignment plan and on the specific amount and timing of the Emergency School Aid Act (ESAA) funds which the Board would receive to implement such a plan. (GX1–21,22). Board counsel indicated that if the negotiations failed and litigation commenced, the Board would present counterclaims against agencies of the federal government.

(GX1–39). There was no significant progress in these negotiations. (GX1–21, GX1–22). (March, 1984 Stipulation No. 103).

104. During the above negotiations, a new Board of Education was appointed and took office. (GX1–22). The new Board formed a Desegregation Committee (GX1–21) and indicated to the United States that it would bring fresh approaches to the negotiations (*Id.*). Thereafter the Board was represented by its new leadership and by new counsel. (GX1–16). Negotiations then progressed rapidly, leading to a draft agreement within a few weeks (GX1–16), and to consummation of the Consent Decree within another six weeks. (GX1–14,-15).

This progress resulted from an altogether different focus. Rather than seeking to negotiate the specific parameters of a student assignment plan, the parties instead agreed to general principles that would guide subsequent development of a plan. (Consent Decree, Part I). Correspondingly, with respect to funding, the parties negotiated a general principle applicable to both parties. These negotiations concerning the general funding provision have been described in a Joint Stipulation of the parties as follows:

At a relatively early stage in the negotiations leading to the Consent Decree, the parties discussed the question of financial support from the United States for the Board's desegregation activities. It was the Government's position that no funding commitment specific as to form and amount could be made in the context of the Consent Decree, because there was no way to anticipate the nature and costs of the Board's Plan, the amount and sources of Government funding, or a variety of other matters. The parties briefly discussed funding possibilities relating not only to the Department of Education (including ESAA and other programs), but also other federal agen-

---

**32.** These stipulations were filed in this Court March 16, 1984 as pages 50–85 of the Board and

United States Final Pre-Trial Order.

cies such as the Department of Justice, the Department of Transportation, and the Department of Housing and Urban Development. Thereafter Mr. Ross conveyed to Mr. Howard by telephone brief descriptions (obtained by Mr. Ross from the Department of Education) of some of the types of planning and implementation activities funded in other instances. Mr. Ross also conveyed to Mr. Howard very sketchy information about grant amounts to other cities, but in general it was the position of the Department of Education that it would not disclose such information. These discussions took place approximately two months before the completion and execution of the Consent Decree. It was concluded that the matter of federal financial support would be handled by including general provisions in the Consent Decree, and Section 15.1 was drafted and incorporated into the Decree. Section 15.1 was not designed to incorporate any specific discussions between the parties on this issue, but to establish a general obligation on the part of both parties which would be interpreted and applied as appropriate in whatever future circumstances might arise.

Section 15.1 provides as follows:

15.1 Each party is obligated to make every good faith effort to find and provide every available form of financial resources adequate for the implementation of the desegregation plan.

The Consent Decree also includes Section 15.3, which provides:

15.3 The parties recognize that financial cost of implementation does not excuse the failure to develop a desegregation plan consistent with the principles set forth in §§ 2–14, and is not a basis for postponement, cancellation or curtailment of implementation of the plan after it has been finally adopted, but is one legitimate consideration of practicability in meeting the objective stated in § 2.1.

(March, 1984 Stipulation No. 104).

105. The Consent Decree was consummated by four events, all of which occurred on September 24, 1980:

a. The filing of a Complaint by the United States;

b. The execution and filing of the Consent Decree;

c. After a hearing and after consideration of the Complaint, the Consent Decree and the United States' Memorandum of Law, the approval by the Court of the Consent Decree and its entry by the Court; and

d. No counterclaim was filed against the United States by the Board. (March, 1984 Stipulation No. 105)

106. Among the general principles set forth in the Consent Decree to guide subsequent development of a desegregation plan were the following:

§ 2. Basic Objectives

2.1 *Desegregated Schools.* The plan will provide for the establishment of the greatest practicable number of stably desegregated schools, considering all the circumstances in Chicago.

2.2 *Compensatory Programs in Schools Remaining Segregated.* In order to assure participation by all students in a system wide remedy and to alleviate the effects of both past and ongoing segregation, the plan shall provide educational and related programs for any black or Hispanic schools remaining segregated.

2.3 *Participation.* To the greatest extent practicable, the plan will provide for desegregation of all racial and ethnic groups, and in all age and grade levels above kindergarten.

2.4 *Fair Allocation of Burdens.* The plan shall ensure that the burdens of desegregation are not imposed arbitrarily on any racial or ethnic group.

§ 7 *Compensatory Programs in Schools Remaining Segregated.* To accomplish the objective stated in § 2.2, the plan will include specific programs for black or Hispanic schools remaining segregated, in the following areas among others:

7.1 Remedial and compensatory educational programs.

7.2 Improved curricula and instructional and evaluative techniques (including the utilization of tests that validly measure student achievement) for academic, vocational and alternative educational studies.

7.3 Pre-service and in-service instruction for administrators, principals, teachers and other school personnel.

7.4 Selection, and evaluation of the performance of, principals and supporting leadership staff.

7.5 Testing, counseling, guidance and student welfare.

7.6 Physical facilities, safety and security.

7.7 Supportive relationships between such schools and groups and institutions in the community and in government.

107. Thus, in agreeing in Section 15.1 to find and provide financial resources "adequate for implementation of the Desegregation Plan," the United States was agreeing to help pay for a plan that would include educational components in racially isolated schools (§ 2.2).[33] covering the subject matter outlined in § 7, in the development of which the Board would exercise discretion. (§ 3.1). (March, 1984 Stipulation Nos. 101–106).

108. Circumstances surrounding entry of the Decree indicate that a joint and mutual obligation was contemplated. The Decree represents the only instance in which a major urban school system has agreed, without any litigation or determination of liability issues, to develop and implement a system-wide Desegregation Plan under court supervision. The Decree contemplated that because of the demographics of the Chicago school system, a substantial number of minority children would inevitably remain in racially isolated schools, requiring the extensive use of expensive compensatory educational remedies to alleviate the effects of past segregation. In 1980, as now, the Board was faced with significant financial deficits, and the joint funding provision of the Consent Decree reflected recognition that the Board's finances were such that it could not voluntarily agree to develop, or successfully implement, an effective desegregation plan of this type unless the federal government were sharing the financial burdens. (March, 1984 Stipulation Nos. 101–156; June 1983 Findings and Plan/ADR data on Board finances).

108A. The United States' financial commitment under Section 15.1 was the principal *quid pro quo* for the Board's willingness to forego litigation and develop the Plan. In return for this commitment, the United States secured the full result that it sought (and may not otherwise have achieved) without the expense and delay of complex litigation. The United States also avoided potential liability for a number of counterclaims that would have been brought against it. (Findings 103, 105).

109. Stated simply, the parties had a common and overriding goal of assuring that an effective desegregation plan was developed and implemented in Chicago. This joint purpose, with respect to financing, included a requirement that the parties provide the total amount of funds adequate for implementation of the Plan. In Section 15.1, each party agreed to do everything possible to supply the necessary funding. (March, 1984 Stipulation Nos. 101–156; June 1983 Findings and Plan/ADR data on Board finances).

110. With respect to "What the parties reasonably expected at the time of signing," the parties' Joint Stipulation (Government's Exhibit 2, June, 1983 hearing, hereinafter "GX")[34] states that:

> Section 15.1 was not designed to incorporate any specific discussions between the parties [on the issue of federal financial support], but to establish a general obligation on the part of both parties

---

**33.** As well as in magnet schools (§ 4.1.2) and desegregated schools (§§ 10.1 and 10.4).

**34.** Footnote deleted.

which would be interpreted and applied as appropriate in whatever future circumstances might arise. (March, 1984 Stipulation No. 107). The extrinsic evidence concerning this issue does not support any notion that there was a recognized specific dollar *limitation* incorporated in Section 15.1, based on the amount of previous ESAA grants or otherwise. Indeed, the Joint Stipulation indicates that the parties had been discussing "funding possibilities relating not only to the Department of Education (including ESAA and other programs), but also other federal agencies such as the Department of Justice, the Department of Transportation, and the Department of Housing and Urban Development." [35] As this Court has determined previously, the extrinsic evidence points to an obligation to conduct a "universal search" (567 F.Supp. at 282 & n. 6), not a limited examination of what ESAA funding was theoretically available to the Board. (March, 1984 Stipulations 101–106; Government Exhibits 1 and 2 in the June 1983 hearing).

111. The Consent Decree in this case is the only instance in which the United States has entered into a desegregation settlement or decree containing the language of § 15.1. (March, 1984 Stipulation No. 107).

B. *Development Of Part I Of The Plan, The Educational Components*

112. To develop the educational components of the Desegregation Plan, the Board retained a team of independent, nationally recognized consultants. The lead consultant, with principal overall responsibility for this process, was Dr. Robert L. Green. He is now the President of the University of the District of Columbia. Dr. Green was then Dean of the College of Urban Development, Michigan State University. Dr. Green was a leading national expert on desegregation plans, especially the aspect of desegregation which emphasizes educational programs to provide equal and effective education for urban and minority children. Dr. Green had participated in many desegregation cases and desegregation plans, traditionally as an expert for the plaintiffs in such litigation, and frequently on behalf of the NAACP. (March, 1984 Stipulation No. 108).

113. Five other education experts from outside the school system were retained on a full-time basis to work on the Educational Components, along with 24 part-time "national consultants." The primary national consultant in the area of curriculum was Professor Ronald Edmonds. While on the faculty of the Harvard Graduate School of Education, Dr. Edmonds directed the well-known major research project, *Search for Effective Schools: The Identification and Analysis of City Schools That Are Instructionally Effective for Poor Children.* Professor Edmonds had also implemented his "effective schools" design as the principal instructional officer for the New York City schools, with the title of Senior Assistant for Instruction. (Dr. Edmonds is now deceased.) The complete list of desegregation project consultants is as follows:

Robert L. Green, Ph.D., Lead Consultant
Dean, College of Urban Development
Michigan State University
East Lansing, Michigan

Staff

Nelvia M. Brady, Ph.D., Staff Director
Professional Associate

---

**35.** Moreover, the Stipulation Nos. 101–102 and the extrinsic evidence offered by the Government, in the form of its correspondence file, reflect that in the spring of 1980, the former counsel representing a former Board of Education were preoccupied with the potential amount of an ESAA grant that might be generated if the parties could agree on the specific parameters of a student assignment plan. However, after a new Board of Education took office and retained new counsel, the negotiations took a sharply different direction, leading to agreement on a general funding principle not incorporating any previous specific discussions.

Educational Testing Service
Evanston, Illinois

Elizabeth Jill Hirt, Ph.D., Staff Associate
Research Associate
College of Urban Development
Michigan State University
East Lansing, Michigan

Judson Hixson, M.A., Staff Associate
Education Director on Leave
Chicago Urban League
Chicago, Illinois

Jodi Martinez-Martin, Ed.D., Consultant
Teacher Education Specialist
Illinois State Office of Education
Springfield, Illinois

Frances S. Thomas, Ph.D., Consultant
Assistant Professor
College of Urban Development
Michigan State University
East Lansing, Michigan

## Primary National Consultants

Curriculum: Professor Ronald Edmonds
Senior Assistant to the Chancellor for Instruction,
NYC Public Schools Staff

Development: Dr. Cassandra Simmons
Assistant Professor and Director,
Office of Student Affairs
Michigan State University
East Lansing, Michigan

### Additional Consultants and Resource Persons

Dr. Beatriz Arias
Stanford University
Stanford, CA

Ms. Norma Barnes
Norma Barnes Associates
Chicago, IL

Dr. Samuel Betances
Northeastern Illinois Univ.
Chicago, IL

Dr. Duane Brown
University of North Carolina
Chapel Hill, NC

Dr. Robert Crain
Johns Hopkins University
Riverside, CA

Ms. Jane Creeden Dore
Freelance Editor/Writer
Chicago, IL

Dr. Joseph Darden
Michigan State University
East Lansing, MI

Dr. Harold Dent
Westside Community Mental
 Health Center
San Francisco, CA

Dr. Edgar Epps
University of Chicago
Chicago, IL

Dr. Josue Gonzalez
Office of Education
Washington, D.C.

Dr. Robert J. Griffore
Michigan State University
East Lansing, Michigan

Dr. James Hawkins, Supt.
Benton Harbor Public Schools
Benton Harbor, MI

Ms. Maureen Larkin
Milwaukee Public Schools
Milwaukee, WI

Dr. Jane Mercer
University of California
Baltimore, MD

Dr. Margaret Parsons
Michigan State University
East Lansing, MI

Ms. Rachel Patrick, J.D.
American Bar Association
Chicago, IL

Dr. Diana Pearce
Center for National Policy
 Review
Washington, D.C.

Mr. Joseph Rosen
Educational Consultant
Chicago, IL

**1330**

Dr. Reynolds Farley
University of Michigan
Ann Arbor, MI

Dr. Walter Farrell
University of Wisconsin
Milwaukee, WI

Dr. Charles Thomas, Supt.
School District #64
North Chicago, IL

Ms. Rebecca Yarlott
Minneapolis Public Schools
Minneapolis, MN

(March, 1984 Stipulation No. 109).

114. During the development of the Educational Components from November 1980 through March 1981, the Board submitted monthly progress reports to the Department of Justice, as required by the Consent Decree. (March, 1984 Stipulation No. 110).

115. Dr. Green submitted his Recommendations on Educational Components to the Board of Education on April 3, 1981. Two weeks later, the Recommendations were adopted by the Board as Part I of the Desegregation Plan: Educational Components. The content of Part I of the Plan is summarized by its Table of Contents:

A. Introduction
B. Educational Components
 1. Curriculum and Instruction—Elementary Schools
 2. Curriculum and Instruction—High Schools
 3. Magnet Schools
 4. Vocational and Technical High Schools
 5. Special Education and Testing
 6. Bilingual Education
 7. Within-School Segregation
 8. Student Discipline
C. Staff Development
D. Other Components
 1. Public Participation
 2. Metropolitan Initiatives
 3. Faculty Desegregation and Affirmative Action
 4. Evaluation
 5. Monitoring
E. Appendix

(March, 1984 Stipulation No. 111).

116. The following statements about Plan costs appeared in the "Financial Aspects" section in Part II of the Plan, adopted in April 1981:

1. *Cost and Funding of the Plan.* Due to the relatively short time available under the Consent Decree for development of the desegregation plan, the planning process has been addressed to the formulation of programs that would be desirable to effectuate the purposes of the Decree.

2. It has not yet been possible to determine the financial feasibility of the programs—i.e., the administrative details of the programs, the exact costs associated with the various elements of the plan, the extent to which these costs can be met from existing resources or require new funding, and the availability of such new funding. (p. 17).

\* \* \* \* \* \*

While the exact costs of the educational components are not yet known, the Board believes that the core level of funding required to make reasonably effective those educational components directed to Black and Hispanic schools remaining racially isolated is $40 million annually in fiscal years 1982 and 1983, and $20 million annually thereafter (although additional funding would be strongly desirable). (p. 19).

(March, 1984 Stipulation No. 112).

117. Prior to the Consent Decree the Board's desegregation programs were administered by a staff of 3 persons. Shortly after the initial adoption of the Educational Components, the Board created a special Office of Equal Educational Opportunity to coordinate the implementation of the Plan. Up to March, 1985, that office was headed by Dr. Nelvia Brady, Associate Superintendent, who was a member of Dr. Green's original desegregation planning staff. The staff of that office has expanded continuously since 1981, and in March, 1984 was comprised of 53 persons, of whom 8 are clerical staff, 8 are teachers, who are district-assigned, 13 are school-committee representatives, and 24 are teachers (7) and administrators (17) assigned to the central office. Twenty-nine of the 40 educational

professionals (72.5%) have their principal responsibilities in the area of implementing the Educational Components of the Desegregation Plan. (March, 1984 Stipulation No. 113).

C. *Statements Of The United States And The Court Relating To The Educational Components*

118. On June 3, 1981, Attorney General William French Smith delivered an address before the American Law Institute. In discussing the policy of the United States concerning desegregation remedies, Mr. Smith Stated:

All of these considerations [concerning mandatory reassignment] point to the need for more innovative and practical approaches to achieve equal educational opportunity. Mandatory busing is not an effective educational remedy, and in many cases it has also proven counterproductive. But this does not mean that desegregation should not continue or that improving the quality of public education for all our children cannot be achieved. To do so, however, we must tailor the remedy to the facts of each case in which a constitutional violation has occurred.

Rather than focusing solely on the means by which discrimination has been practiced in the past, it is time we devoted more attention to remedying the resulting harms actually being suffered today. We should emphasize those remedies that actually improve the quality of education. Rather than continuing to insist in court that the only and best remedy for unconstitutional segregation is pupil reassignment through busing, the Department of Justice will hence forward propose remedies that have the best chance of both improving the quality of education in the schools and promoting desegregation. (Pages 8–9).

(March, 1984 Stipulation No. 114).

119. In the response of the United States to the Desegregation Plan, filed in July 1981, the United States made the following comments concerning the Educational Components of the Plan:

a. With respect to the provision of the Consent Decree concerning providing compensatory programs in schools remaining segregated: "This principle is based squarely on common sense and Supreme Court holdings. The method of compliance with this objective is largely within the discretion of the Board, which has the expertise in educational methods." (Page 5).

b. In the same Response, the United States briefly summarized the Educational Components and stated that "the Government endorses" them. (Page 22).

c. Finally, the United States' Response further evaluated the Educational Components as follows:

The Educational Components have been more fully developed than the student assignment principles. The Board hired an impressive team of nationally known experts and the Plan reflects the substantial time and effort that has gone into the preparation of the Educational Components. The Board and its planners deserve a great deal of credit for the accomplishment of this task. We expect that when these new educational programs are developed in detail and implemented, they will complement the student assignment principles by enhancing the workability of voluntary desegregation techniques and that they will contribute to bringing about equality of educational opportunity in the one-race schools which remain under the final plan. (Pages 32–33).

(March, 1984 Stipulation No. 115).

120. On August 28, 1981, the United States and the Board submitted their Joint Statement to the Court concerning the development of the Desegregation Plan. With respect to the Educational Components, the Joint Statement informed the Court that:

the Board and the United States are in agreement in these general respects: ...

(2) the Educational Components are an integral and necessary aspect of the Board's Plan. They are consistent with the Consent Decree and the Constitution. The United States fully endorses the Educational Components from a legal perspective, although it views the particular educational policy choices as within the Board's discretion. (Page 5).

(March, 1984 Stipulation No. 116).

121. On September 27, 1981, Assistant Attorney General William Bradford Reynolds delivered a speech to the Education Commission of the States, meeting in Chicago. In discussing the policy of the Department of Justice concerning desegregation remedies, Mr. Reynolds stated:

Experience teaches us that blacks in a segregated school environment more often than not receive inferior educational attention. To the extent necessary, their facilities and curriculum must be enhanced to bring them into educational parity with the other public schools in the system. In sum, we must ensure, whatever the ultimate racial composition in the class-room, that all students attending public schools, regardless of race, color, or ethnic background, have an equal opportunity to receive an education. We are concerned, quite frankly, much less with student relocation than we are with student education and our school desegregation plans will be drawn to reflect that predominant concern.

Pursuant to the Department's civil rights policies, we are overseeing the development of a desegregation plan here in Chicago that will be designed to enhance educational opportunities for all students. The public school enrollment in Chicago is approximately 61% black, 18% white, and 21% non-black minorities, mostly Hispanic. The Chicago School Board and the Justice Department recognize that there are schools in the system that will remain racially identifiable under the desegregation plan, and the Board has thus undertaken compensatory programs to enhance the quality of education provided in those schools in order to guarantee equal educational opportunity to all students in the system. To this end, the Board has developed and submitted to the Court, with our enthusiastic approval, detailed plans to enhance educational quality in the schools, and implementation of those plans began this fall.

\* \* \* \* \* \*

By concentrating our attention and resources on teachers and administrators, course offerings, incentives for learning, and other components of education quality, this Administration—with the help and cooperation of civil rights groups, state and local school authorities, and most importantly, professional educators—can formulate desegregation plans that not only will ensure all public school students, irrespective of race, color or ethnic background, equal educational opportunity, but will do so within an educational environment free from state-enforced attendance barriers. If such a cooperative and united effort can be mounted to rid our Nation's public schools of the tragic legacy of racial discrimination, I am confident that, in time, we will be able to review that effort against the test of experience, and say with pride "it worked."

(March, 1984 Stipulation No. 117).

122. In school year 1981–82, the Board submitted quarterly progress reports to the United States and to the Court, detailing the process of implementating the Desegregation Plan, including the Educational Components. (March, 1984 Stipulation No. 118).

123. In February and March of 1982, following the adoption of the Board's Comprehensive Student Assignment Plan, the Court entertained briefs concerning the compliance of the total Desegregation Plan with both constitutional requirements and the Consent Decree. The United States Assessment of the Plan commented on the Educational Components as described in Finding 139. The Chicago Urban League's Assessment of the Plan expressed strong concern about the need to provide signifi-

cant extra funding for implementation of the Educational Components in racially isolated schools. The Urban League stated:

> The provision of extra funds—and therefore resources—to schools which are to remain racially isolated is a form of compensation intended to make up in part for the system's failure to remedy all manifestations of segregation. This component of the Plan is extraordinarily important because the majority of the system's schools are to remain segregated under the Board's proposal...

> The Chicago Urban League believes the notion of compensatory funding requires that racially isolated schools receive extra funding above and beyond what other schools may be receiving...

The Urban League expressed concern that the Board had only committed itself to provide "Milliken II relief" to the extent that funds are available.

The NAACP, in its July 1981 memorandum of the Plan, stated that "we have no specific objection to the content of these programs." In its March 1982 brief, NAACP did not comment further on the Educational Components. (March, 1984 Stipulation Nos. 119, 133).

124. In January 1983 the Court issued its opinion approving the Board's Plan as being clearly within the broad range of constitutionally acceptable plans. With respect to the Educational Components and funding, the Court's opinion stated:

> *Educational Components.* As already indicated, the Educational Components of the Plan were in definitive form well before the assignment provisions that have occupied the discussion in this opinion, and those Educational Components have not drawn the same heated attention. They were approved early by the United States and found favor with the NAACP as well. To the extent they have been criticized (chiefly by the Hispanic organizations and by Designs for Change), the criticisms did not go to claimed constitutional insufficiency and are therefore not within the province of this Court's overview. Though they of course continue to form a vital part of the purposes and hoped-for impact of the Plan—the constitution guaranty is after all one of equality of education—no more need be said at this time.

> *Funding.* Desegregation, like all other aspects of affording quality education to all students in a school system, costs money. In that respect the Board is not master of its own fate. If and to the extent other governmental bodies and agencies that control the pursestrings were to thwart the Board's ability to perform in the way its Plan contemplates and the Constitution requires, this Court would have to examine all appropriate and available remedies. There is no reason to presume at this time that any such delinquency in meeting the mandates of the Constitution, or any such resulting power confrontation, will occur.

(March, 1984 Stipulation No. 120).

125. The Board's 1983 Annual Desegregation Review, Part I, filed April 15, 1983, contained a section on "Financial Aspects" at pp. 402–23, which included the following statements:

> With regard to expenditures for racially identifiable schools, a brief explanation is in order. The Board's initial commitment (as outlined in the April, 1981 Principles) was to spend $40 million a year in 1981–82 and 1982–83 and $20 million a year thereafter. As described above, spending specifically budgeted for this component of the Desegregation Plan has fallen somewhat short of this originally projected level in the first two years of implementation. As a result, the Board believes it to be appropriate to attempt to make up the difference in subsequent years. Hence, the Board believes to be desirable to spend at least $40 million in 1983–84, as opposed to the $20 million initially prescribed by the Principles. However, the funds needed to provide for this level of expenditure simply are not available from within the Board at this time.

> Over and above the level of expenditures for 1983–84 described above, addi-

tional resources would also be highly desirable to maximize the effectiveness of the Desegregation Plan. Such additional funding would help to strengthen and enrich the implementation of desegregation in Chicago in a variety of ways: intensified implementation and evaluation of educational components, expansion of magnet schools and programs (including metropolitan schools and scholastic academies), intensified recruitment efforts, improvement in vocational, technical and special educational programs, initiation of inter-district transfer programs, to name only a few.

*Resources.* The resources necessary to fund desegregation implementation at the levels set forth above unfortunately are not available at this time from within the Board. The Board, for its part, is committed to appropriations for 1983–84 of at least $57 million—a continuation of the amounts it budgeted for the current school year. To the extent additional moneys are made available, the Board will spend them to bring the aggregate levels of expenditures for racially identifiable schools up to $40 million and to further maximize optimum implementation of this and other aspects of student desegregation.

\* \* \* \* \* \*

Thus, at this time precise estimates of the Board's financial condition for future years are slightly premature. However, it may be fairly stated that for 1983–84 the Board faces budget problems of an extremely serious magnitude. Preliminary projections suggest it is facing a budget deficit in the range of $200 million... In any event the Board believes that, in the first instance, the obligation to provide these additional resources for the substantial expenditures which full and complete implementation of the Plan entails lies with the federal and state governments.

\* \* \* \* \* \*

On April 13, 1983, the Board adopted a resolution directing its counsel to initiate litigation against the State of Illinois and the United States seeking contribution for the cost of implementing the Desegregation Plan. The Board expects that the initiation of these actions will be forthcoming. (March, 1984 Stipulation No. 121).

126. The Board's statements concerning the desired expenditure of at least $40 million on the Educational Components in racially isolated schools and on the desired expenditure of additional amounts for those purposes, including the statements described in Findings 116 and 125, do not reflect any determination by the Board that the expenditure of $40 million would be "adequate" for that aspect of the Plan (in terms of § 15.1), or that the expenditure of additional amounts for that aspect of the Plan would not materially aid its success or would not be necessary for its full implementation. (March, 1984 Stipulation Nos. 101–121; Parts I, II and III of the Plan).

127. In August 1983, the Board filed Part II of its 1983 Annual Desegregation Review, a 416-page document which reported in detail on the implementation of the Educational Components ("ADR II"). After the filing of ADR II, the Court provided the United States and the *amici curiae* the opportunity to file comments. Neither the United States nor any of the *amici* filed comments with the Court. (March, 1984 Stipulation No. 122).

128. The United States strongly supported (indeed, insisted upon the inclusion of) the Board's Educational Components as the developmental process moved from the Consent Decree principles to the April 1981 Educational Components Plan to approval by the Court, and raised no subsequent objection as the Board proceeded to add programmatic details to those initial documents. Only when called upon to fulfill its financial responsibility did the United States begin to renege on its approval. (March, 1984 Stipulation Nos. 101–122, 133).

D. *Overview Of The Student Assignment Plan*

129. By the Consent Decree, the Board agreed to adopt a system-wide desegrega-

tion plan with two basic objectives. The first (§ 2.1) was to create the greatest practicable number of stably desegregated schools, considering all the circumstances in Chicago. The second objective, as described above, was to provide educational and related programs for schools which remained racially isolated. (March, 1984 Stipulation No. 123).

130. In January, 1982, the Board adopted its Comprehensive Student Assignment Plan. The Student Assignment Plan divides all schools in the school system into four broad categories. The first category is that of residentially integrated schools. (An integrated school is defined as one whose enrollment includes at least 30% white children and 30% minority children, derived principally from residential or other natural attendance patterns.) The Plan identifies two basic types of schools within this category—stably integrated and integrated but with potential for change. A third type—schools which are currently integrated but whose enrollment of white children is projected to decline below 30%—is also identified.[36] As of October 1981 these three types of schools encompassed 67 schools with an enrollment of 52,067 students. (The enrollment data in Findings 130 through 134 excludes preschool and kindergarten children.) (March, 1984 Stipulation No. 124).

131. The Plan next considers the category of the desegregated school—one whose enrollment includes at least 30% white children and 30% minority children, which has been established primarily by student assignment techniques under the Plan. This category consists both of (a) schools which have previously achieved stably desegregated status through the implementation of various student assignment measures (as of 1981, 42 schools with 20,329 students) and (b) schools which in 1981 were yet to achieve desegregated status,

through previously existing and newly adopted student assignment techniques (in 1981, 33 schools with 17,541 students). These techniques include voluntary transfer programs and magnet and magnet-type programs within schools. (March, 1984 Stipulation No. 125).

132. The Plan also describes various magnet-type schools which are established primarily in minority communities and are designed to promote desegregation by special educational offerings and programs. A target enrollment composition, generally 15–35% white, 65–85% minority, is established for each school in this category. These schools included, in 1981, 41 magnet schools, scholastic academies and metropolitan high schools, enrolling 28,824 students. (March, 1984 Stipulation No. 126).

133. The Student Assignment Plan also considers those schools projected to remain racially identifiable (with an enrollment of greater than 70% minority children, less than 30% white children). In 1981, there were 354 such schools, enrolling 275,794 students. The Plan describes why these schools cannot practicably be desegregated. The Plan also describes the compensatory educational arrangements which will be provided for at these schools and the various voluntary transfer arrangements in which students enrolled at these schools may participate. (March, 1984 Stipulation No. 127).

134. The school types identified in the Plan, and the number and enrollment of these schools, is summarized in the following table:

| Integrated Schools: | Number | 1981 Enr. [37] |
|---|---|---|
| Stably integrated | 42 | 31,791 |
| Integrated schools stable but projected to become mixed | 11 | 7,697 |

---

**36.** Two other subcategories are also identified: (a) stable mixed schools having a small but relatively constant enrollment of white children, and (b) schools whose enrollment composition is currently racially mixed but is projected to become racially identifiable.

**37.** All enrollments excluding 39,221 preschool and kindergarten children. 25 child-parent centers omitted.

| | Number | 1981 Enr.[37] |
|---|---|---|
| Integrated Schools: | | |
| Integrated schools with potential for change | 14 | 12,579 |
| Subtotal | 67 | 52,067 |
| Schools Desegregated and to be Desegregated: | | |
| Schools presently desegregated | 42 | 20,269 |
| Schools to be desegregated | 33 | 17,541 |
| Magnet schools | 29 | 16,765 |
| Scholastic Academies—1982 | 6 | 2,406 |
| Metropolitan High Schools—1982 | 6 | 9,653 |
| Subtotal | 116 | 66,634 |
| Predominantly Minority Schools: | | |
| Stable mixed (15–29% white) | 14 | 11,481 |
| Mixed with potential for racial change | 20 | 14,695 |
| Schools more than 85% minority | 320 | 236,248 |
| Subtotal | 354 | 262,424 |
| Special Needs/Special Admissions: | | |
| Physicially handicapped, apprentice, adult education, bilingual centers, juvenile detention and pregnant students | 43 | 9,173 |
| Total | 580 | 403,668 |

(March, 1984 Stipulation No. 128).

135. Two mandatory requirements were established by the Desegregation Plan. The first of these requirements is that every school achieve by October 1983 a minority enrollment of at least 30%. The second is that, by October, 1983, the school system as a whole achieve a minimum total enrollment in all integrated and desegregated schools (including magnet schools). (This requirement is generally referred to as the "desegregation index" requirement.) (March, 1984 Stipulation No. 129).

136. The Plan sets forth other student assignment provisions to be applied throughout the school system to provide and maintain the maximum practicable desegregation and to ensure that the Plan will not initiate or authorize any segregative actions. Among these provisions are ones concerning school closings, boundary adjustments and within-school segregation. (March, 1984 Stipulation No. 130).

137. The Student Assignment Plan also contains, in a separate volume, school-by-school analyses for each school in the system. These analyses describe in summary terms the work and consideration that went into developing a desegregation strategy for each school. They also provide a detailed statement as to why it is not practicable to desegregate a large number of schools remaining racially identifiable. (March, 1984 Stipulation No. 131).

138. Detailed evaluation of the student assignment component of the Desegregation Plan, including analysis of enrollment composition and prescription of specific actions for over 200 individual schools, is undertaken every year. This evaluation is reported on in an Annual Desegregation Review ("ADR"). (March, 1984 Stipulation No. 132).

139. After the adoption of the Comprehensive Student Assignment Plan in January 1982, the United States filed its Assessment of the Plan. That 33-page document explained the United States' belief that the Plan is constitutional and consistent with the Consent Decree. In the conclusion, the United States stated:

We believe that, for the reasons stated in these comments, once the plan has been thoroughly implemented and the Educational Components completed, the Board will have: (a) provided a system-wide remedy with compensatory programs at remaining segregated schools, (b) established the greatest practicable number of stably desegregated schools, (c) insured that all racial and ethnic groups participate and (d) distributed the benefits and burdens of the plan on a fair basis.

(March, 1984 Stipulation No. 133).

140. On January 6, 1983, the Court issued its opinion concerning the Plan. (554 F.Supp. 912 (N.D.Ill.1983)). In its opinion, the Court incorporated the Board's summary of its extensive and effective activities in the 18 months from the entry of the Consent Decree to the adoption of Part III of

the Desegregation Plan. (554 F.Supp. at 914–15). The Court further noted that it had deferred ruling on the Plan for several months, so that the promises of the Plan could be "test[ed] in the crucible of reality." In light of the fall 1982 implementation results, the Court found that "nothing in the execution of the Plan has been shown to disprove the premises on which it was designed." (554 F.Supp. at 915). Finally, having reviewed the Plan in detail, the Court approved it as being "clearly within the broad range of constitutionally acceptable plans." (554 F.Supp. at 928). (March, 1984 Stipulation No. 134).

141. In April 1983 the Board's Annual Desegregation Review (Part I, Student Assignment) ("ADR I") showed that the implementation of the Plan during school year 1982–83 was a considerable success, and that to a very significant degree its projections of student assignment outcomes had been realized. ADR I was also candid in its assessment of shortcomings, and in adopting measures to address them. (March, 1984 Stipulation No. 135).

142. In its May 1983 response to ADR I, the United States favorably evaluated the Board's substantive implementation process:

The Chicago School Board's April 19, 1983, filing on its first Annual Desegregation Review is an extremely well-conceived document and will be a valuable guide for assessing the Board's compliance with the underlying principles established by the Consent Decree and the Court in this case. Like the desegregation plan itself, this document reflects extensive thought, preparation and effort at implementation in a context that is so complex that it often seems incapable of clear description. The review document makes a significant contribution to the clarification, for all involved, of what this plan has meant for the Chicago public schools.

Our first comment is on the review process itself. We know of no other school board, large or small, that has made as comprehensive, detailed and careful examination of what it is doing to implement a desegregation plan. (Pages 1–2).

\* \* \* \* \* \*

We think that the overall plan implementation process has been excellent and that the Board has applied it in good faith at each school... Should the Board fail to take the remedial steps recommended in the review or otherwise fail to take the steps necessary to fulfill the plan's promise, the plan's present constitutional sufficiency would suffer. At this point, we have no reason even to suspect that this is a possibility. (Pages 4–5).

(March, 1984 Stipulation No. 135).

143. The mandatory requirements of the Student Assignment Plan (Finding 135) are applicable as of October 1983. On November 2, 1983, the Board informed the Court that the requirement of 30% minimum minority enrollment in all schools had been met. (March, 1984 Stipulation No. 137).

144. For comparison with Finding 134, the following table shows fall 1983 data as to the number and total enrollment of the various school types identified in the Plan. These data are comparable with Finding 134, but it should be noted that there has been some recategorization of schools to reflect the experience of the ensuing two years. As in Finding 134, these data exclude kindergarten students; therefore the total enrollment shown is grades 1–12, which is 41,260 students less than system-wide enrollment.

| Integrated Schools: | Number | 1983 Enr. [38] |
|---|---|---|
| Stably integrated | 47 | 36,569 |
| Integrated schools stable but projected to become mixed | 4 | 2,009 |

---

**38.** All enrollments excluding 41,260 preschool and kindergarten children. 25 child-parent centers omitted.

| Integrated Schools: | Number | 1983 Enr.[38] |
|---|---|---|
| Integrated schools with potential for change | 4 | 5,033 |
| Subtotal | 55 | 43,611 |

**Schools Desegregated and to be Desegregated:**

| | Number | 1983 Enr.[38] |
|---|---|---|
| Schools presently desegregated | 77 | 42,382 |
| Schools to be desegregated | 0 | |
| Magnet schools | 33 | 19,155 |
| Scholastic Academies—1982 | 5 | 3,092 |
| Metropolitan High Schools—1982 | 6 | 10,302 |
| Subtotal | 121 | 74,931 |

**Predominantly Minority Schools:**

| | Number | 1983 Enr.[38] |
|---|---|---|
| Stable mixed (15–29% white) | 17 | 12,683 |
| Mixed with potential for racial change | 10 | 8,065 |
| Schools more than 85% minority | 334 | 248,161 |
| Subtotal | 361 | 268,909 |

**Special Needs/Special Admissions:**

Physically handicapped, apprentice, adult education, bilingual centers, juvenile

| Special Needs/Special Admissions: | Number | 1983 Enr.[38] |
|---|---|---|
| detention and pregnant students | 43 | 5,331 |
| Total | 580 | 392,782 |

(March, 1984 Stipulation No. 128).

### E. *Demographics Of The City Of Chicago And Of The Chicago Public Schools*

145. Extensive demographic information is presented in both the Comprehensive Student Assignment Plan (pages 8–39) and in 1983 ADR I (pages 20–23). (March, 1984 Stipulation No. 139).

146. The racial composition of the total population of the City of Chicago from 1940 to 1980 is summarized in the following table:

| Year | White No. | % | Non-White No. | % | Total No. |
|---|---|---|---|---|---|
| 1940 | 3,115,000 | 91.7 | 282,000 | 8.3 | 3,397,000 |
| 1970 | 2,208,000 | 65.6 | 1,159,000 | 34.4 | 3,368,000 |
| 1980 | 1,311,000 | 43.7 | 1,694,000 | 56.3 | 3,005,000 |

(March, 1984 Stipulation No. 140).

147. The racial/ethnic composition of the Chicago public schools from 1970 through 1983 is presented in the following table:

Chicago Public Schools
Racial/Ethnic Composition 1970–1983

| Year | Membership | White No. | % | Black No. | % | Other No. | % | Hispanic No. | % |
|---|---|---|---|---|---|---|---|---|---|
| 1970 | 577,679 | 199,669 | 34.6 | 316,711 | 54.8 | 4,925 | .9 | 56,374 | 9.7 |
| 1971 | 574,495 | 188,312 | 32.8 | 320,797 | 55.8 | 5,608 | 1.0 | 59,778 | 10.7 |
| 1972 | 558,825 | 173,143 | 31.0 | 317,975 | 56.9 | 5,729 | 1.0 | 61,978 | 11.1 |
| 1973 | 544,971 | 160,846 | 29.5 | 314,089 | 57.6 | 6,306 | 1.2 | 63,730 | 11.7 |
| 1974 | 536,657 | 151,290 | 28.2 | 310,880 | 57.9 | 6,535 | 1.2 | 67,952 | 12.7 |
| 1975 | 526,716 | 141,264 | 26.8 | 307,549 | 58.4 | 7,589 | 1.5 | 70,314 | 13.4 |
| 1976 | 524,221 | 130,785 | 24.9 | 311,261 | 59.4 | 8,343 | 1.6 | 73,832 | 14.1 |
| 1977 | 512,052 | 118,713 | 23.2 | 306,997 | 59.9 | 9,071 | 1.8 | 77,271 | 15.1 |
| 1978 | 494,988 | 106,581 | 21.5 | 299,590 | 60.5 | 9,191 | 1.9 | 79,526 | 16.1 |
| 1979 | 477,339 | 95,513 | 20.0 | 289,920 | 60.7 | 9,958 | 2.1 | 81,948 | 17.2 |
| 1980 | 458,497 | 85,292 | 18.6 | 278,726 | 60.8 | 10,253 | 2.2 | 84,226 | 18.4 |
| 1981 | 442,889 | 76,112 | 17.2 | 269,019 | 60.7 | 11,003 | 2.5 | 86,755 | 19.6 |
| 1982 | 435,843 | 71,171 | 16.3 | 264,530 | 60.7 | 11,396 | 2.6 | 88,746 | 20.4 |
| 1983 | 434,042 | 67,829 | 15.6 | 263,163 | 60.6 | 11,283 | 2.6 | 91,763 | 21.2 |

(March, 1984 Stipulation 141)

148. One principal reason that the proportion of minorities is higher among public school students than among the overall city population is that a large number of children (more than half of whom are white) attend non-public schools in Chicago, especially the Catholic parochial schools.

The metropolitan-area enrollment of nearly 190,000 students makes the Catholic schools the fifth largest school system of any kind in the United States. Within Chicago, the Catholic schools as of 1982 had 226 schools enrolling 114,299 students, of whom 56% were white, 25% black, 16% Hispanic and 3% Asian. (March, 1984 Stipulation No. 142).

149. Total membership in the Chicago public schools leveled off in 1984 after 15 years of decline that were often characterized by very substantial drops. The decline in total membership this year is only about 1,800 (0.4%) compared to almost 19,000 (3.9%) in 1980. [Enrollment was 372,278 in 1952. Student membership increased quite dramatically in the 1950's and the 1960's, reaching a peak in 1969 at 580,292. Since then enrollment has declined, generally at the rate of 2–4% per year, with the greatest declines between 1977–1981 (over 15,000 students, or 3–4%, per year). The decline was 1.6% (7,046 students) in 1982 and only 0.4% (1,800 students) in 1983.] (March, 1984 Stipulation No. 143).

150. Enrollment of white students (67,-829 or 15.6% systemwide in October, 1983) has declined at a significantly slower rate since adoption of the Desegregation Plan. From 1977–1981 white enrollment declined at 9–11% per year (or 10,000–12,000 students). In 1982 white enrollment declined 6% (4,941 students), and in 1983 5% (3,342 students). (March, 1984 Stipulation No. 144).

151. In October 1983, Black students numbered 263,163 (60.6% systemwide). The 1983 decline in black enrollment of 1,367 students (0.5%) is significantly lower than declines of 2–4% in the preceding five years. (March, 1984 Stipulation No. 145).

153. The Board's demographers believe that the enrollment changes summarized in Findings 149–152 can be attributed to the following factors:

*Demographics:* continued effects of changes in the number of births, in- and out-migration, and the patterns of student distribution among grades.

*Economics:* recent high unemployment rates which have curtailed ability to pay tuition for private schools and reduced job opportunities for potential high school dropouts; high mortgage rates which have slowed down the housing market and, in turn, the rate of suburbanization.

*Educational Initiatives:* smooth implementation of the desegregation plan without busing; development of a variety of program options and specialty schools designed to attract students; an active recruitment program; increases in achievement scores, and greater parental and community involvement through programs such as report card pickup and Adopt-A-School.

(March, 1984 Stipulation No. 147).

154. During the past two years of relatively stable enrollments, an important factor contributing to changes is the transfer rate between public and non-public schools. The following table reflects that the Chicago public schools have been gaining more students and losing fewer since 1980:

STUDENT TRANSFERS TO/FROM NONPUBLIC SCHOOLS IN CHICAGO

| | 1980 | 1981 | 1982 |
|---|---|---|---|
| Transfers from Non-public Schools in Chicago | 6,084 | 7,041 | 7,934 |
| Transfers to Non-public Schools in Chicago | 12,919 | 11,648 | 10,177 |
| Net Loss | 6,935 | 4,607 | 2,243 |
| Total Membership | 458,497 | 442,889 | 435,843 |
| Percentage Net Loss | 1.5% | 1.0% | 0.5% |

(March, 1984 Stipulation No. 148).

155. The recent trend of enrollment decline in the Chicago public schools appears to have ended in school year 1983–84. As to racial/ethnic composition, the school system is expected to increase in minority enrollment. This is partly because of the greater proportion of whites in the upper grades, combined with continued outflow, and the higher birth rates for minority groups (particularly Hispanics) coupled with continued immigration of Hispanics. (March, 1984 Stipulation No. 149).

156. The racial/ethnic composition of the elementary and secondary levels of the

school system as of October 1983 is detailed in the first table following Finding 157. This data is briefly summarized as follows:

| Type of School | Total Students | White | | Black | | Hispanic | | Other | |
|---|---|---|---|---|---|---|---|---|---|
| | | # | % | # | % | # | % | # | % |
| Elementary | 314,771 | 44,592 | 14.2 | 191,163 | 60.7 | 71,287 | 22.7 | 7,729 | 2.5 |
| Secondary | 111,557 | 21,216 | 19.0 | 67,770 | 60.7 | 19,206 | 17.2 | 3,365 | 3.1 |
| Special | 7,714 | 2,021 | 26.2 | 4,230 | 54.8 | 1,274 | 16.5 | 189 | 2.4 |
| System-wide | 434,042 | 67,829 | 15.6 | 263,163 | 60.6 | 91,767 | 21.2 | 11,283 | 2.6 |

(March, 1984 Stipulation No. 150).

156A. As of October 31, 1984, the Board was operating 495 elementary level, 64 secondary level and 26 special schools. (U.S. no contest).

156B. As of October 31, 1984, there were 312,365 children attending elementary level Chicago public schools. Of this total, 42,303 (13.5%) were white; 188,979 (60.5%) were black; 72,941 (23.4%) were Hispanic and the remainder (2.6%) were American Indian, Alaskan Native, Asian or Pacific Islander. (U.S. no contest).

156C. As of October 31, 1984, there were 111,097 children attending secondary level Chicago public schools. Of this total, 19,154 (17.2%) were white; 68,206 (61.4%) were black; 19,921 (17.9%) were Hispanic; and the remainder (3.5%) were American Indian, Alaskan Native, Asian or Pacific Islander. (U.S. no contest).

156D. As of October 31, 1984, 7,764 children were attending Special Schools operated by the Board. (U.S. no contest).

157. The racial/ethnic composition of the Chicago public schools by grades is detailed in the second table following this Finding. In brief summary the data reflect higher proportions of minority students in the lower grades. For example, minority enrollment is 75–80% in grades 11 and 12, and 85–86% in first grade and kindergarten. (March, 1984 Stipulation No. 151).

SUMMARY OF OCTOBER 31, 1983, STUDENT RACIAL/ETHNIC SURVEY

(By Level and Type of School)

### ELEMENTARY LEVEL

| NO. | TYPE OF SCHOOL | TOTAL STUDENTS | WHITE NON-HISPANIC # | % | BLACK NON-HISPANIC # | % | AMERICAN IND. ALASKAN NATIVE # | % | ASIAN OR PACIFIC ISLANDER # | % | MEXICAN # | % | PUERTO RICAN # | % | CUBAN # | % | OTHER HISPANIC # | % | TOTAL HISPANIC # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 | Regular Elementary * | 271,769 | 89,010 | 14.4 | 163,212 | 60.0 | 400 | 0.1 | 6,136 | 2.3 | 38,621 | 14.2 | 20,059 | 7.4 | 696 | 0.3 | 3,635 | 1.3 | 63,011 | 23.2 |
| 19 | Academic Magnet Centers * | 11,715 | 2,653 | 22.6 | 5,910 | 50.4 | 19 | 0.2 | 305 | 2.6 | 1,843 | 15.7 | 735 | 6.3 | 55 | 0.5 | 195 | 1.7 | 2,828 | 24.1 |
| 14 | Community Academies | 11,155 | 112 | 1.0 | 8,635 | 77.4 | 13 | 0.1 | 73 | 0.6 | 1,343 | 12.0 | 903 | 8.0 | 4 | 0.3 | 72 | 0.6 | 2,322 | 20.8 |
| 6 | Scholastic Academies | 3,849 | 1,161 | 30.2 | 1,876 | 48.7 | 22 | 0.6 | 224 | 5.8 | 321 | 8.3 | 169 | 4.4 | 14 | 0.4 | 62 | 1.6 | 566 | 14.7 |
| 6 | Language Academies | 2,445 | 899 | 36.8 | 1,006 | 41.2 | 8 | 0.3 | 66 | 2.7 | 353 | 14.4 | 67 | 2.7 | 3 | 0.1 | 43 | 1.8 | 466 | 19.1 |
| 5 | Classical Schools | 1,209 | 368 | 30.4 | 660 | 54.6 | 6 | 0.5 | 75 | 6.2 | 50 | 4.1 | 36 | 3.0 | — | — | 14 | 1.2 | 100 | 8.3 |
| 6 | Middle Schools | 5,348 | 253 | 4.7 | 4,159 | 77.8 | 33 | 0.6 | 216 | 4.0 | 219 | 4.1 | 404 | 7.6 | 6 | 0.1 | 58 | 1.1 | 687 | 12.9 |
| 4 | Upper Cycles | 2,058 | 93 | 4.5 | 867 | 42.1 | 4 | 0.2 | 107 | 5.2 | 880 | 42.8 | 70 | 3.4 | 7 | 0.3 | 30 | 1.5 | 987 | 48.0 |
| 7 | E V G Centers | 795 | 6 | 0.8 | 718 | 90.3 | — | — | — | — | 21 | 2.6 | 49 | 6.2 | — | — | 1 | 0.1 | 71 | 8.9 |
| 25 | Child Parent Centers | 4,428 | 37 | 0.8 | 4,120 | 93.0 | 3 | 0.1 | 19 | 0.4 | 115 | 2.6 | 127 | 2.9 | — | — | 7 | 0.2 | 249 | 5.6 |
| 492 | Totals | 314,771 | 44,592 | 14.2 | 191,163 | 60.7 | 508 | 0.2 | 7,221 | 2.3 | 43,766 | 13.9 | 22,619 | 7.2 | 785 | 0.2 | 4,117 | 1.3 | 71,287 | 22.7 |

* Includes branches

### SECONDARY LEVEL

| NO. | TYPE OF SCHOOL | TOTAL STUDENTS | WHITE NON-HISPANIC # | % | BLACK NON-HISPANIC # | % | AMERICAN IND. ALASKAN NATIVE # | % | ASIAN OR PACIFIC ISLANDER # | % | MEXICAN # | % | PUERTO RICAN # | % | CUBAN # | % | OTHER HISPANIC # | % | TOTAL HISPANIC # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 44 | General/Technical * | 76,632 | 17,255 | 22.5 | 42,097 | 54.9 | 94 | 0.1 | 2,046 | 2.7 | 7,351 | 9.6 | 6,277 | 8.2 | 230 | 0.3 | 1,282 | 1.7 | 15,140 | 19.8 |
| 9 | Vocational * | 13,970 | 665 | 4.8 | 12,394 | 88.7 | 7 | 0.1 | 57 | 0.4 | 508 | 3.6 | 266 | 1.9 | 10 | 0.1 | 63 | 0.4 | 847 | 6.1 |
| 7 | Metropolitan | 10,332 | 2,414 | 23.4 | 4,967 | 48.0 | 65 | 0.6 | 905 | 8.8 | 1,363 | 13.2 | 311 | 3.0 | 78 | 0.8 | 229 | 2.2 | 1,981 | 19.2 |
| 5 | Academies/Magnet Schools | 10,623 | 882 | 8.3 | 8,312 | 78.2 | 6 | 0.1 | 185 | 1.7 | 1,084 | 10.2 | 118 | 1.1 | 6 | 0.1 | 30 | 0.3 | 1,238 | 11.7 |
| 65 | Totals | 111,557 | 21,216 | 19.0 | 67,770 | 60.7 | 172 | 0.2 | 3,193 | 2.9 | 10,306 | 9.2 | 6,972 | 6.3 | 324 | 0.3 | 1,604 | 1.4 | 19,206 | 17.2 |

* Includes branches

### OTHER SCHOOLS/PROGRAMS

| NO. | TYPE OF SCHOOL | TOTAL STUDENTS | WHITE NON-HISPANIC # | % | BLACK NON-HISPANIC # | % | AMERICAN IND. ALASKAN NATIVE # | % | ASIAN OR PACIFIC ISLANDER # | % | MEXICAN # | % | PUERTO RICAN # | % | CUBAN # | % | OTHER HISPANIC # | % | TOTAL HISPANIC # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 37 | Special Schools ** | 7,714 | 2,021 | 26.2 | 4,230 | 54.8 | 18 | 0.2 | 171 | 2.2 | 948 | 12.3 | 237 | 3.1 | 14 | 0.2 | 75 | 1.0 | 1,274 | 16.5 |

** Included are schools for the physically and mentally handicapped, students with special needs, bilingual education, adult education and apprentice programs. Students on elementary, secondary, and post-secondary levels are served.

### CITYWIDE SUMMARY

| NO. | TYPE OF SCHOOL | TOTAL STUDENTS | WHITE NON-HISPANIC # | % | BLACK NON-HISPANIC # | % | AMERICAN IND. ALASKAN NATIVE # | % | ASIAN OR PACIFIC ISLANDER # | % | MEXICAN # | % | PUERTO RICAN # | % | CUBAN # | % | OTHER HISPANIC # | % | TOTAL HISPANIC # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 594 | Totals | 434,042 | 67,829 | 15.6 | 263,163 | 60.6 | 698 | 0.2 | 10,585 | 2.4 | 55,020 | 12.7 | 29,828 | 6.9 | 1,123 | 0.3 | 5,796 | 1.3 | 91,767 | 21.2 |

RACIAL/ETHNIC COMPOSITION OF CHICAGO PUBLIC SCHOOLS BY GRADES
October 31, 1983

| GRADE | MEMBERSHIP | % WHITE | % BLACK | % OTHER | % HISPANIC |
|---|---|---|---|---|---|
| Pre-Sch., Sp. Ed. | 1,115 | 22.2 | 57.6 | 1.5 | 18.7 |
| Sp. Ed., Elem. | 10,235 | 16.9 | 68.5 | 0.9 | 13.6 |
| Pre-Kg., Bilingual | 342 | 1.5 | 5.0 | 0.3 | 93.3 |
| Pre-Kindergarten | 4,308 | 3.6 | 84.5 | 1.5 | 10.4 |
| Head Start | 6,174 | 5.7 | 72.9 | 2.6 | 18.8 |
| Kindergarten | 31,121 | 15.6 | 57.4 | 2.1 | 25.0 |
| Grade 1 | 33,896 | 14.2 | 58.6 | 2.4 | 24.9 |
| Grade Pre-2 | 4,691 | 9.7 | 59.3 | 1.8 | 29.3 |
| Grade 2 | 32,838 | 13.3 | 59.0 | 2.3 | 25.4 |
| Grade 3 | 32,333 | 13.4 | 59.4 | 2.4 | 24.9 |
| Grade 4 | 31,106 | 13.5 | 59.7 | 2.6 | 24.1 |
| Grade 5 | 32,430 | 13.9 | 60.9 | 2.7 | 22.6 |
| Grade 6 | 32,953 | 14.2 | 61.9 | 2.7 | 21.3 |
| Grade 7 | 32,073 | 15.7 | 60.7 | 2.8 | 20.8 |
| Grade 8 | 31,952 | 16.6 | 61.1 | 3.1 | 19.2 |
| Grade 9 | 34,874 | 15.8 | 62.3 | 2.5 | 19.4 |
| Grade 10 | 30,849 | 18.7 | 61.5 | 2.8 | 17.1 |
| Grade 11 | 23,998 | 20.7 | 58.3 | 3.8 | 17.2 |
| Grade 12 | 17,540 | 25.3 | 55.4 | 4.1 | 15.3 |
| Sp. Ed., H.S. | 6,623 | 13.3 | 77.8 | 0.7 | 8.2 |
| Non-Graded | 315 | 4.1 | 90.2 | — | 5.7 |
| Satellite | 332 | 3.6 | 85.2 | — | 11.2 |
| Apprentices | 1,944 | 62.9 | 24.7 | 1.7 | 10.5 |
| Total | 434,042 | 15.6 | 60.6 | 2.6 | 21.2 |

158. There are presently 407 schools with enrollments more than 70% black and/or Hispanic (excluding magnet schools):

| % Minority | No. of Schools | Total Enrollment |
|---|---|---|
| 70–80% | 14 | 7,616 |
| 80–90% | 37 | 20,452 |
| 90–95% | 33 | 31,189 |
| 95–99% | 31 | 28,348 |
| 99%+ | 292 | 215,554 |
| | 407 | 303,159 |

These students comprise 69.8% of the systemwide enrollment. The number of students attending schools more than 90% minority is 275,091 (69.4% of systemwide enrollment). (March, 1984 Stipulation No. 152).

159. The number of schools with more than 70% black and/or Hispanic enrollment will increase in coming years, as a result of the demographic and transfer trends described in Findings 145–161. (March, 1984 Stipulation No. 153).

160. In schools with enrollments more than 90% black and/or Hispanic, 1983–84 total kindergarten and pre-school enrollment was as follows:

| % Minority | K & Pre-school Enrollment |
|---|---|
| 90–95% | 3,130 |
| 95–99% | 3,978 |
| 99%+ | 22,733 |
| | 29,841 |

The number of such students was at least as great in school year 1984–85. (Kindergarten students represent approximately two thirds of this total, or 20,000 students.) (March, 1984 Stipulation No. 154).

161. In schools with more than 90% black and/or Hispanic enrollment, the number of black and Hispanic children in grades 1–3 in school year 1983–84 was approximately as follows:

| Grade | Black | Hispanic | Total |
|-------|-------|----------|-------|
| 1 | 16,913 | 4,361 | 21,274 |
| Pre-2 | 2,369 | 710 | 3,079 |
| 2 | 16,497 | 4,310 | 20,807 |
| 3 | 15,733 | 4,002 | 19,735 |
| Total | 51,512 | 13,383 | 64,895 |

The numbers of black and Hispanic primary grade children in these schools were at least as great in school year 1984–85. (March, 1984 Stipulation No. 155).

162. As of June 1983, the Board employed nearly 40,000 persons of which approximately 27,400 were teachers. Since then, that number has been reduced somewhat by budget cuts caused by, among other things, loss of the Yates Bill funding. (U.S. no contest).

*F. Funds Presently Under Restraint*

163. The following table reflects the amounts restrained in the Secretary's "Special Programs" Account as of May 24, 1985.

| Account | (In thousands) Contingent Obligations | |
|---------|-------|-------|
| | FY 1983 | FY 1984 [39] |
| 15. Special Programs | 1,174 | 42,915 |
| a. Women's Educational Equity Act | 1 | ——— |
| b. Training and Advisory Services (Title IV) | 647 | 20,948 |
| c. Follow Through | 482 | 7,919 |
| d. Alcohol and Drug Abuse | 1 | 48 |
| e. Law Related Education | 8 | 1,000 |
| f. Arts in Education | ——— | 100 |
| g. Inexpensive Book Distribution | ——— | 650 |
| h. National Diffusion Network | 20 | 6,462 |
| i. Other Secretary's Discretionary Fund | 15 | 5,788 |

164. Except for the fiscal 1984 lapsed or "excess" funds, all remaining fiscal 1984 funds under restraint in this case have been contingently obligated for use by potential grantees. The identity of the potential grantees and the amount of funds contingently obligated to each of them is reflected by Board group exhibit 119, which are advices of miscellaneous encumbrances, produced to the Board by the United States on or about April 28, 1985. (1985 Stipulation No. 2).

*II. Propriety And Cost Of Programs Proposed For Adequate Implementation Of The Plan*

201. Dr. Nelvia Brady is a qualified expert with respect to effects of racial segregation on minority children; the nature and types of desegregation programs which are capable of eliminating or alleviating those effects; the design, development and implementation of the Board's Desegregation Plan. (1984 Brady Testimony, pp. 53–74).

202. Dr. Brady was one of the experts with principal responsibility for drafting

**39.** With the exception of the Alcohol and Drug Abuse program, specific grantees were identified as potential recipients of these funds. Further releases by this Court have reduced the amount of restrained FY 1984 National Diffusion Network funds by about $3 million, other discretionary funds by about $788,000, Title IV funds by about $5 million and Follow Through Funds by about $4 million. There are also "excess funds" restrained, which are detailed in Chapter 4 below.

the Educational Components of the Plan. (1984 Brady Testimony, p. 57).

203. In April of 1981, the Board adopted the Recommendations on Educational Components (prepared by its nationally known expert, Robert Green). These Recommendations accurately explain the justifications for educational components, as follows:

The rationale for this approach lies in the notion that the desegregation of a school system involves much more than the reassignment of students. Too often, desegregation planners have seemed to be concerned only with the movement of students in order to achieve some specified distribution by race and ethnic background. This preoccupation has been matched by a public concern with 'busing,' as though the question of how a student reached school was more important than what the student received from the school.

Research covering the last thirty years indicates that the physical separation of students by race and ethnic background is almost always accompanied by disparities in the educational services provided to minority and nonminority students, and by significant gaps in the achievement of minority students particularly those from low-income backgrounds. Stated simply, segregation creates educational deprivation for minority children —black, Hispanic, Asian, and Native American—and also results in attitudinal deprivation for all students.

A desegregation plan must, therefore, address not only the physical desegregation of schools but also the educational desegregation of individual students. The educational disadvantages resulting from past racial/ethnic isolation—or any such isolation that may have to continue—must be remedied. The overriding goal of this plan is to address minority students' educational needs arising from the segregation of the public schools. The method being proposed is through improving achievement in all schools, with particular emphasis on those schools with the greatest needs and attended by children who have been the most disadvantaged.

(1984 Brady Testimony, pp. 75–76).

204. Dr. Brady described those elements of the Desegregation Plan which have been implemented to date and provided an evaluation of the Board's efforts in this area. In general, this portion of Dr. Brady's testimony addressed both the student assignment aspects of the Plan and those elements of the educational components of the Plan as to which implementation has already been initiated. She also discussed those elements which the Board had intended to implement in school year 1984–85 if there had been sufficient available funding. More specific testimony with respect to the implementation status of the Curriculum, Bilingual and Vocational/Technical Education components was provided by Dr. Gerald Heing, Dr. Josue Gonzalez, and Dr. Philip Viso, respectively. (1984 Testimony of Brady, Heing, and Viso, pp. 75–76, 94–96, 539–40, 586–88, 592–94, 642–82, respectively).

205. Dr. Brady showed that the Board had experienced significant successes in its implementation efforts to date. This testimony was supported by evaluations performed during the last two years at those 45 racially isolated targeted elementary schools which were first included in the Chicago Effective Schools Project. (1984 Brady Testimony, pp. 125–30).

206. Dr. Brady's testimony described the process by which the Board's Plan was designed and developed. She related how past segregation in the Chicago public schools has affected the basic learning skills achievement levels of children, particularly minority children now attending, or who in the future will attend, racially identifiable minority schools. She explained that each component of the Plan is carefully designed to alleviate the effects of past segregation, and will substantially further implementation of a successful desegregation plan. Dr. Brady explained that, given the historic backdrop and the demographics of Chicago, full and successful implementation of the Educational Components is cru-

cial to the success of the Desegregation Plan. (1984 Brady Testimony, pp. 140–43, 147–53).

207. A primary goal of the Educational Components is to eliminate or alleviate the effects of past racial segregation on minority children who will remain in racially identifiable schools under the Student Assignment Plan and who will attend such racially identifiable schools in the future. In pursuit of this goal, the Plan also addresses the need for systemic and institutional changes in the manner in which the school system provides educational services. (1984 Brady Testimony; U.S. Resp. to Bd. Request to Admit 207).

208. Minority children attending Chicago public schools in March, 1984 suffered from, or had been affected by, one or more of the following effects of racial segregation:

a. reading, math, and communication skills which are one grade or more below their current grade levels;

b. tests and testing procedures with racial, ethnic, or cultural bias;

c. unequal treatment of minority children in racially identifiable schools by teachers and administrative staff;

d. less access for minority children to vocational and technical educational programs;

e. curricula colored by racial, ethnic or cultural bias;

f. the psychological pressures of attending racially identifiable schools and the resulting loss of self-esteem;

g. codes governing student conduct which are affected by racial, ethnic or cultural bias; .

h. speech habits that vary from those used in an environment in which they must ultimately compete;

i. lack of interpersonal learning experiences derived from open association with other students of varying races, cultures and religions;

j. lack of access to majority culture which is reflected in the standards that determine success in society.

(March, 1984 Stipulation No. 155; 1984 Brady Testimony, pp. 67–73, 140–50).

209. This broad spectrum of inequalities and injuries resulting from racial isolation could not then and cannot now be remedied only by student assignment, even where student assignment is available; it requires other remedies, particularly compensatory educational remedies, where student assignment is unavailable. (1984 Brady Testimony, pp. 90–93).

210. OEEO, in conjunction with other Board departments and units, developed the programs described in petitioner's trial exhibit 28. OEEO was primarily responsible for developing the following program elements:

a. Effective School Project

b. Racially Isolated Schools

c. Magnet Schools

d. Trainers Institute

e. Management Information

f. Affirmative Action

g. Equity Compliance

h. Staff Development

i. Within School Segregation

The Department of Pupil Personnel Services and Special Education was primarily responsible for developing the Special Education and Discipline program elements.

The Department of Vocational and Technical Education was primarily responsible for developing the Vocational and Technical Education program elements.

The Department of Curriculum and Instruction was primarily responsible for developing the curriculum program elements.

The Department of International and Multicultural Education was primarily responsible for developing the bilingual program.

The Department of Research and Evaluation was primarily responsible for developing the program to evaluate the results of Plan implementation. (1984 Brady, Heing, and Viso Testimony, pp. 88–89, 154–55, 539–43 and 636–37, respectively).

211. The original version of Board Trial Exhibit 28 was provided to the United States on or about September 16, 1983. (1985 Stipulation No. 3).

211A. The nature and detail of the programs and program components set forth in Board trial exhibits 28 and 117 are accurately described in the March, 1984 hearing testimony of Dr. Nelvia Brady, Dr. Gerald Heing, Dr. Josue Gonzalez and Dr. Philip Viso. (U.S. no contest).

212. Dr. Brady reviewed each program in petitioner's trial exhibit 28 and testified that each program was designed to implement the Educational Components of the Plan, would significantly alleviate the effects of past segregation and was necessary for a successful desegregation effort in Chicago. Dr. Brady described how each program element was developed, how each works or is expected to work and how each relates to one or more of the Plan's Educational Components. Dr. Brady testified that each of these program elements materially aids successful implementation of the Plan by alleviating the effects of past segregation. Her testimony also explained how the cost of each element was calculated. (1984 Brady Testimony, pp. 93-300).

213. In school years 1981-82 and 1982-83, implementation of the Plan's Educational Components included the introduction and implementation of Effective Schools Project ("ESP") programs at 45 specially targeted racially identifiable schools and the implementation of certain elements of the ESP program at other racially identifiable schools. (1984 Brady Testimony, pp. 94-96).

214. The 45 specially targeted schools are as follows:

| District | School |
|---|---|
| 3 | Schiller |
| 4 | Hay Branch |
| 5 | Lowell |
| | Morton |
| | Stowe |
| 6 | Anderson |
| | Diego |
| | LaFayette |
| | Moos Von Humboldt |
| | Yates |
| 7 | Beidler |
| | Douglass |
| | Middle |
| | Goldblatt |
| | Melody |
| | Tilton |
| 8 | Chalmers |
| | Komensky |
| 9 | Dett |
| | Dodge |
| | Herbert |
| | Medill Primary |
| | Smyth |
| | Suder |
| 10 | Frazier Henson Lawndale |
| 11 | Donoghue |
| | Douglas |
| | Einstein |
| | Williams |
| 12 | Fulton Branch |
| | Sherman |
| 13 | Beethoven |
| | Burke |
| | Colman |
| | Farren |
| | Hartigan |
| | McCorkle |
| | Parkman |
| 14 | Oakenwald South |
| | Robinson Branch |
| | Wadsworth |
| 15 | Raster |
| | Raster Branch |

(ADR II; 1984 Brady Testimony, p. 96).

215. The 45 ESP target schools were selected from among all racially identifiable schools in the system. First, all racially identifiable schools were ranked lowest to highest based on achievement test scores in reading and math, with a double weighting for reading, over a two year period. In addition, attendance and student mobility statistics and the extent of racial isolation were taken into consideration in the ranking process. This process produced a ranked list of the lowest achieving most racially identifiable schools in the system. The 45 lowest achieving most racially identifiable schools were chosen as target schools. (1984 Brady Testimony, pp. 96-97).

216. For school year 1983-84, the complete ESP program was continued at the 45

target schools and implemented for the first time at 62 additional racially identifiable schools. The 62 additional schools are listed below. Of these schools, 7 are educational vocational guidance centers which are also listed below:

| District | School |
|---|---|
| 2 | Gale Academy |
| | Marti Bilingual Education Center |
| 3 | Byrd Academy |
| | Jenner Elementary |
| | Mulligan Elementary |
| 4 | Howe Elementary |
| 5 | Avondale Elementary |
| | Morton E.V.G.C. |
| | Nobel Elementary |
| | Piccolo Middle School |
| | Ryerson Elementary |
| | L. Ward Elementary |
| | Wright Elementary |
| 6 | Anderson E.V.G.C. |
| | Chopin Elementary |
| | Koscuiszko Elementary |
| | Otis Elementary |
| 7 | M. Clark Middle School |
| | DePriest Elementary |
| | Ericson Elementary |
| | Roetgen E.V.G.C. |
| | Spencer Elementary |
| 8 | Bethune Elementary |
| | Hammond Elementary |
| | Howland Elementary |
| | Lathrop Elementary |
| | Pope Elementary |
| | Spry Elementary |
| 9 | Brown Elementary |
| | Grant Elementary |
| | Irving Elementary |
| | McKinley E.V.G.C. |
| | Medill Intermediate & Upper Grades |
| 10 | Gregory Elementary |
| | C. Hughes Elementary |
| | McCormick Elementary |
| | Webster Elementary |
| 11 | Abbott Elementary |
| | Drake E.V.G.C. |
| | Mayo Elementary |
| 12 | Copernicus Elementary |
| | Fulton Elementary |
| 13 | Dyett Middle |
| | Hope Community Academy |
| | Ross Elementary |
| | Terrell Elementary |

| District | School |
|---|---|
| 14 | Dulles Elementary |
| | Mollison Elementary |
| | Price Elementary |
| | Woodson North Elementary |
| 15 | O'Toole Elementary |
| 16 | Bass Elementary |
| | Goethals E.V.G.C. |
| | Kershaw Elementary |
| | Low Upper Cycle |
| 17 | Bryn Mawr Elementary |
| | Revere Elementary |
| 19 | J.N. Thorp Elementary |
| | J.N. Thorp E.V.G.C. |
| 20 | Aldridge Elementary |
| | Carver Middle School |
| | Kohn Elementary |

(Board Exs. 30 and 112; 1984 Brady Testimony, pp. 98–112).

217. The additional 62 racially identifiable schools chosen to participate in the full ESP program in school year 1983–84 were selected through the same formula used to select the 45 target schools. Using the formula stated in Finding 215, all racially identifiable schools in the system were again listed in rank order in the fall of 1983, with the lowest achieving most racially identifiable school ranked first. After excluding the 45 targeted schools already participating in the ESP programs, the 62 next lowest achieving most racially identifiable schools were selected for implementation of the full ESP program in school year 1983–84. (1984 the Brady Testimony, p. 117).

218. The full ESP program was being implemented at these 62 racially identifiable schools in 1983–1984 only because of the $20 million appropriation to the Board pursuant to the Yates Bill. The Yates Bill provided a one year appropriation of funds. The Board lacked the financial resources to continue full ESP programs at these 62 racially identifiable schools in school year 1984–85. (1984 Brady Testimony, pp. 98–99).

219. The full ESP programs implemented at 107 racially identifiable Chicago public schools are accurately described in peti-

tioner's trial exhibits 28, 31, 32, 110 and 117. These ESP programs were implemented in school year 1983-84 in accordance with the Plan set forth in the Board's trial exhibit 30. (1984 Brady Testimony, pp. 185, 350).

219A. Implementation of the full ESP program at the 107 racially identifiable Chicago public schools in school year 1983-84 would not have involved duplication of other desegregation programs previously placed in those schools which the Board is continuing to implement. Implementation of the full ESP program at these 107 schools and at an additional 100 racially identifiable Chicago public schools in school year 1984-85 would have involved only minor duplication of already existing desegregation programs in those schools. (1984 Brady Testimony, pp. 1244-53).

220. The essential purpose of the Board's ESP program is to improve instructional effectiveness in schools that are racially identifiable in order to improve educational outcomes for black and Hispanic children. Educational outcomes means improving achievement levels, attendance, discipline and the likelihood of a student's successfully moving to the next school level or into society in general. This is accomplished by programmatic interventions addressing six major areas: instructional emphasis, including increased time on task; leadership; use of assessment data; parental support and involvement; general school climate; and staff development and training. Among the elements of the ESP program which are designed to increase a student's time on task are extended day and extended year instruction, and full-day kindergarten instruction. (1984 Brady Testimony, pp. 91-92).

221. One of the major goals of the ESP program, as described in Board's trial exhibits 28, 31, 32, 110 and 117, is to reduce the gap in achievement levels between national grade level norms and the achievement levels of minority children now attending, or who will attend, racially identifiable schools in the system. (1984 Brady Testimony, pp. 91-93).

222. The effective schools concept is based on educational research which suggests that if the proper learning conditions are created, all children, regardless of their race and the racial composition of the school they attend, can learn. The effective schools model is an important structure for ensuring implementation of effective educational remedies at racially identifiable schools. It serves as a primary focus for implementation of the Plan's Educational Components, particularly those in curriculum-related areas. The Board's "Effective Schools Project" is derived from and supported by the leading research in "effective schools" learning. (1984 Brady Testimony, pp. 91-92).

223. The inservice training component at each ESP school is a local, school specific program which provides staff with the specialized skills necessary to implement effectively the Plan's educational remedies. The teaching staff at each school are or will be receiving training intended to eliminate unequal treatment of minority pupils by raising the staff's awareness of its possible racial biases and by modifying any biased attitudes, expectations and behaviors toward the teaching of minority pupils. The teaching staff at each school also are or will be receiving training designed to develop the specialized skills, instructional methods and educational techniques necessary to effectively teach and to increase the academic achievement of minority pupils who must remain in racially identifiable schools. The inservice component at each ESP school is directed toward instructing staff in meeting the particular educational needs of minority pupils and in adapting existing instructional approaches to successfully meet those needs. (1984 Brady Testimony, pp. 286-89).

224. The ESP program described in petitioner's exhibits 28, 30, 31, 110 and 117, as implemented in 107 racially identifiable schools in school year 1983-84, materially aids the successful implementation of the Educational Components of the Board's Desegregation Plan. The ESP program eliminates or alleviates the effects of racial seg-

regation on minority children in that it raises the achievement levels of minority children, ends the unequal treatment of minority children in racially identifiable schools by teachers and administrative staff, and reduces the psychological pressures of attending racially identifiable schools and the resulting loss of self-esteem. (1984 Brady Testimony, pp. 192–95).

225. Implementation of the ESP program in the 45 racially identifiable target schools in school years 1981–82 and 1982–83 has raised the median level achievement scores of minority children as described in petitioner's trial exhibits 36, 37 and 38 (as substituted and modified by Petitioner's Exhibit 91). (1984 Brady Testimony, pp. 124–26).

226. To close the existing gap in grade level norms and achievement levels between students in integrated schools and minority students attending racially identifiable schools, it will be necessary to implement the full ESP program in the 45 original target schools for another 3 to 5 years and in the 62 additional racially identifiable schools for another 4 to 6 years. (1984 Brady Testimony, pp. 356–61; Board Ex. 30).

227. With adequate funding, the Board would have continued to implement the full ESP program in the 107 racially identifiable schools previously identified in these Findings in school year 1984–85. In addition, it would have implemented the full ESP program in the next 100 lowest achieving racially identifiable Chicago public schools (the Level II schools). (1984 Brady Testimony, pp. 311–13; 1985 Brady Dep., at 70–75, 106–11).

228. Petitioner's trial exhibit 28, as modified by Petitioner's exhibit 117 and Dr. Brady's testimony, sets forth the projected cost of implementing a full ESP program in 207 racially identifiable schools for school year 1984–85. (1984 Brady and Glasper Testimony, pp. 153–54, 309–11, 806, respectively). Those cost figures are reasonable under the circumstances shown at trial. (1984 Brady and Glasper Testimony, pp. 153–54 and 806 respectively).

229. Petitioner's trial exhibit 28 as modified by Petitioner's trial exhibit 117 and Dr. Brady's testimony, set forth the projected cost in school year 1984–85 of implementing certain components of the ESP program at racially identifiable schools (the level III schools) not participating in the full ESP program. (1984 Brady and Glasper Testimony, pp. 153–54, 309–11, 806, respectively). Those projected cost figures are reasonable under the circumstances shown at trial. (1984 Glasper Testimony, p. 806).

230. Petitioner's trial exhibit 31 sets forth the amount which the Board expected to spend in school year 1983–84 for implementing certain components of the ESP program at 100 racially identifiable schools not then participating in the full ESP program. (1984 Brady Testimony, pp. 114–17). Those projected cost figures are reasonable under the circumstances shown at trial. (1984 Glasper Testimony, p. 806).

231. To implement the Educational Components of the Plan, the Board must, at a minimum, implement those components of the ESP program used in school year 1983–84 at the 100 racially identifiable schools not currently participating in the full ESP program (the Level II schools), and, to some extent, at all other racially identifiable schools not participating in the full ESP program (the Level III schools). The components to be implemented at these nonparticipant racially identifiable schools are those which require full day kindergarten at each of these schools, the use of extended day and extended year instruction, and the inservice training of staff at these schools. (1984 Brady Testimony, pp. 160–71, 197–200). For the reasons stated in Finding 224, implementation of these components of the ESP program at racially identifiable schools not participating in the full ESP program will materially aid the successful implementation of the Educational Components of the Board's Desegregation Plan. The cost of implementing these components of the ESP program at all racially identifiable schools not participating in the full ESP program would have

been at least $10 million in school year 1984–85. That cost is reasonable under the circumstances. (1984 Brady and Glasper Testimony, pp. 200 and 806, respectively; Board Ex. 117).

233. With adequate funding, the Board would implement a full ESP program at the 100 racially identifiable schools which are the lowest achieving most racially identifiable next in order after the 45 racially identifiable schools listed in Finding 214. Implementation of a full ESP program at each of these 100 racially identifiable schools would materially aid successful implementation of the Educational Components of the Plan for the reasons stated in Finding 224. The cost of implementing a full ESP program at 100 additional racially identifiable schools in school year 1984–85 would have been as shown on Exhibit 117 and would have been reasonable under the circumstances. Full implementation at these schools would reduce the cost of implementating certain ESP components at racially identifiable schools not participating in the full ESP program to approximately $10 million. (1984 Brady Testimony, pp. 153–54, 190–94; Board Ex. 117).

233A. Board trial exhibit 28 represents an initial estimate, prepared in August and September of 1983, of the cost and budget breakdown of the program components (and the program elements thereof) designed to materially aid the implementation of the Desegregation Plan. (1984 Brady Testimony, pp. 153–54).

233B. Board exhibit 117 was prepared by the OEEO staff under the direction and supervision of Dr. Brady, in response to requests made by the United States and the Court during the course of the 1984 hearing. Board Exhibit 117 reflected the cost in school year 1984–85 of implementation of the full ESP program at 207 schools and the partial implementation of the ESP program at all other racially identifiable schools. (1984 Brady Testimony, pp. 1239–40).

233C. Exhibit 117 also reflects:
(1) Corrections of errors and duplications which appear in Exhibit 28;

(2) Consideration of the fact that the detailed line-by-line budget breakdown by cost category for certain of the program elements differs slightly from that initially set forth in Exhibit 28;

(3) Consideration of the fact that certain of the program elements set forth in Exhibit 28 were funded in part in school year 1983–84 by Board incremental desegregation expenditures and the fact that the Board is expected to provide $67.7 million for incremental desegregation expenditures in school year 1984–85, thereby enabling the Board to provide continued funding for certain of the program elements included in Exhibit 28;

(4) Consideration of the fact that certain of the items funded in school year 1983–84 are one-time costs and will not recur in subsequent years.

(1984 Brady Testimony, pp. 1239–44).

233D. With respect to program components funded in school year 1983–84 with moneys appropriated by the Yates Bill, Exhibit 117 contains three columns of numbers: *the first* representing the line-by-line budget breakdown of costs as set forth in Exhibit 28; *the second* representing those portions of program elements actually funded in 1983–84; and *the third* representing the amount required to implement these programs in school year 1984–85. (1984 Brady Testimony, p. 1240).

233E. With respect to program components funded in school year 1983–84 with incremental Board funds, Exhibit 117 contains four columns of numbers: the first representing the line-by-line breakdown of costs as set forth in Exhibit 28; the second representing those portions of program elements actually funded in school year 1983–84; the third representing the amount required to implement those programs in school year 1984–85 after consideration of nonrecurring costs (as reflected by Finding 233C(4)); and the fourth representing the amount which the Board was not able to fund from its own resources in school year 1984–85, despite its good faith efforts (and reflecting the considerations set forth in

Finding 233C(3)). (1984 Brady Testimony, p. 1240).

234. The purpose of the Trainers Institute program is to build within the Chicago public school system the internal capacity to provide inservice training to teachers and staff with respect to implementation of the Student Assignment Plan and the Educational Components, and generally with respect to the education of minority children in racially identifiable schools. This Institute will materially aid successful implementation of the Board's Desegregation Plan. It will eliminate or alleviate the effects of racial segregation on minority children in that it will assist the raising of their achievement levels and help end the unequal treatment of minority children in racially identifiable schools by teachers and administrative staff. (1984 Brady Testimony, pp. 289–93).

235. With adequate funding, the Board would have fully implemented the Trainers Institute in school year 1984–85. Petitioner's trial exhibit 117 sets forth the projected annual cost of implementing the Trainers Institute in 1984–85. That cost is reasonable under the circumstances. (1984 Brady and Glasper Testimony, pp. 292–93 and 806, respectively).

236. The purpose of the Management Information System is to establish and maintain a comprehensive information system to collect, analyze, review and disseminate data related to all desegregation activities under the Educational Components and the Student Assignment Plan. The Management Information System materially aids the successful implementation of the Board's Desegregation Plan by tracing and measuring progress in achieving the goals of the Plan. The Board's trial exhibit 117 sets forth the projected cost of this system. That projected cost is reasonable under the circumstances. (1984 Brady and Glasper Testimony, pp. 203–09 and 806, respectively).

237. The purpose of the Equity Compliance program described in petitioner's trial exhibit 28 is to manage program expenditures, gather OEEO statistical data, carry out desegregation reporting functions, monitor and audit desegregation activities and establish means to measure and assess compliance with the Plan. Certain aspects of this program were implemented in school year 1983–84, as detailed in the Board's exhibits 31 and 117. Each component of the Equity Compliance Program will materially aid successful implementation of the Educational Components of the Plan. The projected cost of implementing this program, as set forth in petitioner's trial exhibit 117, is reasonable under the circumstances. (1984 Brady and Glasper Testimony, pp. 79–81 and 806, respectively).

238. The purpose of the system-wide Staff Development program for racially identifiable schools, described in exhibit 28, is to provide staff with the information and skills necessary to implement effectively the Plan's educational components. Through twelve major conferences, staff from all racially identifiable schools will receive a general overview in many desegregation related areas, including the requirements of the desegregation plan, and methods of ensuring equal educational opportunity in a racially identifiable school. Specific topics encompassed in these conferences will address multi-cultural awareness and teaching approaches, effective discipline techniques, classroom management and instructional strategies to raise minority pupils' academic achievement. The general staff development provided through this program is intended to introduce staff to problems in implementing the desegregation plan, and to increase staff's effectiveness in dealing with the problems addressed. (1984 Brady Testimony, pp. 295–99).

239. The Staff Development program for the racially identifiable schools will materially aid successful implementation of the Board's Desegregation Plan. It will eliminate or alleviate the effects of racial segregation on minority children in that it will assist teachers in raising the achievement levels of the children and it will help in ending the unequal treatment of minority children in racially identifiable schools

by teachers and staff. The consultant component of the staff development program is required to hire specialists to conduct inservice training conferences. These consultants are necessary to implement the Staff Development program. Petitioner's trial exhibit 117 sets forth the projected cost of this training program. That cost is reasonable under the circumstances. (1984 Glasper Testimony, p. 806).

240. The purpose of the system-wide Staff Development program for Desegregated Schools described in petitioner's trial exhibit 28, is to provide staff with general information and an overview of skills necessary to effectively implement the Plan's student assignment and educational components. Staff from desegregated schools will receive training in many areas, including the requirements of the desegregation plan, multicultural awareness and teaching approaches, effective discipline techniques and classroom management in a desegregated setting. This staff development program will materially aid the successful implementation of the Board's Desegregation Plan. It will eliminate or alleviate the past effect of racial segregation on minority children now attending desegregated schools by assisting teachers in raising their acheivement levels. It will also assist in the effective implementation of the Plan by raising staff awareness of and eliminating its unequal treatment of minority pupils in desegregated schools. As set forth in petitioner's trial exhibits 28 and 117, the cost of this program is reasonable under the circumstances. (1984 Brady and Glasper Testimony, pp. 295 and 806, respectively).

241. The purpose of the Within-School Segregation Program is to gather information about the racial composition of classrooms and to monitor the assignment of students to classrooms within the particular schools. This program will materially aid successful implementation of the Board's desegregation plan. It will eliminate or alleviate the racial segregation of students in classrooms through, for example, forms of "tracking" or "ability grouping." It will accordingly ensure that students are actually taught, insofar as is practicable, in a physically desegregated environment. Petitioner's trial exhibit 117 sets forth the cost of this program. That cost is reasonable under the circumstances. (1984 Brady and Glasper Testimony, pp. 214–18 and 806, respectively).

242. The purpose of the Magnet Schools programs described in petitioner's Trial Exhibit 28 is to construct new magnet schools, develop and expand special curriculum offerings at certain racially identifiable schools, and to provide inservice training and staff development at 150 magnet schools and magnet programs. Specialized curriculum offerings or magnet programs will be introduced or expanded at racially identifiable "community academies" as part of the special educational improvements and remedies required by the Plan. Staff training and advisory services are necessary and will materially assist staff in planning and developing the expanded curriculum offerings and in successfully introducing them in racially identifiable schools. The Magnet School programs [40] described in Board exhibit 28 will materially aid successful implementation of the desegregation plan. Board exhibit 117 sets forth the cost of these programs. That cost is reasonable under the circumstances. (1984 Brady, Glasper, Viso Testimony, pp. 219–44, 806, and 642, respectively).

243. The Staff Development Program at the 150 magnet schools and magnet programs, referred to in Finding 242, is intended to meet school specific needs related to the particular school's curriculum, including maintaining the consistency of the magnet program with system-wide standards, training teachers in instructing students in the special magnet program offering, and planning, developing and refining the magnet program to maintain its quality. The staff development program also will train staff in multicultural awareness, teaching approaches and classroom management in a desegregated school. The purpose of

**40.** Except the Board's Residential Magnet High School.

this staff development program is to enhance the likelihood that magnet schools and magnet programs will develop and maintain the quality curriculum and school climate necessary to attract a desegregated student body. (1984 Brady Testimony, p. 302).

244. Each component of the Staff Development Program referred to in Finding 241 and 242 is directly related to the Board's Desegregation Plan and will materially aid its successful implementation by raising minority pupil achievement, eliminating unequal treatment of minority pupils, and achieving and maintaining physical desegregation in school populations. With adequate funding the Board would have implemented these components of its Magnet School program in school year 1984–85. Petitioner's Trial Exhibit 117 sets forth the projected cost of implementing these components. This cost is reasonable under the circumstances. (1984 Glasper Testimony, p. 806).

245. The purpose of the Special Education/Testing program described in petitioner's trial exhibit 28 is to implement and, as required by the Plan, to validate procedures designed to ensure non-discriminatory assessment and placement of students in educable mentally handicapped classes. Consultants and inservice programs are necessary to provide Board staff with the skills to evaluate whether its current assessment procedures are accurate and race neutral. The purpose of the Special Education/Testing program is also to provide transition services and special educational support for students who were previously placed in mentally handicapped classes, based upon potentially biased assessment instruments, and who are now being returned to the regular classroom. Inservice training is required to provide teachers and other staff with awareness of and the skills to deal with these students' special educational needs during the period of their transition to the regular classroom. (1984 Brady Testimony, pp. 246–51).

246. The components of the Special Education/Testing program described in trial exhibit 28 will materially aid the Board's implementation of its Desegregation Plan. It will eliminate or alleviate the effects of racial segregation on minority pupils in that it will assist their return to regular classrooms and thus the raising of their achievement levels, and it will help end the unequal assessment and placement of minority pupils in special education classes. The projected cost of the Special Education/Testing program, as set forth in petitioner's trial exhibit 117, was reasonable under the circumstances. (1984 Brady and Glasper Testimony, pp. 251–52 and 806, respectively).

247. The Vocational and Technical Education Program is described in the Board's trial exhibits 28 and 116. The purpose of this program is to provide vocational educational information to staff and students, to recruit minority students for vocational education classes, to provide vocational educational support services for minority students, and to expand and adapt vocational education program offerings to increase the opportunity for minority students to participate in vocational education programs. Inservice training and consultant services are required to acquaint teachers with vocational education opportunities open to minority pupils, to improve the staff's skills and capabilities to effectively provide vocational education services to minority students, and to assist staff in planning, developing and effectively providing additional vocational program offerings to students. (1984 Brady and Viso Testimony, pp. 258 and 650–59, respectively). These inservice and consulting components are directly related to the Board's Desegregation Plan and will materially assist it in implementing its Vocational and Technical Education Program. (1984 Brady and Viso Testimony, pp. 258 and 650–59, respectively).

248. The components of the Vocational and Technical Education program [41] will materially assist the Board in implementing

41. Except the Handicapped component.

its Desegregation Plan. It will alleviate or eliminate the effects of past segregation in vocational and technical education programs by various activities intended to end the unequal participation of minority students in these programs. The projected cost of each component of the Vocational and Technical Education program, as set forth in petitioner's trial exhibit 117, is reasonable under the circumstances. (1984 Brady, Viso and Glasper Testimony, pp. 262–63, 642, and 806, respectively).

249. Activities in the Board's Department of Curriculum that are related to its desegregation plan needs are described in petitioner's trial exhibits 28 and 114. The purpose of these programs is to ensure that curriculum offerings are consistent with the goals of the educational components and modified and refined to meet those goals. Desegregation related activities in the Department of Curriculum will include, planning, developing and implementing the special curriculum improvements required by the Plan's Educational Components, coordinating these improvements and monitoring their consistency with system-wide educational goals, maintaining the curriculum and course quality of the special educational programs required by the Educational Components. The inservice and advisory components of these programs are necessary to provide Board staff with the information and skills to plan and provide effectively the various curriculum. development, and implementation activities necessary to achieve the overall goals of the educational components. (1984 Brady and Heing Testimony, pp. 265–66 and 622–24, respectively).

250. The components of the Curriculum and Instruction program [42] will materially assist the Board in implementing its Desegregation Plan by raising the achievement levels of minority students and maintaining or enhancing the quality of curriculum designed to raise the achievement of minority students. Petitioner's trial exhibit 117 sets forth the projected cost of implementing these curriculum and instruction activities

in school year 1984–85. That cost would have been reasonable under the circumstances. (1984 Brady and Heing Testimony, pp. 269, 546–66, and 574–85, respectively).

251. The purpose of the Student Discipline program described in Board's trial exhibit 28 is to provide discipline managers in schools who will enforce the Uniform Discipline Code, provide training to staff in the provisions of the Code and behavior modification techniques, develop and operate in-school suspension and behavior improvement programs as an alternative to suspension, and monitor and report on disciplinary infractions. The School Discipline Program will materially assist the Board in implementing its desegregation plan by eliminating or alleviating unequal disciplinary treatment of minority pupils. The projected cost of this proposed program, as set forth in petitioner's trial exhibit 117, is reasonable under the circumstances. (1984 Brady and Glasper Testimony, pp. 271–75 and 806, respectively).

252. The purpose of the Bilingual Education programs as described in petitioner's trial exhibit 28, is to assist in achieving the national origin desegregation required by the Plan. Activities that would be undertaken include establishing special "immersion" educational programs to instruct pupils in their native language until they can make the transition to regular classrooms, developing a special curriculum responsive to the needs of bilingual students, performing research on the educational needs of bilingual and limited English proficient students, and recruiting qualified bilingual teachers. In-service training and consulting activities are necessary to provide staff with the skills to conduct research, plan and develop bilingual and limited English proficient education programs, and to effectively instruct bilingual and limited English proficient students. (1984 Brady and Gonzalez Testimony, pp. 276–77, 906–24, and 936–57, respectively).

---

42. Except "High School Renaissance."

253. Except for Statewide Network (which was withdrawn by the Board), each component of the Bilingual Education program will materially assist the Board in implementing its Desegregation Plan. It will alleviate or eliminate the effects of segregation on bilingual or limited English proficient students in that it will assist the raising of their academic achievement and help end the unequal treatment of and unequal educational opportunities available to these children. The projected cost of each proposed component of the Bilingual Education program, as set forth in petitioner's trial exhibit 117, is reasonable under the circumstances. (Brady, Gonzalez and Glasper Testimony, pp. 278, 928–30, 933–38, 964–69, and 806, respectively).

254. The purpose of the evaluation program described in petitioner's trial exhibit 28 is to permit OEEO to collect, analyze and evaluate information to determine the overall effects of the desegregation plan, as implemented, and to indicate areas where programs must be refined or modified to achieve the Plan's goals. Consultant and inservice programs are necessary to provide staff with the skills to conduct this research and evaluate the effects of the Plan. The Evaluation Program will materially aid the successful implementation of the Board's Desegregation Plan by providing information necessary to continue and correct implementation of the plan and to reach the Plan's goals. Petitioner's Trial Exhibit 117 sets forth the costs of the Evaluation Program. That cost is reasonable under the circumstances. (1984 Brady and Glasper Testimony, pp. 285 and 806, respectively).

255. The inservice training and staff development programs described in various of the Findings 223–253 do not duplicate each other and do not duplicate other inservice training provided by the Board. Each program related training or staff development activity will address specific needs and topics related to the program it will assist in implementing. These program specific needs will not be addressed to the extent required to effectively implement the programs in the Educational Compo-

nents in the general, system-wide desegregation related staff development programs operated by OEEO, nor in any other of the Board's ongoing staff development activities. (1984 Brady Testimony, pp. 302–03).

257. The costs (with reference both to the total amount and the amount which the Board is unable to fund despite its every good faith effort) of the program elements set forth in petitioner's exhibit 117 are reasonable estimates of the amounts needed to implement such programs. (1984 Testimony of Viso, Heing, Gonzalez and Glasper, pp. 642–43, 543–44, 969–72, and 806, respectively).

258. The cost attributable to each program element of Exhibit 28 was included therein after consultation between the Budget Office, the EEO Office and central office administrative/personnel responsible for the preparation thereof. (1984 Brady and Glasper Testimony, pp. 153, 795–96, and 803–04, respectively).

259. The projected cost of the program elements set forth in Board exhibit 28 was reviewed and verified by the Board's Office of Budget and Financial Planning. (1984 Glasper Testimony, pp. 795–96, 803–04).

260. Of the $108 million in program components identified by Board exhibit 28, approximately $6 million were funded by Board resources in school year 1983–84. (1984 Glasper Testimony, p. 861).

261. Another $20 million, appropriated by the Yates Bill, was devoted to Board exhibit 28 program components during the second half of the 1983–84 school year. (1984 Brady Testimony, p. 98).

262. Board exhibit 31 sets forth those elements of the Educational Components of the Plan which were to be funded by the $20 million appropriated by the Yates Bill. (1984 Brady Testimony, p. 114).

265. Neither Board exhibit 28 nor 117 make any provision for increases in employee compensation over and above the levels in effect for the 1982–83 school year. They did not, for example, take account of the 5% salary increase agreed to by the

Board and the Chicago Teachers' Union for the 1983–84 school year or of any such future salary increase which may be negotiated between the Board and its employees. (1984 Brady and Glasper Testimony, pp. 313, 1242, 803, respectively).

265A. Set forth on the following page is a chart which reflects the adjustments to Board Exhibit 28 made by Board Exhibit 117 (as described in Findings 233A–E and which reflects the 5% salary increase [43] implemented in school year 1983–84 referred to in Finding 265. Set forth on the seven pages which follow this chart are individual charts which reflect these adjustments made for each of the program components for which there is more than one program element—i.e., Staff Development, Magnet Schools, Special Education/Testing, Vocational/Technical Education, Curriculum, Bilingual Educational and Evaluation.

265B. As reflected by the attached charts, the level of funding adequate for full implementation of the Plan in school year 1984–85 would have been approximately $171.631 million. Of that amount, Board was able to budget approximately $67.773 million, leaving an increment of approximately $103.858 million that Board, despite its best efforts, was not able to fund. For planning purposes, it can reasonably be assumed that approximately $171.631 million will be necessary for adequate implementation of the Plan in subsequent school years, including school year 1985–86.

| Program | As Shown on Page 1 of Exhibit 28 | As Revised to Reflect the Term of the Costs Set Forth in the Program Sheets Included in Exhibit 28 * | As Revised by Exhibit 117 to Reflect Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect (A) Full Implementation of the Effective Schools Project, at Level I and Level II Schools (B) Partial Implementation at Level III Schools (C) Consideration of Non-Recurring Costs and (D) Assumed Continuation of Incremental Board Funding in 1984–85 | | As Revised to Reflect the Effect of the 5% Salary Increase Implemented in 1983–84 | |
|---|---|---|---|---|---|---|---|
| Effective Schools | | | | | | | |
| Level I | $ 20,841,218 | $ 20,841,218 | $ 21,741,218 | $ ~~24,176,273~~ | $ 22,408,163 | $ ~~25,037,712~~ | $ 23,269,602 |
| Level II | ------ | ------ | ------ | 20,288,726 | | 21,093,741 | |
| Trainers Institute | 563,678 | 563,678 | 567,678 | 144,599 | | 167,211 | |
| Racially Identifiable Schools – Level II | 17,000,000 | 17,000,000 | 17,000,000 | ------ | | ------ | |
| Level III | ------ | ------ | ------ | 10,000,000 | | 10,000,000 | |
| Management Information | 371,230 | 371,230 | 371,230 | 46,230 | | 48,079 | |
| Affirmative Action | 364,475 | 364,475 | 364,475 | 136,666 | | 136,666 | |
| Equity Compliance | 564,808 | 564,808 | 564,808 | 406,562 | | 416,107 | |
| Staff Development | 2,760,495 | 2,760,495 | 1,847,519 | ~~1,474,819~~ | 1,288,390 | ~~1,595,761~~ | 1,359,021 |
| Within School Segregation | 134,425 | 134,425 | 134,425 | 134,425 | | 139,592 | |
| Magnet Schools | 19,678,850 | 19,407,350 | 19,407,350 | ~~19,407,350~~ | 17,967,350 | ~~19,607,895~~ | 8,916,895 |
| Special Education/Testing | 2,017,870 | 2,017,870 | 2,017,870 | 563,608*** | | 606,613 | |
| Vocational/Tech | | | 22,648,444 | | | | |
| Education | 25,991,634 | 24,423,954 | ~~24,468,599~~** | ~~24,018,639~~**** | 22,197,484**** | ~~24,018,639~~ | 21,547,987 |
| Curriculum | 6,280,433 | 6,280,433 | 6,280,433 | 4,604,339 | | ~~4,796,478~~ | 3,883,289 |
| Student Discipline | 6,963,390 | 6,963,390 | 6,963,390 | 6,963,390 | | 7,233,940 | |
| Bilingual Education | 4,514,215 | 4,483,257 | 4,478,257 | ~~4,296,153~~ | 4,136,703 | ~~4,486,823~~ | 4,321,386 |
| Evaluation | 738,747 | 738,747 | 738,747 | 701,226 | | 718,513 | |
| Total | $108,785,468 | $106,915,330 | $106,945,999 | ~~$117,362,505~~ | $111,987,861 | ~~$120,048,270~~ | $103,858,642 |

\* With regard to the Magnet Schools, Vocational/Technical Education and Bilingual Education components, the amount shown on p. 1 of Exhibit 28 does not equal the sum of the costs shown for each of the program elements included therein. This column reflects the projected total costs for these program elements, as reflected by the program budget sheets included in Exhibit 28.

\*\* As revised by Exhibit 116 with respect to the Vocational Assessment program element (Viso Testimony) and Board Post-Trial Brief.

\*\*\* Reflects consideration of $222,655 of incremental Board funds available for other purposes (Special Education—Reassessment Validation) and assumes this amount will be used to fund other elements of the Special Education component.

\*\*\*\* See accompanying chart for Vocational Education program elements.

43. To reflect this increase, an appropriate adjustment was made in the teacher salary and career service salary cost categories set forth in the budget sheets included in Exhibit 117.

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984–85 | | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 | |
|---|---|---|---|---|---|---|
| **Staff Development** | | | | | | |
| Racially Identifiable School | $2,181,470 | $1,268,494 | $~~895,294~~ | $ 709,365 | $ ~~932,012~~ | $ 755,263 |
| Staff Development—100 Schools | 579,025 | 579,025 | 579,025 | | 603,749 | |
| Total | $2,760,495 | · $1,847,519 | ~~$1,474,319~~ | $1,288,390 | ~~$1,535,761~~ | $1,359,021 |

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984–85 | | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 | |
|---|---|---|---|---|---|---|
| **Magnet Schools** | ò | | | | | |
| Residential High School | $ 9,251,000 | $ 9,251,000 | $ 9,251,000 | | $ ~~9,251,000~~ | -0- |
| School for Agricultural Sciences | 3,000,000 | 3,000,000 | 3,000,000 | | 3,006,152 | |
| Program Expansion | 3,001,600 | 3,001,600 | 3,001,600 | | 3,079,480 | |
| Staff Development | 2,017,500 | 2,017,500 | ~~2,017,500~~ | 577,500 | ~~2,028,375~~ | 588,375 |
| Centralized Enrollment | 121,250 | 121,500 | 121,500 | | 126,088 | |
| Bus Aides | 2,016,000 | 2,016,000 | 2,016,000 | | 2,116,800 | |
| Total | $19,407,350 | $19,407,350 | ~~$19,407,350~~ | $17,967,350 | ~~$19,607,895~~ | $8,916,895 |

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984–85 | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 |
|---|---|---|---|---|
| **Special Education/Testing** | | | | |
| Special Ed/Testing/Transition | $1,452,870 | $1,452,870 | $786,263 | $818.963 |
| Assessment Techniques | 565,000 | 565,000 | –222,655 | –212,350 |
| Total | $2,017,870 | $2,017,870 | $563,608 | $606,613 |

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed continuation of Incremental Board Funding in 1984–85 | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 |
|---|---|---|---|---|
| **Vocational/Tech Education** | | | | |
| Community Resource Data Bank | $ 311,750 | $ 311,750 | $ ~~306,017~~ $ 305,543 | $ ~~306,017~~ $ 305,543 |
| Washburne Trade School | 14,125,000 | 14,125,000 | ~~13,865,251~~ 13,843,753 | ~~13,865,251~~ 13,843,753 |
| Maximizing Training Levels | 30,000 | 30,000 | ~~29,448~~ 29,403 | ~~29,448~~ 29,403 |
| Vocational Articulation | 955,660 | 955,660 | ~~938,086~~ 936,632 | ~~938,086~~ 936,632 |
| Handicapped Component | 662,692 | 662,692 | ~~650,505~~ 649,497 | ~~650,505~~ -0- |
| Limited English Proficient Component | 989,020 | 989,020 | ~~970,832~~ 969,327 | ~~970,832~~ 969,327 |
| Student Service Corporation | 771,902 | 771,902 | ~~757,707~~ 756,532 | ~~757,707~~ 756,532 |
| Vocational Assessment | 6,577,930 | ~~6,623,575~~* 4,802,420* | ~~6,500,793~~ 4,706,798 | ~~6,500,793~~ 4,706,798 |
| Total | $24,423,954 | ~~$24,468,599~~ $22,648,444 | ~~$24,018,639~~** 22,197,484** | ~~$24,018,639~~*** $21,547,987*** |

\* As revised by Ex. 116. (Viso Testimony) and Post-Trial Brief.

\*\* All items funded in 1983–84 are considered non-recurring costs. (Brady Testimony) Unfunded recurring costs for 1984–85 are allocated proportionately among program elements.

\*\*\* No revision is made to reflect 5% salary increase as a result of the pro rata allocation of "unfunded recurring" costs among program elements.

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984–85 | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 |
|---|---|---|---|---|
| **Curriculum** | | | | |
| Staff—Program Planning | $ 144,688 | $ 144,688 | $ 387,856* | $ 387,856** |
| Computer System | 15,230 | 15,230 | * | ** |
| Staff—Program Review | 198,244 | 198,244 | 198,244 | 201,944 |
| High School Renaissance Program | 1,213,839 | 1,213,839 | 867,849 | ~~913,189~~ -0- |
| Staff—Implementation | 527,481 | 527,481 | * | ** |
| Summer Curriculum Writing Teams | 196,380 | 196,380 | 196,380 | 206,174 |
| Bureau of Language Arts | 385,831 | 385,831 | 385,831 | 399,162 |
| Intensive Writing Improvement Program | 1,823,820 | 1,823,820 | 1,823,820 | 1,908,195 |
| Staff—Coordination of New Programs | 586,361 | 586,361 | * | ** |
| CMLMP Handbook | 47,822 | 47,822 | 47,822 | 50,135 |
| Paideia Programs | 998,352 | 998,352 | 554,152 | 583,219 |
| Assistants—Bureau of Language Arts | 142,385 | 142,385 | 142,385 | 146,604 |
| Total | $6,280,433 | $6,280,433 | $4,604,339 | ~~$4,796,478~~ $3,883,289 |

\* With respect to funding provided in 1983–84, these four program elements have been aggregated. The amount of $387,856 reflected in this column represents the total "unfunded recurring" costs for all four program elements.

\*\* No revision is made to reflect 5% salary increase for these four program elements.

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984–85 | | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 | |
|---|---|---|---|---|---|---|
| Bilingual Education | | | | | | |
| Immersion Programs | $ 358,041 | $ 358,041 | $ 358,041 | | $ 372,144 | |
| Evaluation Activities | 697,270 | 697,270 | 697,270 | 537,894 | 721,599 | 556,662 |
| Recruitment | 86,972 | 86,972 | 47,668 | | 50,668 | |
| Statewide Network | 5,000 | ------ | ------ | | ------ | |
| Advisory Council | 3,000 | 3,000 | 3,000 | | 3,000 | |
| Public Involvement | 390,781 | 390,781 | 390,781 | | 406,412 | |
| Translation Activities | 154,544 | 154,544 | 103,781 | 103,707 | 109,611 | |
| Parent Institute | 36,500 | 36,500 | 36,500 | | 36,500 | |
| Instructional Materials | 350,000 | 350,000 | 297,453 | | 297,963 | |
| Staff Development | 204,365 | 204,365 | 168,699 | | 192,346 | |
| Gifted Programs | 155,610 | 155,610 | 155,610 | | 159,386 | |
| Haitian Bilingual Center | 60,306 | 60,306 | 56,556 | | 57,756 | |
| Curriculum Development | 1,935,132 | 1,935,132 | 1,935,132 | | 2,031,889 | |
| Training of Teachers | 45,736 | 45,736 | 45,736 | | 47,049 | |
| Total | $4,483,257 | $4,478,257 | $4,296,153 | $4,136,703 | $4,486,323 | $4,321,386 |

| Program | As Reflected in the Budget Sheets Set Forth in Exhibit 28 | As Revised by Exhibit 117 to Reflect the Correction of Errors and Duplications | As Revised by Exhibit 117 to Reflect the Consideration of Non-Recurring Costs and the Assumed Continuation of Incremental Board Funding in 1984–85 | As Revised to Reflect the Effect of 5% Salary Increase Implemented in 1983–84 |
|---|---|---|---|---|
| Evaluation | | | | |
| Native Language Assessment | $ 36,684 | $ 36,684 | $ 36,684 | $ 38,112 |
| Local School Development Program | 678,596 | 678,596 | 641,075 | 656,634 |
| ESEA Title VII Bilingual Desegregation Support | 23,467 | 23,467 | 23,467 | 23,767 |
| Total | $738,747 | $738,747 | $701,226 | $718,513 |

267. Each of the various programmatic elements which, in their entirety, comprise the Student Assignment and Educational Components of the Plan would, if implemented, materially aid in the desegregation of the Chicago public schools. (1984 Testimony of Brady, Viso, Heing and Gonzalez, pp. 193–300, 685–89, 546–66, 574–85, 928–30, 933–38, and 964–69 respectively).

268. These programs would work together with ongoing programs first implemented in earlier school years to achieve the goals of the Plan's Educational Components. (1984 Brady Testimony, pp. 59–61).

269. Prior to school year 1983–84, only certain elements of the Educational Components had been implemented at the vast majority of racially identifiable schools and, as a result, achievement of the Plan's overall objectives has been limited. Even if additional elements had been implemented in school year 1984–85 because of the increased Board budget for desegregation and the appropriation in the Yates Bill, many other elements would not have been implemented. (1984 Brady Testimony, pp. 94, 201).

270. At this point, 1985–86 is the first year in which full implementation of the Plan could occur. Trial Exhibit 28 was prepared under the assumption that each of the various program elements would be initially implemented in 1983–84. However, only $26 million in new financial re-

sources became available, allowing for only limited implementation of these program elements. (1984 Brady Testimony, pp. 285–86).

271. Full implementation, however, was not possible in school year 1984–85. Except for a significantly less comprehensive model of the ESP program at the 107 Level I racially identifiable schools, none of the programs and program components described in Board Exhibits 28 and 117 and in Findings 227–254 were implemented in school year 1984–85, and none will be implemented in school year 1985–86 without funding in addition to the amount budgeted by the Board for desegregation activities. (Brady 1985 Dep. at 108–12; Board Ex. 120, Office of Equal Educational Opportunity, Transition Report (Feb. 1985), hereinafter "Feb. 1985 Transition Report").

272. It is accordingly necessary to treat school year 1985–86 as the first year of full implementation.

272A. For implementation of the programs described in Findings 227–254 in school year 1985–86, the Board's financial needs exceed the amount allocated by the United States from the restrained Title IV funds for grantees who could provide services to the Board. (U.S. no contest).

272B. For implementation of the programs described in Findings 227–254 in school year 1985–86, the Board's financial needs exceeds the amount it has budgeted for desegregation purposes, by an amount which is at least equal to the total federal funds now under restraint. (Board Ex. 121, Board of Education of the City of Chicago, Financial Plan—Fiscal Years 1986–1988, hereinafter "1986–88 Financial Plan").

III. *The Board's Financial Affairs and Condition and the Financial Aspects of School Desegregation*

A. *1983–84 Incremental Desegregation Expenditures*

301. As of September 1983, the Chicago public school system consisted of 70 high schools, 442 elementary schools and 25 branches, 25 child-parent centers, and a small number of schools of other types (such as special education facilities, apprentice and trade schools, adult schools and bilingual-bicultural schools). The enrollment for the 1983–84 academic year was approximately 434,000 students. As of June 1983, the Board employed nearly 40,000 persons, of whom approximately 27,400 were represented by the Chicago Teachers' Union and approximately 9,500 were members of other unions and employee groups that negotiate with the Board. (March, 1984 Stipulation No. 201).

302. The Board's budget for school year 1983–84 provides for appropriations of approximately $1.455 billion for operating expenditures. (March, 1984 Stipulation No. 202).

303A. For school year 1983–84, the Board budgeted and expended $87,718,108 for desegregation activities. Of this amount, $67,366,466 was provided from Board funds and the United States provided $20,000,000 through the Yates Bill, $1,800,000 from Chapter 2 block grant funds and $551,642 from Title VII funds. (U.S. no contest).

303B. The Board budgeted $72,431,133 for incremental desegregation expenses in school year 1984–85. Of this amount, $70,631,133 was derived from local funds and $1,800,000 million was provided by the United States from Chapter 2 block grant funds. (U.S. no contest).

303C. For school year 1985–86, the Board presently expects that it will budget at least approximately $72 million for incremental desegregation expenses. Of this amount, approximately $70.2 million will be derived from local funds and $1.8 million will be provided by the United States from Chapter 2 block grant funds. (Board Exhibit 121, Board of Education of the City of Chicago, Financial Plan—Fiscal Years 1986–1988).

304. Incremental desegregation expenditures refers to those desegregation expenditures which are budgeted and accounted for by the Board by specific three-

digit codes. These three-digit project codes identify appropriations and expenditures by their source or purpose. (March, 1984 Stipulation No. 204).

305. In 1980–81, the year in which the Consent Decree was entered, incremental desegregation expenditures consisted of certain student assignment programs accounted for under Project Code 512 (as described in Finding 306 below). As the Board expanded implementation of the Plan in each of the subsequent school years, additional project codes were established to account for the various programs which constituted the components of such expansion. (March, 1984 Stipulation No. 205).

306. Incremental desegregation expenditures are budgeted and accounted for by reference to the following three-digit project codes:

(a) Project Code 512 appropriations and expenditures refer to components of the Plan which comprise those initial elements of the Options for Knowledge student assignment programs which were initiated prior to the Consent Decree and are sometimes referred to as the continued "Access to Excellence" programs. Generally, these are magnet schools and programs and voluntary transfer programs.

(b) Project Code 163 appropriations and expenditures refer to components of the Plan initially established in school year 1981–82 primarily relating to implementation of the Plan's Educational Components at racially identifiable schools (and in part in 1981–82 to certain student assignment programs established in that year).

(c) Project Code 946 appropriations and expenditures refer to components of the

Plan which relate to implementation of the Educational Components at racially isolated schools also initially established in school year 1981–82 and funded by a supplementary allocation of State Title I funds.[44]

(d) Project Code 536 appropriations and expenditures refer to components of the Plan funded under Title VII of the Elementary and Secondary Education Act of 1965 (ESEA) to implement certain elements of bilingual education aspects of the Plan, beginning in school year 1981–82.

(e) Project Code 576[45] appropriations and expenditures refer to components of the Plan funded under ECIA Chapter 2 and relate to the salaries of central office and support staff engaged in inservice training, recruitment, evaluation and management of the Plan. These federal funds were first received in school year 1981–82 as a grant under the ESEA statute.

(f) Project Code 065 appropriations and expenditures refer to components of the Plan initially established in school year 1982–83 to implement new and expanded elements of the Options for Knowledge student assignment programs and related transportation costs.

(g) Project Code 496[46] appropriations and expenditures refer to components of the Plan funded by the $10 million increase in Board resources for desegregation implementation in school year 1983–84.

(h) Project Code 400[47] appropriations and expenditures refer to components of the Plan funded by the $20 million appropriated by the Yates Bill and relating to expansion of the implementation of Educational Components at racially isolated schools. (March, 1984 Stipulation No. 206).

**44.** A portion of the moneys which are budgeted by the Board for incremental desegregation expenditures are attributable to State Title I school aid. State Title I aid constitutes that portion of Common School Fund State Aid (or general state distributive aid) distributed to Illinois school districts based on the number of economically disadvantaged or "Title I eligible" students enrolled in each district. Addendum A, which was attached to the 1984 Findings (following Finding No. 376), describes the rela-

tionship between State Title I school aid and desegregation expenditures. (1984 Bacchus Testimony, pp. 1193–96).

**45.** Now designated as Project Code 374/447.

**46.** Certain amounts of this $10 million increase were ultimately allocated to other Project Codes during the course of the 1983–84 school year.

**47.** Now designated as Project Code 399.

307. Set forth on the following page are incremental desegregation appropriations and expenditures, identified by project codes, for school years 1980–81 through 1982–83 and incremental desegregation expenditures of $87.7 million, also identified by project codes, the Board has budgeted for school year 1983–84. (March, 1984 Stipulation No. 207; 1984 Glasper Testimony pp. 807–10; Board Ex. 41).[48]

FOUR–YEAR DESEGREGATION ANALYSIS SUMMARY

| | 1980–81 | | 1981–82 | | 1982–83 | | 1983–84 |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Budget | Expenditures | Budget | Expenditures | Budget | Expenditures | Budget |
| **512** | | | | | | | |
| Salaries/Benefits | 2,235,246 | 2,356,958 | 3,764,333 | 3,601,101 | 3,539,343 | 3,752,259 | 4,035,843 |
| Supplies | 13,461 | 11,209 | 19,001 | 11,470 | 12,002 | 8,286 | 16,002 |
| Rentals | 170,595 | 114,300 | 87,492 | 87,492 | 78,039 | 78,030 | 72,000 |
| Repairs | 48,641 | 33,338 | 60,411 | 59,071 | 71,363 | 71,078 | 126,576 |
| Trans. of Students | 7,341,895 | 6,963,492 | 9,177,200 | 9,225,468 | 5,265,320 | 6,551,234 | 5,395,000 |
| Carfare | 163,800 | 304,804 | 506,304 | 503,693 | 1,368,184 | 803,698 | 975,000 |
| Other | 17,387 | 10,698 | 200,130 | 1,313 | 25,887 | 2,651,671 | 1,584 |
| TOTAL: | 9,991,025 | 9,794,799 | 13,814,871 | 13,489,608 | 10,360,138 | 13,916,256 | 10,622,005 |
| **163** | | | | | | | |
| Salaries/Benefits | -0- | 34,810 | 9,205,834 | 6,872,280 | 9,636,899 | 10,310,833 | 10,846,644 |
| Supplies | -0- | -0- | 600,000 | 555,463 | 10,000 | 9,086 | 10,500 |
| Prof. Services | -0- | -0- | 200,000 | 212,945 | 178,000 | 82,694 | 403,000 |
| Printing | -0- | -0- | 25,000 | 26,213 | 44,200 | 31,543 | 54,200 |
| Auto Reimb. | -0- | -0- | 18,200 | 10,681 | 10,578 | 10,570 | 10,146 |
| Trans. of Students | -0- | -0- | 25,000 | 22,399 | -0- | -0- | -0- |
| Miscellaneous | -0- | -0- | 850,328 | 461,605 | -0- | -0- | 644,117 |
| Other | -0- | -0- | 5,097 | 2,318 | 10,340 | 9,903 | 31,393 |
| TOTAL: | -0- | 34,810 | 10,929,459 | 8,163,904 | 9,890,017 | 10,454,629 | 12,000,000 |
| **946–947** | | | | | | | |
| Salaries/Benefits | -0- | -0- | 12,774,889 | 10,614,838 | 9,256,002 | 11,674,698 | 8,984,764 |
| Textbooks | -0- | -0- | 1,943,460 | 1,813,482 | 2,797,806 | 1,949,908 | 1,168,137 |
| Supplies | -0- | -0- | 524,647 | 1,816,377 | -0- | 523,624 | -0- |
| Miscellaneous | -0- | -0- | 2,184,030 | 257,276 | 4,373,701 | -0- | 5,177,156 |
| Equipment | -0- | -0- | -0- | -0- | -0- | 579,139 | -0- |
| Other | -0- | -0- | -0- | -0- | -0- | 42,054 | 78 |
| TOTAL: | -0- | -0- | 17,427,026 | 14,501,973 | 16,427,509 | 14,769,423 | 15,330,135 |
| **536/Title VII** | | | | | | | |
| Salaries/Benefits | -0- | -0- | 488,143 | 477,562 | 280,503 | 206,941 | 487,329 |
| Prof. Svcs. | -0- | -0- | 35,395 | 15,472 | 47,075 | 32,557 | 25,169 |
| Auto Reimb. | -0- | -0- | 5,589 | 2,443 | 7,433 | 5,139 | 3,489 |
| Textbooks | -0- | -0- | 26,080 | 11,400 | 34,687 | 23,982 | 7,976 |
| Printing | -0- | -0- | 72,653 | 31,758 | 96,628 | 66,807 | 262 |
| Supplies | -0- | -0- | 39,121 | 17,100 | 52,030 | 35,973 | 3,050 |
| Other | -0- | -0- | 7,451 | 3,259 | 9,911 | 6,851 | 4,718 |
| TOTAL: | -0- | -0- | 674,432 | 558,994 | 528,267 | 378,250 | 531,993 |
| **576/Chap. II Grant** | | | | | | | |
| Salaries/Benefits | -0- | -0- | 1,298,172 | 1,475,802 | 1,286,714 | 1,124,569 | 1,425,791 |
| Prof. Svcs. | -0- | -0- | 211,090 | 146,417 | 215,788 | 131,020 | 52,603 |
| Equipment | -0- | -0- | 66,930 | 46,425 | 68,420 | 41,543 | 6,000 |
| Travel | -0- | -0- | 36,040 | 24,998 | 36,842 | 22,370 | 135,000 |
| Printing | -0- | -0- | 5,149 | 3,571 | 5,263 | 3,196 | 17,000 |
| Textbooks | -0- | -0- | 82,376 | 57,138 | 84,210 | 51,130 | 270 |
| Other | -0- | -0- | 113,268 | 78,565 | 115,788 | 70,304 | 83,148 |
| TOTAL: | -0- | -0- | 1,813,025 | 1,832,916 | 1,813,025 | 1,444,132 | 1,719,812 |

**48.** Board Ex. 122, Interrogatory Exhibit No. 19 of the Board Answers to the United States First Set of 1985 Interrogatories, filed April 8, 1985, provides a more current version of incremental desegregation appropriations and expenditures for 1980–1981 through 1983–84 and appropriations for 1984–85.

FOUR–YEAR DESEGREGATION ANALYSIS SUMMARY—Continued

| | 1980–81 Budget | 1980–81 Expenditures | 1981–82 Budget | 1981–82 Expenditures | 1982–83 Budget | 1982–83 Expenditures | 1983–84 Budget |
|---|---|---|---|---|---|---|---|
| **065–067** | | | | | | | |
| Salaries/Benefits | –0– | –0– | –0– | –0– | 10,588,555 | 5,063,462 | 6,997,005 |
| Textbooks | –0– | –0– | –0– | –0– | 210,400 | 350,037 | 1,492,445 |
| Trans. of Students | –0– | –0– | –0– | –0– | 5,805,000 | 5,880,000 | |
| Supplies | –0– | –0– | –0– | –0– | 350,400 | 372,293 | 95,000 |
| Equipment | –0– | –0– | –0– | –0– | 869,845 | 1,358,831 | 97,180 |
| Other | –0– | –0– | –0– | –0– | 61,800 | 43,230 | 7,696 |
| TOTAL: | –0– | –0– | –0– | –0– | 17,886,000 | 12,292,560 | 17,569,326 |
| **496/Deseg. Expan.-Board Funds** | | | | | | | |
| Salaries | –0– | –0– | –0– | –0– | –0– | –0– | 2,000,000 |
| Trans. of Students | –0– | –0– | –0– | –0– | –0– | –0– | 2,000,000 |
| Expan. of Program Elements of Educational Components | –0– | –0– | –0– | –0– | –0– | –0– | 6,000,000 |
| TOTAL: | –0– | –0– | –0– | –0– | –0– | –0– | 10,000,000 |
| **400/Deseg. Expan.-Yates Bill** | | | | | | | |
| Salaries | –0– | –0– | –0– | –0– | –0– | –0– | 14,060,346 |
| Textbooks | –0– | –0– | –0– | –0– | –0– | –0– | 1,444,060 |
| Supplies | –0– | –0– | –0– | –0– | –0– | –0– | 1,220,521 |
| Prof. Svcs. | –0– | –0– | –0– | –0– | –0– | –0– | 733,928 |
| Repairs | –0– | –0– | –0– | –0– | –0– | –0– | 1,374,797 |
| Trans. of Students | –0– | –0– | –0– | –0– | –0– | –0– | 365,220 |
| Equipment | –0– | –0– | –0– | –0– | –0– | –0– | 725,095 |
| Other | –0– | –0– | –0– | –0– | –0– | –0– | 76,033 |
| TOTAL: | –0– | –0– | –0– | –0– | –0– | –0– | 20,000,000 |
| GRAND TOTALS: | 9,991,025 | 9,829,609 | 44,658,813 | 38,547,395 | 56,904,956 | 53,255,250 | 87,773,271 |

308. The Board budgeted and spent approximately $57 million for "incremental desegregation expenditures" in school year 1982–83. Of this amount, approximately $2.3 million was derived from federal resources—approximately $.5 million in funds under Title VII of ESEA to implement certain aspects of the Plan's bilingual education components and approximately $1.8 million in funds received by the Board under Chapter 2 of ECIA. (This $1.8 million was equal to the amount of ESEA funds which the Board had received prior to the repeal of ESEA and the enactment of ECIA and thus comprised that portion of the ECIA Chapter 2 block grant which the Board determined to allocate to implementation of the Plan.) The remaining amount of approximately $54.5 million was derived from Board resources.

(1984 Glasper Testimony, pp. 806–09 and Board Ex. 41).[49]

311. With respect to incremental desegregation expenditures, Board resources budgeted for desegregation implementation increased by $10 million (or approximately 18%) from the level budgeted for the 1982–83 school year. (March, 1984 Stipulation No. 211; 1984 Glasper and Bacchus Testimony, pp. 822–23 and 809, respectively). Desegregation implementation was the most significant area of programatic expansion undertaken by the Board for school year 1983–84. (March, 1984 Stipulation No. 211; 1984 Bacchus Testimony, pp. 1178–84).

312. The increase in federal resources received by the Board in school year 1983–84 for desegregation implementation was attributable solely to the $20 million appropriated by the Yates Bill. (March, 1984 Stipulation No. 212).

49. See footnote to Finding 307.

B. *1983–84 School Budget—Board Resources And Expenditures*

318. Evidence as to the Board's present and projected financial condition was presented through the testimony of the Board's chief financial and business officers, J. Maxey Bacchus, the Board's Business Manager, and Rufus Glasper, its Director of Budgeting and Financial Planning, as well as through various Board budget documents. (1984 Bacchus and Glasper Testimony, pp. 1178–92, 838–45, respectively).

319. Board trial exhibit 43 is the Board's annual school budget for 1983–84 which contains summary tables of Board revenue and expenditures for the 1983–84 school year budget. (March, 1984 Stipulation No. 216).[50]

320. The four primary sources of operating revenue for the Board are local property taxes (34.6%), state school aid (45.6%), federal educational assistance (13.8%), personal property replacement taxes (3.8%) and miscellaneous (2.2%). (March, 1984 Stipulation No. 217).

321. The rates at which the Board can levy taxes for its four general operating funds (education, building, textbook and playground) are prescribed by the Illinois School Code (Ill.Rev.Stat., 1983, ch. 122, §§ 34–1 *et seq.*) and determined by the Illinois General Assembly and not the Board. The Board is presently levying taxes for these funds at the maximum rates authorized by the General Assembly. (March, 1984 Stipulation No. 218).

322. The amount of state school aid which the Board receives is determined by various formulae which are prescribed by the School Code and are determined by the Illinois General Assembly and not the Board. (March, 1984 Stipulation No. 219).

323. The amount of federal educational assistance which the Board receives is determined by (a) the amounts which are appropriated by Congress for various educational programs, and (b) the manner in which the Department of Education and, in certain instances, the Illinois State Board of Education, determine to allocate these resources. The Board does not have control over these determinations, except in making applications and requests and seeking to meet applicable eligibility and competition requirements. (March, 1984 Stipulation No. 220).

324. Personal property replacement tax revenues are generated through an income tax on corporations, an income tax on partnerships and a tax on the invested capital on certain public utilities. These tax revenues are collected by the State of Illinois and distributed to local taxing districts, including the Board. (March, 1984 Stipulation No. 221).

325. The amount of personal property replacement tax revenues collected is a function of the rates in effect for such taxes. These rates are prescribed by the Illinois General Assembly. The amount of personal property replacement tax revenues which are distributed to the Board is determined pursuant to a formula which is prescribed by the General Assembly. The Board does not have control over these decisions. (March, 1984 Stipulation No. 222).

326. The amount and nature of the Board's revenues are determined by other governmental bodies and agencies particularly the State of Illinois and the United States. (March, 1984, Stipulations 216–222). The Board "is not the master of its own fate." 554 F.Supp. 912, 912. To the extent that the Board has limited discretion over the amount of its revenues, such as the discretion to levy taxes up to a maximum amount permitted by state statute, the Board has exercised such discretion to maximize its revenues. (March, 1984 Stipulation No. 216–222).

328. Of the total of $1.45 billion in operating expenditures budgeted for school year 1983–84, approximately $1.162 billion (or approximately 75%) is budgeted for em-

---

**50.** Board Ex. 123, Interrogatory Exhibit No. 4 of the Board's Answers to the United States' First Set of 1985 Interrogatories provides summary tables for the 1984–85 school year.

ployee compensation, including pension and fringe benefits. All elements of employee compensation, including pension and fringe benefits, are subject to negotiation between the Board and the various employee groups with which it engages in collective bargaining, including the Chicago Teacher's Union. Employee compensation levels cannot be determined unilaterally by the Board. (March, 1984 Stipulation No. 223).[51]

329. Of the total of $1.45 billion in operating expenditures budgeted for school year 1983–84, approximately $91 million is budgeted for food and utilities, approximately $33 million for repair and rehabilitation of school buildings and approximately $23 million for payment of tuition for handicapped children who cannot be served in the public schools. The tuition rate for such children is set by the State Board of Education, not the Board. In the aggregate, the various expenditure components described in Findings 329–330 comprise approximately $1.309 billion (or 90%) of the Board's budgeted operating expenditures for school year 1983–84. (March, 1984 Stipulation No. 224).[52]

### C. *1979–1980 Financial Crisis*

330. The Board suffered an acute financial crisis in November of 1979. The causes of this financial crisis were the subject of various studies and commentaries, in particular, of a report of the Illinois General Assembly Joint House and Senate Chicago Board of Education Investigation Committee. The most immediate cause of the crisis, however, was the Board's inability to engage in short-term borrowing. As a result, it suffered a severe cash shortfall. It was forced to decide which of its obligations would be paid in timely fashion and which would of necessity be delayed in payment. By the latter part of December 1979, the Board was virtually without any available cash. Governor Thompson convened a meeting in Springfield in early January 1980 to address the Board's financial crisis. The participants at this meeting

agreed to a multi-faceted plan which included: (a) adoption of the School Finance Authority Act (the "Act"), leading to the creation of the Chicago School Finance Authority (the "Authority"); (b) a three-phased financing plan to provide funds for the Board (which plan was fully implemented during 1980); and (c) imposition of certain financial, legal and structural changes upon the operation of the Board, including (i) the reduction in the Board's educational fund tax rate from 2.11% to 1.61% of equalized assessed valuation, (ii) the appointment of a chief financial officer who has responsibility for preparing and supervising the budget and financial plan of the Board and who reports directly to the Board and (iii) the expiration on April 30, 1980 of the terms of office of all members of the Board who held office on January 16, 1980. (March, 1984 Stipulation No. 225).

### D. *Relationship To School Finance Authority*

335. The Chicago School Finance Authority (the "Authority") is a five-member body whose members are appointed by the Mayor and Governor and are not subject to approval by the General Assembly. The Authority was created to serve two basic functions: (a) to exercise financial oversight and control over the Board; and (b) to issue bonds and notes to provide financing for the Board. The Authority is to remain in existence until one year after the date that all bonds and notes it has issued are paid in full. It is currently anticipated that the Authority's obligation will not be fully paid until 2009 and that it will therefore remain in existence until 2010. However, as discussed below, it is likely that many of its powers will be suspended before that time.

*Financial Control and Oversight Powers*

The most significant powers and responsibilities granted to the Authority (and the

---

**51.** See footnote to Finding 319.

**52.** See footnote to Finding 319.

corresponding duties imposed upon the Board) are in the following areas:

(A) *Budgets:* The Authority must approve or reject the Board's annual budget for each fiscal year. Each budget must contain such information and detail as the Authority may prescribe and must be based upon the revenue estimates the Authority approves or prepares. The Board must submit its budget to the Authority at least 45 days prior to the beginning of the fiscal year to which that budget relates. The Authority is required to approve or reject the Board's budget within thirty days of its receipt. The Act sets forth certain standards by which the Authority is to review the budget. It states that the Authority shall approve any budget it believes to be complete, reasonably capable of being achieved and consistent with the Financial Plan then in effect. The Authority does not have line-item veto powers over the budget—it must either accept or reject the budget in its entirety.

Following the adoption of a budget for a fiscal year, the Board must notify the Authority of any material change in its revenue or expenditure estimates for that year. Based on such changes, the Board may submit, or the Authority may require the Board to submit, a supplemental budget, or to take other actions.

(B) *Balanced Budget:* The Board is required to have a balanced budget in accordance with the accounting system and procedures the Authority prescribes. The Authority has promulgated regulations which govern the Board's preparation of its annual budget and which provide a framework for the determination of what constitutes a "balanced budget."

(C) *Financial Plan:* The Authority has the power to approve or reject the Board's Financial Plans. Each Financial Plan of the Board must cover a period of at least three fiscal years. Each Financial Plan must contain a description of revenues and expenditures, provision for debt service, cash resources and uses, and capital improvements for each fiscal year covered.

The Authority has promulgated regulations setting forth the type of information and detail which must be contained in each Financial Plan of the Board.

In connection with approving each Financial Plan, the Authority must approve, reject or amend the Board's revenue estimates. It may also review the Board's operations, and obtain budgetary data and financial statements. In general, the Authority has a right of access to all information in the Board's possession that it deems relevant. The Authority also may issue recommendations or directives to the Board to assure compliance with Financial Plans and may require the Board to submit modified Financial Plans based upon revised revenue or expenditure estimates or for any other good reason. In the absence of a budget and Financial Plan which the Authority has approved, the Act prohibits the Board from making any expenditures other than for payment of its debt service obligations.

The regulations of the Authority, as amended, require that the Board submit each Financial Plan to the Authority on or before the May 1 prior to the first fiscal year to which the plan relates. Thus the Financial Plan for fiscal years 1984–85 through 1986–87 was due on May 1, 1984.[53]

(D) *Contracts:* The Authority has the power to adopt and amend regulations identifying categories and types of contracts and other obligations of the Board that shall be subject to the Authority's approval and the procedures for submitting contracts for approval. The Authority shall approve those contracts if, in its judgment, the information required to be submitted is complete and the contract is consistent with the budget and financial plan of the Board then in effect. The Authority has adopted regulations setting forth the types of contracts for which its approval will be required. They include collective bargaining agreements, contracts involving an amount in excess of $10 million, contracts in excess of $1 million involving the

---

**53.** The Financial Plan for fiscal years 1985–86 through 1987–88 was approved on May 1, 1985.

disposition of real property and contracts creating an obligation to repay borrowed money.

(E) *Chief Financial Officer:* The Authority has the power to approve the appointment of and to remove the Chief Financial Officer of the Board.

(F) *Accounting and Auditing:* The Authority may direct the Board to reorganize its financial accounts, management and budgetary systems in whatever manner the Authority deems appropriate to achieve greater financial responsibility and efficiency. The Authority also has the power annually to approve the Board's appointment of certified public accountants to audit the Board's financial statements.

(G) *Cash Management:* The Authority is authorized to require the Board to establish and maintain separate cash accounts and separate bank accounts in accordance with such rules, standards and procedures as the Authority may prescribe. The Authority also may assume exclusive administration of the Board's cash accounts and bank accounts and to withdraw funds from such accounts for the Board's lawful expenditures.

(H) *Duration of Powers:* The Authority will retain the power to approve or reject the Board's budget and the power to examine its business records and audit its accounts for as long as the Authority remains in existence. However, other powers of the Authority set forth above (including without limitation the power to review and approve Financial Plans and contracts and to require the Board to appoint a Chief Financial Officer) will be suspended upon certification to the Mayor and Governor that the Board has completed three [54] successive fiscal years with a budget balanced in accordance with standards prescribed by the Authority. (It is generally thought that the Board's fiscal year which

ended in August, 1982, was the first fiscal year to qualify under this statutory definition and that the Board has now achieved two successive years of a "balanced budget.") The Act also provides that the suspended powers will be restored upon certification by the Authority that the Board has failed to adopt a balanced budget or failed to achieve a balanced budget for two successive fiscal years. (March, 1984 Stipulation No. 226; Exhibit 115).

336. The Authority has approved the Board's budget for school year 1983-84 as complete, reasonably capable of being achieved and balanced in accordance with accounting systems and procedures prescribed by the Authority. (March, 1984 Stipulation No. 227).[55]

E. *Projected Deficits For Future Years*

337. The Board has adopted and, in December, 1983, the Authority approved the Board's Financial Plan for fiscal years 1984-86. This Financial Plan is Board Exhibit 51. (March, 1984 Stipulation No. 228).[56]

338. The Board's 1984-86 Financial Plan projects the following deficits: for fiscal year 1984-85—$146.7 million; for fiscal year 1985-86—$71.9 million. (March, 1984 Stipulation No. 229).[57]

345. The Board does not have sufficient revenues from present sources to cure the projected deficits for school years 1984-85 and 1985-86. In fact, it may be virtually impossible for the Board to avoid annual financial crises or attain long term financial stability in the near future. (1984 Bacchus Testimony, pp. 1189-92).

F. *Board Efforts To Find Resources*

347. In June of 1983, the Board projected a budget deficit for fiscal year 1983-84

---

**54.** The School Finance Authority Act was recently amended to change this three year requirement to a six year requirement.

**55.** The Authority has similarly approved the Board's budget for 1984-85.

**56.** *See* footnote to Finding 335C.

**57.** The 1986-88 Financial Plan projects the following deficits: fiscal year 1985-86—$75.0 million; fiscal year 1986-87—$63.8; fiscal year—$61.6 million.

of approximately $200 million. This projected deficit was eliminated, in part, as a result of the receipt by the Board of additional revenues. (March, 1984 Stipulation No. 236).

348. The two most significant revenue increases which contributed to the elimination of the Board's projected deficit for school year 1983–84 were (a) an increase of approximately $100 million in educational fund taxes, and (b) an "increase" of approximately $65 million in State distributive fund aid. Also contributing to the elimination of this projected deficit were small increases in miscellaneous revenues and various expenditure reductions effectuated by the Board. (In fact, almost all of this so-called "increase" represented no more than a restoration of State aid to the level in effect for the prior-school year.) (March, 1984 Stipulation No. 237; Board Ex. 115).

349. The increases in educational fund taxes and state distributive fund aid resulted from actions taken by Illinois General Assembly to (a) increase the maximum tax rate for the Board's educational fund, and (b) increase the State income tax, respectively. (March, 1984 Stipulation No. 238).

350. The Board lobbied vigorously in support of both of the legislative measures described in Finding 348. The Board's lobbying activities included meetings among the General Superintendent, Board members, and members of the General Assembly, and the Governor and his staff. The Board also organized rallies and public displays of support for these legislative measures, and drafted appropriate amendments to the School Code which enabled the Board to take immediate advantage of the increase in educational fund tax rates. (1984 Bacchus Testimony, pp. 1181, 1227–29, 1235–36).

351. The Board's commitment to increase expenditures for incremental desegregation programs by $10 million is an assumption upon which the projected deficit of $200 million for fiscal year 1983–84

was based. Therefore, the Board's efforts to increase its revenues for fiscal year 1983–84 were taken, in part, to fulfill this commitment to increase its incremental desegregation expenditures. (1984 Bacchus Testimony, pp. 1178–81).

351A. Since the entry of the Consent Decree, the Board has repeatedly sought to obtain funding for desegregation from the State of Illinois. As a part of these efforts, the Board has drafted and proposed legislation which would provide desegregation funding for Chicago. To date, the Board's efforts in this regard have been unsuccessful. (Inference from 1984 Bacchus Testimony, pp. 1135–36).

352. The Board's budget for school year 1983–84, as approved by the school Finance Authority, was balanced only after approximately $23.6 million in expenditure reductions from the Board's original proposal (including at least approximately $12.2 million in reductions from the expenditure level for the 1982–83 school year). Proposed desegregation expenditures were not reduced. (1984 Bacchus and Glasper Testimony, pp. 1181–82 and 1180–82, 834–44, respectively).

353. In the summer and fall of 1983, the Board encountered a prolonged dispute with the collective bargaining representatives of its employees, including the Chicago Teachers' Union. This included a three-week strike of Board employees. The principal demand of the employee groups was increased compensation. The employee groups specifically and consistently demanded that the Board delete its proposed $10 million increase in desegregation expenditures, and devote those funds to increased employee compensation. The Board successfully resisted that demand and preserved this proposed increase in desegregation expenditures for its 1983–84 school year budget, thereby complying with the Board's previously made commitment and determination as to its level of desegregation expenditures in 1983–84.[58] (1984 Bacchus Testimony, pp. 1182–84).

---

**58.** See Board Ex. 122, Interrogatory Exhibit No. 19 with respect to the Board's commitment for

### G. Federal And State Funds Received By The Board

354. The Board submitted applications for an ESAA grant in fiscal 1981 and for Title IV grants in fiscal years 1980 and 1981 as part of those programs' regular grant review process. The 1981 ESAA application was for approximately $23.8 million, and the amount of the grant was $1.8 million. The Board's awards of $422,800 in fiscal 1980 and $298,639 in fiscal year 1981 were the largest awards to local educational agencies for race desegregation assistance under Title IV in those years. (March, 1984 Stipulation No. 335).

355. In fiscal year 1983, the Board submitted two applications for $9 million and $13 million for funds from the Secretary's Discretionary Fund. The Department of Education ranked the Board's applications 13th and 28th respectively, out of 34 applications received in the priority area for which they were filed. Only 10 programs were funded. (March, 1984 Stipulation No. 337).

### H. Board's Good Faith Efforts

368. As of June 30, 1983, the Board had already expended approximately $120 million in its efforts to implement fully the various elements and components of the Plan, and had appropriated approximately $67 million for this purpose in school year 1983–84. These actions were taken at a time when the Board was suffering severe financial constraints and projecting a budget deficit for the 1983–84 school year of approximately $200 million. Moreover, implementation of the Plan had been the most significant area of program expansion in recent school years. In light of these facts, the Court found that from September 24, 1980 to June 30, 1983, the Board had made every good faith effort to find and provide every available form of financial resources adequate to pay the costs of full implementation of the Plan. (June 30 Findings Nos. 3–7; 567 F.Supp. at 274).

369. During the same time period (as of June 30—when the Board had expended $120 million) the United States provided only about $2.5 million in direct desegregation assistance (almost all in fiscal 1981), despite the fact that it had substantial additional funds available which it could have provided to the Board had it made every good faith effort to do so. (1984 Glasper Testimony, pp. 811–12, 861).

370. The Board's good faith compliance with the Consent Decree in its allocation of resources among competing needs has been determined as a factual matter in June 30 Finding No. 3. This decision was not appealed, and it is the law of the case. Comparable decisions made by the Board in its allocation of available resources since June 30, 1983 or in the future also constitute every good faith effort. (Inference from Board Exs. 28, 117 and Board Ex. 120, Feb. 1985 Transition Report; 1984 Brady, Glasper and Bacchus Testimony, pp. 93–300, 799–847, 1178–96, respectively).

371. In light of the fact the Educational Components of the Plan were intended to provide a supplemental remedy for minority students attending racially isolated schools, the Board has sought, from both the United States and the State of Illinois, new resources for the Plan which are supplemental to those already being provided. (As an example, the Board has succeeded in obtaining a restoration of previously unavailable taxing authority from the State of Illinois.) To the extent the Board is unable to obtain new resources, however, the Board faces the choice between inability to implement the Plan, or allocating funds to implement the Plan by shifting existing resources or revenue increments from other educational obligations and priorities. In making these choices, the Board has made very good faith effort to provide funds, in compliance with the Consent Decree. (Inference from 1984 Glasper Testimony, pp. 841–44).

372. The good faith obligation of Section 15.1 of the Consent Decree does not require the Board to reallocate unlimited incremental desegregation expenditures for 1984–85.

amounts of its general revenues away from basic educational programs to the Desegregation Plan. The Board is in compliance with the Consent Decree without doing so. (Inference from Bacchus Testimony).

373. The good faith obligation of the Consent Decree does not require the Board to reallocate more State Title I funds to pay desegregation expenses; the Board is in compliance with the Consent Decree without doing so. (Inference from Bacchus Testimony).

374. The Board's decision to budget approximately $1.8 million of its 1983–84 (and 1984–85) ECIA Chapter 2 block grant to incremental desegregation expenditures constituted "good faith efforts" under Section 15.1 of the Consent Decree. (1984 Bacchus Testimony, pp. 1192–93).

375. The Board's decision to budget and spend approximately $67.7 million of its 1983–84 operating revenues (excluding the moneys appropriated by the Yates Bill) for incremental desegregation expenditures constituted "every good effort" under Section 15.1 of the Consent Decree. (1984 Glasper Testimony, pp. 806–09, 844; Board Ex. 122, 1985 Int.Ex. No. 19).

377. The amount of local funds budgeted and expended in school year 1984–85 for desegregation activities (which was an amount greater than the budgeted and expended for 1983–84) satisfies the Board's obligation under Section 15.1 of the Consent Decree. Absent significant change in the Board's financial circumstances, the budgeting and expenditure by the Board of equivalent or corresponding amounts for such activities in school year 1985–86 will also satisfy its obligations under Section 15.1 of the Consent Decree. (Board Ex. 122, 1985 Board Interrogatory Exhibit No. 19; Board Ex. 121, 1986–88 Financial Plan).

## IV. *Other Restrained Excess Funds*

### A. *Findings of Fact*

401. "Excess" funds are funds which were unused by the Department and its grantees and which, absent the Court's restraint, would have lapsed into the United States Treasury. There are no intended or competing grantees for these funds. These excess funds have all been contingently obligated only to the Board. They are otherwise unencumbered. (U.S. District Court Memorandum Orders of Sept. 27, 1983 and Sept. 28, 1984 (restraining funds)). The United States refers to these funds as "lapsing" funds. We will use the Board's term in referring to these funds.

401A. The restrained amounts in the following accounts are excess funds which the Board concedes are unavailable to its Desegregation Plan under present statutory criteria:

a. Office of the Inspector General
b. Impact Aid
c. Libraries
d. Indian Education
e. Student Aid
f. Higher Education

401B. The restrained amounts in the following accounts are excess funds to which the Board claims entitlement under relevant statutory criteria:

a. Bilingual Education account
b. Chapter I account
c. Education Research and Development account
d. Education for the Handicapped and Handicapped Research account.
e. Vocational Education account
f. Office for Civil Rights account
g. Office Management account

(Board Ex. 124, Ross letter of Jan. 10, 1985 w/attachments; U.S. Ex. 30).

401C. The amounts restrained in the accounts identified in Finding 401A total $22,348,000 (U.S. Ex. 30). Those listed in Finding 401B total $19,411,000 (*Id.*). The latter are broken down by account in the following Findings.

402. There are $259,000 in fiscal year 1983 and $443,000 in fiscal year 1984 funds, or a total $702,000 restrained in the Compensatory Education for the Disadvantaged account ("ECIA Chapter 1"). (U.S. Ex. 30).

403. There are $998,000 in fiscal year 1983 and $866,000 in fiscal year 1984 funds, or a total of $1,864,000 restrained in the Education for the Handicapped account. (U.S. Ex. 30).

404. There are $1,631,000 in fiscal year 1983 and $1,470,000 in fiscal year 1984 funds, or a total of $3,101,000 in excess funds restrained in the Rehabilitation Services and Handicapped Research account. (U.S. Ex. 30).

405. There are $3,995,000 in fiscal year 1983 and $2,129,000 in fiscal year 1984 funds, or a total of $6,124,000, restrained in the Bilingual Education account. (U.S. Ex. 30).

406. There are $545,000 in fiscal year 1983 and $507,000 in fiscal year 1984 funds, or a total of $1,052,000, restrained in the Education Research and Statistics account. (U.S. Ex. 30).

407. There are $23,000 in fiscal year 1983 and $2,862,000 in fiscal year 1984 funds, or a total of $2,885,000, restrained in the Departmental Management Account. (U.S. Ex. 30).

408. There is $931,000 in fiscal year 1983 and $2,696,000 in fiscal year 1984 funds, or a total of $3,627,000, restrained in the Office for Civil Rights account. (U.S. Ex. 30).

409. The Secretary will not provide the Board a priority in allocating, or determining whether to allocate, funds appropriated to programs where the program's authorizing statute does not explicitly mandate desegregation assistance as a permissible use of funds. (U.S. Report, Feb. 28, 1985, at 14–15, 20–26; U.S.Supp.Ans. to Board 1985 1st Set Int. at No. 7).

416. The Secretary has not provided to the Board any of the restrained fiscal year 1983 or fiscal year 1984 excess funds. In its appendix to its merits brief, it did finally agree to provide a small part of excess Bilingual Education funds. The Secretary did not, in recognition of the Consent Decree, search among these excess funds to determine if they were available to assist the Board in implementing any of the activities, projects or programs comprising its desegregation plan. He did not provide the Board any priority for nor even consider allocating them to the Board for purposes of desegregation assistance. (Fagan Dep. at 71; U.S. Reply Brief Motion to Vacate at 35–36).

417. It is the Secretary's position that, except for the Bilingual funds mentioned above, the United States has no obligation to provide any excess funds even though they might be used to assist the Board in implementing certain projects or activities within its desegregation plan. (U.S. Reply Brief Motion to Vacate at 2–3)

## B. Conclusions of Law

4.1 The excess funds present different issues than do the funds discussed in later chapters. In general, these are the funds that remain at the end of the fiscal year, after the Secretary has spent the money as he sees fit and satisfied the needs of competing grantees. Thus, these funds do not present issues concerning Executive policy (like the Pipeline issue) or how to equitably balance the Board's needs against those of competing grantees (the "share issue"). Yet even though many of these funds were not needed for any of the Secretary's priorities, and even though the Secretary cares so little about them, he is willing to let his funds simply slip away into the Treasury, he argues vociferously that the Board has no right to all but a tiny fraction of these funds. We cannot square this conduct with any reasonable interpretation of the words "every good faith effort to find and provide every available form of financial resources."

4.2 The so-called excess funds fall into two broad categories, which the government has labelled Categories A and B, respectively. *See* Findings 401A, 401B. Most of the present dispute focusses on Category B funds, which we will now concentrate on.

4.3 Category B funds can in turn be divided into two sub-categories. First, there are funds in accounts which name,

either in statute or committee report, "desegregation" as a statutory purpose. Second, several of the "excess fund" accounts do not explicitly contemplate "desegregation" as a statutory purpose, but authorize funding for educational projects of the types contained in the Board's Plan. Under our resolution of the scope issue in our Preliminary Conclusions, *see* above at 14–27, both sub-categories must be considered "available" to the Board within the meaning of ¶ 15.1. Much of the United States' analysis of the excess funds hinges on its restrictive position on the scope issue, and, thus, the Court rejects its analysis to that extent.

4.4 The Category B appropriation accounts generally, like most accounts, contain several "line items" (U.S. term) or "subaccounts." (Board term). These terms appear synonymous. We will use the term "line item" below. These line items usually correspond to the various programs authorized by Congress in appropriation legislation. Generally, when Congress appropriates money for a certain account, it does not specify in the statute how much should be spent for each separate "program" or "line item" within that account. Instead, Congress usually "earmarks" an amount to be spent for a certain program via Committee reports, including Conference committee reports. *See* Findings 526–531; Conclusions 5.8, 5.13. (Examples of "earmarking" of Discretionary Fund money). Thus, when we use the term "line item" below, we mean any subdivision of funds that can be traced to congressional committee action.

4.5 The "line items" earmarked in Committee Reports do not carry statutory authority. The United States admits that committee reports do not legally bind the Executive Branch to spend money in the way the reports urge. *See International Union, Aerospace Workers v. Donovan,* 746 F.2d 855, 860–62 (D.C.Cir.1984); *In the Matter of LTV Aerospace Corp.,* 55 Comp. Gen. 307, 319 (1975). The parties agree that the Secretary is only legally bound to spend funds in a manner consistent with

explicit statutory language of the relevant appropriation account.

4.6 Despite the non-binding nature of these "line items," the Secretary considers it his "practical" duty to comply with them as a matter of comity with Congress. While he is free to ignore these line items, he does so "at the peril of strained relations with the Congress." *LTV Aerospace,* 55 Comp.Gen at 325–26.

4.7 When the Secretary wants to spend money "from" one line item on a statutory purpose authorized by another line item, he generally seeks a "reprogramming." *See* 1984 Finding 427, 588 F.Supp. at 203. Because of the principles of comity noted above, he generally tells the relevant House and and Senate Committees how he wants to spend the funds, and usually does not "reprogram" the funds without their advance approval. This informal process is not uncommon. Between 1979 and 1984, the Secretary made 18 reprogramming requests, of which 5 were disapproved. *See* U.S. Ex. 35, 1984 Bd. Ex. 69. As this history suggests, Congress is often receptive to reprogramming requests. *See LTV Aerospace,* 55 Comp.Gen. at 318, 325, 327.

4.8 In light of the preceding discussion, it is appropriate from this point on to divide the excess funds into three different categories: (1) those in line items through which the Board could receive funding for its Plan, regardless of whether the line item or account it is in bears a "desegregation" label; (2) those in line items for which the Board is ineligible, but which could be reprogrammed into different line items within the same account for which the Board is eligible; and (3) those which are in accounts or subaccounts which would have to be reappropriated by the full Congress into accounts for which the Board is eligible. Categories (1) and (2) correspond to United States "Category B"; Category (3) coincides with "Category A". *See* Conclusion 401A–B; Finding 4.1.

4.9 For the reasons spelled out in Conclusions 4.10–4–26, the ¶ 15.1 priority applies to the excess funds in both Categories (1) and (2). Category (3) funds are outside

the scope of ¶ 15.1, but must be restrained for other reasons. *See* Conclusions 4.27–4.-29.

4.10 As a threshold matter, we must reject the argument of the United States that the excess funds are "unavailable" to the Board because they are "obligated" to the Treasury. It is true, as the Government contends, that in general unobligated, unspent funds lapse into the Treasury at the end of the fiscal year. *See* 31 U.S.C. § 1552(a)(2); *Principles of Federal Appropriations Law* at 33 (1982). It is also true that this Court's restraining orders have prevented the excess funds from lapsing. But it is wrong to conclude, as the United States does, that these funds are "unavailable" to the Board or "unencumbered" because they are "obligated" to the Treasury by statutory mandate. *See* U.S. Merits Brief at 111, n. 15.

▮ 4.10A The Secretary's argument places the cart before the horse. To the extent these funds are subject to the Secretary's discretion, they can lapse *only after the Secretary has decided not to spend them on one of their permissible statutory purposes*. The funds in Categories (1) and (2) were "available" to the Board when appropriated, since they exist in accounts which can fund the Board's Plan under the relevant statutes. Thus, they would have lapsed not because of this Court's restraining order, but *because the Secretary chose not to spend them on the Board's Plan before letting them lapse*. In other words, the Secretary has not even given the Board a "bottom of the list" priority concerning these excess funds. After spending the money as he saw fit, without regard to the Consent Decree, he decided to let the excess funds lapse, without making any effort at all to provide these funds to the Board. The effect of the restraining order, then, is to preserve the *pre*-lapsing status quo, preventing the lapsing process so that the Secretary can obligate the "leftover" funds to the Board as his last actions before letting the funds lapse. In short, the question is not whether the funds are now ready to lapse; rather, the issue is whether

¶ 15.1 requires the Secretary to lawfully exercise his discretion to provide all or part of this money to the Board *before* letting the funds lapse.

4.10B The Secretary also takes a skewed approach to the lapsing process. Even if the funds had lapsed, the Secretary has authority to *withdraw* lapsed funds from the Treasury if he "decides that part of a withdrawn unobligated balance is required to pay obligations ...." 31 U.S.C. § 1552(a)(2). An "obligation" includes "a grant payable ... under an agreement authorized by law." 31 U.S.C. § 1501(a)(5).

4.10C Thus, the excess funds are not hopelessly lost, as the Secretary would have us believe. They are purportedly "lost" only because the Secretary decided not to spend them on the Board before letting them go. The Secretary's inaction makes a mockery of his "substantial obligation to provide available funds" and ignores the Court of Appeals' mandate that he search for "unencumbered funds." It also ignores the expansive language, "every available form of financial resources," and the stipulation that the ¶ 15.1 obligation is flexible, as it is to "be interpreted and applied as appropriate in whatever future circumstances might arise." *See* 1983 Stipulation, Government Exhibit 2. The Secretary's arguments concerning the excess funds spotlight just how rigid, even hostile, his attitude is toward the Consent Decree. A naive observer would think that the Secretary would be pleased to spend some or all of the excess funds on the Board, since it would go a long way toward discharging his ¶ 15.1 obligations *without* seriously affecting his Executive discretion · and *without* harming other grantees *at all*. But the Secretary seems hell-bent on ·denying extra funds to the Board unless ordered to do so by statute or court order.

4.11 The parties agree that, by definition, Category 2 funds cannot be provided to the Board without a reprogramming from the line item they are in to line items in the same account under which the Board's Plan qualifies for funding. In the

following Conclusions, we reject the United States' position that the Second Opinion bars such a reprogramming.

4.11A We begin by noting some background on reprogramming. As noted earlier, reprogramming is a practical rather than legal restraint on the Secretary. While the Secretary has a general policy of requesting committee approval for permission to reprogram,[59] he has no general, formal policy concerning *when* he decides to ask Congress for permission. He made such requests 18 times between 1979 and 1984, and was denied only 5 times. *See* U.S. Ex. 35, 1984 Bd. Ex. 69. It appears, then, that the Secretary is not shy about approaching Committee leaders when he decides it is important to do so.

4.11B Reprogramming is an integral part of the administrative process. Congress makes lump-sum appropriations, with non-binding "line items", so that the Executive Branch retains flexibility to tackle unforseen situations:

> In this regard, Congress has recognized that in most instances it is desirable to maintain Executive flexibility to shift around funds within a particular lump-sum appropriation account so that agencies can make the necessary adjustments for "unforeseen developments, changing requirements, incorrect price estimates, wage-rate adjustments, changes in the international situation, and legislation enacted subsequent to appropriations." Fisher, "Reprogramming of Funds by the Defense Department," 36 The Journal of Politics 77, 78 (1974).

*LTV Aerospace*, 55 Comp.Gen. at 318. This Consent Decree is just the sort of special situation in which reprogrammings, especially of excess funds, are proper and anticipated by Congress. With respect to the excess funds, the Secretary has already fulfilled his "practical duty" of adhering to line items. As such, a reprogramming request is quite proper and highly unlikely to strain relations with Congress, contrary to

the Secretary's laments. Indeed, by asking permission to reprogram the Secretary would be showing that he respects Congress' will.

4.12 In Part II(B) of the Second Opinion, the Court of Appeals held that "the district court erred in concluding that the government acted in bad faith ... by deciding not to reprogram funds for use by the Board." The Court apparently reasoned that such conduct was not bad faith *per se*, since the Secretary's policy of asking for approval from Congressional leaders applies to all reprogramming. *Id.* at 1307 n. 9. The Court also apparently grounded its conclusion in its holding of Part II(A) "that ¶ 15.1 does not require the government to engage in legislative activities in order to make desegregation funds available." *Id.* at 1307.

4.13 We think the language quoted in Conclusion 4.12 allows the Secretary to decide not to seek reprogramming of *unlapsed* funds. But we also think that the language does *not* cover the unique situation we have here concerning the "lapsed" or "excess" funds.

4.14 It is crucial to note that the Court of Appeals was not considering any "excess funds" issues in 1984. The Court was reviewing Judge Shadur's rulings that the Secretary had a regular duty to reprogram funds from line items within the Special Programs and Population account into the Title IV line item within that account. These funds had not lapsed and were subject to competing demands. The Court simply did not have before it the issue of whether the Secretary must informally ask Congressional leaders for a reprogramming of excess funds, where no competing grantees or demands exist. Moreover, these were "pure" line items in the sense that they appeared in conference committee reports, and they related to programs expressly created by statute. The Court did not consider reprogramming in the context where *one* house simply earmarks

---

59. As noted in Findings 526–29, the Secretary does not always follow line items contained in committee reports, and even ignores his prac- tical duty to the request reprogramming on occasion.

funding in a committee report, as is the case with many of the excess funds.

4.15 It is clear that separation of powers concerns underlay much of the Second Opinion, including the reprogramming holding. Such concerns have much less, if any, weight in the present context. There is no problem with frustrating Congressional intent here since reprogramming would further intent in that (1) the funds could only be spent on a program within the general account, and (2) by definition no competing grantees or priorities remain in the line item to be reprogrammed. Moreover, we are for now only addressing whether ¶ 15.1 requires the Secretary to *ask* the Committees for a reprogramming, not whether he must do so either without asking or even after their disapproval; thus, a reprogramming request can only further Congressional intent.

4.16 A reprogramming request of the type we are considering is an executive activity, not a "legislative" one of the type forbidden by Part II(A) of the Second Opinion. It is clear that the Second Opinion was primarily concerned with a certain type of "legislative" activity, that is the constitutional power of the Executive Branch under Article II, § 3 to "from time to time ... recommend to [Congressional] consideration such measures as [it] shall judge necessary and expedient." Thus Part II(A) deals with the district court's conclusion that ¶ 15.1 requires the Executive Branch to undertake various lobbying activities to persuade the *full* Congress to *appropriate* funds for the Board. *See* 1984 Conclusion 142, 588 F.Supp. at 242. The United States argued (and no doubt influenced the Court) that the Judiciary could not in general tell the Executive how to go about *these* activities with Congress. *See* 1984 Brief for the United States on Appeal at 32–35. The Court was concerned about the Executive's role in the full, formal legislative appropriation process. But a request for reprogramming is not this sort of formal legislative activity at all, and, indeed, is not a legislative activity. We are dealing here with funds *already appropriated* by Congress. They are *al-*

*ready* available to the Board under statutory criteria. As noted earlier, the Secretary *already* has the legal power to spend them on the Board. He approaches Congressional committees for reprogramming only out of courtesy and comity; he need not secure their approval to spend them as he sees fit under the statute. The decision to contact committee members is purely an executive initiative and prerogative, since Congress has already exercised its formal legislative appropriation power.

4.17 The mere fact that a reprogramming request involves informal contact with committee members does not render it a "legislative activity" within the meaning of Part II(A) of the Second Opinion. The Court clearly did not view *all* contacts with the Congress as immune from judicial scrutiny. Although it allowed the Executive wide discretion under ¶ 15.1 to make general appropriation requests of Congress, it implied in Part II(B) that where Legislative activities move from general policy to specific actions intended to harm the Board, they may run afoul of ¶ 15.1. Moreover, the Court obviously felt that the Executive could violate the Decree by the Article II, § 3 activity of submitting a budget that intentionally tries to render funds *un*available to the Board. 744 F.2d at 1308 n. 12. A proper remedy for these assumed acts of bad faith would include judicial regulation of Executive's contacts with Congress: an order "to refrain from specific efforts to make desegregation funds unavailable to the Board or to inform Congress about the funding obligations under the Decree." 744 F.2d at 1308. Thus, the Court of Appeals did not spread a blanket immunity over the Executive's contacts with Congress. Contacts for reprogramming purposes, then, not necessarily escape our scope of review.

4.18 The Secretary's decision to not even *ask* Committee leaders about reprogramming excess funds for use by the Board is akin to an intentional decision to render funds *un*available to the Board. It is one thing for the Secretary to adhere to his policy of asking approval for repro-

gramming. Such a decision is not bad faith *per se*. 744 F.2d at 1307 n. 9. The Secretary may also properly spend *unlapsed* funds within line items without seeking a reprogramming. But it is quite another thing to decide not even to ask permission to reprogram the excess funds. That is a purely executive decision that is tantamount to saying, "Even though I have no other educational use for these funds and no other grantee claims entitlement to them, I would rather let them lapse and become *un*available to the Board than to take even a small step toward providing these funds to the Board." For now, we reserve decision on whether such a decision constitutes an actual bad faith violation of the Decree. We simply note that the decision not to seek reprogramming of *excess* funds is related to that class of activities (even the "Legislative" activities) which are specifically directed at the Board. As such, we feel the Court of Appeals, applying its analysis of Part II(B), would disapprove of such a decision.

4.19 Requiring a request for reprogramming in this context is consistent with the Second Opinion in a different way. The Court clearly felt that ¶ 15.1 extends to "unencumbered funds" sitting anywhere in the Executive Branch. 744 F.2d at 1306–07. Since we have held that the excess funds are not "encumbered" to the Treasury, it is hard to imagine a more appropriate example of "unencumbered" funds. The funds are not encumbered by promises to other grantees or by educational policy decisions. And since "line items" are not a formal legal encumbrance, we do not think the Court of Appeals would frown on our requiring a request for reprogramming of these otherwise unencumbered funds.

4.20 In sum, the Second Opinion does not prevent this Court from ordering the Secretary to make reprogramming re-

quests within the limited context of the excess funds. Such a request is not a "legislative activity" of the type found outside the scope of ¶ 15.1 by the Court of Appeals in Part II(A). Since the general appropriation statutes render Category 2 funds "available" to the Board, *see* Conclusions 4.2, 4.8, the duty to make "every good faith effort to ... provide" available funds applies to these funds. And since ¶ 15.1 binds Executive discretion generally, *see* Preliminary Conclusion at 27–35, the duty to make "every good faith effort" includes the Executive decision to try to provide these available funds via a reprogramming request.

■ 4.21 We next reject the position of the United States that regulatory "competitive selection criteria" must be applied to available excess funds. Because there are no competing grantees for these funds, the idea of a competition is farcical. So long as the Board projects qualify under relevant statutory criteria they should be funded.

4.22 It follows from Conclusion 4.21 that the Board is entitled to 100% of excess funds in line items under which it has qualifying projects. That is the "equitable fair share" of the available funds.[60] Similarly, 100% is the "maximum level of funding available" under statutory criteria in light of the lack of competing grantees and purposes for the funds.

4.23 Having concluded that Category 1 and 2 funds are "available" to the Board, we will outline below how the parties are to analyze each restrained account. We do not at this point award any sum certain to the Board. Instead, having defined the United States' duties under the Decree, we will give the government a chance to show how it intends to comply with our opinion. *See First Opinion*, 717 F.2d at 384; 1984 Conclusion 158, 588 F.Supp. at 245. Thus,

---

60. It might be that some of the restrained accounts, which require allocation by statutory formula rather than administrative discretion, cannot be allocated fully to the Board without a reappropriation. This is just a specific example of the general rule governing this whole proceeding: statutory criteria are controlling. However, to the extent that the allocation of funds is discretionary, and that administrative mechanisms exist or can exist in order to allocate excess funds to the Board, all of these funds should be provided to statutorily qualifying Board projects.

we do not now engage in the extensive program-by-program analysis done by the parties in their appendices. Nor do we propose how which funds are to be spent on which projects. We will merely outline the approach both sides should take in providing excess funds in light of our above conclusions. We expect that in applying this largely mechanical approach to each statutory program, the parties can stipulate to much of the excess funds. To the extent the parties cannot agree, (for example, some disagreements may remain on a few issues of statutory interpretation), we will decide the issues as needed.[61] However, we think it best that the parties try to stipulate to as much as possible and leave only genuine disputes to the Court. We add that the United States should apply our analysis even if it wants to appeal. This will clarify the record for appeal. In doing so, the United States may of course reserve its rights to contest our analysis on appeal, but a decision to appeal will not excuse the United States from stipulating to as much as possible with the Board as to the many restrained line items.

4.24 The first step is to decide whether a particular restrained account falls into category (1), (2) or (3). This involves matching unfunded Board projects with the statutory criteria of the appropriation account. In particular, the parties must ask:

(a) Is the Board project consistent with at least one of the statutory purposes of the appropriation account, regardless of whether the account carries a "desegregation label"? If the answer to this question is "no", the funds fall into Category (3), and are presently and concededly unavailable to the Board. These funds are to be dealt with as discussed in Conclusions 4.27–4.29 below. If the answer to this question is "yes", the funds are "available", and must be dealt with under paragraph (b) below.

(b) If the answer to (a) is "yes", does the Board project fall within one or more of the "line items" of the relevant appropriation account? If so, the funds are in Category (1); if not, they are in Category (2).

4.25 The next step is to deal with Category (1) and (2) funds as follows:

(a) All Category (1) funds should be provided immediately to the Board to the extent its project in question remains unfunded. If the funds in a category (1) line item become depleted, and the Board's project(s) within that line item are still not fully funded, analyze these projects under the Category (2) process set forth below.

(b) Category (2) funds shall remain under restraint pending action by the Secretary to reprogram the funds from the line items they are now in into a line item in that account which can fund the relevant Board project. This process would continue until all line items within an account have been exhausted or until the relevant Board project is fully funded, whichever occurs first. The Secretary may effect this reprogramming directly, if he chooses, or he may informally seek approval from the relevant Congressional Committees. The Board and the Secretary shall propose a method by which the Board and the Court can monitor a reprogramming request, in order to ensure that the Secretary makes such a request in good faith. If the Committees approve the request, the funds are to be provided to the Board as specified in the preceding sub-paragraph. We do not now address whether the funds must lapse if the Committees deny the request.

■ 4.26 To receive excess funds under the method suggested by Conclusions 4.24–4.25, the relevant Board project must, in addition to satisfying statutory criteria: (a) materially further its Desegregation Plan, and (b) have reasonable costs. To the extent the Board's projects have already

---

**61.** We do note now, however, that the Board's detailed analysis of the relevant statutes appears consistent with the scheme we outline below. Moreover, though we make no formal findings now, the Board's analysis of whether its projects meet statutory criteria appears correct, at least to our perusal.

been subjected to this analysis by Judge Shadur in 1984 (and by this Court, through adopting Judge Shadur's findings), these questions have already been resolved.

4.27 The Board concedes that Category (3) funds are now unavailable to it absent a reappropriation. We think that Part II(A)'s holding that legislative activities fall outside the scope of what ¶ 15.1 affirmatively requires embraces even reappropriation of excess funds. Of course, this does not mean that the United States cannot or should not further the "spirit of the Decree," 744 F.2d at 1308, by voluntarily seeking a reappropriation when funds become "excess". And of course the Board can lobby local Congressional figures to try to reappropriate these funds. However, given the present unavailability of these funds, we must decide whether continued restraint of Category (3) funds is warranted. We hold below that it is because of the government's alleged bad faith rather than because ¶ 15.1 requires reappropriation.

4.28 While the Appellate Court held that (1) ¶ 15.1 does not affirmatively require that the Secretary seek reappropriations (Part II(A)) and (2) that his failure to do so does not indicate bad faith (Part II(B)), it did not directly address whether this Court, as part of its Article III remedial power to cure *other* violations of the Decree, can order the Secretary to seek a reappropriation of all or part of these excess funds. Notably, there are no competing grantees for these funds. Thus, the situation which moved the Court to find unreasonable the monetary remedy for the Yates-Weicker lobbying activities is not present here. 744 F.2d at 1307–08 (district court's monetary remedy for government's bad faith is unreasonable where it renders all desegregation funds unavailable to other school districts). As noted earlier, a

proper remedy for bad faith violations may include informing "Congress about the funding obligations ... under the Decree." Continued restraint of the excess appropriations in Category (3) preserves these funds as a remedy for the government's alleged bad faith, should Congress decide, as it has before, to provide funds directly to the Board after being informed of the government's funding obligation.

4.29 We do not decide now conclusively that the Second Opinion allows such a result. We merely hold that the interpretation of the opinion posited in the preceding Conclusion is plausible [62] and that the Board has some likelihood of showing that the government has acted in bad faith. *See* Conclusion 9.20(b). Since this Court will address alleged bad faith on the part of the government some time in the near future, the Court will continue restraining the funds to preserve a meaningful remedy for the Board. While release of the funds may destroy the Board's remedies, the continued restraint will not harm the United States or any third party. In sum, under traditional equitable principles discussed in our June 4, 1985 opinion in this case, *see* 610 F.Supp. at 704–705, 709, continued restraint of the excess funds is warranted, pending a hearing on alleged bad faith.

## V. *The Secretary of Education's Discretionary Fund*

### A. *Findings of Fact*

501. There are presently $8.2 million in fiscal year 1984 appropriations restrained in the Discretionary Fund.

502. The United States does not intend to and will not provide to the Board any fiscal year 1984 appropriations in the Discretionary Fund. It believes that the

---

**62.** The relevant questions (1) whether certain government conduct (*see, e.g.,* 744 F.2d at 1308 n. 12; Conclusion 4.18) constitutes bad faith; (2) and whether this court, as a remedy for bad faith rather than an interpretation of ¶ 15.1, can order the Secretary to request reappropriation of excess funds—have not been briefed extensively. The Court of Appeals decided that failing to request appropriation is not bad faith,

744 F.2d at 1307; it did not discuss whether a request for reappropriation of excess funds can be ordered as a *remedy* for other bad faith. Continued restraint of the funds preserves the status quo pending resolution of these issues. If the Board turns out to be wrong on either of the above two issues, the court will lift the restraint immediately.

Board failed to submit an application for these funds and, therefore, it had no obligation to give the Board a priority in allocating or awarding these funds. (U.S. Report, Feb. 28, 1985, at 24; U.S. Response to Board Requests to Admit 505, 512(p), 514).

503. The Secretary concedes that desegregation assistance is one of the permissible uses of funds appropriated to the Discretionary Fund. (*E.g.,* U.S. Report, Feb. 28, 1985, at 20).

504. The United States believes that only the fraction of Discretionary Funds voluntarily allocated by the Secretary to the Unsolicited Grants Program are available to provide desegregation assistance to the Board. (U.S. Report, Feb. 28, 1985, at 24; U.S. Supp. Ans. to Board 1985 1st Set Int. No. 7).

505. Chapter 2 of the Education Consolidation and Improvement Act ("ECIA") consolidates approximately forty previously authorized categorical programs—including the Emergency School Aid Act—into an elementary and secondary education block grant program. (20 U.S.C. § 3811). A minimum of ninety-four percent of the appropriations for Chapter 2 must be allocated by statutory formula to States and territories (20 U.S.C. § 3813). In turn, at least eighty percent of these amounts must be suballocated by formula by the State to local educational agencies within the State. (20 U.S.C. § 3815). The Board received approximately $6.3 million of these suballocated funds in fiscal year 1983 and again in fiscal year 1984, of which it allocated $1.8 million to its Desegregation Plan. See Finding 374 above. The remaining twenty percent of funds allocated to each State may be awarded to local educational agencies, at the discretion of the State educational agency. (20 U.S.C. 3814; Response of Board to United States First Set of Post-Remand Interrogatories and Document Request 5).

505A. A maximum of six percent of the funds appropriated for Chapter 2 may be used by the Secretary of Education to fund projects throughout the country. (The "Secretary's Discretionary Fund"). (20 U.S.C. 3813(a) ).

505B. The Discretionary Fund authorizes the Secretary to fund programs and projects which (1) provide a national source for gathering and disseminating educational information; (2) carry out research and demonstrations related to the purposes of Chapter 2; (3) are designed to improve the training of instructional personnel needed to carry out the purposes of Chapter 2; (4) are designed to assist State and local educational agencies in the implementation of programs under Chapter 2. (20 U.S.C. § 3851(a)(1)–(4) ).

506. In fiscal year 1984, Congress on October 31, 1983 appropriated $28,765,000 for the Discretionary Fund, 20 U.S.C. § 3851; P.L. 98–139, 97 Stat. 871 et seq. (U.S. Response to Board Request to Admit 501). At the time of this appropriation, the Secretary was required by statute to use $10,725,000 to fund the programs specified in 20 U.S.C. § 3851(b). The Secretary was authorized to spend the remaining $18,040,000 appropriated for the Secretary's Discretionary Fund for the purposes or programs specified in 20 U.S.C. § 3851(a). Subsequently, on June 12, 1984, Congress enacted P.L. 98–312, 98 Stat. 234, which amended the authorizing statute for the Discretionary Fund. This amendment requires the Secretary to reserve $1,000,000 from his Discretionary Fund each year to support the Law Related Education Program. (U.S. Response to Board Request to Admit 501; Board Ex. 127, P.L. 98–139; Board Ex. 128, P.L. 98–312; Cichowski Dep. at 47–48).

507. The United States believes that it is not required to consider the Board's desegregation needs or the Consent Decree in determining which "priority" uses to establish for the Discretionary Fund. It will not reserve any funds appropriated to the Discretionary Fund to provide desegregation assistance to the Board. (U.S. Response to Board Request to Admit 505; U.S. Report, Feb. 28, 1985, at 24; U.S.Ans. and Supp. Ans. to Board 1985 1st Set Int. 7; LeTen-

dre Dep. at 45–46, 48, 70–72; Cichowski Dep. at 81, 87).

508. The Secretary provided no fiscal year 1984 Discretionary Fund money to the Board and has contingently obligated all funds allocated to that program to grantees other than the Board. (Board Ex. 135, Cichowski Dep. Ex. 1).

508A. The Secretary has interpreted Section 583(a)(4) of ECIA, 20 U.S.C. § 3851(a)(4), which authorizes projects to assist State and local educational agencies in carrying out their Chapter 2–funded programs, as a technical assistance provision to help improve State and local programs funded under other parts of the ECIA, not as an authority for direct funding of State and local programs. (34 C.F.R. § 760.10(a); 49 Fed.Reg. 43230–31, October 26, 1984, United States Ex. 1).

508B. In regulations issued for the Discretionary Fund, the Secretary has interpreted Section 583 of ECIA not to permit funding for projects that are designed to meet the applicant's own financial needs. The regulations specifically forbid the provision of general operating revenue to meet an applicant's local needs. (34 C.F.R. § 760.10(b); LeTendre Dep. at 81–82; 49 Fed. Reg. 43231, October 26, 1984, United States Ex. 1).

508C. The Secretary did not distribute any fiscal year 1984 monies from the Secretary's Discretionary Fund to Provide "operational" support to any local educational agency.

509. With respect to the allocation, obligation and payment of the $28.765 million appropriated to the fiscal year 1984 Discretionary Fund:

a. The Secretary allocated $6.5 million to the Inexpensive Book Distribution program. The establishment of this program, and the allocation of $5.85 million to it, were mandated by statute. The Secretary allocated the additional $650,000 to this program as a result of House and Senate Committee Reports recommending this amount of further funding. (U.S. Response to Board Request to Admit 512(a); Cichowski Dep.

at 33–34). The Secretary's determination to fund this program in the additional amount of $650,000 was made without reference to the obligations of the United States to the Board under the Consent Decree and without consideration of the needs of the Board for its Desegregation Plan. (Board Ex. 131, H.Rep. No. 98–357, 98th Cong. 1st Sess. 109; Board Ex. 132, S.Rep. No. 98–247, 98th Cong. 1st Sess. 129; Board Ex. 133, Discretionary Fund Summary Chart; Board Ex. 134, Cichowski Dep. Ex. 3; Cichowski Dep. at 43, 77; Board Ex. 130, Martin memorandum of Oct. 26, 1984 w/attachments).

b. $2.125 million were allocated to the Arts in Education Program. The establishment or continued funding of this program, and the allocation of $2.025 million to it, were mandated by statute. The Secretary allocated an additional $100,000 to this program as a result of House and Senate Committee Reports recommending such additional funding. (U.S. Response to Board Request to Admit 512(a)). The Secretary's determination to allocate the additional $100,000 was made without reference to the United States' obligations to the Board under the Consent Decree, and without consideration of the Board's needs for desegregation funding. (Board Ex. 131, H.Rep. No. 98–357, 98th Cong. 1st Sess. 110; Board Ex. 132, S.Rep. No. 98–247, 98th Cong. 1st Sess. 129; Board Ex. 133, Discretionary Fund Summary Chart; Board Ex. 134, Cichowski Dep. Ex. 3; Cichowski Dep. at 43, 77; Board Ex. 130, Martin memorandum of Oct. 26, 1984 w/attachments).

c. $2.85 million were allocated to the Alcohol and Drug Abuse Education Program. The establishment, or continued funding of, and amount of funding allocated to, this program were mandated by statute. In fiscal year 1984, $2,801,494 were actually obligated to grantees under this program. The ad-

ditional $48,506 has been contingently obligated to prevent its lapse but has not been provided to grantees under this program. These funds were not needed for the Alcohol and Drug Abuse Program for fiscal year 1984 and are not otherwise needed for fiscal year 1984 Department of Education programs. (U.S. Response to Board Request to Admit 512(c); Board Ex. 135, Cichowski Dep. Ex. 1; Cichowski Dep. at 45–46; Board Ex. 133, Discretionary Fund Summary Chart; Board Ex. 134, Cichowski Dep. Ex. 3; Board Ex. 130, Martin memorandum of Oct. 26, 1984 w/attachments).

d. After allocation of these funds mandated by statute to the three programs referred to above, $18.04 million remained to be allocated from the fiscal year 1984 Discretionary Fund appropriation. (Board Ex. 135, Cichowski Dep. Ex. 1; Board Ex. 130, Martin memorandum of Oct. 26, 1984 w/attachments; Board Ex. 129, Cichowski Dep. Ex. 2).

e. $1 million was allocated to the Law Related Education Program. (U.S. Response to Board Request to Admit 512(d)). The initial establishment of this program and the initial allocation and contingent obligation to its intended grantees of $1 million were not mandated by statute, but instead was done by the Secretary as a result of the House and Conference Committee Reports. (Board Ex. 131, H.Rep. No. 98–357, 98th Cong. 1st Sess. 110; Board Ex. 65, H.Rep. No. 98–422, 98th Cong. 1st Sess. 21; Cichowski Dep. at 47–48). The Secretary's initial determination to establish and allocate $1 million to this program was made without reference to the Consent Decree, and without considering the needs of the Board for its Desegregation Plan. (Board Ex. 136, Cichowski memorandum of Feb. 2, 1984; Board Ex. 137, Bell memorandum of March 27, 1984 w/attachment; Cichowski Dep. at 14–16, 43, 77, 80–81). Subsequently on June 12, 1984, Congress enacted Public Law 98–312 which amended the authorizing statute for the Discretionary Fund, 20 U.S.C. § 3851. This amendment mandates that from his Discretionary Fund the Secretary reserve each year $1 million for the Law Related Education program. (Cichowski Dep. at 14–16, 43, 77, 80–81; Board Ex. 135, Cichowski Dep. Ex. 1).

f. After allocation of funds mandated by statute and to the Law Related Education program, $17.04 million remained to be allocated from the fiscal year 1984 Discretionary Fund. (Board Ex. 135, Cichowski Dep. Ex. 1; Board Ex. 130, Martin memorandum of Oct. 26, 1984 w/attachments; Board Ex. 133, Discretionary Fund Summary Chart).

g. $10 million was allocated to the National Diffusion Network Program. This program, and the amount to be allocated to it, were not mandated by statute. The House Committee Report directed the Secretary to use, at a minimum, $10.7 million for this program. (Cichowski Dep. at 53–56; Board Ex. 131, H.Rep. No. 98–357, 98th Cong. 1st Sess. 110). The Conference Committee Report stated that the "amount available ... will continue to the greatest extent possible the current funding level...." (which was $10 million). (Board Ex. 65, H.Rep. No. 98–422, 98th Cong. 1st Sess. 21; U.S. Response to Board Request to Admit 512(f)). The creation of this program and the decision to allocate $10 million to it were based on the Conference Committee Report. The determination did not reflect any consideration of the United States' obligation to the Board under the Consent Decree, or of the needs of the Board for its Desegregation Plan. (Board Ex. 129, Cichowski Dep. Ex. 2; Cichowski Dep. at 53–56; Board Ex. 133, Discretionary Fund Summary Chart).

h. Approximately $1,290,000 was allocated to the Education Technology Program. The establishment and funding

of this program was not mandated by statute. The Senate Committee Report "urges the Secretary to give Educational Television a high priority," but the Congressional Committee Reports do not otherwise refer to this program. (Board Ex. 132, S.Rep. No. 98–247, 98th 1st Sess. 129). The Secretary's decision to establish or continue providing funds for this program, and to allocate approximately $1,290,000 to this program, was made without reference to the United States' obligation to the Board under the Consent Decree, or to the needs of the Board for its Desegregation Plan. (Cichowski Dep. at 17, 43, 77; U.S. Response to Board Request to Admit 512(g); Cichowski Dep. at 17, 43, 77, 80–81; Board Ex. 138, Special Programs Chart; Board Ex. 130, Martin memorandum of Oct. 26, 1984 w/attachments; Board Ex. 133, Discretionary Fund Summary Chart).

i. $489,000 was allocated for evaluations and studies of Chapter 2. This program is not mandated by statute and is not directed, encouraged or recommended in any of the fiscal year 1984 Congressional Committee Reports. The Senate Report mentions that the Secretary intends to use Discretionary Fund moneys for this purpose. (Board Ex. 132, S.Rep. No. 98–247, 98th 1st Sess. 129). The Secretary's determination to establish or continue funding this program and to provide $489,000 to it was made without reference to the United States' obligation to the Board under the Consent Decree, and without consideration of the Board's needs for its Desegregation Plan. (U.S. Response to Board Request to Admit 512(h); Cichowski Dep. at 17, 43, 77, 80–81; LeTendre Dep. at 47–50, 83–86; 1984 Fagan Testimony, pp. 1327–32; Board Ex. 130, Martin memorandum of Oct. 26, 1984; Board Ex. 138, Special Programs Chart).

j. After establishment and allocation of funding to the programs detailed above, $5.801 million remained to be allocated of the $28.765 million appropriated to the Discretionary Fund. (U.S. Response to Board Request to Admit 512(i); Board Ex. 135, Cichowski Dep. Ex. 1; Cichowski Dep. at 68; Board Ex. 130, Martin memorandum of Oct. 26, 1984 w/attachments).

k. $40,000 was allocated to Commission Follow-up activities. The decision to fund these activities, and in this amount, was not mandated by statute nor recommended or encouraged by Congressional Committee Report. The Senate Report mentions that the Secretary plans to use Discretionary Fund moneys for this purpose. (Board Ex. 132, S.Rep. No. 98–247, 98th 1st Sess. 129; Board Ex. 138, Special Programs Chart). The Secretary's determination to finance this activity was not based upon the language in the Senate Report, but rather on his view of educational priorities. (U.S. Response to Board Request to Admit 512(j)). The Secretary's determination to fund these activities in the amount indicated was made without reference to the United States' obligation to the Board under the Consent Decree, and without consideration of the Board's needs for its Desegregation Plan. (U.S. Response to Board Request to Admit 512(j); Cichowski Dep. at 80–88; LeTendre Dep. at 47–50, 83–86).

l. $986,546 was allocated to the Teacher Incentive Planning Grants Program. The establishment and funding of this program, and the amount of funds to be provided to this program, were not mandated by statute nor recommended by Congressional Committee Report. (U.S. Response to Board Request to Admit 512(k); Board Ex. 137, Bell memorandum of March 27, 1984 w/attachment). The Secretary's determination to establish and fund this program, and of the amount to be allocated to this program, was made without reference to the United States' obligation to the Board under the Consent Decree, and without consideration of

the Board's needs for its Desegregation Plan. (Cichowski Dep. at 80–81; LeTendre Dep. at 44–45).

m. $100,000 was allocated to Regional Office Activities. The funding of Regional Office Activities was not mandated by statute nor recommended by Congressional Committee Report. (U.S. Response to Board Request to Admit 512(1); Board Ex. 137, Bell memorandum of March 27, 1984 w/attachment; Board Ex. 138, Special Programs Chart). The Secretary's determination to fund these activities and in the amount indicated was made without reference to the United States' obligation to the Board under the Consent Decree, and without consideration of the Board's needs for its Desegregation Plan. (Cichowski Dep. at 80–81).

n. $3,384,354 was allocated to the Unsolicited Grants Program. (U.S. Response to Board Request to Admit 512(m)). In determining both the other program priorities and the amount to be allocated to the Unsolicited Grants Program, no consideration was given to the United States' obligations to the Board under the Consent Decree or to the Board's needs for its Desegregation Plan. (U.S. Response to Board Request to Admit 512(m); Cichowski Dep. at 79–81; LeTendre Dep. at 69–71, 73–74, 78–79, 83–86).

(Board Ex. 134, Cichowski Dep. Ex. 3; Board Ex. 136, Cichowski memorandum of Feb. 2, 1984; Board Ex. 140, CFDA 84.-122B).

510. In establishing the fiscal year 1984 Unsolicited Grants Program, the Secretary also established competitive preferences which allowed additional points to be awarded to applications meeting certain identified factors. Fifteen points, out of a total of 100, were reserved to the Secretary for this purpose. The factors given preference by the Secretary in his discretionary award of these 15 points were (1) national significance; (2) evaluation; and (3) improving elementary and secondary education. (LeTendre Dep. at 66–73; 83–86; Board Ex. 141; 34 C.F.R. § 760.30(b), published at 49

Fed.Reg. 7550 (Feb. 29, 1984)). In establishing these factors for which additional points were awarded in considering applications for funding, the Secretary did not consider the United States' obligations to the Board under the Consent Decree, and did not consider the Board's needs for its Desegregation Plan. (Cichowski Dep. at 80–81).

511. In the notice establishing the fiscal year 1984 Unsolicited Grants program, the Secretary suggested that applicants limit their requests for assistance to $100,000 or less. However, the notice also stated that this limitation "did not bind the U.S. Department of Education." (Board Ex. 141, 49 Fed.Reg. 7550, 7551 (Feb. 29, 1984)).

512. In awarding the $3,384,354 allocated to the Unsolicited Grants Program, no consideration was given to the United States' obligation to the Board under the Consent Decree, to the Board's desegregation needs, or to actually providing any of those funds to the Board. (Cichowski Dep. at 78–81; LeTendre Dep. at 69–75, 78–85, 83–86).

513. The Discretionary Fund is a grant program to which the Department of Education's General Administrative Regulations ("EDGAR") apply. These regulations, promulgated by the Secretary of Education, give the Secretary the authority to reserve all Discretionary Fund money for a particular purpose. He may do so by publishing a notice in the Federal Register prior to receiving any applications for these funds. (34 C.F.R. § 75.105; Board Ex. 142, 49 Fed.Reg. 43226 (Oct. 26, 1984); LeTendre Dep. at 48–49, 52–54, 57; Cichowski Dep. at 87).

514. The Secretary usually applies the EDGAR provisions relating to the selection of projects for funding after a rank ordering of all applications for grants from the Discretionary Fund. However, the Secretary makes the final selection of these applications for funding and may change the rank order. He may determine which applications will be funded based on any information in the application, any other in-

formation he deems relevant to the usual program criteria and any priorities or other program criteria he may have established to set aside or otherwise use his Discretionary Funds. (1984 Conclusion 62; 34 C.F.R. § 75.105; 34 C.F.R. § 75.217(d)–(e); Board Ex. 142, 34 C.F.R. § 760.11, published at 49 Fed.Reg. 43226 (Oct. 26, 1984); U.S. Response to Board Request to Admit 503; LeTendre Dep. at 47–49, 53–54, 57, 68; Cichowski Dep. at 87).

515. The Secretary selected applicants, other than the applicants most highly rated by independent panels of three experts, to be awarded grants under the 1984 Unsolicited Grants Program based upon (1) the extent to which the proposed project addressed the national priorities of the administration and (2) the desire for broad and equitable geographic distribution of funding. The national priorities of the administration with respect to the Discretionary Fund, as reflected in the Unsolicited Grants Program Notice and otherwise, did not in fiscal year 1984 include providing a priority for desegregation either generally or with respect to the Board's Plan, specifically. (LeTendre Dep. at 47–50, 69–73, 84–86; Board Ex. 141, 49 Fed.Reg. 7550 (Feb. 29, 1984); Board Ex. 143, Withrow memorandum of Sept. 18, 1984).

517. The Secretary has authority to establish program priorities, competitive preferences and absolute funding priorities with respect to the Discretionary Fund by publishing a notice in the Federal Register. He may use these preferences and priorities to create a program for a single applicant, reserve Discretionary Funds for that applicant and thus award Discretionary Fund moneys to that applicant. (1984 Finding 140; 34 C.F.R. § 75.105; Board Ex. 142, 34 C.F.R. § 760.11, published at 49 Fed. Reg. 43226 (Oct. 26, 1984); LeTendre Dep. at 47–49, 52–54, 57; Cichowski Dep. at 17).

518. In the Special Services for Disadvantaged Student Program, and notwithstanding regulations requiring a "competitive" process for selecting applications for funds (34 C.F.R. § 646.30), the Secretary has created a funding priority for selected potential applicants located in the U.S. Territories. He has reserved funds for and will provide them to any "acceptable" application submitted by an eligible recipient even though the application would not have received funds absent the priority. (Board Ex. 144, 49 Fed.Reg. 28909 (July 17, 1984) ). He could also create such a priority for the Board.

519. The Secretary allocates moneys in the Discretionary Fund to programmatic areas for which he has established a "priority". The Secretary creates these priorities by publishing a notice in the Federal Register and inviting only applications which meet this priority. (34 C.F.R. § 75.105; Board Ex. 142, 49 Fed.Reg. 43226 (Oct. 26, 1984) ). These priorities may be established in any program area for which Discretionary Funds could lawfully be used, including desegregation assistance. (U.S. Response to Board Requests to Admit 502, 504; U.S. Report, Feb. 25, 1985, at 20; Cichowski Dep. at 16–17; LeTendre Dep. at 22, 47–49, 70–71).

520. The Secretary believes that he is authorized to create absolute priorities for using appropriations allocated to the Discretionary Fund, and thus to reserve funds for this purpose only, when this use is permitted by statute and it is his opinion that it is important to make funds available to meet that purpose. As stated by a Department official responsible for allocating Discretionary Funds, the Secretary creates priorities where he feels "firmly and keenly" about a program. (LeTendre Dep. at 39, 40, 48–49, 59; Cichowski Dep. at 87).

523. The Secretary could, by publishing a notice in the Federal Register, create an absolute priority for providing Discretionary Fund moneys to assist the Board in implementing its Desegregation Plan and, thus, reserve Discretionary Fund moneys only for the Board. He could do so prior to receiving an application for any Discretionary Fund moneys from the Board. (34 C.F.R. § 75.105(c); Board Ex. 142, 34 C.F.R. § 760.11, published at 49 Fed.Reg.

43226 (Oct. 26, 1984); LeTendre Dep. at 48–49).

524. The Secretary could, by publishing a notice in the Federal Register, have created in the Discretionary Fund an absolute funding priority for desegregation assistance projects, or alternatively, for desegregation projects related to consent decrees, and provided the Board a competitive or absolute preference for obtaining assistance through this program in fiscal year 1984. (34 C.F.R. § 75.105(c); U.S. Response to Board Requests to Admit 502, 504; Board Ex. 142, 34 C.F.R. § 760.11, published at 49 Fed.Reg. 43226, (Oct. 26, 1984); Cichowski Dep. at 16–17, 87–88; LeTendre Dep. at 48–49; 52–54, 57).

525. The language contained in congressional appropriation committee reports is generally proposed by the Department of Education and submitted to Congress as a justification for the Department's appropriation requests. This language is submitted in advance of Congress' consideration of the Department's appropriation act. Hence language purporting to "direct" or "recommend" that the Secretary allocate funds in a certain manner often reflects the Secretary's own prior decision about how he desires to spend those funds. (1984 Christensen Testimony pp. 1165–66; compare Board Ex. 58 with Board Ex. 65, H.Rep. No. 98–422, 98th Cong. 1st Session 21; Board Ex. 132, S.Rep. No. 98–247, 98th 1st Session 129; see also, U.S. Response to Board Request to Admit 509).

526. The Secretary's budgetary officials have experience with congressional appropriation committee reports and the Secretary's practices in complying with them. These officials, however, take conflicting positions concerning the Secretary's approach. One official has stated that the Secretary consistently adheres to language in reports either "directing" or "recommending" that he allocate funds in a certain manner. (1984 Christensen Testimony, pp. 1143–45; 1048, 1049–50, 1102, 1110, 1161–63). Another official has stated that the Secretary considers himself constrained to allocate moneys in the manner specified in a congressional report only where that allocation appears as a "line item" in a budget table accompanying the Conference Committee Report. (Cichowski Dep. at 34–37). The extent to which the Secretary in practice abides by the language in these reports appears problematic.

527. The Secretary has at times acknowledged that he is not required to and will not use his Discretionary Funds to finance those programs which Reports of Congressional Appropriations Committees "recommend" or "encourage" that he finance. (U.S. Response to Board Request to Admit 508). In fiscal year 1984, the Secretary did not finance the Biomedical Services program, although "encouraged" to apply $2.8 million to this end in the Conference Committee Report. (Board Ex. 65, H.Rep. No. 98–422, 98th Cong. 1st Session 21 (October 19, 1983) ). He did not allocate Discretionary Funds for that program because (a) it did not appear as a "line item" in a Conference Committee Report and (b) there was not in his opinion sufficient appropriations to address the Secretary's own priorities as well as the Biomedical Program. (Cichowski Dep. at 40–41, 69–70; Bd. Ex. 129, U.S. Response to Board Request to Admit 511; Cichowski Dep. Ex. 2; Bd. Ex. 130, Martin Memorandum of Oct. 26, 1984 w/attachments). Accordingly, the Secretary has not in the past consistently abided by such Committee Report language. (U.S. Response to Board Request to Admit 511; Cichowski Dep. at 36–37; Board Ex. 134, Cichowski Dep. Ex. 3; Board Ex. 133, Discretionary Fund Summary Chart).

528. The Secretary has also acknowledged that, in general, he is not bound by language in Committee Reports. The Department of Education's position concerning the States' obligations with respect to distribution of Chapter 2 funds differs from the position stated in Congressional Committee Reports, although the Secretary claims his position is being reconsidered. (U.S. Response to Board Request to Admit 510). When asked about this difference in positions, the Assistant Secretary for Ele-

mentary and Secondary Education, Lawrence Davenport, was quoted in the March 6, 1984 edition of Urban Education Review as stating, "The conference report, as you know, is not the law." (Board Ex. 134, Cichowski Dep. Ex. 3). The Secretary claims that Davenport does not recall such a statement. (U.S. Response to Board Request to Admit 510).

529. It has also been stated that the Secretary, as a practical matter, considers himself constrained to allocate Discretionary Fund moneys in a particular manner only where that use is mandated by statute or appears as a "line item" in a table appended to the Conference Report of the Appropriations Committee. (Cichowski Dep. at 36–37; see also U.S. Response to Board Request to Admit 511). No such table is attached to the Fiscal Year 1984 Conference Committee Report. (U.S. Response to Board Request to Admit 511;

Board Ex. 65, H.Rep. No. 98–422, 98th Cong. 1st Sess.).

530. With respect to the Report of the House of Representatives Appropriation Committee Report, there are no "line items" indicating the uses of the Secretary's Discretionary Fund. There is merely a single undifferentiated appropriation recommendation for "special elementary and secondary education programs." (Board Ex. 131, H.Rep. No. 98–357, 98th Cong. 1st Sess. 153; Board Ex. 133, Discretionary Fund Summary Chart).

531. With respect to the Report of the Senate Appropriation Committee there is an appended table presenting budgetary line items and indicating certain uses for these Discretionary Funds as a House "allowance" and a Senate Committee "recommendation":

| | House "allowance" | Senate "recommendation" |
|---|---|---|
| Inexpensive Book Distribution | $6,500,000 | $6,500,000 |
| Arts in Education | 2,125,000 | 2,125,000 |
| Alcohol and Drug Abuse Education | 2,850,000 | 2,850,000 |
| Law Related Education | 1,000,000 | 0 |
| Discretionary Projects | 5,049,000 | 17,290,000 |
| NDN | 10,700,000 | 0 |
| Subtotal | $28,224,000 | $28,765,000 |

(Board Ex. 132, S.Rep. No. 98–247, 98th Cong. 1st Sess. 201). $17.29 million of the fiscal year 1984 moneys appropriated to the Discretionary Fund neither appeared as "line items" in a table appended to the Conference Report, nor were otherwise "directed" in the narrative of the Conference Report. (Board Ex. 133, Discretionary Fund Summary Chart).

532. The Secretary has admitted that of the fiscal year 1984 moneys appropriated to the Discretionary Fund, at least $5.801 million constituted "truly discretionary" funds. (Cichowski Dep. at 68; LeTendre Dep. at 33, 83–84). These funds were considered discretionary because, in his opinion, the uses for these funds were neither mandated by statute, nor "directed" for particular purposes by Congressional Committee Reports. (LeTendre Dep. at 33, 83–

84). This is so, although Committee Reports "urged", "encouraged" or suggested that certain of these funds "should be used for" particular purposes. (Board Ex. 129, Cichowski Dep. Ex. 2; Board Ex. 133, Discretionary Fund Summary Chart; U.S. Response to Board Request to Admit 511; U.S. Report, Feb. 28, 1985, at 19; Cichowski Dep. at 68).

533. The $5.801 million remaining for allocation in the Discretionary Fund after the Secretary created and funded the programs detailed in Findings of Fact 508(a)– (i) was considered "truly discretionary" by the Department of Education. The Department considered these "truly discretionary" funds available for any priority or program within the authorized purposes of the discretionary fund, including desegregation assistance, which the Secretary

might, in his discretion, choose to support, establish or fund in fiscal year 1984. (U.S. Report, Feb. 28, 1985, at 19; U.S. Response to Board Request to Admit 512(i); LeTendre Dep. at 47–49; Cichowski Dep. at 68, 86–87).

534. Although the Secretary takes the position that the only Discretionary Fund program through which the Board may receive desegregation assistance is the Unsolicited Grants Competition no effort was made to maximize the amount of funds allocated to that program. Rather, those funds which remain, if any, after the Secretary has allocated funds to the areas in which he establishes priorities, are remitted to the Unsolicited Grant Competition. (Board Ex. 139, 48 Fed.Reg. 13222 (March 30, 1983);[63] LeTendre Dep. at 61–62, 72).

535. After the Secretary had established the 1984 Unsolicted Grants Competition in the Discretionary Fund, no consideration was given to establishing a priority or competitive preference points for factors, such as model desegregation efforts or consent decree undertakings, which would have provided a priority or preference for the Board's Desegregation Plan. In establishing the Unsolicited Grants Competition or the amount allocated to it, the Department of Education did not consider the Board's desegregation needs or the Consent Decree. He did not create priorities or preferences for desegregation projects or programs in general or for the projects or activities comprising the Board's Desegregation Plan. (Cichowski Dep. at 79–81; LeTendre Dep. at 69–75, 78–79, 84–86).

536. The funds existing in the Unsolicited Grant Program are those funds which were not, in the Secretary's opinion, required to meet his or the Department's priorities. By contrast, where the Secretary believes that funds are necessary to address his or the Department's priorities, he creates absolute preferences and reserves funds for those specific purposes.

(LeTendre Dep. at 15–16, 39–40, 61–62, 72). Accordingly, the manner in which and purposes for which funds allocated by the Secretary to the Unsolicited Grant Program are distributed do not implicate the Secretary's discretion to create educational policies and priorities. (Inference from Findings of Fact 509–511, 527–536).

537. The Secretary created no priority for the Board or for desegregation assistance in general in allocating his fiscal year 1984 Discretionary Funds to programmatic areas. The Secretary provided to the Board no competitive priority for these funds. (LeTendre Dep. at 48–50, 69–72, 83–84; Cichowski Dep. at 77–78).

538. In fiscal year 1984, the Secretary contingently awarded the $3.384 million allocated to the Unsolicited Grants Program to 40 projects. This amount of funds was provided to 40 fiscal year 1984 intended grantees from funds appropriated by Congress for fiscal year 1985. (U.S. Ans. to Board 1985 1st Set Int. No. 3(a) at n. *; Board Ex. 146, Bauer memorandum of Dec. 13, 1984). Consistent with his view that this program has a low priority, the Secretary subsequently altered his original plans to fully fund the 40 fiscal year 1984 projects using $3.384 million in fiscal year 1985 funds and instead decided to use $885,840 of these fiscal year 1985 funds for Technology Demonstration Projects. These technology projects were not originally selected for and did not receive fiscal year 1984 funds. Accordingly, only $2,498,160 remains in fiscal year 1984 funds for the Unsolicited Grant Program projects. (Board Ex. 146, Bauer memorandum of Dec. 13, 1984; U.S. Ans. to Board 1985 1st Set Int. 3(a) at 17).

539. The Secretary intends to return the $885,840 balance of the funds originally allocated to the Unsolicited Grants Program projects to fund Technology Projects if the Court's restraint on fiscal year 1984 funds is vacated and the restrained funds

63. For example, in fiscal year 1983, the Secretary stated that only "in the event that Discretionary Funds remain after awards have been made for the specific purposes" of other notices

or priorities established by the Secretary would the Secretary "consider any unsolicited grant application." (Id.)

are returned to the Secretary's control. (Board Ex. 146, Bauer memorandum of Dec. 13, 1984; U.S.Ans. to Board 1985 1st Set Int. 3(a)). However, if the Court should determine that the restrained fiscal year 1984 funds must be provided to the Board, the Unsolicited Grant Program projects will not receive the balance of the grants initially awarded to them. Rather than the original $3.384 million allocation, only $2.498 million would be available for the Board through the Unsolicited Grant Program. (U.S. Response to Board Request to Admit 523).

540. The priority guaranteed to the Board by the United States with respect to fiscal year 1984 Discretionary Funds was not applied at the time amounts were allocated to different programs within the Discretionary Fund, either with respect to what programs were selected for funding or with respect to the amounts which were allocated to each program. No priority was applied in establishing any particular programs, or in creating competitive preferences within programs. (Inference; LeTendre Dep. at 48–50, 69–72; Cichowski Dep. at 77–78, 80–82).

541. In creating priorities for, establishing the uses of, and awarding fiscal year 1984 Discretionary Funds to particular grantees, the Secretary and his officials responsible for allocating and awarding Discretionary Funds admittedly did not consider or discuss the Board's desegregation needs, the Consent Decree, or the Attorney General's purported "guarantee" to the Court of Appeals that the Board would receive "top of the list priority" or any funding priority for Discretionary Fund moneys. They had never heard the phrase "equitable fair share." (LeTendre Dep. at 85–86, see also 83–84; Cichowski Dep. at 80–81, 86).

542. The Secretary's officials responsible for administering the allocations and awards of Discretionary Funds in fiscal year 1984 were never informed that they were required to, should attempt to or even might create a priority or preference for the Board in allocating or distributing Dis-

cretionary Funds. (Inference from Cichowski Dep. at 14–15; LeTendre Dep. at 49–50, 69–70, 85–86).

543. The Secretary did not consider setting aside any portion of the funds appropriated to the fiscal year 1984 Discretionary Fund for the Board, nor did he consider creating an absolute priority for the Board, or creating special preferences or even competitive preferences for the Board, nor otherwise establishing programs, or absolute or competitive priorities or preferences within programs, which would provide funds for projects related to desegregation or would otherwise provide substantial funding to the Board. (LeTendre Dep. at 48–50, 69–72, 84–85; Cichowski Dep. at 80–81).

544. The Secretary's subordinates responsible for administering the allocation and award of fiscal year 1984 Discretionary Funds did not review the Board's programs to determine whether any of them were or might be eligible to receive assistance through the Discretionary Fund, or any program areas which the Secretary might establish within the Discretionary Fund. (Cichowski Dep. at 14–15; LeTendre Dep. at 17–18, 45–46, 74–75).

545. In sum, in administering the Discretionary Fund, the Secretary disregarded his obligation to the Board under the Consent Decree and his guarantee to the Court of Appeals that the Award would receive "top of the list priority" for those funds. With respect to the Discretionary Fund, the Secretary behaved as he would have if ¶ 15.1 did not exist at all. The Secretary took no steps directly or through his subordinates to meet his commitment to the Board or his promise to this Court and the Court of Appeals. (Inference from Findings 532–544).

546. The United States first communicated to the Board on September 6, 1984, through the Attorney General's representation at oral argument before the Seventh Circuit, that the Board might receive a priority in obtaining substantial desegregation assistance through the Discretionary Fund. (744 F.2d at 1305–06). The final

date for applying for fiscal year 1984 Discretionary Funds had already closed on August 1, 1984, well in advance of the Attorney General's representations. (Board Ex. 141, 49 Fed.Reg. 7550 (February 29, 1984).

547. The Secretary has previously extended the closing dates of grant competitions to permit potential applicants additional time to submit requests for assistance. (Fagan Dep. at 48–49; Board Ex. 147, Fagan memorandum of May 2, 1985). He did not do so in the Discretionary Fund to permit the Board a reasonable period of time after the Attorney General's "guarantee" of a priority for the Board in obtaining Discretionary Funds.

548. The Secretary did not contact the Board or otherwise suggest to the Board, before the application deadline for the Unsolicited Grants Program for fiscal year 1984 Discretionary Funds, that the Board should submit an application under this grant program, that the Board would be afforded priority treatment should it do so, or that the Secretary needed further information about the Board's desegregation projects and activities to determine their eligibility for Discretionary Fund assistance. (U.S. Response Board Request to Admit 515; LeTendre Dep. at 73–75, see also 46).

549. Prior to the application deadlines for the Unsolicited Grants Program, or any other Discretionary Fund Programs, the United States did not formally or informally communicate to the Board that it intended to provide the Board a priority in receiving Discretionary Fund moneys. The United States' November 10, 1983 Plan allowed the Board no priority for Discretionary Funds. Rather, it stated that any priority it purported to extend was limited to "programs that provide operational support." (Nov. 10 Plan § 3 at 4). It is the United States' view that the Secretary's Discretionary Funds does not provide operational support. (U.S. Response to Board Requests to Admit 516, 524; Board Ex. 142, 34 C.F.R. § 160.10(b), published at 49 Fed. Reg. 43226 (Oct. 26, 1984); U.S. Ans. to Board 1984 3rd Set Int. No. 11; U.S. Ans.

to Board 1984 5th Set Int. Nos. 1–4; U.S. Response to Board 2d Set Request to Admit No. 13). Moreover, after the November 10, 1983 Plan, the United States explicitly informed the Board that it would not provide it a priority in applying for or receiving Discretionary Funds for any purpose. (U.S. Response to Board 1984 2d Request to Admit No. 27).

550. Before the application deadlines for the Unsolicited Grants Program or any other Discretionary Fund programs, the Secretary had indicated his intent not to distribute any Discretionary Fund moneys to a local educational agency for the costs of implementing a desegregation plan. The Secretary had further indicated his intent by that time to use all moneys appropriated to the Discretionary Fund only to support projects or activities that the Secretary determined would further a national education priority or need or that were mentioned in congressional committee reports. The Secretary did not consider providing assistance, directly or indirectly, to a desegregation plan or to desegregation efforts, including the Board's, to be a project or activity furthering a national education priority or need. (U.S. Response to Board Request to Admit 516.; Board Ex. 141, 49 Fed.Reg. 7550 (Feb. 29, 1984); U.S. Ans. to Board 1984 3rd Set Int. No. 11; U.S. Ans. to Board 1984 5th Set Int. Nos. 1–4; U.S. Response to Board 2d Set Request to Admit No. 13; LeTendre Dep. at 71–73).

551. Before the application deadlines for all programs under the Discretionary Fund, the Secretary indicated his intent not to provide Discretionary Funds to meet "local needs". The Secretary defines a program which meets a "local need" for purposes of awarding Discretionary Fund moneys as any program which is also authorized for financing under ECIA Chapter 2, 20 U.S.C. § 3821. (U.S. Response to Board Request to Admit 516; Board Ex. 142, 49 Fed.Reg. 43226, 43231 (Oct. 26, 1984); U.S.Ans. to Board 1984 3rd Set Int. No. 11; U.S. Ans. to Board 1984 5th Set Int. Nos. 1–4; U.S. Response to Board 2d Set Request to Admit No. 13). Desegrega-

tion projects are authorized for assistance under Chapter 2.

552. Had the Board submitted a formal application in the 1984 Unsolicited Grants Program, the Board might have received a grant for approximately $100,000 (or possibly up to $200,000) for a research and demonstration project related to, but not directly supporting, its Desegregation Plan. (U.S. Response to Board Request to Admit 516, 521; U.S. Ans. to Board 5th Set 1984 Int. No. 1).

553. The Board had submitted on July 31, 1983 an application for desegregation assistance from the Secretary's Discretionary Fund. The Board was not given a priority in the review of these applications. They were not ranked sufficiently high for assistance and the Board was denied funding. (LeTendre Dep. at 17–22; Board Ex. 148, Grant memorandum of July 25, 1983 w/application; Brady Dep. at 96–98).

554. The Secretary's actions and the United States' formal communications to the Board, as detailed in Findings 548 through 553, discouraged the Board from applying for fiscal year 1984 Discretionary Fund moneys. The Board reasonably, if not inevitably, concluded that to apply for desegregation assistance through that source would be futile. (Brady Dep. at 96–98). It was the United States' conduct and not the Board's failure to make a reasonable effort, which proximately caused the Board not to submit a formal application for fiscal year 1984 Discretionary Funds.

555. The United States was aware, from the outset of the proceedings initiated by the Board's Petition to Enforce Section 15.1 of the Consent Decree, and particularly from the Board's submissions in connection with the March, 1984 hearings, that the Board sought to obtain fiscal year 1984 Discretionary Fund moneys and was specifically requesting assistance for its Desegregation Plan from this source. (U.S. Ans. to Board 1984 3rd Set Int. No. 11; U.S. Ans. to Board 1984 5th Set Int. Nos. 1–4; U.S. Response to Board 2d Set Request to Admit No. 13; 1984 Board Trial Brief).

556. In form letters sent to all the Secretary's intended grantees of Discretionary Fund moneys, the Secretary stated that the Court's restraint of these funds was "based on the Chicago Board's contentions that it has a prior claim—for support of its desegregation program—to all discretionary funds of the Department, including the funds to be used for your grant." (Board Ex. 149, Hopkins letter to McElroth).

557. The United States received on March 16, 1984 Board trial exhibits 28–89. Moreover, the Secretary's representatives and the United States attorneys attended the March, 1984 hearings in which numerous Board witnesses described in detail the Board's desegregation plan and the projects and activities comprising it. (Board Exs. 28, 30–32, 117; 1984 Trial Testimony, pp. 93–300, 535–589, 636–690, 794–848, 904–77, 1177–96). The Board's submissions and testimony in connection with this litigation contained sufficient information concerning the Board's desegregation programs to permit the United States to evaluate whether any or all of these programs were eligible for Discretionary Fund assistance. (Inference).

558. Given that the Secretary and the United States knew of the Board's claimed entitlement to desegregation assistance from the 1984 Discretionary Fund, and that these officials insisted repeatedly that the Board was ineligible for such assistance, the United States could not reasonably have expected the Board to submit a formal application for such funds absent a request that it do so and information that its application would be given priority consideration. The United States made no such reasonable efforts. (Inference).

559. All fiscal year 1984 moneys in the Discretionary Fund were, by Court order, restrained and obligated contingently to the Board or other potential grantees pending resolution of this proceeding. (U.S. District Court Memorandum Order of Sept. 28, 1984). Whatever "closing dates" the Secretary may have established to select among these other potential grantees applications pertained only to the contingent

award of funds to them. In application notices and letters sent to these other potential grantees, the Secretary explicitly informed them that their award was contingent upon the Court's finding that the Board was not entitled to these Discretionary Funds. (Board Ex. 141, 49 Fed.Reg. 7551 (Feb. 29, 1984); Board Ex. 150, 49 Fed.Reg. 2462 (Jan. 19, 1984); Board Ex. 149, Hopkins lettter to McElroth).

■ 560. The Court's restraint over fiscal year 1984 Discretionary Fund moneys and the Secretary's contingent obligation of them to the Board preserved the Board's eligibility to obtain them to assist various projects and activities comprising its Desegregation Plan, pending resolution of the dispute concerning the Discretionary Fund. This is so regardless of the Secretary's administrative "competitions" to select among other potential grantees for contingent awards of these funds. Until or if the Court's restraint is dissolved, the Board may still submit a formal application for these funds.

561. The Secretary's desire to assure broad and equitable geographic distribution of the funds awarded through the Unsolicited Grants Program was a major factor in the decision that grants should be in the amount of approximately $100,000 and that no grant actually awarded was greater than approximately $170,000. (LeTendre Dep. at 76–77).

562. The Secretary's suggested monetary range for awards of Discretionary Fund moneys through various competitions appear in notices for grant competitions and not in his regulations. These grant competition notices reserve to the Secretary the right to waive the amount limitation. (Board Ex. 141, 49 Fed.Reg. 7551 (Feb. 29, 1984)). The notices state "[t]his estimate does not bind the Department of Education to a specific number of grants or to the amount of any grant unless that amount is otherwise specified by statute or regulation." (Id.) Furthermore, these notices do not limit, and do not purport to limit the amount of funds that he may, by establishing a priority, reserve for a partic-

ular use, purpose, or grantee. (LeTendre Dep. at 48–49, 76).

■ 564. The Board's unfunded desegregation projects and activities constitute services it would not normally provide and cannot provide. Many of them, as described, involve evaluation, consultation, staff development and other special educational services and projects which are not "operating" costs. (Fagan Dep. at 85–86; Board's Appendix I and supporting exhibits). They fall within the broad definition of projects authorized for assistance through the Discretionary Fund.

565. The Secretary has previously financed with his Discretionary Funds the following types of unsolicited proposals:

a. A project similar to the Board's Trainers Institute, to provide training for teachers instructing limited English proficient students.

b. A project designed to raise student achievement in reading and mathematics.

c. A project training staff in effective instructional techniques and the evaluation and development of curricula.

d. A project to provide guidelines and effects associated with the learning and teaching of disadvantaged students.

e. A project in five schools to develop staff training activities, evaluate the factors that create an "effective school."

f. A project to improve education at a local educational agency through parent involvement.

(Board Ex. 140, CFDA 84.122B).

566. The Board's Desegregation Plan has previously been praised by the United States as a "model plan" which employs unique, innovative desegregation approaches and educational techniques. Educational researchers have also acknowledged that the activities comprising the Plan are exemplary. (Board Ex. 151, Reynolds letter to Bell of Sept. 14, 1982; Board Ex. 152, Coleman memorandum of April 21,

1981 at 2). Many of the Board's desegregation activities fall within the broad definition of "research," "demonstration" or "model" projects.

567. The Board's desegregation programs or their various components, as described, could be found to constitute programs or projects authorized for assistance under the board criteria of the Secretary's Discretionary Fund, and the Secretary's historic funding practices. (Board Exs. 28, 117, Board Ex. 120, Feb. 1985 Transition Report; 1984 Brady, Hearing, Viso and Gonzalez Testimony, pp. 93–300, 546–90, 644–84, 906–07 and 911–67, respectively; Board Ex. 140).

568. In meeting Consent Decree obligations to provide financial assistance to certain entities, other executive agencies have established priorities to permit the allocation of substantial amounts of discretionary grant moneys, as model projects, to these entities. *Gautreaux v. Pierce,* 690 F.2d 616, 621 (7th Cir.1982).

B. *Conclusions of Law*

5.1. The Secretary was authorized in fiscal year 1984 to spend $17,040,000 reserved for the Secretary's Discretionary Fund for any of the purposes or programs specified in 20 U.S.C. § 3851(a), including research and demonstration projects related to the purposes of ECIA. Those purposes include assisting local educational agencies in implementing desegregation plans, in meeting the needs of children in schools undergoing desegregation and in addressing educational problems caused by racial isolation in schools, 20 U.S.C. § 3851(a)(2); 20 U.S.C. § 3832(3) and (7). *See* 1984 Conclusion 56.

5.2. All programs and program elements making up the Board's educational components are related to the purposes of ECIA, 20 U.S.C. § 3832(3) and (7). Many of those programs could have been found by the Secretary to qualify for discretionary funds under the plain meaning of 20 U.S.C. § 3851(a)(2) as demonstrating desegregation techniques or educational remedies of national or general significance. 1984 Conclusion 57.

5.3. The Secretary is also authorized through the Discretionary Fund to provide grants to local educational agencies to assist them in implementing programs under ECIA Chapter 2, including programs to assist local educational agencies in implementing desegregation plans, in meeting the needs of children in schools undergoing desegregation and in addressing educational problems caused by racial isolation. 20 U.S.C. § 3851(a)(4); 20 U.S.C. § 3832(3) and (7). By its plain an unambiguous language, 20 U.S.C. § 3851(a)(4) authorizes the Secretary to provide direct grants of discretionary funds to local educational agencies to supplement activities or programs also eligible for financial assistance through the ECIA Chapter 2 state block grants, including 20 U.S.C. § 3832(3) and (7). Nothing submitted by the United States has shown a clearly expressed legislative intent contrary to the plain statutory language. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 75, 102 S.Ct. 1534, 1540, 71 L.Ed.2d 748 (1982); *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 1088, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1982); *Pullman Standard v. ICC,* 705 F.2d 875, 879 (7th Cir.1983). 1984 Conclusion 58.

5.4. All programs and program elements making up the Board's educational components are authorized for funding under ECIA Chapter 2, 20 U.S.C. § 3832(3) and (7), and are eligible for financing through a direct grant of discretionary funds to the Board under 20 U.S.C. § 3851(a)(4). 1984 Conclusion 59.

5.5. The Secretary's Discretionary Fund regulations, 49 Fed.Reg. 43228 (Oct. 26, 1984), U.S. Exh. 1, state (a) discretionary funds may not be used to meet "local needs" and (b) under 20 U.S.C. § 3851(a)(4) the Secretary may only provide technical assistance to local educational agencies. Those are solely administrative constraints and do not implement statutorily imposed limitations on the Secretary's use of discretionary funds. Given his stat-

utory authority to provide discretionary funds to the Board under 20 U.S.C. § 3851(a)(2) and (4), the Secretary could modify his regulations to enable him to comply fully with the United States' financial commitment to the Board under Section 15.1. *Gautreaux, supra; Citizens for a Better Govt. v. Gorsuch,* 718 F.2d 1117 (D.C.Cir.1983); *Ferrell v. Pierce,* 560 F.Supp. 1344 (N.D.Ill.1983). 1984 Conclusion 60.

■ 5.6. The Secretary is authorized by statute to allocate discretionary funds among potential applicants for those funds. It is within the Secretary's regulatory authority to establish program priorities for the uses of those funds, to establish absolute preferences that reserve all or part of the funds for a particular priority, and to establish competitive preferences for applications that meet a particular priority. 34 C.F.R. § 75.105(b)(1), (c)(2), (c)(3). The Secretary may under those regulations establish priorities and competitive and absolute preferences for a broad range of purposes, including recognition of the United States' financial commitment to the Board under the Consent Decree. The Secretary is authorized to establish a priority and a competitive or absolute preference in the Board's favor, and thus specifically reserve all or part of non-statutorily mandated Discretionary Fund monies for the Plan. See, e.g., 48 Fed.Reg. 450919 (November 4, 1983). 1984 Conclusion 61.

5.7. The Secretary's EDGAR provisions relating to the selection of projects for funding after a rank ordering of all submitted applications are usually used by the Secretary to make grants from the Discretionary Fund. However, the Secretary makes the final selection of applications for funding, and he is permitted by his regulations to change the rank order in which applications would otherwise be selected for funding based upon any information in the application, any other information he deems relevant to the program criteria, and any priorities he had established that set aside or reserve discretionary funds. 34 C.F.R. § 75.217(d)-(e). The Secretary's au-

thority to create preferences and priorities subsumes the EDGAR "competitive" selection procedures. It permits him to reserve discretionary monies for one applicant and to award them to that applicant without regard to the EDGAR competitive selection criteria. 34 C.F.R. § 75.105(c)(3). 1984 Conclusion 62.

■ 5.8. In its fiscal year 1983 and 1984 appropriation acts Congress did not earmark or allocate particular sums for the nonmandated programs within the Secretary's Discretionary Fund. The Secretary is not legally bound by program allocations or budgetary estimates not incorporated into the language of an appropriation act itself. *Matter of LTV Aerospace Corp.,* 55 Comp.Gen. 308, 319 (1975); *Matter of Financial Assistance to Intervenors,* 59 Comp.Gen. 228, 231 (1980); *see also Blackhawk Heating & Plumbing Co. v. United States,* 622 F.2d 539, 547 n. 6, 224 Ct.Cl. 111 (1980); United States General Accounting Office, *Principles of Federal Appropriations Law* 5–94 to 5–103 (1982). Notwithstanding language in congressional Committee Reports recommending or directing certain uses for the Secretary's Discretionary Funds, the Secretary did in fiscal year 1983, and did in fiscal year 1984, have the authority to make such discretionary funds available to the Board to finance its desegregation activities. See 1984 Conclusion 63.

■ 5.9. All fiscal year 1984 funds reserved for the programs or purposes specified in 20 U.S.C. § 3851(a) are currently contingently obligated. No potential applicant, other than the Board, has any legal entitlement to those Discretionary Fund monies. To the extent (if any) such potential applicants could have asserted due process rights to "compete" under the Secretary's established priorities for the use of his discretionary funds, the Secretary could have obviated any such problem in fiscal years 1983 and 1984 by publishing a notice in the Federal Register of his prospective intention to establish a priority or preference reserving certain discretionary funds for the Board pursuant to the United

States' Consent Decree obligation. 20 U.S.C. § 1232(b)(2)(A) and (B); 5 U.S.C. § 553(d)(1), and (3). In any event, potential applicants for fiscal year 1984 discretionary fund monies have no due process right to "compete" for those funds in light of the Secretary's announcements in the Federal Register that any availability of those funds for 1984 grant competitions is contingent upon the outcome of the present litigation. 49 Fed.Reg. 7551 (February 29, 1984); 49 Fed.Reg. 2462 (January 19, 1984); 48 Fed.Reg. 40919 (November 4, 1983).

5.10. In fiscal years 1983 and 1984 the Secretary was not legally obligated to provide monies from his discretionary fund for continuation awards to particular applicants other than the Board. It was within the Secretary's authority to decline to finance continuation projects on the ground that, as a result of his financial commitment to the Board, there were no program funds "available" for continuation awards or that it was in the United States' "best interest" to provide those funds to the Board rather than to continuation projects. 34 C.F.R. § 75.253(a). 1984 Conclusion 65.

5.11. In sum as to Discretionary Funds, there were in fiscal years 1983 and 1984 no statutory, regulatory or other legal constraints that prevented the Secretary from providing all or part of the nonstatutorily directed $17,040,000 appropriated to the Discretionary Fund to the Board for financing the programs included in the Board's educational components. All fiscal year 1984 funds have been and currently are "available" to the United States within the meaning of Section 15.1, even as interpreted in the second Court of Appeals opinion and explained above in our preliminary Conclusions of Law. *See* 1984 Conclusion 66.

5.12. Conclusion 5.11 by no means suggests that all of these "available" funds must be provided to the Board. *See* Preliminary Conclusion at 32. Nevertheless, in light of our Preliminary Conclusions at 27–35, and the Findings in this chapter, the Secretary violated ¶ 15.1 by never considering the Board's Plan as a

priority as to these funds at any point in "the pipeline." This total failure is obvious from admissions of the Secretary's personnel, *see* Findings 540–45, as well as from the fact that the Secretary did not even offer a priority concerning the Discretionary Fund until oral argument on appeal, well after all significant policy and funding decisions had been made.

5.13. Even though some $17 million was "available" within the meaning of ¶ 15.1, the Second Opinion and our preliminary discussion at 32–35 make clear that the Secretary had great discretion to set other priorities and fund other programs. Thus, although the Secretary had no legal obligation to follow Committee Report language, it was not bad faith per se or improper for him to do so in funding various projects "encouraged" or "directed" by Committee Reports. However, the Consent Decree imposes an affirmative obligation to accord similar priority consideration to the Board's Plan. The Secretary's failure to give the Consent Decree any consideration, let alone similar priority consideration, amounts to a violation of ¶ 15.1. Even if the Secretary followed every Committee Report recommendation to the letter, it should have (but did not) give similar deference to ¶ 15.1 in allocating the remaining funds.

5.14. Various statements and acts of the Secretary underscore that the ¶ 15.1 was not even considered as a lowly priority. For example, in its brief, the government concedes, "Undoubtedly the Secretary had authority to establish a priority for projects related to desegregation, and he could have reserved money from the Discretionary Fund for research or demonstration projects in this category." It adds, however, "But the Secretary made an educational judgment that desegregation was not the type of unmet national need that effectively could be addressed with the limited resources available under the discretionary Fund." United States' Merits Brief at 98. Such a statement admits a violation of the Consent Decree under our analysis at 27–35. ¶ 15.1 requires the Secretary to

consider the Board a priority. Otherwise it has no meaning. Thus, the Secretary may decide he does not want to fund desegregation generally, but ¶ 15.1—if it is to mean anything—compels the Secretary to adhere to his promise to fund the Board's plan specifically, or to fund desegregation programs related to Consent Decrees:

> The Executive Branch initiated this critical litigation and bears a continuing shared and special responsibility for its eventual outcome, regardless of changes in personnel and ideology that will inevitably accompany the passage of time.

744 F.2d at 1308.

5.15. Similarly, the Secretary's actions concerning the Unsolicited Grants competition show that ¶ 15.1 meant nothing to him in fiscal year 1984. As Findings 534–39 show, he allocated to this program money that was left over after he set all his other priorities. He did not even consider doing that with desegregation generally or with the Board specifically. Then, without considering ¶ 15.1, he limited any one grant of these remaining funds to about $100,000. This failure to even consider ¶ 15.1 in making these decisions, or to make an exception for the Board because of ¶ 15.1, violated ¶ 15.1. *See* Preliminary Conclusions at 27–35.

5.16. The evidence submitted under seal supports our findings and conclusions. In particular, the documents reveal that the Secretary's obligations under ¶ 15.1 were not even mentioned, let alone discounted and rejected. ¶ 15.1 was not even the lowest priority. In fiscal year 1984, ¶ 15.1 might well have not existed as far as the Discretionary Fund was concerned. Moreover, these documents, *see, e.g.*, Document "B5" confirm that the Secretary considered $17.29 million to be "truly discretionary." They also confirm that he felt bound to follow Committee language, absent reprogramming, only where both Houses agree to a particular line item number. He did not consider other Committee Report language binding, although it usually weighed heavily as a factor in his decision. But

¶ 15.1 carried no weight, let alone comparable weight, in his decisions.

 5.17. The Secretary's defense that the Board's failure to submit a formal application for 1984 Discretionary Funds prevents it from recovering now is without merit. We have previously rejected this position. *See* 610 F.Supp. at 706 n. 5. The Secretary has not persuaded us that this position was incorrect. Our Findings 546–60 as well as Conclusions 5.11–5.16 bolster that position. The "application defense" is simply another ploy of the United States in its battle to avoid its obligations under ¶ 15.1. It created the hostile conditions that caused the Board not to submit a formal application. We will not allow it to take cynical advantage of the conditions it created. *See* Findings 546–60. The United States should be ashamed to raise this defense when it had previously been so obstructive about the availability of Discretionary Funds. It continues to diminish "the respect to which [the Consent Decree] is entitled and [its actions] do not befit ... the United States Department of Justice." 744 F.2d at 1308.

5.18. The Second Opinion does not at all bolster the application defense. The Court there quoted the Assistant Attorney General's representation at oral argument that "if the Board were to submit a research or development project that would aid its desegregation efforts, the Board would have priority 'to get what the project called for.'" 744 F.2d at 1305. The government was there simply articulating its priority standard for the future. The Court nor the government was not by any means stating that the Board must have applied for fiscal year 1984 funds in order to receive them. The oral representations were the first time such a priority was offered and were made *after* the application deadline had passed. *See* Finding 546. The opinion cannot reasonably be read to imply that the Board waived its right to priority treatment by not filing an application when that treatment was not even offered and confirmed until after the application deadline had passed.

5.19. An application requirement should apply in future years, when, we presume, the government will finally be complying with ¶ 15.1. Even in that seemingly utopian situation, however, ¶ 15.1 will require the United States to alert the Board to the existence of available funds, encourage the Board to apply for such funds, give it technical assistance in applying and give the application top of the list priority. An application defense may not prevail even then, if the United States fails to fulfill these requirements, especially the "alert" and "encourage" duties. Of course, in turn, the Board must continue as it has done to date: make every good faith effort to seek available federal funds, including filing formal applications when necessary and not made futile by the United States' conduct.

## VI. *Title IV Of The Civil Rights Act of 1964*

### A. *Findings of Fact*

#### 1. *Overview of the DAC's, SEA and the Funds They Received*

601. In fiscal year 1984, $24 million were appropriated for Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c *et seq.*

602. The Secretary has allocated $428,-573 in restrained Title IV funds to the Illinois State Board of Education ("SEA"), the Indiana University Desegregation Assistance Center ("DAC" or "IDAC") and the University of Wisconsin National Origin Desegregation Assistance Center ("NO-DAC") to provide Title IV services to the Board (U.S. Report Feb. 28, 1985 at 20). It is the United States' position that this amount and earmarking of services meets its obligation to the Board under the Consent Decree. (*Id.* at 1, 21).

603. The cost of the Board's need for Title IV eligible services in school year 1985–86 far exceeds the amount of restrained Title IV funds which the Secretary has allocated to grantees who would provide such services to the Board.

604. DACs and SEAs provide assistance and are awarded funding for projects in the areas of race desegregation assistance, national origin desegregation assistance and sex desegregation assistance. (U.S. Response to Board Request to Admit 614).

605. Under 42 U.S.C. § 2000c–3, a DAC or SEA may provide technical assistance to a local educational agency for the same training, staff development and advisory services authorized by 42 U.S.C. § 2000c–4. (U.S. Response to Board Request to Admit 699C).

606. A DAC or SEA which provides in-service training to a local educational agency may provide stipends to the personnel attending that training or may reimburse the local educational agency for the cost of hiring substitutes for those personnel, to the extent the stipends or costs of substitutes do not exceed the limits set in section 270.07 of the Title IV regulations. (U.S. Response to Board Request to Admit 699B).

607. In fiscal year 1982, 1983, and 1984, 40 grants were awarded to DACs. The institutions receiving these DAC grants were identical in fiscal years 1982 and 1983, because DACs received continuation awards for these years. In fiscal year 1984, a new competition was held for DACs and 9 of the 40 DACs changed hands. (U.S. Response to Board Request to Admit 615).

608. In fiscal year 1984, Title IV grants were made to 106 SEA projects for race, sex, and national origin desegregation assistance. Approximately the same number of SEA projects were funded in fiscal years 1982 and 1983. (U.S. Response to Board Request to Admit 616).

609. In fiscal year 1984, 112 applications were submitted for Title IV SEA projects in the areas of race, sex and national origin desegregation. In fiscal year 1984, 52 applications were received for the 40 DAC awards. (U.S. Response to Board Request to Admit 617).

610. Of the $24 million used for Title IV funding in fiscal year 1984, the Department

awarded $10 million to be provided to DACs and $14 million to be provided to SEAs. Of the $10 million allocated for funding DACs, $4,521,853 was allocated for race projects, $2,922,163 for national origin projects and $2,555,984 for gender projects. Of the $14 million allocated for funding SEAs, $4,634,062 was allocated for race projects, $3,875,289 for national origin projects and $5,490,642 for gender projects. (1985 Stipulation No. 6).

611. The decision to award $10 million of the $24 million in Title IV funds for funding DACs and $14 million for funding SEAs was announced in the Application Notice for New Projects for Fiscal Year 1984 published in the Federal Register, Vol. 48, No. 245 (Dec. 20, 1983). (1985 Stipulation No. 7).

612. Coates Deposition Exhibit 3, entitled "Title IV Civil Rights Act FY 1984 Grant Awards," accurately lists the final fiscal year 1984 Title IV awards to the grantees for race and national origin projects. (1985 Stipulation No. 8).

613. The amounts actually provided, under Title IV, to fiscal year 1984 grantees serving the Board were as follows:

(a) Indiana University DAC (race)— $482,538, of which $190,000 was earmarked for the provision of services to the Board. This was the largest Title IV award granted to a race DAC in fiscal year 1984.

(b) University of Wisconsin DAC (national origin)—$401,631, of which $64,270 was earmarked for the provision of services to the Board. This was the largest Title IV award granted to a national origin DAC in fiscal year 1984.

(c) Illinois SEA (national origin)—$249,-523 of which $72,048 was earmarked for the provision services to the Board.

(d) Illinois SEA (race)—$396,564 of which $102,000 was earmarked for the provision of services to the Board. The Illinois SEA received the largest Title IV award granted to SEA race and national origin desegre-

gation assistance projects in fiscal year 1984.

### 2. Overview of the Secretary's Main Actors and Their Approach

614. Ms. Mary Winkler ("Winkler") is a Program Officer for the Title IV program. She was responsible for reviewing and making funding recommendations concerning the fiscal year 1984 applications of Title IV grantees serving the Board. (U.S. Response to Board Request to Admit 619).

615. Mr. Curtis Coates ("Coates") is the Section Chief for the section that administers Title IV of the Civil Rights Act. He has held this position for approximately 1 and ½ years. Before occupying this position, he was a program officer in the same section for about 1 and ½ years and a program officer in other program sections for about 17 years. (U.S. Response to Board Request to Admit 618).

616. The final funding decisions in fiscal year 1984 concerning the amount of Title IV funds to be awarded to grantees serving the Board were based upon the analysis of Winkler and reflected the recommendations of Winkler and Coates. (U.S. Response to Board Request to Admit 620).

617. The Department's Title IV Program Specialists encourage all of the grantees for which they are responsible to prioritize services to eligible school districts within states or service areas based on need. Since 1983, Winkler had given the grantees serving the Board priority to reflect the Board's need, and encouraged them to give the Board priority reflecting its need. (1985 Stipulation No. 9; Winkler Dep. at 32–33, 41; see also Bladholm Dep. at 32).

618. The first time Winkler became aware that the Department was to give "priority" to the Board under the Consent Decree was on April 10, 1984, at a meeting with Susan Craig. The priority she was told to apply was that described on page 24 of United States' Brief on Remand Pro-

ceedings filed in March, 1984. (1985 Stipulation No. 10).

619. In determining the specific amount of Title IV funding to recommend to be earmarked and set aside for the Board, Winkler first considered the value of the services which she believed, based on Department estimates, grantees had actually provided to the Board in fiscal years 1982 and 1983. Her initial "working estimate" of the amount which should be set aside was that it should be double the annual value of the services which the Department believed had previously been provided to the Board. This estimate was developed before her April 30 meeting with the grantees serving the Board. (1985 Stipulation No. 12).

620. Coates made a presentation about the pretrial brief at the April 30 meeting with Directors of the DAC and SEA projects serving the Board. He told the Directors that competitive priority would be given to the Board, but did not mention any approximate amounts or potential sizes of the awards. The Directors were informed, among other things, that the amount of funding for the Board would be based on the magnitude of the Board's needs and the cost of providing that assistance. The December 20, 1983 application notice for the fiscal year 1984 DAC and SEA grant competition states that the estimated award amounts to which it refers "do not bind the United States Department of Education to a specific number of grants or to the amount of any grant." 48 Fed. Reg. 56524–25, (Dec. 20, 1983). (1985 Stipulation No. 11).

621. On May 15, 1984, Winkler and Shirley Bryant, a Department grants officer, met with each of the Title IV grantees serving the Board. At these meetings, the amount of each grant award was negotiated, including the amount to be earmarked for provision of services to the Board. Each of the grantees was instructed to submit a revised budget and budget narrative reflecting the negotiated amounts. The negotiated amount generally mirrored Winkler's "working estimates." (U.S. Response to Board Request to Admit 645; Board Ex. 157, Winkler Dep. Ex. 7).

3. *Overview of IDAC's Application Process*

622. In fiscal year 1982, the Indiana Desegregation Assistance Center ("IDAC") applied for and received $311,629 in Title IV Funding. (U.S. Response to Board Request to Admit 634).

623. In fiscal year 1983, the IDAC applied for $490,690 in Title IV funding and received a grant of $292,538. (U.S. Response to Board Request to Admit 635).

624. In fiscal year 1984, the Indiana University DAC's application, submitted in February of 1984, requested a grant award of $588,089. (U.S. Response to Board Request to Admit 636; Board Ex. 158, IDAC Feb. 1984 Application).

625. In March of 1984, Winkler reviewed the IDAC's February 1984 application and made an initial recommendation that the IDAC receive an award of $362,-909. (U.S. Response to Board Request to Admit 637; Board Ex. 159, Winkler Dep. Ex. 20).

626. In April of 1984, Winkler revised her initial recommendation for the IDAC. She recommended that $636,251 be awarded to the IDAC to permit additional services to the Chicago School Board in order to implement the United States' commitment in its November 10, 1983 Plan. (U.S. Response to Board Request to Admit 638; Board Ex. 159, Winkler Dep. Ex. 20).

627. The April 18, 1984 Decision Memorandum No. 1, signed by Lawrence F. Davenport, Assistant Secretary of Education, containing recommendations as to all DAC funding, recommended that the IDAC receive $636,251. (U.S. Response to Board Request to Admit 639; Board Ex. 160, Winkler Dep. Ex. 15)

628. The Department's estimate of the value of fiscal year 1983 services provided to the Board by the IDAC was $95,000; Winkler's "working estimate" of the amount to be recommended be provided to the DAC as earmarked for the Board was

$190,000. This recommendation was forwarded to her superiors. The recommendation was adopted on April 18, 1984 by her immediate superiors and by the Department after April 18. The IDAC was ultimately awarded $190,000 for services to the Board, despite all of the events described later which followed. (1985 Stipulation No. 14).

629. After the April 30—May 3, 1984 meeting at Chicago's Richmont Hotel ("the April 30 meeting"), the Indiana University DAC (unaware of Winkler's "working estimate") submitted on May 7, 1984 a revised budget and budget narrative requesting $380,244 for the provision of services to Chicago. (U.S. Response to Board Request to Admit 643; Board Ex. 161, Winkler Dep. Ex. 22).

630. On May 15, 1984, the recommendations which later became final with respect to providing Title IV funding to DACs were made. These recommendations included the Amendment to Decision Memorandum No. 1, reducing the previously recommended award to IDAC from $636,251 to $482,538. Of this $482,538, $190,000 (not the $380,244 requested) was to be set aside for provision of services to the Board. (U.S. Response to Board Request to Admit 644; Board Ex. 162, Winkler Dep. Ex. 16; 1985 Stipulation No. 14).

631. On May 29, 1984, the Indiana University DAC submitted a revised budget and budget narrative reflecting the amounts negotiated at the May 15 meeting. The revised budget provided for a $482,538 grant award of which $190,000 was earmarked for the provision of services to the Board. (U.S. Response to Board Request to Admit 646; Board Ex. 163, 1984–85 Proposed Technical Assistance for Chicago Public Schools).

632. Approximately 27.2 percent of the $190,000 set aside for provision of services to the Board by the IDAC were paid to Indiana University as "indirect costs" in connection with University administration of the grant. (U.S. Response to Board Request to Admit 657; Board Ex. 164, Bladholm Dep. Ex. 2; Board Ex. 163, 1984–85

Proposed Technical Assistance for Chicago Public Schools).

633. The priority provided to the Board by the United States from fiscal year 1984 appropriations was actually only provided with respect to the Title IV program.

4. *Overview of the NODAC's Application Process*

634. In fiscal year 1982, the NODAC received a Title IV grant of $358,560. (U.S. Response to Board Request to Admit 660).

635. In fiscal year 1983, the Midwest National Origin Desegregation Assistance Center ("NODAC") requested $358,560 in Title IV assistance and received a grant of $337,361. (U.S. Response to Board Request to Admit 661).

636. The initial application of the NODAC for fiscal year 1984, submitted on February 20, requested $371,528 in Title IV assistance. (U.S. Response to Board Request to Admit 662; Board Ex. 165, Midwest NODAC 1984 application).

637. In March of 1984, Winkler evaluated the NODAC's February application and initially recommended that it be approved in the amount of $334,028. (U.S. Response to Board Request to Admit 663; Board Ex. 166, Winkler Dep. Ex. 24).

638. In April of 1984, Winkler crossed out the March 1984 recommendation. At that time, she recommended a grant award of $401,631 to the NODAC because of the need to increase funding to grantees serving the Board in order to implement the priority in the United States' November 10, 1983 Plan. (U.S. Response to Board Request to Admit 664; Board Ex. 166, Winkler Dep. Ex. 24).

639. The April 18, 1984 Decision Memorandum No. 1 DAC funding recommendations by Coates, which later became the final decisions of the Department of Education (except as altered by the May 15 Decision Memorandum Amendment No. 1) included a recommendation that $401,631 be awarded to the NODAC in fiscal year 1984. (U.S. Response to Board Request to

Admit 665; Board Ex. 167, Coates Dep. Ex. 2).

640. After the April 30—May 3, 1984 meeting with Winkler and Coates, the University of Wisconsin DAC submitted on May 9, 1984 a revised budget and budget narrative requesting a total grant of $441,-000, of which $83,000 was to be earmarked for services to the Board. (U.S. Response to Board Request to Admit 666; Board Ex. 168, May 9, 1984 NODAC Rev. Budget).

641. At the May 15, 1984 meeting with Winkler and Bryant, the amount of the University of Wisconsin DAC grant award was negotiated and was set at $401,631, of which $64,270 was earmarked for the provision of services to the Board (U.S. Response to Board Request to Admit 667; Board Ex. 169, June 11, 1984 NODAC Rev. Application).

642. On June 11, 1984, the NODAC submitted a revised budget and budget narrative requesting an award of $401,631, of which $64,270 was to be earmarked for the provision of services, to the Board. Of the $401,631 total grant award, $64,804 was awarded to the NODAC in September of 1984, and $336,827 was awarded in December of 1984. (U.S. Response to Board Request to Admit 668; Board Ex. 169, June 11, 1984 NODAC Rev. Application).

5. *Overview of SEA's Application Process*

643. The Illinois State Education Agency—National Origin ("SEA–NO") submitted an application for fiscal year 1984 Title IV funding on February 20, 1984 requesting an award of $202,988. (U.S. Response to Board Request to Admit 676; Board Ex. 170, Feb. 20, 1984 SEA–NO Application).

644. On May 15, 1984 the recommendation, accepted by the Department of Education, for Title IV funding of the SEA–NO was made. The recommendation was that the SEA–NO receive a grant of $251,548, of which $72,048 was to be used exclusively for provision of services to the Board. (Board Ex. 171, June 15, 1984 SEA–NO Rev. Application (Dixon cover letter);

Board Ex. 172, Winkler Memorandum re 1984 Board Funding).

645. The final grant actually awarded the SEA–NO was in the amount of $249,-523, of which $72,048 was to be set aside for provision of services to the Board. (U.S. Response to Board Request to Admit 679; Board Ex. 171, June 15, 1984 SEA–NO Rev. Application).

646. On February 21, 1984, the Illinois SEA–R submitted an application for $350,-349 for a Title IV race desegregation assistance project. (U.S. Response to Board Request to Admit 687; Board Ex. 173, Feb. 21, 1984 SEA–R Application).

647. After the April 30 meeting with Winkler and Coates, the Illinois SEA submitted on May 11, 1984 a revised budget and budget narrative for its race desegregation assistance project requesting $184,-140 for provision of services to the Board. (U.S. Response to Board Request to Admit 688; Board Ex. 174, May 11, 1984 SEA Rev. Budget).

648. On May 15, 1984, Curtis Coates recommended to his supervisors that the Illinois SEA receive an award for its race desegregation assistance project in the amount of $398,564, of which $102,255 would be earmarked for the provision of services to the Board. (U.S. Response to Board Request to Admit 689; Board Ex. 172, Winkler memorandum re 1984 Board Funding).

649. On June 14, 1984, the Illinois SEA submitted a revised budget and budget narrative reflecting the amounts negotiated at the May 15, 1984 meeting with Winkler and Bryant. The revised budget provided for a $398,564 grant of which $102,255 was earmarked for the provision of services to the Board. (U.S. Response to Board Request to Admit 690; Board Ex. 175, June 14, 1984 SEA Rev. Budget (Dixon cover letter)).

650. The Illinois SEA received $396,539 for its fiscal year 1984 Title IV race desegregation assistance project, of which $102,-255 was earmarked for the provision of services to the Board. Of the $396,539 total grant amount, $64,309 was awarded

to the SEA in September of 1984, and $322,230 was awarded in December of 1984. (U.S. Response to Board Request to Admit 691; Board Ex. 172, Winkler memorandum re 1984 Board Funding).

### 6. *The Secretary's Usual Title IV Granting Mechanism*

652. All of the fiscal year 1984 appropriation for Title IV was allocated by the Department of Education to Desegregation Assistance Centers ("DACs") and State Educational Agencies ("SEA projects"). No funds were provided directly to local educational agencies. (Coates Dep. at 22–23). Although not mandated by statute or required by Congressional Committee Report, it is the Department's practice to award funding to SEAs serving every state and to DACs serving every region of the country, assuming their applications meet applicable regulatory criteria. (U.S. Response to Board Request to Admit 613; Winkler Dep. at 9, 21–22; Coates Dep. at 10–11, 23).

652A. It has been the Department's policy since at least 1978 to award grants for race, sex and national origin desegregation assistance to DACs serving every region of the country. (43 F.R. 11686 *et seq.* (March 20, 1978); 46 F.R. 5039 *et seq.* (January 19, 1981); 48 F.R. 56254 *et seq.* (December 20, 1983)). Each DAC is assigned to a geographic service area. There are separate geographic service areas for race, sex and national origin desegregation assistance. The service areas are established in a notice published in the Federal Register. There is a separate competition for each service area; i.e., an applicant competes only with other applicants that are proposing to provide the same type of assistance (race, sex or national origin desegregation) in the same geographic service area. (48 F.R. 56254 *et seq.* (December 20, 1983), 34 C.F.R. 270.39(a)).

652B. It has been the Department's policy since at least 1978 to award grant awards for race, sex and national origin desegregation assistance to SEA projects from each State that submits an application of sufficient quality to meet a cut-off score established by regulation. SEAs do not compete with other SEA applicants for Title IV awards. If an SEA demonstrates its capability under the regulatory funding criteria by meeting the cut-off score, it is assured of receiving an award. (43 F.R. 32377 (July 26, 1978); *see* 1984 Finding 414, 588 F.Supp. at 202).

653. The Department announced, in December 1983, its recommended ranges for awards of fiscal year 1984 Title IV funds. It stated that the average amount awarded for SEA projects would be $127,000 and for DAC projects would be $250,000. Its announcement also stated that "these estimates do not bind the Department to any specific number of grants or to the amount of any grant." (Board Ex. 176, 48 Fed. Reg. 56255 (Dec. 20, 1983); *see also* Winkler Dep. at 170–71) This language reserved to the Department the discretion to ignore its recommended ranges, should it have chosen to do so, in providing funds for particular eligible applicants. (Winkler Dep. at 170–171).

653A. The Department's December 20, 1983 announcement of fiscal year 1984 DAC and SEA grant awards established a closing date of February 21, 1984. (Board Ex. 176, 48 Fed.Reg. 56255 (Dec. 20, 1983). The closing dates for SEAs was later extended to April 1984. (49 Fed.Reg. 10479 (March 23, 1984)).

654. In fiscal year 1984, 40 DACs were provided funding, the same number as were provided funding in fiscal year 1983 and fiscal year 1982. (Coates Dep. 26–27, 116; Board Ex. 177, Coates Dep. Ex. 1) In fiscal years 1982 and 1983, the DACs receiving Title IV grants were the same DACs that received funding in prior years. (U.S. Response to Board Request to Admit 615; Coates Dep. at 26–27).

655. In general, approximately 89 percent of applicants for Title IV projects receive grant awards. (U.S. Response to Board Request to Admit 617; Coates Dep. at 25).

656. The general administrative process for awarding Title IV funds to a grantee is as follows. First, Department of Education staff person reviews applications to determine the applicant's eligibility for Title IV assistance and the completeness of the application. If it is determined that the application is adequate, it is then sent to one of approximately seven review panels. The number of panels varies depending upon the number of Title IV applications received in any fiscal year. (Coates Dep. at 27–29; Winkler Dep. at 11–15). Applications in the areas of race, sex and national origin projects are evaluated independently by different panels. (Coates Dep. at 29; Winkler Dep. at 15–16, 18). These panels review the respective applications and rank them based upon the criteria established in the regulations. (34 C.F.R. § 270.17) This rating is made both by number, evaluative comments and by assignment of a numerical score. The scores are on a scale of 100 points. Applicants for state projects receiving less than 60 points are rendered ineligible for funding. (34 C.F.R. 270.20; Winkler Dep. at 21). The applications and panel recommendations are then forwarded to the Title IV Civil Rights Program Section of the Department of Education, supervised by Curtis Coates. Mr. Coates divides these applications and panel evaluations and assigns them to one of several staff persons in his office. A staff person again reviews each application with its accompanying panel recommendation. At this point, the staff person first recommends an amount of money to be awarded to the application. Coates then reviews each application and the recommended funding amounts, and, if there are no problems forwards the recommendations to his supervisor and the division director, Dr. George Rhoades. (U.S. Response to Board Request to Admit 621; Winkler Dep. at 24–28; Coates Dep. at 28–31, 33, 102, 110–13).

657. In recommending and determining the amount of Title IV funds awarded to each grantee, the Department ordinarily relies only upon the proposed services and information contained in the application in assessing the funding needs of the grantee. (Coates Dep. at 31, 41–42, *see also* 19–20, 40–42, 130–31; Winkler Dep. at 34–35, 93). Factors which may be considered in making the determination about the monetary amount of the grant include prior applications submitted by this applicant and the amount of its previous years' grants. To the extent the information is contained in the applications, factors also considered include: the number of desegregating school districts served by the potential grantee, the amount of Title IV services needed by each of those districts, the number of students served by each of those districts, whether a court ordered desegregation plan is in effect, the costs of the proposed services, as well as other factors set forth in the regulations. (Coates Dep. at 40–46; Winkler Dep. at 33–37, 95–98; 34 C.F.R. § 270.20). The Department does not normally independently obtain information concerning these factors from the school districts served by the grantee. Instead it relies solely upon the grantee's application for this information, considering these factors only to the extent that the relevant information is contained in the application. (U.S. Response to Board Request to Admit 622; Winkler Dep. at 33–36, 93, 98–99; Coates Dep. at 28–31, 42, 93, *see also* 19–20).

658. In recommending and determining the amount of Title IV funds awarded to each grantee staff members normally consider each application independently. (Coates Dep. at 31; Winkler Dep. at 33–35). Because there are several different staff members independently and simultaneously considering several applications for grant amounts, they cannot and do not in practice compare the relative needs of school districts served by one grantee against the relative needs of school districts served by other grantees. Rather, in actual practice, a staff member recommends a particular amount of funding if, first, it is "in line" or within the Secretary's average range of permissible grant amounts and then, second, if this amount is justified by the services the grantee proposes to provide to the

school districts it serves. (Coates Dep. at 27–32, 43–46; Winkler Dep. at 93, 94–98, 146–47, 151–53, 167, 170–72).

659. The staff who review applications for Title IV assistance, including Winkler, are aware of the total amount available for funding SEAs and DACs under Title IV and of the Department's estimates concerning the permissible range of assistance to provide these entities. (U.S. Response to Board Request to Admit 623). These initial allocation decisions guide staff in approving grant amounts. (Winkler Dep. at 98–99, 170–72; *see also* 146–47, 151–53, 167).

7. *Title IV Personnel Learn of the Priority, Make Preliminary Estimates, Which Turn Out to be Final Ones*

660. On April 6, 1984, Coates and Winkler received a memorandum informing them that:

The attached portion of the Government's pretrial brief sets forth the position the Government has taken with respect to Title IV assistance to Chicago. The section I have underlined (p. 24) summarizes this position, describes the Governments [sic] intentions, and serves as the basis for what Title IV will be expected to do.

(Board Ex. 178, Winkler Dep. Ex. 1; Winkler Dep. at 42–44; Coates Dep. at 35–39). This memorandum also informed Coates and Winkler that a meeting had been scheduled for April 10 between them and Susan Craig, an attorney in the Department of Education, concerning Title IV assistance to the Board. (*Id.*)

661. This memorandum was the first communication from the Department to Coates and Winkler about the decision to afford the Board priority treatment with respect to Title IV assistance, and the nature of that priority. Other than the November 10, 1983 Plan of the United States and the United States' pretrial brief, referred to in this memorandum, no other written matter or instructions were provided to them. (U.S. Response to Board Request to Admit 624; Winkler Dep. at 43–45,

140–41; Coates Dep. at 35–39; Board Ex. 178, Winkler Dep. Ex. 1).

662. On April 10, 1984, the Department of Education's intention to give the Board a priority in receiving Title IV services was first explained to Coates and Winkler. They were instructed by Susan Craig, a Department attorney, that the Board was to receive a competitive priority based on need as described in the United States' Pre-Trial brief and the November 10, 1983 Plan of the United States. (Winkler Dep. at 42–46; Coates Dep. at 35–40; Board Ex. 178, Winkler Dep. Ex. 1).

663. At the April 10, 1984 meeting neither Winkler nor Mr. Coates was told how to implement that priority nor the precise meaning of it. (Winkler Dep. at 44–45, 81–83; Coates Dep. at 35–39, 127–29 (Inference)). They were not told then or ever that they should ensure that Chicago received the "maximum level" or its "equitable fair share" of available Title IV services or that the grantees serving it receive the "maximum amount" or their equitable fair share of Title IV funds available to provide those services. (U.S. Response to Board Request to Admit 699D, Winkler Dep. at 44–45, 101–02; Coates Dep. at 54–55, 128).

664. Winkler, who had responsibility for evaluating applications and making grant recommendations concerning the Title IV grantees serving the Board, developed alone recommended funding estimates ("working estimates") and a plan to implement the priority treatment, as explained to her at the April 10, 1984 meeting. This plan was entitled "Working Plan for Chicago Board of Education." (Winkler Dep. at 48–50, 69, 118–22, 139–41; Coates Dep. at 58–59, 62; Board Ex. 179, Winkler Dep. Ex. 4).

665. In accordance with Winkler's working plan for Chicago, she invited the Directors of the DACs and SEA projects serving the Board to meet with Coates and her in Chicago beginning on April 30, 1984. (Winkler Dep. at 52; Board Ex. 180, Winkler Dep. Ex. 2; Coates Dep. at 57–58).

666. Prior to the April 10, 1984 meeting with Susan Craig, Ms. Winkler and all other Title IV staff, had already received the panel evaluations and had reviewed the applications assigned to them. Specifically, Winkler had received and reviewed the applications of the grantees serving the Board. All program staff had developed recommendations for the amount of funding to be provided to Title IV grantees, including those serving the Board. (Winkler Dep. at 47, 81; Coates Dep. at 75, 122–23); *see, e.g.,* Findings 626–28.

667. After the April 10 meeting with Susan Craig, but before the April 30 meeting with the grantees, Winkler revised her Title IV award recommendations in light of what she had been told at the April 10 meeting. (Winkler Dep. at 47–48, 117–18, 121–22, 137–39). At that time, Winkler revised her initial recommendations to grantees serving the Board, increasing them "to permit additional services to the Chicago School Board, in order to implement the commitment made in a Nov. 1983 Plan of the United States...." (*Id.;* Board Ex. 159, Winkler Dep.Ex. 20; Board Ex. 166, Winkler Dep.Ex. 24). These recommendations, like the original recommendations, were for the total amount of funding to be provided to grantees serving the Board, and did not formally include a separate statement of the amount of this total which was to be set aside for services to the Board. (Winkler Dep. at 122–23; Board Ex. 159, Winkler Dep.Ex. 20; Board Ex. 181, Winkler Dep.Ex. 21; Board Ex. 166, Winkler Dep.Ex. 24; Board Ex. 182, Winkler Dep.Ex. 25).

668. With respect to the DAC projects, Winkler's revisions in the recommendations as to the total amounts to be awarded to the grantees serving the Board, made after the April 10, 1984 meeting with Susan Craig, were forwarded to Coates and by him to George Rhoades and were approved by them on April 18, 1984. On April 18, 1984, two weeks before the April 30 meeting with the Title IV grantees in Chicago, Coates and Rhoades had approved funding recommendations for all DAC projects, including Winkler's, for grantees serving the Board. (Winkler Dep. at 47, 81, 123; Board Ex. 183, Winkler Dep.Ex. 13; Board Ex. 184, Winkler Dep.Ex. 14, Board Ex. 185, Winkler Dep.Ex. 15; Coates Dep. 122–26, 131, see also 74–75).

669. Between April 10, 1984 and April 30, 1984 Winkler also developed her "working estimates" of the amount of the awards which should be earmarked or set aside for the Board to implement the competitive priority explained to her at the April 10, 1984 meeting. (Winkler Dep. at 69, 118–22, 137, 139–41, 156; Coates Dep. at 58, 74–75; 1985 Stipulation No. 2). Ms. Winkler understood that she was to provide for this set aside in the limited context of estimated funding ranges for DACs and SEAs, established in the Dec. 20, 1983 Federal Register notice of competitions for these Title IV grants. (Winkler Dep. at 98–99, 146–47, 151–53, 167, 170–72).

670. Winkler's initial working estimates for the value of Title IV services to be provided to the Board as a "priority" was that the value should simply be double the value of services assumed to have been previously provided to the Board in fiscal year 1983. She provided, and the Secretary has since provided, no rationale for this determination. (1985 Stipulation No. 12; Winkler Dep. at 69, 118–22, 139–41, 168–69).

671. Winkler's initial "working estimates" were based upon her estimation that the Board had received approximately $95,000 in fiscal year 1983 services from the IDAC (Winkler Dep. at 118–19, 168–69; 1985 Stipulation No. 14), $30,000 in fiscal year 1983 services from the NODAC (Winkler Dep. at 66–70, 140); and $150,000 in combined services from the SEA–R and from the SEA–NO. (Winkler Dep. 140–41; Board Ex. 186, Winkler Dep.Ex. 11). Winkler's estimates of the value of these services were based upon her review of the grantees' previous applications and previous Department estimates (Board Ex. 186, Winkler Dep.Ex. 11; Simms Affidavit; U.S. Plan, Nov. 10, 1983; Winkler Dep. at 69, 140–41).

672. However, before her April 10, 1984 meeting with Susan Craig, Winkler had received from another Department of Education staff person certain documents describing proposed Board desegregation projects and activities and the costs of those activities. (Winkler Dep. at 53–54, 88–90; Board Ex. 187, Winkler Dep.Ex. 9; Board Ex. 188, Winkler Dep.Ex. 10). These documents were, in fact, excerpts from Board 1984 Trial Exhibit 28. Winkler determined that all these proposed Board projects were eligible for Title IV assistance. (Winkler Dep. at 55–56; *see* note at Finding 680). The cost total of these projects authorized for Title IV assistance was $35 million. (1985 Stipulation No. 13). Between April 10, 1984 and April 30, 1984, Winkler organized these documents to provide to the grantees serving the Board at the April 30 meeting. (Winkler Dep. at 52, 56).

673. From April 30, 1984 to May 3, 1984, Winkler and Curtis Coates met with representatives of each of the grantees serving Chicago and requested they each submit a revised application for fiscal year 1984 funds which included a separate budget specifying and earmarking the Title IV services to be provided to the Board. (U.S. Response to Board Request to Admit 642). At this meeting Curtis Coates explained to the grantees that the priority to be applied in formulating their proposed separate budgets and estimated services was that contained in the United States' pretrial brief. (1985 Stipulation No. 11; Winkler Dep. at 51–52, 57–59 et seq., 80, 85–86, 91; Coates Dep. at 39, 50, 55–60, 127–31; Harris Dep. at 19, 52–53; Wofford Dep. at 15–18).

674. At the April 30 meeting, Winkler also distributed to the grantees serving the Board, the documents she had previously received describing certain proposed Board desegregation projects and activities. (Winkler Dep. at 56–58). In her opinion, the Board's projects were generally eligible for Title IV assistance. She intended that these described activities would assist the grantees in formulating their proposals for Title IV services to be provided to the Board. (Winkler Dep. at 55–56).

675. On May 15, 1984 the Decision Memoranda for the Illinois race and national origin projects were submitted and approved. (Board Ex. 197, Decision Memorandum # 1 on Race Desegregation; Board Ex. 198, Davenport memorandum of May 25, 1984). On May 25, 1984, the decisions concerning the identity of and amounts to be awarded to all Title IV SEA grantees were made by the Department as reflected in Decision Memorandum No. 1 on SEA funding from Davenport to Maimone. Those decisions were based upon and identical to the May 15 recommendations Coates submitted to his supervisor on May 16. (Board Exs. 199–200, Winkler Dep. Exs. 17–18). Grant awards were made to the grantees and in approximately the amounts identified in these recommendations. (Winkler Dep. at 111–12; Board Ex. 201, Coates Dep.Ex. 3; Board Ex. 198, Davenport memorandum of May 25, 1984; Coates Dep. at 48, 104, 131–33). The only variance was caused by the addition of one state grantee, previously denied funding, to the list of awarded projects in September. The amounts the Department had earmarked for all SEA projects, including the SEA serving the Board, were reduced by approximately $2,000 to provide $212,000 for the additional grantee. (U.S. Response to Board Request to Admit 630, 631; *Compare* Board Ex. 201, Coates Dep.Ex. 3 with Board Ex. 198, Davenport memorandum of May 25, 1984; Coates Dep. at 132–34; Winkler Dep. at 111–12, 154–55).

8. *The Board's Plan Has Title IV–Eligible Projects Which Cost Several Million Dollars*

676. During fiscal year 1984, the Title IV authorizing statute, the Department of Education Appropriation Act and the Secretary of Education's regulations permitted a direct grant of Title IV assistance through the program authorized at 42 U.S.C. § 2000c–4. The Department retained the discretion to make a direct grant to the Board to finance its projects and activities

authorized for Title IV assistance. (Coates Dep. at 135). It also retained the discretion to make all of the Title IV appropriation available directly or indirectly to provide assistance to the Board. (Harrison Dep. at 70–72). *See* Conclusions 6.3, 6.10 below.

677. The types of programs or activities for which the Secretary makes Title IV funds available, directly or indirectly, are accurately described in the Secretary's 1981 decision memoranda for race and national origin desegregation assistance plans:

(a) The Secretary has approved advisory, staff development and inservice training programs for Title IV funds where the programs contribute, develop or disseminate information or skills which materially assist in implementing effectively a race or national origin desegregation assistance plan. The Secretary has approved training, staff development and advisory services for Title IV funds where he finds that they are related to or materially assist in implementing a desegregation plan.

(b) The Secretary has approved inservice training and advisory activities for Title IV funding or technical assistance in connection with programs designed to raise minority pupils' or limited English proficient pupils' academic achievement where these programs were required educational remedies in a court approved race or national origin desegregation plan and were supplemental to a school district's pre-existing compensatory education or basic skills programs.

(c) The Secretary has approved for Title IV funding or technical assistance inservice training and advisory activities in connection with programs designed to raise minority pupils' or limited English proficient pupils' academic achievement where the inservice and advisory activities were specifically directed toward educational techniques or instructional strategies to teach minority pupils effectively. (Board Ex.

203, National Origin decision memoranda; *see also* 1984 Findings 409–12, 588 F.Supp. at 201).

678. The Secretary approved fiscal year 1980 and 1981 Title IV grants to the Board in the amounts of $422,800 and $298,639 respectively. The Secretary determined that the inservice and advisory programs described in the Board's applications were found activities eligible for Title IV assistance in the planning and initial implementation of the Board's educational components. These were activities authorized for Title IV assistance either directly or through a DAC or SEA. (Inferences from U.S. Responses to Board Requests to Admit 699B, 699C; Board Ex. 73–74).

679. Board Appendix B depicts the inservice, staff development and advisory components of the Board's desegregation plan, as represented in Board exhibit 28, which remain unfunded. (Board Ex. 213, Board Appendix B). The projected cost of implementing these components is $11,775,300. According to the Secretary's historic funding practices detailed in Findings 677–678, these activities, as described, fall within the broad range of activities authorized for direct Title IV assistance to a local educational agency. As admitted by the United States, such activities are accordingly also authorized for assistance through a DAC or SEA. (U.S. Response to Board Request to Admit 699B, 699C).

680. Based upon certain selected excerpts submitted to her from Board trial exhibit 28 (Board Exs. 187–188; Winkler Dep.Exs. 9 and 10). Winkler knew that at a minimum the Board had several million dollars in unmet needs authorized for Title IV assistance.[64] (Winkler Dep. at 53–56, 98–99; 1985 Stipulation No. 13). Winkler is an experienced Department of Education staff person familiar with the requirements and Secretary's practices in administering Title IV. (Finding 614; Winkler Dep. at 3–4). Her conclusion as to the eligibility of

---

64. Winkler admits that she obtained only excerpts from trial exhibit 28. (Winkler Dep. at 55). At that time Winkler did not know the author or the origin of the documents. (Winkler Dep. at 53–54). Had Winkler received all of trial exhibit 28 she might have known that the Board had a far greater need for Title IV assistance.

the Board's programs for Title IV assistance demonstrates that Secretary could fund many of the activities in these programs.[65]

681. Accordingly, a substantial portion of the inservice and advisory programs in the Board's Desegregation Plan including those described in Board Exhibit 28, Winkler Deposition Exhibits 9 and 10, and all of those in Appendix B are eligible for race and national origin desegregation assistance under Title IV of the Civil Rights Act of 1964, §§ 42 U.S.C. 2000c–2, 2000c–4. (U.S. Response to Board Request to Admit 601; Winkler Dep. at 8–9, 55–56; Wofford Dep. at 24, 27, 40, 43, 47–49; Harris Dep. at 26, 48–49; *see also* 1984 Finding 408, 588 F.Supp. at 201; Conclusions 43–45, 588 F.Supp. at 222–23).

682. The Board has submitted to the Illinois State Board of Education its "Request for Title IV Desegregation Implementation Assistance." (Board Ex. 212, Implementation Report; Wofford Dep. at 68–79). This document represents that at a minimum the cost of meeting the Board's need for Title IV assistance in school year 1984–85 is $12,150,000. (*Id.*) This document requests services similar to those proposed in Board Appendix B. (*Compare* Board Ex. 213, Board Appendix B *with* Board Ex. 212, Implementation Report). The services it requests were relied upon by the Illinois State Board of Education in submitting to the Department its revised application for Title IV assistance to the Board in fiscal year 1985. (Wofford Dep. at 47–48, *see also* 40–41, 68–70). According to the evaluation of the Illinois State Board, and the Secretary's historic funding practices detailed in Findings 677–80, the advisory and inservice activities requested in Board Request of Title IV Implementation Assistance are eligible for Title IV services. (Wofford Dep. at 40–41, 47–49).

683. The inservice and advisory activities described in the Board's Request for Title IV Desegregation Implementation Assistance (Board Ex. 212), submitted to the Illinois State Board of Education, are eligible for Title IV assistance and accurately represent the Board's need for Title IV assistance in school year 1985–86. (Wofford Dep. at 40–41, 48–49, 68–70).

684. The cost of providing in fiscal year 1984, and in school year 1985–86, the unfunded incremental programs or aspects of programs of the Board's Desegregation Plan which are eligible for Title IV assistance is at least $12 million. (Board Ex. 213, Board Appendix B; Winkler Dep. at 8–9, 55–56; Wofford Dep. at 40–41, 47–49, 68–70; Harris Dep. at 68).

#### 9. *Title IV Personnel Did Not Thoroughly Consider the Board's Title IV Needs*

685. Coates, Winkler's supervisor, in implementing the "priority" in providing Title IV assistance to the Board did not analyze or assess the Board's general needs or priorities for Title IV assistance. (Coates Dep. at 15–18, 135–36). Coates had not reviewed thoroughly the Board's Desegregation Plan, its 1984 trial exhibits 28 or 117 or Appendix B to the Board's Post-trial Submission. (Coates Dep. at 6–8, 18). Consequently, Coates could not have made a thorough evaluation of the Board's need or eligibility for Title IV assistance. (Coates Dep. at 13–16, 21, 41–42, 55, 58–59, 61–62, 93–94).

686. Other than reviewing a limited excerpt from trial exhibit 28 and the previous applications submitted by the grantees serving the Board, Ms. Winkler also did not otherwise analyze or assess the Board's general needs or priorities for Title IV services before the April 30 meeting. She also was not familiar with the Board's Plan, the remainder of trial exhibit 28 or Appendix B. (Winkler Dep. at 5–6, 77–79, 92–93, 99, 133). She did not contact the

---

**65.** Despite her testimony that "all of the activities outlined in these documents were eligible in terms of Title IV assistance," Winkler Dep. at 55, Winkler submitted an addendum to her deposition, claiming that the *programs* described in these documents were eligible, but every *activity* in those programs might have not been eligible. Even if this is true, the import of her testimony as amended is still that the Board has huge eligible, unmet Title IV needs.

Board. (Brady Dep. at 50–51, 91; Winkler Dep. at 53–56, 78–80, 92–93, 99, 133) (Inference).

687. Specifically, then during this period when Winkler was formulating her "working estimates" for the level of Title IV services that might be provided to the Board, she did not contact the Board or review materials concerning its Desegregation Plan. (*Id.;* Coates Dep. at 58–60; Brady Dep. at 91). Although she had in her possession documents indicating that the Board's need for Title IV assistance was at least $12 million, she based her working estimates solely upon the level of services she believed the Board had previously been provided by the Title IV grantees, and simply doubled that. (Winkler Dep. at 69, 118–21, 140–41; Coates Dep. at 58–59, 61–62).

### 10. *The April 30—May 3 Meeting with the Grantees*

688. At the April 30, 1984 meeting with the Title IV grantees serving the Board, Winkler distributed the memoranda addressed, respectively, to the Title IV race grantees and the Title IV national origin grantees. (Board Exs. 187–88; Winkler Ex. 9 and 10; Winkler Dep. at 52–53, 55–56, 57; Wofford Dep. at 27–28). Attached to these memoranda were documents described as "a summary of the [race and national origin] desegregation needs of the [Board]." (Board Exs. 187–188; Winkler Dep. at 56). These attachments were the excerpts from Board trial exhibit 28 described in Finding of Fact 680. (*Id.*) Winkler believed and represented to the grantees that all programs encompassed in these attachments were eligible for Title IV assistance by the grantees. (Winkler Dep. at 55–56; Wofford Dep. at 27–28).

689. Although Winkler had made the preliminary determination that the Board had these substantial Title IV authorized needs, which cost at least several million dollars, she did not at the April 30, 1984 meeting inform the grantees of the level of services that they might provide to the Board or were likely to obtain funds to

provide. (Winkler Dep. at 57, 91, 98–99; Coates Dep. at 128; Wofford Dep. at 21; Harris Dep. at 53). She provided the grantees a copy of the memoranda and attachments and simply requested that they prepare proposed budgets specifically outlining services to be provided only to the Board. The grantees were not given additional guidance in preparing these budgets, narratives, or proposed applications for providing additional services to Chicago. (Winkler Dep. at 81, 85–86, 89–90, 100; Wofford Dep. at 17–18, 27–30; Harris Dep. at 19, 53–54; Coates Dep. at 127–31).

690. Specifically, Winkler did not inform the grantees that they might request and have a reasonable expectation of receiving a grant award significantly greater than the Secretary's predetermined range of permissible awards in Federal Register application notice. (Winkler Dep. at 56–57, 85–86, 91; Coates Dep. at 127–131; Wofford Dep. at 10–13, 17–18, 20–21, 39–40; Harris Dep. at 53, 61, 62–63). The Department did not at any time in fiscal year 1984, either at or after the April 30, 1984 meeting, request that the grantees serving the Board assess the Board's total Title IV eligible needs or submit a plan, proposal, application or budget narrative addressing those total needs or the Board's priority needs. (Inference from Wofford Dep. at 29–31; Winkler Dep. at 57–58, 78, 85–86, 90–92, 98–99, 128, 145–46). None of these people was informed or instructed that the Board should receive its "equitable fair share" of Title IV assistance or the "maximum level of [Title IV] assistance" that could be provided to the Board. (Winkler Dep. 101–102; Coates Dep. at 54–55, 128; Harris Dep. 53, 61–62; Wofford Dep. at 21).

691. None of the grantees who would provide fiscal year 1984 Title IV services had undertaken a thorough assessment of the Board's Title IV eligible needs. (Winkler Dep. at 78, 88–90; Wofford Dep. at 11–12, 29, 30). They did not carefully review or evaluate the Board Trial Exhibit 28 excerpts provided to them by Winkler. They considered these excerpts no more

than guidelines to determine broad areas in which the Board might use Title IV services. They did not consider these excerpts as a recommendation to seek to attempt to provide a significant part of these services to the Board. (Wofford Dep. at 28–29, 31, 39, 40, 44; Harris Dep. at 53–54).

693. At the April 30, 1984 meeting with the Title IV grantees serving the Board, Winkler did not suggest that they tailor their proposed services to the needs of the Board's Plan.[66] (Inference from Findings 689–90; Wofford Dep. at 29–31, 39, 44; Harris Dep. at 68). She provided the grantees no documents describing the plan other than the limited excerpts from trial exhibit 28. (Winkler Dep. at 56–57, 89–90; Wofford Dep. at 27–30; Harris Dep. at 19, 54).

694. Winkler did not inform the grantees of the facts that she had already estimated the total awards to these grantees, and the "earmarked" portions, and that these estimates had been formally approved by the Department. (Winkler Dep. at 56–59, 85–86, 91, 139; Coates Dep. at 74–75, 127–30; Harris Dep. at 53, 61–62, 67–68; 1985 Stipulation No. 11).

695. At the April 30, 1984 meeting with the Title IV grantees, Winkler did not suggest that the grantees might provide significant direct Title IV assistance to the Board through subcontracting, retaining the services of independent consultants to assist the Board or providing stipends to Board teachers attending staff development sessions. (Inferences from Winkler Dep. at 127, 85, 81, 89–90; Harris Dep. at 24, 70, 77; Wofford Dep. at 70). Rather, the grantees assumed that their proposals for assistance to the Board should reflect a level of services which they could themselves provide. The grantees' self-perceived capacity, alone, to provide substan-

tial services to the Board was a principal constraint upon the level of Title IV services they proposed to provide to the Board. (Wofford Dep. at 22–23, 38–40, 44; Harris Dep. at 62–63, 59–60).

696. At the April 30, 1984 meeting, the grantees were instructed to submit budget and budget narratives for fiscal year 1984 which would specifically delineate and document the Title IV services they would provide to the Board in school year 1984–85. (U.S. Response to Board Request to Admit 642). They understood this to mean that they should separately account for their services to the Board in a different manner from their regular grants. (Winkler Dep. at 80–81, 88–89, 123–26, 132; Coates Dep. at 52–53, 68–69). They did not all assume that they should provide services purely in addition to or of a substantially greater value than those provided in previous years. Rather, some assumed it was simply to ensure that Chicago received the services specified.[67] (Harris Dep. at 36; see also 55–56, 68, 81–82; Winkler Dep. at 156–57; Coates Dep. at 54; U.S. Response to Board Request to Admit 659).

697. At the April 30, 1984 meeting, the grantees were instructed to submit their revised budgets and proposals for Chicago Title IV services within approximately one week of the meeting. (Wofford Dep. at 51; Winkler Dep. at 100). As a consequence of this short period of time the grantees could not fully determine the Board's priority needs, formulate detailed proposals for services to Chicago nor attempt to address the type or known "enormous" magnitude of the Board's Title IV needs. (Wofford Dep. at 26, 30–33, 37–40).

697A. At the April 30, 1983 meeting, Winkler also discussed with the grantees the level of Title IV services they had actu-

---

66. There is conflicting evidence about whether Winkler told the grantees not to contact the Board about its needs. This conflict is not significant. Regardless of the truth of this fact, our conclusions of law would be the same. Thus, we need not decide this factual dispute.

67. See Findings 699.9 & n. 69, 699.11 for elaboration. It should be noted that the NODAC and

the SEA–R seemed to have a better understanding that the earmarked funds were supposed to be purely supplemental. See Findings 699.21, 699.36. But even the NODAC used its earmarked funds to pay for, rather than supplement, some of its "regular" Title IV costs. See Finding 699.22.

ally provided to the Board in previous fiscal years. She and Coates also learned the enormity of the Board's Title IV need. (Winkler Dep. at 57, 58; Board Ex. 214, Agenda or Winkler Dep. Ex. 8; Wofford Dep. at 26–27). They also learned that the value of services the grantees had previously provided to the Board was only $20,-000 (Winkler Dep. at 70–71; Coates Dep. at 74; *see* Conclusion 6.17C & n. 77). Although this estimate conflicted with her own previous estimate that of $275,000 or $300,000 in Title IV assistance had been provided to Board, Winkler did not revise her "working estimates". (Winkler Dep. at 130–31; 168–69; Board Ex. 186, Simms Aff.). The Board apparently only requested this amount of services from the grantees in 1983 because of its litigation posture. (*See* Conclusion 6.17C). This does not suggest that the Board does not need millions in Title IV assistance.

697B. The meeting of April 30, 1984 did not provide a realistic opportunity for the Title IV grantees to propose a substantial increase in the amount of assistance made available to the Board. Winkler and Coates failure to encourage the grantees to meet or attempt to meet a substantial portion of the Board's Title IV needs limited the nature and monetary amount of the grantees' proposals for Title IV services to the Board. This meeting was not a serious attempt to maximize the level of services the grantees would propose to provide. (Wofford Dep. at 17–21, 27–31, 33, 35, 37–40, 43–44, 61; Winkler Dep. at 88; *also* Inference from Findings 685–697A).

11. *After the Meeting: The Grantees Apply and Their Requests are Whittled to Match the Pre-Determined "Working Estimates"*

698. As detailed in the following Findings, after the April 30 meeting, each of the Title IV grantees serving the Board submitted their revised Budgets and proposals for providing fiscal year 1984 Title IV assistance to the Board. In general, these applications for assistance were sent to the Department within 7–10 days of the meeting. (Board Exs. 168, 174, 182, 204). After each application was received, Winkler reviewed it and recommended an amount for funding. (Winkler Dep. at 100–12, 131). On May 15, 1984, Shirley Bryant, a Department grant officer, actually negotiated with each grantee the final amount of award for Title IV services to the Board. (Winkler Dep. at 100–01, 112; Coates Dep. at 131; Board Ex. 157). At the time of these negotiations, Bryant was aware of Winkler's recommendations. (Winkler Dep. at 100–01, *112*; Coates Dep. at 86). After Ms. Bryant's negotiations with each grantee, the grantees submitted revised applications reflecting the negotiated grant amount. (Board Exs. 169, 171, 175, 207; Coates Dep. at 67). These revised applications were accepted by the Department and the grants in the amounts determined were awarded. (Winkler Dep. at 131–32, 164–65; Coates Dep. at 67).

699. Winkler used a similar process in making recommendations to Ms. Bryant about the awards for each Title IV grantee serving the board. Winkler knew that the Board's Title IV eligible needs reached several million dollars and admits that she knew that the Board's Title IV needs were far in excess of the amounts requested in the grantees' revised applications. (Winkler Dep. at 108, 128, 145–146). However, she substantially reduced the amount proposed for services to the Board in the budgets of the IDAC, the Wisconsin NODAC and the Illinois SEA. (Winkler Dep. at 98–100, 114–33, 140 *et seq.;* Board Exs. 168, 182, 204, 174, 209, 210) Winkler admits that she did not review the applications or proposals of the grantees to determine the extent to which they addressed the Board's needs or whether they provided the maximum level of Title IV services that could be made available to the Board. (Winkler Dep. at 98–100, 108, 126, 130, 150). She claims that she instead determined whether, as an accounting matter, the costs presented were reasonable in light of the level of services the grantees proposed to provide to Chicago (Winkler Dep. 96–98, 130, see also 126–131, 133, 144–151, 157). She did not question the adequa-

cy of the level of the proposed services or whether they ensured "priority treatment." (Wofford Dep. at 17 *et seq.*, 39, 43–44, 46–47).

699A. Although Winkler knew that the Board had enormous, eligible Title IV needs, she relied on the information contained in the grantees' revised applications to make her recommendations for funding (Winkler Dep. at 99–100, 133, 144–145). To the extent such information was not contained in the grantees' applications, she did not consider the Board's needs in making her grant recommendations. (*Id., see also* at 126, 128, 145–46; Wofford Dep. at 43–44, 46–47). Moreover, as detailed in Finding 699, the grantees' budgetary justifications, rather than the Board's needs, were her preeminent consideration in recommending a grant amount.

699.1. Although Winkler substantially reduced the grantee's proposed budgets on a basis other than the Board's needs for Title IV assistance, she did not request that the grantees revise their budgets to attempt to justify their proposed costs, nor did she suggest that they seek additional amounts for other services with proper justification. (Winkler Dep. at 135, 163–64). She did not permit the grantees to attempt to address the Board's needs. Rather, she determined that these reduced figures would constitute her "recommendations" for the value of Title IV services to be provided to the Board by the grantees. (Winkler Dep. at 96–98, 101, 126, 156–57; Board Ex. 209).

699.2. As detailed in the following Findings, Winkler's recommendations were, remarkably, nearly identical to her previous "working estimates." Moreover, as detailed in the following Findings, after the May 15 negotiations between Winkler, Bryant and each of the Title IV grantees serving the Board, the amounts "agreed" to as the grantees' awards for services to the Board were also nearly identical to Winkler's previous "working estimates" and identical later recommendations. (Winkler Dep. at 101, 130–31, 140, 168–69; Board Ex. 157; Board Ex. 211, Bryant

Funding Document; Wofford Dep. at 43–44, 46–47).

699.2B. Despite the various discussions with the grantees serving the Board about the Board's needs, and their review of the grantees' budgets for proposed services, the remarkable coincidence between the "working estimates" and the final earmarked awards makes clear that Winkler was never willing to recommend nor Coates willing to approve any award of funds significantly in excess of Winkler's predetermined working estimates. Reciting "budgetary considerations," "accounting justifications," and vague subjective impressions of other grantees' "needs," both stated that they would not have approved amounts significantly in excess of those actually provided for the Board. (Coates Dep. at 90–93; Winkler Dep. at 93–100, 127–29, 144–53, 157, 170–171).

699.3. On May 15, 1984, after Winkler's negotiations with the grantees serving the Board, the Department issued an amended decision memorandum specifying the final grant awards for the DACs. This decision memorandum amended the one issued on April 18, 1984. It reduced the final negotiated award to the IDAC from $636,000 to $483,000. The $153,000 reduction in the IDAC grant—which did not come out of funds earmarked to the Board—was redistributed to increase the amount of Title IV grant awards to five other DACs not serving the Board. (Coates Dep. 105–106; Board Ex. 162). The justification for this amendment stated that "the new recommendations will enable grantees to provide assistance to additional school districts *beyond those with the most pressing needs.*" (Board Ex. 162, at 2, emphasis supplied). The memorandum also stated that the reduced assistance for the IDAC represented "the level of funding needed to ensure the availability of *adequate* services to the Board." (Board Ex. 162, at 2). Although Winkler believed that the Board's needs for Title IV assistance were far in excess of the grantees' proposals and approved awards, these funds for which the grantees could not provide sufficient budgetary "justifications," were reallocated to other

grantees whose funds had been reduced. (Coates Dep. 107; Winkler Dep. at 108, 128).

699.4 A second Department of Education Decision memorandum also accurately summarizes the Department's rationale in adjusting the Title IV awards to various DAC grantees. That rationale was to maintain funding at levels requested by other grantees, regardless of any commitment to provide the Board a priority in receiving Title IV services. This second memorandum provides: "The Fiscal Year 1984 Funding Levels for all grantees, except the Indiana University and Wisconsin National Origin Desegregation Assistance Centers, were recommended for funding at the current fiscal year 1983 levels or below. *These recommendations will allow each Center to maintain the same level of assistance to requesting local Educational Agencies within their services area.*" (Board Ex. 177, emphasis added).

699.4A Overall, the rationale guiding Winkler and the Department in analyzing the grantees' proposed requests for assistance, recommending funding amounts and awarding grants is expressed in the final grant document issued to each grantee serving the Board. That document provides that the amount awarded "reflects the level of funding needed to ensure the availability of *adequate* Title IV services to the Board." (U.S. Report, Feb. 28, 1985, attachments) Coupled with the rationale expressed in Finding 699.4, it appears first that the Department awarded for services to the Board only a level of Title IV funds which it did not otherwise intend to use or that other Title IV grantees did not have a need for. And second, that it determined summarily that this amount provided "adequate" rather than maximum services to the Board.

12. *The Post-April 30 Process with Respect to Each Grantee*

699.5. In response to Winkler's request that it prepare a separate proposal and

budget for services to Chicago, the IDAC submitted on May 7, 1984 a narrative document similar to that previously submitted to the Department (*Compare* Board Ex. 182 *with* Board Ex. 158). Services it proposed to provide to the Board were not significantly different, if at all from those described in its first submission to the Department. (*Compare* Board Ex. 158 at 7–24 *with* Board Ex. 187 at 1–7; Winkler Dep. at 132, 135–36; Harris Dep. at 17–18, 26, 31, 33–36). The document does not reflect a serious evaluation of the Board's total Title IV needs or the costs of those needs. (Board Ex. 182; Winkler Dep. at 90, 128, 145–46; Harris Dep. at 19, 22; Wofford Dep. at 29–31, 38–40, 44). Rather, it reflects services that the DAC chose to provide and does customarily provide to all school districts in the region. (*Compare* Board Ex. 208, 1983 IDAC application, at 18 *with* Board Ex. 158 at 1–5 *with* Board Ex. 182 at 1–9; Harris Dep. at 17–18). In formulating their proposal, the IDAC did not communicate with the Board to determine its needs.[68] (Harris Dep. at 19; Wofford Dep. at 29–33).

699.6. The Department of Education did not ask whether the IDAC had reviewed Board Trial Exhibits 28 or 117, Appendix B to the Board's post-trial submission, or any other documents containing a detailed evaluation of the Board's Plan implementation programs or the aspects of those programs eligible for Title IV services. (Inferences from Winkler Dep. at 56–57; Harris Dep. at 19, 69).

699.7. None of the applications for fiscal year 1984 Title IV funding submitted by the IDAC reflected or represented that they contained a thorough assessment of the Board's Title IV eligible needs. (*Compare* Board Ex. 208, 1983 IDAC application at 18 *with* Board Ex. 158 at 1–5 *with* Board Ex. 182 at 1–9; Harris Dep. at 17–18, 19, 53–54; Winkler Dep. at 78, 90). The IDAC

---

**68.** As noted below, the Board had cut off direct communication with IDAC. *See* Conclusion of Law 6.17–6.17B. But this "silence" did not re-

strict the amount that IDAC requested in its applications. *Id.*

did not seek even a substantial portion of the funding which, in the view of IDAC, would be required to meet all of the Board's Title IV eligible needs. (Harris Dep. at 17–18, 59, 60, 68; Winkler Dep. at 128; *compare* Board Ex. 208, 1983 IDAC application, at 18 *with* Board Ex. 158 at 1–5 with Board Ex. 182 at 1–9).

699.8. The IDAC knew that the Board's Title IV eligible needs exceeded by several million dollars the set aside and the amount that the DAC requested for providing Title IV services solely to the Board. (*Id.*) The IDAC was never informed that the Department had initially recommended a Title IV grant of $636,251, or asked by the Department whether that level of funding could be used to meet all or any part of the Board's Title IV needs. (U.S. Response to Board Request to Admit 653; Harris Dep. at 57, 60; Winkler Dep. at 110). The limited amount of funding requested by the IDAC, in these subsequent 1984 proposals, was largely a function of the amount of funding which it could anticipate receiving from the Department of Education. (Inference from Findings 688–697B; Inference from Wofford Dep. at 12–13, 18, 40).

699.9. The IDAC understood the requirement that it "earmark" or "set aside" funds to be only a requirement that it separately budget for the funds that it planned to expend to provide services to the Board, and that it actually spend no less than this amount on such services. As understood by the IDAC, it was *not* a requirement that these funds be used to provide only additional or supplemental services, beyond those which had been provided in previous years from its regular grant, or which would normally have been provided in fiscal year 1984 from its regular grant. These would be given to the Board only if the earmarked funds were spent

and other funds remained. (U.S. Response to Board Request to Admit 659; Harris Dep. at 33–36, 55–56, 81–82).[69]

699.10. On May 29, 1984, the IDAC submitted a revised proposal reflecting the results of the May 15, 1985 negotiations and Winkler's recommendation as to the award amount. This May 29 revision, setting aside the negotiated $190,000 for services to the Board, was identical to Winkler's "working estimates". (1985 Stipulation No. 14; Winkler Dep. at 101, 120–26, 130–31, 168–69). It proposed substantially similar services for the Board, with the addition of a series of workshops and one consultant's services. (*Compare* Board Ex. 207, May 29, 1984 IDAC Proposal at 699 *with* Board Ex. 182 at 1–7 *with* Board Ex. 158 at 7–24; Harris Dep. at 26). Most of the costs and services identified in the IDAC proposal of May 29, 1984 for the $190,000 were contemplated by its initial proposals for fiscal year 1984 Title IV funding and were provided in prior years. (Compare Board Ex. 207, May 29, 1984 IDAC Proposal at 687–698 *with* Board Ex. 182 at i–ii; Harris Dep. at 33–36; Bladholm Dep. at 8–9).

699.11. The $190,000 set aside for provision of services to the Board in the grant to the IDAC represents the initial pool of funds which the IDAC contemplated providing to the Board. Only if these "earmarked" funds were exhausted, additional services were required, *and* if additional funds remained available from the balance of the grant, would the IDAC have considered taking any of the remaining funds from the balance of its basic grant to augment the $190,000. (Harris Dep. at 33–36, 55–56, 81–82). The amount set aside by the IDAC for providing services to the Board was not intended or understood to provide services purely supplemental to those pro-

---

**69.** The head of IDAC, J.J. Harris ("Harris") submitted an affidavit which contradicts his deposition testimony. He now belatedly claims that he understood the earmarked portion to be purely supplemental. This affidavit deserves little weight, since it is inconsistent with Harris' deposition testimony, which was live and subject to cross-examination. Moreover, as Find-

ing 699.11 makes clear, the IDAC *did* use some of the "earmarked" funds to pay for, rather than supplement, services previously provided out of the "regular" grant. The earmarked portion was thus not purely supplemental, but rather supplanted a significant portion of the regular grant.

vided in previous years. (*Id.;* Board Ex. 202, Title IV Grant Conditions; United States Response to Board Request to Admit 659). For example, 80% of the salary of Ann Bladholm, a member of the IDAC staff who had *previously* spent about 80% of her time serving Chicago, was shifted from the budget for the regular grant to the supplemental budget for the earmarked funds. (Board Ex. 158, 161, 164; Harris Dep. at 33–36). Similarly, certain rental and overhead costs were shifted from IDAC's regular budget to its Chicago budget. (*Id.*). Consequently, some services from the grantees' basic grants that would otherwise have gone to the Board and should have been provided to it, were actually available in fiscal year 1984 to assist other school districts. To the extent the funds earmarked by Winkler were intended to double the services the Board would have received from the basic grant, some of these funds—theoretically up to one-half—could have gone to other school districts.

699.12. Thus, not all of the $190,000 awarded to the IDAC and set aside for the Board, and perhaps as little as $95,000,[70] represented additional funding to provide services which had not been provided in prior years. Of the amount that is truly supplemental, after overhead costs and expenses only about 20% was available for providing direct services to the Board. (Harris Dep. at 42).[71]

699.13. Accordingly, to the extent the IDAC is typical of the grantees serving the Board (U.S. Stipulation No 1), at most only 20% of the $428,573 that is apparently supplemental funding, or about $85,000, was actually provided for supplemental direct services to the Board. (Inference). To the extent that earmarked funds supplanted the basic grant, somewhere between 10 and 20% of the $428,573 was actually provided for supplemental direct services. (Inference).

699.14. The applications for fiscal year 1984 funding submitted by the NODAC do not reflect or represent a thorough evaluation of the programs or aspects of programs in the Board's Desegregation Plan eligible for fiscal year 1984 Title IV services. (Board Ex. 165, NODAC 1984 Title IV Application at 114–20; Winkler Dep. at 78, 90, 145–46; Inference from Wofford Dep. at 12, 21, 29–31, 38–42, 44).

699.15. The Department of Education did not inquire whether the NODAC had reviewed Board Trial Exhibits 28 or 117, Appendix B to the Board's post-trial submission, or any other documents containing a detailed evaluation of the Board's Plan implementation programs or the aspects of those programs eligible for Title IV services. (Winkler Dep. at 78–79, 89–90, 100, 145–46; Wofford Dep. at 28–29; Inference from Finding 699.6).

699.16. Since it received from Winkler a document outlining the Board's Title IV eligible national origin needs at over $4,000,000, the NODAC knew that the Board's Title IV needs exceeded by several million dollars the amount it requested for providing services to the Board. (Winkler Dep. at 56–57; Board Ex. 187, Winkler Dep.Ex. 9).

699.17. The Board's fiscal year 1984 Title IV eligible needs were thus far in excess of the amounts of Title IV funding which the NODAC thought it could anticipate receiving from the Department of Education. (Winkler Dep. at 145–46; Inferences from Wofford Dep. at 12–13, 18–22, 39–40, 44, 62, 63; Board Ex. 168, May 9, 1984 NODAC Application).

699.18. The amount of funding requested by the NODAC, particularly in its subse-

---

**70.** This assumes first that the $190,000 earmarked for the Board is the only source from which it will receive assistance from the IDAC. It assumes second that the Board previously could have received $95,000 in services from the IDACs grant. Hence, only the remaining $95,000 represents additional funding for the Board.

**71.** Harris testified that approximately $40,000 of the entire $190,000 grant for the Board was available for direct services. (*Id.* at 42) Accordingly, if in reality only ½ of that grant represents additional services for the Board, then ½ of $40,000 or $20,000 is available for additional direct services.

quent 1984 proposals, was largely a function of the amount of funding which it believed might be available from the Department of Education. (Inference from Findings 688–697B; *see also* Wofford Dep. at 18–22, 39–40, 44, 62, 63).

699.19. In response to Winkler's request that it prepare a separate proposal and budget for services to Chicago, the NODAC submitted on May 9, 1984 a narrative document similar to that previously submitted to the Department. (Board Ex. 168, NODAC May 9, 1984 Application) The services it proposed to provide to Chicago were not significantly different from those described in its first submission to the Department. (*Compare* Board Ex. 168 at 1–4 *with* Board Ex. 165, at 114–20). The document does not reflect an in-depth evaluation of the Board's total Title IV needs or the costs of those needs. (Winkler Dep. at 78, 90, 145–46; Inference from Wofford Dep. at 12, 21, 29–31, 38–42, 44). Rather, it reflects the services that the NODAC chose to provide and does customarily provide to all school districts in the region. (*Compare* Board Ex. 168 at 1–4 *with* Board Ex. 206, 1983–84 NODAC proposal at 9–21). In formulating its proposal, the NODAC did not communicate with the Board to determine its needs or Title IV priorities. (Brady Dep. at 89–91; Inference from Wofford Dep. at 31; Board Ex. 168, May 9, 1984 NODAC Application).

699.20. Winkler did a detailed budget analysis and edit of the NODAC's May proposal, and determined that the proposal justified an award of $64,000 to be earmarked for services to the Board. (Winkler Dep. at 144; Board Ex. 210, Winkler Dep.Ex. 26). In yet another "coincidence," this amount of earmark approximately matched Winkler's April "working estimate." She had doubled the estimated 1983 services in the range of $30,000. (Winkler Dep. at 101, 140).

699.21. Unlike the circumstances with respect to IDAC, the NODAC's final budget revision, submitted on June 12, 1984, and approved by the Department of Education, states that a significant percentage of the NODAC's regular grant would be used to provide services to the Board, in addition to the services provided with the earmarked funds. (Bd.Ex. 169, p. 1). The DAC's May 9, 1984 revised budget narrative states that 10 percent of the regular grant would be used to provide services to the Board, in addition to services provided with the earmarked funds. (Bd.Ex. 168).

699.22. However, similar to the IDAC, a substantial portion of the $64,000 earmarked for the NODAC to provide services to the Board, reflected indirect costs such as overhead and other administrative expenses. Accordingly only a part of these supplemental funds was available for direct Title IV services to the Board. (Winkler Dep. at 62, 167–68).

699.23. After the April 30, 1984 meeting with Winkler, the SEA–NO submitted a revised proposal and budget, on May 11, 1984, requesting a total of $251,548, of which $90,190 was to be set aside for provision of services to the Board. (Board Ex. 204, SEA–NO May 11, 1984, at 12).

699.24. $90,190 was earmarked for the Board in the SEA–NO's revised May proposal. (Board Ex. 204, SEA–NO May 11, 1984, at 12–13). This amount was calculated by the SEA–NO based upon its estimate that the value of services it initially contemplated providing to the Board prior to the April 30 meeting was $41,660, and that $48,560 in *additional* services should be provided to the Board through the amended proposal. (*Id.* at 11, 13). It added the cost of the services it intended to provide from its basic grant to the cost of the supplemental services to determine the $90,190 amount of its set aside for the Board. This formulation indicates that the SEA–NO viewed the earmark as reflecting the total services it would provide to the Board and not merely supplemental services. Thus, the supplemental funding for the Board requested by the SEA–NO was only $48,560. This constituted approximately half the amount that Winkler intended it to earmark for services to the Board. (Board Ex. 204, SEA–NO May 11

proposal; U.S. Response to Board Request to Admit 659; Winkler Dep. at 86–87).

699.25. The proposal the SEA–NO submitted in May was a narrative document similar to that previously submitted to the Department. (*Compare* Board Ex. 204, May 11, 1984 SEA–NO Application, *with* Board Ex. 170, Feb. 20, 1984 SEA–NO) The services it proposed to provide to Chicago were not significantly different from those described in its first submission to the Department. (*Compare* Board Ex. 204, May 11, 1984 SEA–NO Application, at 2–8 *with* Board Ex. 170 at 16–34). The document does not reflect a thorough evaluation of the Board's total Title IV needs or the costs of those needs. (Inferences from Winkler Dep. at 78, 90; Wofford Dep. at 12, 21, 29–31, 38–42, 44). Rather, it reflects the services that the SEA–NO chose to provide and does customarily provide to all school districts in the state. (Board Ex. 204, May 11, 1984 SEA–NO Application, at 5–8). In formulating its proposal, the SEA–NO did not communicate with the Board to determine its needs or Title IV priorities. (Brady Dep. at 89–91; Wofford Dep. at 31; Board Ex. 204, May 11 SEA–NO Application).

699.26. The Department of Education did not inquire whether the SEA–NO had reviewed, nor did the Department provide to the SEA–NO, Board Trial Exhibits 28 or 117, Appendix B to the Board's post-trial submission, or any other documents containing a detailed evaluation of the Board's Plan implementation programs or the aspects of those programs eligible for Title IV services. (Inference from Winkler Dep. at 78–79, 89–90, 100; Wofford Dep. at 27–29, 31; Harris Dep. at 19).

699.27. Because it received from Winkler a document outlining the Board's Title IV eligible national origin needs, the SEA–NO knew that the Board's Title IV needs exceeded by several million dollars the amount it requested for providing services to the Board. (Winkler Dep. at 55–57; Board Ex. 187, Winkler Dep.Ex. 9).

699.28. The Board's fiscal year 1984 Title IV eligible needs were thus far in excess of the amounts of Title IV funding which the SEA–NO thought it would anticipate receiving from the DOE. (Inference from Wofford Dep. at 38–42; Board Ex. 187, Winkler Dep.Ex. 9).

699.29. On May 15, 1984 the recommendation, accepted by the Department of Education, for Title IV funding of the SEA–NO was made. The recommendation was that the SEA–NO receive a grant of $251,548. Of this amount $72,048 was to be used exclusively for providing services to the Board. The balance $179,500, was to be used for providing the SEA–NO's services to school districts other than the Board. (Inference from Findings 699.24, 699.11; Board Ex. 148; U.S. Response to Board Request to Admit 659, 678; Board Ex. 211, Bryant Funding Documents; Inference from Harris Dep. at 33–36, 55, 81).

699.30. Like the NODAC, the SEA–NO initially contemplated providing funds to the Board from its basic grant and later reallocated those funds to the amount it earmarked for the Board. Of the $72,048 awarded to the SEA–NO for services for the Board, the SEA–NO originally estimated that $41,660 would have been provided to it from its basic grant. Consequently only the $30,388 balance remaining constitutes supplemental services for the Board. (Inference from Finding 699.24; U.S. Response to Board Request to Admit 659; Harris Dep. at 36, 55–56, 81; Board Ex. 175, June 14, 1984 SEA–NO Application; Board Ex. 173, Feb. 21, 1984 SEA–R Application, at E–14 to E–15).[72]

699.31. A substantial portion of the $30,388, which the SEA–NO used to provide actual additional services for the Board, was consumed in indirect, overhead and administrative costs for providing indirect services. (Winkler Dep. at 62, 167–68; U.S. Response to Board Request to Admit 659; Board Ex. 175, June 14, 1984 SEA–NO Application; Board Ex. 173, Feb. 21, 1984 SEA–R Application, at E–14 to E–15).

**72.** The rationale behind this calculation is explained in Finding 699.12 at n. 70 and n. 71.

699.32. In response to Winkler's request that it prepare a separate proposal and budget for Title IV services to Chicago, the SEA–R submitted a narrative document similar to that previously submitted by it to the Department. The services it proposed to provide to the Board were not markedly different from those described in its previous submissions. (*Compare* Board Ex. 174, SEA–R May 11, 1984 Application *with* Board Ex. 205, SEA–R 1983 Application) These services were largely those that it would have awarded from the basic grant and had provided in previous years. (*Id.;* Wofford Dep. at 31, 38–42, 60–61). It reflects the services that the SEA–R chose to provide and does customarily provide to all school districts in the region. (*Id.*) In formulating its proposal, the SEA–R did not communicate with the Board to determine its needs or Title IV priorities. (Wofford Dep. at 31; Board Ex. 174).

699.33. The applications submitted by the SEA–R did not contain a thorough evaluation of the programs or aspects of programs in the Board's Desegregation Plan eligible for the provision of fiscal year 1984 Title IV services. The SEA–R did not review or evaluate Board's Trial Exhibits 28 or 117 or Appendix B to its post-trial submission. (U.S. Response to Board Request to Admit 693; Wofford Dep. at 12, 21, 27–31, 38–42, 44; Board Ex. 173 at i–ii; Board Ex. 174, May 11, 1984 SEA–R Proposal and cover letter).

699.34. None of the applications for fiscal year 1984 Title IV funding submitted by the SEA–R reflected or represented that they contained a thorough assessment of the Board's Title IV eligible needs, or sought even a substantial portion of the funding which, in the view of SEA–R, would be required to meet all of the Board's Title IV eligible needs. (Wofford Dep. at 38–42; Board Ex. 174).

699.35. The Board's fiscal year 1984 Title IV eligible needs were far in excess of any amounts of Title IV funding which the SEA–R thought it could anticipate receiving from the Department of Education. The amount of funding requested by the SEA–R in its subsequent proposals was largely a function of the amount of funding which it believed it could anticipate recovering from the Department of Education. (Wofford Dep. at 12–13, 18–19, 21, 38, 40, 43, 44, 62–63; Inference From Findings 699.8–699.18).

699.36. Unlike the circumstances with respect to the other grantees, the SEA–R used its special grant award to provide *only* additional or supplemental services for the Board. The SEA–R contemplated providing $59,000 in services to the Board from its basic grant, in addition to the $102,000 set aside for services to the Board. (Wofford Dep. at 45; Board Ex. 174).

699.37. A substantial part of the value of the Title IV assistance earmarked for the Board by the SEA–R was consumed in indirect overhead and administrative costs or for providing indirect services. (U.S. Response to Board Request to Admit 659; Board Ex. 174; Winkler Dep. at 62, 167–68).

699.38. Like the other grantees, the amount of the set aside "negotiated" and awarded to the SEA–R and SEA–NO was not changed after Winkler's review of its application, and formulation of her funding recommendations. It "coincidentally" remained identical to her original pre-April 30 "working estimate." (Winkler Dep. at 101; Wofford Dep. at 43, 46–47).

699.39. Fiscal year 1984 Title IV grant awards were not actually made by the Department of Education until December of 1984. As a result, there were substantial delays in the provision of assistance to the Board. As of June 1985, the grantees had provided to the Board few, if any, of the services contemplated in their applications. (U.S. Response to Board Request to Admit 654; Wofford Dep. at 51; Brady Dep. at 94).

13. *Summary of What the Secretary Actually did in Fiscal Year 1984*

699.39A. Despite the haphazard and somewhat arbitrary funding process de-

scribed exhaustively above, these facts are clear from the above findings.

(1) The value of Title IV services available to the Board in fiscal year 1984 was greater (although not substantially so) than the value of Title IV services that would have been available without the consent decree.

(2) The amounts set aside for the Board through the earmarking of funds in Title IV grant awards to grantees serving the Board were the only Title IV funds so earmarked and set aside for any school district in fiscal year 1984 or in any previous year. (February 25, 1985 Winkler Affidavit, ¶ 9; Winkler Dep. at 166; Coates Dep. at 89).

(3) The Illinois SEA and the NODAC were the only Title IV grantees in fiscal year 1984 to receive larger grants than they requested in their initial applications. (Bd.Ex. 183, 184, 199, 200, 201). However, they received less than they requested in their revised applications so that the amount they received mirrored Winkler's working estimates.

(4) The general administrative process for awarding Title IV grants to SEAs and DACs *was* modified, albeit haphazardly, in fiscal year 1984 with regard to the four Title IV projects providing race and national origin desegregation assistance to the Board in order to provide some additional money to the Board.

Despite the findings in paragraph 699.-39A, the following is equally clear:

699.40. From the $24,000,000 allocated to Title IV in fiscal year 1984, the Secretary established priorities for using those funds *before* inviting applications for them and without considering either the needs of the Board or providing a priority for the Title IV grantees serving the Board.

699.41. At the outset of fiscal year 1984, without considering the Board's needs or extending a priority for the grantees providing Title IV services to the Board, the Secretary determined that the average awards of Title IV assistance for a

DAC would be $250,000 and for a SEA would be $127,000.

699.42. In its April 18 Decision Memorandum No. 1 recommendations concerning the allocation of Title IV funds and the amount of awards to all Title IV grantees, the Department effectively made its decision about the amount of Title IV funds available to meet its "priority" to the Board. This decision was made without considering the Department's obligation to the Board or providing a priority in allocating assistance to the grantees serving the Board. This decision was made well in advance of any attempt by the Department to obtain or elicit reliable information about the Board's Title IV needs.

699.43. Winkler is a mid-level staff person in the Department of Education. She was delegated the task of implementing the Title IV priority for the Board. Neither she nor her ostensible supervisor Coates were told how she should do this. Neither she nor Coates were told that they should or were explicitly authorized by the Department to provide the Board any substantial amount of the Title IV funding, or its "equitable fair share" or the maximum level of Title IV assistance that could be provided by the Department. (Finding 663). Absent such explicit directions it was reasonable to expect that each person would deviate little from usual Department procedures to provide the Board a meaningful priority under the consent decree.

699.44. Winkler was not supervised by Coates or other Department policy-making officials in implementing this priority. They simply placed their imprimatur upon her recommended funding amounts. Absent instructions to the contrary, Winkler thus determined the amount that could be provided to the Board to meet this "priority" from the perspective of a mid-level Department of Education staff person. She was necessarily guided by the Department's usual procedures. As any staff person, she was constrained in the amount that she could provide for the Board both by the April 18, 1984 funding recommendations, and the Secretary's recommended

ranges of permissible grant awards for DACs and SEAs. (Winkler Dep. at 170–172). Regardless of the magnitude of the Board's Title IV needs, those restraints guided her estimates for the amount of Title IV assistance to be provided for the Board. She and Coates also stated that, at most and regardless of this "priority," she could have provided the grantees serving the Board only a few thousand more dollars to implement this priority. (Finding 699.2B).

699.45. The Department did not establish any formal criteria or procedures for Winkler to follow in determining the maximum level of Title IV funds it could provide to the grantees serving the Board. There was no systematic analysis or any investigation by her or the Department into the needs of the Board, other Title IV grantees or the maximum level of Title IV assistance that could be provided to the Board. Ms. Winkler states that to the extent this analysis occurred, she learned by talking informally with other staff people. (Winkler Dep. at 94–96; Finding 699.2B) Although the Department ostensibly provided the Board a priority based upon its need for Title IV assistance, the Department gave Winkler no instructions about how to reconcile the Board's priority with the other staff persons' perceived needs to provide Title IV assistance for their grantees. Winkler apparently accepted that she had limited, if any authority, to request Title IV moneys significantly in excess of those made available to other grantees by other staff persons. (Inference; Finding 699.2B).

699.45A. Because of her position in the Department of Education, Ms. Winkler could not act independently to determine or decide the maximum level of Title IV assistance which the *Department* could make available to the Board. Absent supervision by policy officials, official criteria to follow or special authorization, the Department could not reasonably have expected her to implement meaningfully the expansive priority guaranteed to the Board. From the outset, Winkler lacked the perspective and the authority to fulfill this commitment.[73]

699.46. To implement her task in obtaining priority assistance for the Board, Winkler developed what are referred to above as her "working estimates" for providing Title IV assistance to the Board. She concluded that to meet the priority for the Board she would double the amount of Title IV assistance provided to it in previous fiscal years. She provided no rationale for this calculation. There is no apparent relationship between this formula and the Board's extensive unmet need for Title IV assistance. Nor is there any obvious relationship between this calculation, the needs of other Title IV grantees or the maximum level of Title IV assistance that could have been provided to the Board.

699.47. Moreover, in implementing the priority and in determining the value of Title IV services to be provided to the Board, Winkler relied exclusively upon the proposals and budgets of the grantees. She did not independently analyze the Board's needs. To the extent that the Board received any priority for Title IV services, its value was artificially limited by the grantees' estimates of the level of funds they might ultimately receive, their constraints in providing Title IV services and, essentially, their grant writing abilities. This approach fundamentally misperceived the Department's promise in ¶ 15.1. Its commitment was to guarantee that the

---

73. In making these findings, we by no means cast judgment on Winkler's professional abilities. To the contrary, we sympathize with the predicament she doubtless found herself in during April 1984. She was told to give the Board some undefined priority; she had to do *something*. Constrained by usual Department criteria, acting under serious time pressure and largely ignorant of the Board's Title IV needs, it comes as no surprise that her approach was largely arbitrary—simply double the value previously estimated services, and "negotiate" with the grantees to accept this value of services. Her predicament aptly illustrates the point we make later in our conclusions: The burden of providing "priority" treatment to the Board should not have fallen on Winkler alone without guidance; rather, it should have begun at the top of the bureaucratic pecking order.

Board obtained the maximum level of Title IV assistance available under *program criteria* and not under the requests, perceptions or perceived capabilities of the grantees serving it.

699.48. Although Winkler and Coates later met with the grantees providing Title IV services to the Board on April 30, 1984, they did not seriously encourage or permit the grantees to propose substantial, additional Title IV services for the Board. To the extent the grantees proposed additional services, Winkler recommended substantial reductions in the proposals. In her opinion, as an accounting matter, the grantees had failed to "justify" the costs of the level of services they proposed to provide to the Board. This criteria was unrelated either to the Board's or other potential grantees' needs for Title IV services or the maximum level of assistance that could have been provided to the Board. It, again, misperceived and disregarded the Department's commitment to make available to the Board the maximum level of Title IV assistance under criteria.

699.48A. Winkler's suggested reductions were identical to the final grant awards "negotiated" and made by the Department. (Winkler Dep. at 101) These awards, as made, approximate Winkler's predetermined "working estimates." From the outset, the Department or Winkler had preconceived that the "working estimates," or an amount of funds within the range of these estimates, would constitute the additional Title IV assistance made available to the Board. No meaningful evaluation was made to determine the maximum level of assistance that could be provided to the Board.

699.49. There is no discernible relationship between the rationale underlying either Winkler's "working estimates," the amount of additional Title IV assistance actually provided to the Board and the Department's obligation to provide the maximum level of Title IV assistance to the Board. According to the admitted criteria used by the Department's officials responsible for implementing the priority guaran-

teed to the Board, no serious effort was made by the Department either to determine the maximum level of Title IV assistance that it could provide to the Board, or to make that assistance available to the Board.

699.50. Although the United States has said that it provided a "priority" in the value of Title IV services made available to the Board, it apparently provided only Title IV funds not needed by other grantees. The amount of fiscal year 1984 Title IV funding awarded to each of the grantees not serving the Board was either approximately the same amount as that grantee had received the prior year or reduced to reflect the lower demand for that grantee's services by school districts in its service region. Hence, it seems only that "excess" department funds were provided to the grantees serving the Board to meet this "priority."

699.50A. As implemented, the top of the list priority the Department guaranteed to the Board and promised the Court of Appeals has amounted only to the Board receiving a separate budget valuing the Title IV assistance provided to it and having few additional services made available to it.

### B. *Conclusions of Law*

6.1. Our discussion of the pipeline and scope issues earlier renders Judge Shadur's Conclusion 39 still valid, as applied to Title IV. *See* Preliminary Conclusions at 14–37.

6.2. As Conclusions 6.3–6.12 establish, the Secretary had several options open to him in according priority treatment to the Board, either directly or indirectly.

6.3. In fiscal year 1984, the Secretary was authorized to grant all or any part of those Title IV monies directly to local educational agencies to finance the desegregation activities specified in 42 U.S.C. § 2000c–4. In that year the Board was implementing a court approved desegregation plan and qualified as a local educational agency eligible to receive direct Title IV race and national origin desegregation as-

sistance. 42 U.S.C. § 2000c–4; 34 C.F.R. §§ 270.04, 270.06. 1984 Conclusion 42, 588 F.Supp. at 222. Findings 677–681, as well as 1984 Conclusions 43–45, 588 F.Supp. at 222–23, establish that the Board's Plan contains many projects which meet all applicable statutory criteria and which are eligible for direct or indirect Title IV assistance.

■■■■ 6.4. The Secretary's statutory authority to consider "such other factors as he finds relevant," 42 U.S.C. §§ 2000c–2, 2000c–4, in making Title IV grant awards permits him to formulate additional selection criteria and, pursuant to such criteria, to establish classifications or priorities for allocating available Title IV funds among otherwise eligible applicants, and to reserve or set aside Title IV funds for particular eligible applicants. Title IV's statutory provision that the Secretary "consider" other applications for funds does not subsume his authority referred to in the preceding sentence to establish priorities and to reserve or set aside funds for particular applicants. 1984 Conclusion 46, 588 F.Supp. 223. Thus, although the Secretary's regulations provide that he is to consider the needs of other educational agencies in determining the amounts of a particular award of funds, they give him discretion to find (based upon "other factors"— such as the Consent Decree) that one applicant's needs take priority to some extent over others! *Id.;* 34 C.F.R. § 270.38[d][2].

■■■■ 6.5. The Secretary's EDGAR provisions apply to the Title IV program only to the extent not expressly prohibited by Title IV's implementing regulations. 34 C.F.R. §§ 75.1, 75.2. Those implementing regulations, which permit the Secretary to make Title IV grants at any time and on an application-by-application basis, do not require that he award funds only after a "competition" among all eligible applicants for those funds. 34 C.F.R. § 270.74(a). 1984 Conclusion 43, 588 F.Supp. at 223.

6.6. EDGAR provisions requiring a competition among all applications for a program's available funds, including awards based in part upon a rank ordering of all submitted applications, do not apply

to grant awards through Title IV, which may be made by the Secretary at any time. 34 C.F.R. §§ 270.02(c) and (e), 270.74(a). The Secretary's authority to create preferences and priorities permits him to reserve Title IV funds for one applicant and to award them without regard to any competitive selection procedures otherwise specified in his Title IV or other regulations. 1984 Conclusion 49, 588 F.Supp. at 223. The Secretary could have created an "absolute preference" for providing Title IV funds to the Board, or the DACs and SEA serving the Board. This would take place before considering applications for remaining funds.

■■■ 6.7. The Secretary's existing Title IV implementing regulations, which permit him to consider as award criteria (a) the availability of financial resources to a school district and (b) the nature and gravity of a school district's desegregation problems, allow him to consider the Consent Decree in allocating Title IV funds among otherwise eligible applicants. 1984 Conclusion 50, 588 F.Supp. at 223.

■■■ 6.8. The United States' legal obligation under Section 15.1, as well as the policy determinations embodied in the Consent Decree, constitute "relevant factors" within the meaning of 42 U.S.C. § 2000c–4(b), the EDGAR provisions and the Title IV implementing regulations. Thus the Secretary has the power to reserve the Title IV funds for the Board, or otherwise to provide Title IV funds to the Board, in preference to other eligible applicants for these funds. 1984 Conclusion 51, 588 F.Supp. at 223.

6.9. Even without formally establishing priorities or preferences described in Conclusions 6.4–6.8, the Secretary could have, under existing criteria recognizing the factor of needs, *see* 34 C.F.R. §§ 270.20(b), 270.38(d), 270.74(b), and provided much of the Title IV funds that the Board needs for its Desegregation Plan. .

■■■ 6.10. Even while maintaining his general policy of funding only DACs

and SEAs, the Secretary could have made an exception for the Board because of ¶ 15.1, and provided it a direct grant. Congress did not in fiscal year 1984 prohibit allocation of Title IV funds directly to local educational agencies. Certain Committee Report language describes the Secretary's administrative practice of providing Title IV grants to state educational agencies and desegregation assistance centers. *See* Bd.Ex. 132, S.Rep. 247, 98th Cong., 1st Sess. 1301 (1983); Bd.Ex. 131, H.R.Rep. 357, 98th Cong., 1st Sess. 110 (1983). That language does not expressly prohibit the Secretary from providing Title IV grants directly to local educational agencies under the program authorized at 42 U.S.C. § 2000c–4. Such language in appropriation acts is insufficient to repeal the Secretary's statutory authority to provide such grants to local educational agencies or to operate as congressional ratification of the Secretary's prior funding practices. *TVA v. Hill*, 437 U.S. 153, 189–93, 98 S.Ct. 2279, 2299–2301, 57 L.Ed.2d 117 (1978); *SEC v. Sloan*, 436 U.S. 103, 117–19, 98 S.Ct. 1702, 1711–12, 56 L.Ed.2d 148 (1978); *Demby v. Schweicker* 671 F.2d 507, 512–13 (D.C.Cir. 1981). *See also* 1984 Conclusion 63. Such a *direct* grant of Title IV funds to the Board would have given it much more effective and meaningful help than available under the usual indirect funding process.

6.11. Finally, the Secretary could have taken steps to maximize the utility of the Title IV services provided to the Board through the DACs and the SEA. For example, the DACs and SEA could have been authorized to use funds to pay stipends for Board teachers participating in in-service training and in-staff development activities. 34 C.F.R. § 270.07 (1982); *see* Findings 677, 679, 683. Similarly, the DACs and the SEA could have been authorized and encouraged to enter into subcontracts with Board employees or independent consultants. *See* 34 C.F.R. §§ 74.103[d][2], 75.515; Finding 695. Often the DACs or SEAs lack the onsite expertise or ongoing program-specific knowledge to best serve the Board's Title IV services to meet these needs.

6.12. In sum, as to Title IV funds, there were in fiscal year 1984 no statutory, regulatory or other legal constraints that would have precluded the Secretary from providing a substantial part of the $24 million allocated to the Title IV subaccount to the Board for implementing the programs identified as eligible for direct Title IV assistance in 1984 Conclusions 44 and 45.

 6.13. Our previous discussion of the "pipeline" issue establishes that we cannot find that the Secretary acted in bad faith *per se* for individual decisions such as issuing Title IV funding only indirectly through DACs and SEAs. However, that discussion also establishes that the Secretary has an affirmative duty under ¶ 15.1 to consider the Board as a priority as soon as funds became "available" as defined in Conclusion 6.1. The Secretary plainly failed to do this. His failure to even consider any of the options listed in Conclusions 6.2–6.12, or other alternatives, constituted a violation of his affirmative duty under ¶ 15.1.

6.14. What the Secretary *did do*, as spelled out in the Findings of this "chapter," was also insufficient to meet his affirmative obligation under ¶ 15.1.

(a) For priority consideration to be meaningful, it must begin at the top, with the Secretary, who has the authority to modify official and unofficial program criteria as needed to implement the ¶ 15.1 priority. As noted in Findings 699.43–699.45A, among others, Winkler and Coates lacked this kind of authority, thus unnecessarily and arbitrarily limiting the amount of funds the Board received.

(b) The priority consideration given was arbitrary. There was no serious detailed consideration of the Board's actual Title IV needs, how those needs compared to other school board's needs, or how best to tailor grants to suit the Board's needs. No rhyme or reason explains the amount of funds the Board indirectly received. Winkler simply picked numbers out of a hat, and led the grantees through an application process (or "charade," as the Board calls it)

through which they "accepted" Winkler's pre-determined numbers.

(c) Indeed, these pre-determined numbers do not reflect any serious attempt to "maximize" the level of available funds. When the grantees submitted applications for *more* funds than specified in the "estimates," Winkler, citing accounting reasons, *cut back* on these proposals so that they fit her estimates. This procrustean process reflects neither "maximization" nor "priority related to need." In fact, Winkler knew the Board has much greater needs. But she cut back on the applications to give the Board what she called "adequate" (rather than maximum) service, and to allow other grantees to meet *less pressing* needs.

■■■ 6.15. It will not do to argue, as the United States essentially does, that the Board received more than anyone else, got treatment no one else got and it therefore as a matter of law received "top of the list priority" and the "maximum level of available funding." As the United States emphasized at oral argument on appeal, the *process*, rather than the mere bottom line awarded, is the relevant issue. *See* Transcript at 2. The United States used no rational process in fiscal year 1984. It essentially funnelled some extra money to the Board, and then concluded that, since the Board got more than anyone, it got enough.[74] This is not the priority *process* required, which entails actual consideration of the Consent Decree, and of the Board's relative needs, by authoritative persons

within the Department, from the beginning of the "pipeline."

■■■ 6.16. We again emphasize that "priority treatment from the beginning" does *not* mean that the Board gets all, most or even necessarily a substantial plurality of Title IV funds. *See* Conclusion 9.7 below. But general concepts like "maximum level" and "equitable fair share" require more than what the Secretary did.

6.17. We reject the United States' attempt to apply a variation of the "application defense," *see* Conclusions 5.17–5.19, to Title IV. One of the government's tactics has been to divert attention from its own failings by blaming the Board for the low level of funds awarded. Consistent with this position, the United States argues that the Board received low funding because it (a) failed to inform the grantees of its needs and (b) that it failed to request or use all the services available. As we explain below, neither contention has merit.

6.17A. The United States' first argument is irrelevant. It is based on a letter written by Board counsel to the head of IDAC, stating that, because of this litigation, the Board would not detail its needs outside of the courtroom.[75] First, the grantees already knew the Board has much greater needs than they could hope to fulfill from a federal grant award. *See, e.g.,* Finding 699.8.

Second, the revised applications filed by the grantees proved to be largely irrelevant anyway, since, by the time they were filed,

**74.** Such an argument begs the question. If ¶ 15.1 means anything, it means that, if all else is equal, the Board gets at *least* as much as anyone else. And if the Board has more needs than anyone else, it should get more, even *absent* the Consent Decree. *See, e.g.,* Conclusion 6.9 (grant amounts are related to need). Thus, "the share" question remains. How *much* "more" is enough?

**75.** *See* U.S. Ex. 11. That letter, dated September 12, 1983, states in relevant part:

As you know, the Board of Education of the City of Chicago and the United States are currently litigating the issue of the Federal Government's obligation to provide financial assistance for the Board's school desegregation efforts. A hearing will be held in mid-

September before the United States District Court for the Northern District of Illinois, during which the Board will introduce evidence regarding its need for additional funds to implement its desegregation plan, including the need for technical assistance. This proof will not be limited to the four CUME working goals identified in your letters for 1983–4. Given the pendency of this hearing, we have advised our client not to detail its needs outside of the courtroom. However, to help in your planning we have enclosed a copy of the Board's recently filed Annual Desegregation Review, Part II, which details the directions in which the Board intends to proceed.

Winkler and her superiors had already decided what the grantees would receive in earmarked funds. For both of these reasons, the Board's "silence" outside of the courtroom [76] has marginal, if any, relevance to what the Board actually received.

6.17B. The United States' first argument in Conclusion 6.17 is also false. First, it contradicts its position that the Department really followed the regulations and comprehensively compared the Board's needs with those of other school districts. Our findings show that is not the case. Second, the "silence" was limited to IDAC. And even there, the letter sent to IDAC *enclosed* information about the Board's needs. It did not say that the needs were secret, but merely that it chose to disclose those needs via the litigation. IDAC's head attended the 1984 hearings where the Board's Title IV needs were spelled out. *See* Harris Dep. at 5-6. Thus, IDAC surely knew generally of the Board's needs. And so did the United States, which also attended the 1984 hearings. The record is clear that the size of the 1984 grant awards had little, if anything, to do with what the Board did, but rather with the Secretary's conduct. As we found earlier, the Secretary's general limitations on funding constrained Winkler and the grantees, and the grantees were also constrained by their perception of their capacity to provide much greater services. *See, e.g.,* Findings 699.8, 699.18, 699.19, 699.41–699.43.

6.17C. The United States' allegation that the Board's failure to request much in Title IV services from the grantees in 1983–84, even if true,[77] has nothing to do with the size of the grantees' fiscal year 1984 applications or the amount actually awarded to the grantees. No evidence supports the government's proposition. And

neither IDAC nor the Illinois SEA suggested that such a reason affected the size of their applications. *See* Harris Dep. at 61–62, 68; Wofford Dep. at 30, 38–39.

6.18. In short, in fiscal year 1984, the Secretary did not "make every good faith effort to find and provide" available Title IV funds. He failed to give the Board meaningful priority, or the equitable fair share or "maximum level" of funds.

## VII. *United States' Failure To Search For Available Funds In 1984*

### A. *Findings of Fact*

701. The United States and the Secretary made no effort to locate and identify fiscal year 1984 funds which could have been used to assist the Board in implementing the projects and activities comprising its Desegregation Plan. (Fagan Dep. at 71) Despite the Court of Appeals 1983 ruling and the United States' concession that it was obligated to do so, the criteria of 1984 funding programs in neither the Department of Education nor other Departments were reviewed to determine if they could be used to finance any of the components of the Board's Plan. (*Id.* at 60–71)

702. From the time of the Court of Appeal's September 1983 decision, through at least February 22, 1985, no efforts were made to locate and identify funds available for the Board's Plan. On February 22, 1985, Dr. Thomas Fagan in the Department of Education was asked to coordinate an "effort to provide technical assistance to Chicago in identifying and applying for" assistance from Department of Education grant programs. This effort was limited to programs within the Department of Education. (Fagan Dep. at 11, 21–22, 71;

---

**76.** Notably, this "silence" extended only to IDAC. No evidence suggests that NODAC or SEA were out of direct contact with the Board. In fact, the evidence suggests otherwise. *See* Wofford Dep. at 8–9.

**77.** Winkler testified that the Board had requested relatively low levels of services from the grantees in 1983–84. *See* Winkler Dep. at 65–72. If true, such a failure does not amount to any sort of waiver, and certainly does not release

the Secretary from his obligation to provide maximum level of available funds. During the relevant time period, 1983–84, the Board contended that it was entitled to a *direct* grant of Title IV funds, a position Judge Shadur adopted in both his 1983 and 1984 opinions. Quite reasonably anticipating a large grant of Title IV funds *directly*, the Board apparently did not push the grantees for indirect services.

Board Ex. 153, Bauer memorandum of Feb. 22, 1985 w/ attachments; Board Ex. 147, Fagan memorandum of May 2, 1985).

703. With respect to 1985 programs within the Department of Education, the Department has identified Title IV of the Civil Rights Act of 1964, the Magnet Schools Assistance Program and the Unsolicited Grant Competition authorized within the Discretionary Fund as its only existing desegregation programs. These are the only fiscal year 1985 programs in which the Department believes it must provide the Board priority funding. With respect to other funds which might be used to assist the Board in implementing certain projects or activities within its Plan, the Department believes its sole obligation, and the task assigned to Dr. Fagan, is to provide the Board technical assistance in understanding the criteria of these programs and in applying for funds from them. (Fagan Dep. at 19, 57–58; U.S.Supp.Ans. to Board 1985 1st Set Int. No. 7(a); U.S. Reply Brief Motion to Vacate at 18; Board Ex. 153, Bauer memorandum of Feb. 22, 1985 w/attachments).

704. Dr. Fagan has not personally determined whether the Board's desegregation programs could be funded from sources within the Department of Education. Dr. Fagan has not contacted the Board to obtain specific information about the projects and activities encompassed in the Plan. (Fagan Dep. at 60–71). Moreover, Dr. Fagan has limited personal knowledge of the criteria of various programs within the Department of Education. (Fagan Dep. at 50–71).

705. After being assigned his coordination task, Dr. Fagan circulated brief memoranda to various Department officials asking that they review programs under their supervision to determine if funds within those programs could be used to provide desegregation assistance to the Board. Dr. Fagan did not provide these officials with descriptions of the Board's desegregation components, the projects or activities comprising them, or any other information about the Plan. (Fagan Dep. at 69.) However, the Acting Secretary had distributed a list of Board programs that are part of its Desegregation Plan. (Bd.Ex. 153).

706. In response to this inquiry, Dr. Fagan received various memoranda comprised of lists of grant programs. In general these programs were not described. The memoranda stated, often without explanation, that funds might or might not be available for the Board depending upon the nature of the projects for which the Board would seek assistance. (Fagan Dep. at 52–72; Board Ex. 153, Bauer memorandum of Feb. 22, 1985 w/ attachments). In many instances the closing dates for applications for 1985 funds from these programs had passed. (Fagan Dep. at 56–66).

707. In the Board's Answers to the United States' First Set of 1985 Remand Interrogatories, the Board identified approximately 30 grant programs as possible sources through which it could receive assistance in implementing its plan or various components in the Plan. (Board Ans. to U.S. 1985 1st Set Int. No. 1). Dr. Fagan was not familiar with these programs, and his search had not yet encompassed those programs. (Fagan Dep. at 80–86). The Board has received no communication as yet from Dr. Fagan or the Department about whether it is eligible to receive assistance for its Desegregation Plan through these programs.

708. As the culmination of the United States' duty to search for funds, Dr. Fagan has forwarded to the Board's attorneys a short list of programs for which the Board may or may not qualify for funds. (Fagan Dep. at 56–57). According to Dr. Fagan, it is the Board's responsibility to independently review the criteria of these programs to determine if it is indeed eligible for assistance from them. (Fagan Dep. at 56–58). Dr. Fagan admits that until the Board applies for these funds or makes requests about the eligibility of specific components for these funds, the Department will make no determination as to whether the Board can possibly receive desegregation assistance from these sources. (Fagan Dep. at 56–58).

709. The Department's effort to "search for other funds" to assist the Board in implementing its desegregation plan is little more than the technical assistance it would provide to any potential applicant for federal funds. It places almost exclusively upon the Board the duty to locate and identify available funding sources. (Inference from Findings 702–708).

710. The United States has not attempted to determine if fiscal year 1985 funds appropriated to any Department in the Executive Branch other than the Department of Education may be used for the Plan. Although the Court of Appeals decision requires the United States to locate and identify any funding sources within the Executive Branch, 744 F.2d at 1306–07, Dr. Fagan has limited his search to the Department of Education. (Fagan Dep. at 71, 79, 84; *see also* Fagan Affidavit of 6/25/85). No other official has been asked to review programs or appropriation accounts in other Departments.

711. The United States does not intend in fiscal year 1985 to examine appropriation accounts or funding sources for departments or agencies other than the Department of Education. In response to the Board's request that it do so, the United States replied that "[a] complete list of the federal programs for which these [other] funds have been appropriated is contained in the *Catalog of Federal Domestic Assistance* (1984), a copy of which is in the Board's possession." (U.S.Supp.Ans. to Board 1985 1st Set Int. No. 7(a) at 2).

712. The United States has failed to identify sources of funding which could be used to advance the Board's desegregation activities other than Title IV, the Unsolicited Grants Program in the Discretionary Fund, and the Magnet Schools Assistance program. Absent an order from this Court, the United States will continue to restrict its search to the programs only within the Department of Education and to these three programs which it believes are the only "desegregation" programs in the Department.[78] (Inference).

713. Unless specifically instructed by an order from this Court, the United States will not attempt to locate and therefore not give the Board the maximum level of funding to which it is entitled under the applicable program criteria for the federal programs identified in Findings 401–408. (Inference).

714. The June 25, 1985 affidavit of Thomas Fagan, U.S.Ex. 13, lists some of the activities he has taken in fiscal year 1985. Dr. Fagan's affidavit focuses on Title IV, a program which the Secretary concedes is subject to the ¶ 15.1 priority. Dr. Fagan states that he has encouraged the four Title IV grantees serving the Board to make certain that they properly address the Board's needs in their applications for 1985–86 assistance and that they include Board personnel in this process. Fagan also extended the Title IV application deadline to enable the Board to supply supplementary information to the grantees. In addition, Fagan has offered some technical assistance concerning the Department's Magnet Schools, Bilingual Education, and Handicapped programs.

### B. *Conclusions of Law*

7.1 In its 1983 opinion, our Court of Appeals affirmed Judge Shadur's finding that "the United States' obligations under the Decree go beyond assisting the Board in locating and applying for federal funds, and that ¶ 15.1 imposes a substantial obligation on the government to provide available funds." 717 F.2d at 383. Merely providing technical assistance in searching and applying for "available" funds is insufficient under this holding.

---

**78.** Nor would it be futile or unreasonable to ask the Department of Education to search for funds appropriated to other Departments or executive agencies to assist the Board in implementing the Plan. The Board already receives funds to finance its educational programs from other Departments: the Community Development Block Grants, 42 U.S.C. § 5301 *et seq.*, the Economic Opportunity Act, 42 U.S.C. § 9801, the Law Enforcement Act, 42 U.S.C. § 5601 *et seq.*, 5631, 5634. (Board Ex. 123, 1984–85 Budget at T34; Grant Dep. at 44–46, 48–49)

7.2 The Court reaffirmed this holding in 1984, and added that so long as the Board has unmet financial needs, the United States has an admitted duty to search among funds that Congress had indeed made available. 744 F.2d at 1306. We held earlier, at 14–27, that this duty to search for "available" funds is not bifurcated from the duty to provide such funds to the Board on a priority basis. Moreover, to be "available" such funds need not be located in "desegregation-label" programs, but rather in programs under whose criteria projects in the Board's Desegregation Plan are eligible.

7.3 The Court of Appeals wrote that the best proof that the government is fulfilling this [search] duty would be the assignment of *personnel* to the task of periodically reviewing federal funding programs, in the Department of Education *and in other federal agencies,* for unencumbered funds that may be used to advance the Board's desegregation plan. 744 F.2d at 1306–07 (emphasis added). The Court's use of the word "personnel" suggests that more than one person might be needed to fulfill the substantial search task contemplated by the Court of Appeals and ¶ 15.1. The Court and ¶ 15.1 also clearly contemplated that this search was to be conducted not only in the Department of Education, but throughout the Executive Branch.

▆▆ 7.4 Under Findings 701–02, the United States violated ¶ 15.1 in fiscal year 1984 because it conducted no search for available funds outside of Title IV and the Discretionary Fund, either in the Department of Education or in the rest of the Executive Branch. The United States did not seriously contest this assertion in its brief.

▆▆ 7.5 The United States' fiscal year 1985 search, while marginally better than its 1984 search, has been still grossly defi-

cient under ¶ 15.1 and the Court of Appeals' two opinions:

(a) It appointed only one person, Dr. Fagan, to conduct the search. While Dr. Fagan has apparently enlisted the aid of others, *see* Fagan affidavit ¶ 15, it is clear that the search of the kind the Consent Decree and the Court of Appeals require will entail more personnel than now in use.

(b) The appointment of Dr. Fagan took place *well into* fiscal year 1985 and months *after* the Second Opinion, which suggested such an appointment.

(c) To the extent a search took place at all, it happened only within the Department of Education, despite the Court of Appeals' command (and the consent decree requirement) that the search embrace the Executive Branch.

(d) Dr. Fagan admittedly does not hold a top rank in the Department and has limited knowledge about the funding criteria within the Department of Education and about the Board's Desegregation Plan. *See* Findings 704, 707.

(e) The minimal search that happened was a one-time *ad hoc* event, involving little more than the circulation of a single memorandum within the Department. The Memorandum itself tended to constrict the search, since it relied heavily on the term "desegregation;" thus it did not, as it should have, explicitly suggest that the search encompass even federal programs without "desegregation" labels, but rather those that may authorize funding for projects in the Board's Desegregation Plan.

(f) Not surprisingly, the responses to the memorandum stated generally that funds were not available for desegregation projects, that the application deadlines had passed, or that more details about the Board's plan were needed for an answer. Finding 706.

7.6 The activities summarized in the Fagan affidavit,[79] while small steps in the

---

79. The Board's motion to strike the Fagan affidavit is denied, except for the information contained in paragraphs 9–11. Much of the affidavit addresses the 1985 search activities, which

we ordered the United States to do on June 18, 1985. Thus, we are not concerned that it was submitted after the close of discovery. We appreciate the fact that the Board has had no

right direction, still fall far short of what the Consent Decree requires. The activities center on desegregation-label programs, especially Title IV. The affidavit does not describe a *search* for other funds, but rather some efforts to provide more funds from the little already known to be "available." And nothing happened outside of the Department of Education. Much more must take place, including a serious canvass of all Department of Education programs that can provide aid to projects in the Board's Plan, as well as those outside the Department.

7.7 The search that took place in 1985 was too little, too late, and does not reflect "every good faith effort to find and provide" additional unencumbered funds to the Board. It thus plainly violates ¶ 15.1.

7.8 The United States does not seriously address the above findings and conclusions. As we describe below, the arguments it does make are meritless and largely irrelevant.

■ 7.9 The United States continues to assert, as it did in 1983 and 1984, that $91 million in fiscal year 1983 federal funds were potentially available for the Board's Plan. This assertion, which treads near the border of a Rule 11 violation, is wholly irrelevant and has been rejected by this Court and the Court of Appeals. These

funds had been provided in previous years and would be provided again *without regard* to the ¶ 15.1 priority [80] or the Board's Desegregation Plan. And most of these funds pay for programs which predate the Desegregation Plan. To be meaningful and truly compensatory, the Plan's Educational Components must supplement, not supplant, existing educational programs. The United States' argument, then, is that the Board must divert these funds to its Plan, that is, it must rob Peter to pay Paul. The Court of Appeals implicitly rejected this argument in 1983, by affirming the violation of ¶ 15.1 even though the United States had claimed that these precise funds satisfied its duty. And in rulings that the Court of Appeals did not reverse or vacate, Judge Shadur in 1984 strongly rejected the government's identical argument. *See* 588 F.Supp. at 193–96, 219 (Findings 353, 357–68; Conclusions 28–30). We join Judge Shadur and do so again, hopefully for the last time.

■ 7.10 The United States appears to claim that it can satisfy its duty to search outside of the Department of Education by merely helping the Board use the "Federal Assistance Programs Retrieval System ["FAPRS"], a computerized system giving information about every federal domestic program. United States' Merits Brief at

---

opportunity for cross-examination on several of the affidavit's allegations. But even taking the allegations at face value, it is clear that the 1985 search activities are woefully deficient.

Paragraphs 9–11 should be stricken, however. These paragraphs address not search activities, but rather an informal survey of Title IV grantees that Fagan conducted in an effort to compare how much assistance the Board received viz. other school boards. Such a survey is hearsay, and the United States has not shown that it comes within some exception to the hearsay rule. Moreover, the summaries attached to the affidavit do not pass muster under Fed.R.Evid. 1006, since the United States never made the underlying data available to the Board, despite a standing Document Production request to do so. In sum, paragraphs 9–11 are stricken to the extent they violate the hearsay rule and Rule 1006. It is so ordered.

**80.** We reject United States' proposed finding 801, which concludes that "[n]one of [the $91

million] would have been provided in the absence of the consent decree because, absent the consent decree and plan, the Board would be out of compliance with the Constitution and Title VI of the Civil Rights Act of 1964 and therefore ineligible for any federal financial assistance." While perhaps true as a matter of pure logic, this assertion has little, if any, relevance to the issues before us, and the United States should be embarrassed to make such an assertion. Simply because the Consent Decree cured the Board's alleged violations of the Constitution or Title VI does not mean, as the United States implies, that the United States goes a long way toward discharging its duties by resuming *normal* funding to the Board, funding that it gives anyone else. This court and the Court of Appeals have held that the ¶ 15.1 obligation is "substantial," requiring more than normal efforts by the United States. The focus is not on what the government would do for the Board normally, but on what it must do additionally.

114." The United States has also referred the Board to an index of federal programs. Such an effort, if it can be called "effort", is trivial. The Court of Appeals held that "the *government* has admitted that *it* has a duty to search...." 744 F.2d at 1306 (emphasis added). The United States cannot satisfy *its* duty to search by merely tossing a catalog to the Board or helping the Board use a government computer. ¶ 15.1 requires that the parties work *together* in finding available funds. The United States is obviously in a much better position to find its own funds than the Board is. Then, working closely with the Board, the two sides can link Board projects with federal programs. Such a process demands that the United States take a very active, leading role in deciphering the nuances and intricacies of its *own* funding programs. Merely giving the Board the federal version of "The Yellow Pages" will not do under ¶ 15.1. The government's "fingers" must "do the walking."

7.11 In short, the United States' 1984 and 1985 search activities fall far short of what ¶ 15.1 requires of it and fly in the face of the Second Opinion. The failure to take any steps to search for funds outside of the Department of Education suggests a cavalier attitude on the part of the government as to its obligations for compliance with the Consent Decree, not to mention the clear commands of the Seventh Circuit. Such conduct may very well constitute bad faith, although we reserve decision for now on that question.

VIII. *Block Grant and Follow-Through Funds*

A. *Findings of Fact*

1. *Chapter 2*

801. ECIA Chapter 2 consolidates, on a block grant basis, several programs from which the Board previously received funds on a categortical basis. 20 U.S.C. § 3811 *et seq.* These funds are funnelled to the Board through the State of Illinois. The funds must be spent for the same purposes

as permitted by the programs consolidated, but the State and local agencies generally decide how much to spend for which purpose. 20 U.S.C. § 3811(a); *see also* Findings 505, 505A. Desegregation is one of those purposes. *Id.* (Chapter 2 incorporates ESAA).

■ 802. Under Chapter 2, the Board has received about $6 million annually from the State Board of Education, appropriated to finance several educational programs, some of which continue previously funded categorical programs and some of which implement new programs. The Board has allocated about $1.8 million of this block grant—which equals what it received under ESAA before its repeal—to fund its Desegregation Plan. (1984 Finding 352). This allocation satisfies the Board's good faith obligations under ¶ 15.1 (1984 & 1985 Findings 374).

803. Under Chapter 2, funds are allotted by the Illinois State Board of Education according to a statutory formula that may be adjusted by the State Board to provide higher per pupil allocations to local educational agencies with the greatest numbers or percentages of children whose education imposes a higher than average cost per child. (Response to United States First Post-Remand Request for Admissions, 9; 20 U.S.C. § 3815).

804. Specifically, of the Chapter 2 Block Grant, at least 80% must be allocated by the state

according to the relative enrollments in public and private, nonprofit schools within the school districts of such agencies, adjusted, *in accordance with criteria approved by the Secretary,* to provide higher per pupil allocations to local educational agencies which have the greatest numbers of percentages of children whose education imposes a higher than average cost per child, such as:

(1) children from low-income families,

(2) children living in economically depressed urban and rural areas, and

(3) children living in sparsely populated areas.

20 U.S.C. § 3815(a) (emphasis added). The Secretary shall approve the State's allocative criteria "if such criteria are reasonably calculated to produce an equitable distribution of funds with reference to the factors set forth in [§ 3815(a)]." 20 U.S.C. § 3815(b). This plainly implies that he may disapprove such criteria if not reasonably calculated to produce an equitable distribution of funds under § 3815(a). *See* 20 U.S.C. §§ 3871, 3872 (Secretary may pass regulations to enforce requirements of Chapter 2 and may withhold funds for failure to comply).

805. As made clear by 1984 Findings 354–55, the enactment of Chapter 2 has markedly decreased the amount of desegregation funding available to local school districts, including the Board. This has been in part caused by the Secretary's approval of state formulas which allocated inadequate funds to local districts undergoing desegregation.

806. The Illinois State Board of Education did not use desegregation as a specific factor to adjust its formula for making allocations of fiscal year 1984 Chapter 2 funds. (Response to United States First Post-Remand Request for Admission, 10).

807. The Illinois State Board of Education could have, but did not, adjust its Chapter 2 formula in fiscal year 1984 to provide additional Chapter 2 funds to the Board based on the Board's desegregation program. (Response to United States First Post-Remand Request for Admissions, 11).

808. In fiscal year 1984 the Secretary wrote the Illinois Superintendent of Education three times, advising him how to adjust the state formula for allocating Chapter 2 funds in order to provide more assistance to the Board. (U.S.Ex. 24). The secretary did not exercise his authority to disapprove the State formula for failing to meet the criteria of 20 U.S.C. § 3815(a), but merely urged the Superintendent to follow the criteria relating to "high-cost" children to increase the allocation to the Board. The Secretary believes that these exhortations satisfy ¶ 15.1.

809. It is obvious and we take judicial notice that the Chicago Public Schools have a huge number of "high-cost" children, such as "children from low-income families, living in economically depressed urban areas." 20 U.S.C. § 3815(a)(1) & (2). On top of these high costs is the large expense (*see* 1984 Findings 365–68) of the compensatory components of the Desegregation Plan, which apply to the 300,000 minority children still attending racially isolated schools. The parties agree that the State's Chapter 2 formula does not account for these costs.

809.1. Under the ECIA Chapter 2 state block grant program, a state may reserve 20 percent of its allocated funds for model projects or research and demonstration projects similar to those authorized by the Secretary's Discretionary Fund. (20 U.S.C. § 3822). The Secretary of Education recommended to the Illinois Superintendent of Education that he had the authority to "us[e] *all* or part of the funds reserved for the state's use for a grant to Chicago for desegregation purposes." (Board Ex. 145, Letter of May 30, 1984, from Bell to Gill at 2).

809.2. It is the United States' position that the Illinois State Board of Education could reserve all or part of its state Chapter 2 discretionary moneys for a single grant to the Board for desegregation purposes. (1985 Stipulation No. 5).

### 2. *Follow-Through*

810. $4,482,000 are presently restrained in the Follow-Through account. These funds included $482,000 carryover funds from fiscal year 1983 and $4,000,000 in funds appropriated to the Department of Education in fiscal year 1984.

811. The Board presently receives Follow Through funds which are awarded to it as a consequence of the Secretary's usual grant making procedures and according to his usual selection processes. Despite the Consent Decree, the Board has received no priority or preference either in obtaining its Follow Through grants or in the amount of its grant awards. It has received no sup-

plemental Follow Through funds in recognition of the Consent Decree and for desegregation assistance. (U.S. Report, Feb. 28, 1985, at 14–15, 20–26; U.S.Supp.Ans. to Board. 1985 1st Set Int. No. 7).

812. In fiscal year 1984, the Secretary did not consider providing nor actually provide the Board a priority in awarding funds allocated to the Follow Through program. The Board received $273,541, the grant amount it would have been awarded absent the Consent Decree. Consistent with his position on the scope issue, the Secretary claims that the Board is not entitled to a priority in receiving Follow Through funds for purposes implementing its Desegregation Plan. (Reply Memorandum In Support Of United States' Motion To Vacate Restraining Order, May 8, 1985, at 23–26) (hereinafter "U.S. Reply Brief Motion to Vacate").

813. The Board is eligible to receive an award of funds under the Follow Through program for the components in the Desegregation Plan which provide special educational services, including compensatory education programs, to disadvantaged children in the primary grades who are primarily from low income families. (U.S. Response to Board Request to Admit 710; 42 U.S.C. § 9861; 34 C.F.R. §§ 215.1, 215.26; U.S. Report, July 15, 1983, at 22)

814. The Follow Through program is a discretionary grant program in which the Secretary may establish preferences and priorities. (34 C.F.R. § 75.105) (the "EDGAR" criteria). The Secretary could, if he wanted to, create a priority under EDGAR in the Follow Through Program to provide supplemental Follow Through funds to the Board, in recognition of the Consent Decree, for desegregation assistance. *See generally* Findings 523–24, Conclusions 5.6–5.7.

815. Follow Through is a program through which desegregation assistance could be provided to the Board. The Effective Schools project ("ESP") component in the Board's desegregation plan is eligible to receive financial assistance from the Follow Through program:

a. ESP, as described, provides compensatory educational and related services to students in kindergarten through the primary grades who attend racially isolated schools. (Board Ex. 28 at 1–7) These services meet the definition of projects authorized for assistance under the Follow Through program and address the same educational disadvantages.

b. ESP provides services primarily to children from low income families who meet the definition of children eligible to receive assistance from Follow Through projects. (1984 Brady Testimony, p. 91)

c. ESP can be implemented on a project by project or classroom by classroom basis to ensure that only children eligible to participate in Follow Through programs will do so where ESP projects are assisted with Follow Through funds. (Board Ex. 120, Feb. 1985 Transition Report at 35).

d. At a minimum the Board has an unmet need of at least $3,400,000 (this figure is for teacher salaries from Exh. 28) to implement the kindergarten component of its ESP project. (Board Ex. 28 at 5) It has a further need to implement components of its ESP in first grade through third grade.

816. In court papers previously filed in this case, the United States recognized that the Board may lawfully use Follow Through funds to help implement its Desegregation Plan. *See, e.g.,* July 15, 1983 Report of the United States at 22. The Secretary's regulations also acknowledge that Follow Through funds may properly finance certain compensatory components of a desegregation plan. *Cf.* 34 C.F.R. § 215.12(a) (allowing for waiver of certain regulations where those regulations would prevent effective use of funds as aid to a desegregation plan). Thus, the Secretary acknowledges that Follow Through funding can properly be spent on qualifying projects in the Board's Plan.

817. Follow Through is an experimental community services program designed to assist, in a research setting, the overall

development of children from low-income families enrolled in kindergarten through third grade by (a) implementing innovative education approaches, (b) providing comprehensive services and special activities in the areas of physical and mental health, social service, nutrition, and such other areas which supplement basic services already available within the school system, (c) conducting the program in a context of effective community service and parental involvement, and (d) providing documentation on those models which are found to be effective. (42 U.S.C. § 9861; 34 C.F.R. 215.1; 34 C.F.R. 215.26).

818. The Follow Through program funds three types of grantees: sponsors, local educational agencies, and resource centers. Sponsors are generally institutions of higher education or educational research laboratories which propose and design innovative instructional models for the education and development of disadvantaged children. Local educational agencies around the country establish Follow Through projects that implement the instructional models developed by the sponsors. Resource centers are local educational agencies that have been certified as exemplary educational projects. They demonstrate their exemplary projects to other local educational agencies and disseminate information on their projects to promote adoptions. Both resource centers and sponsors conduct workshops and training sessions for administrators, teachers, and para-professionals. (34 C.F.R. 215.11; 215.15a; 215.51; Affidavit of Dr. John F. Staehle, ¶ 4, May 28, 1985).

819. Follow Through was established by the Economic Opportunity Act amendments of 1967 to preserve the educational gains made by children enrolled in Headstart or similar quality preschool programs by continuing comprehensive instructional, health, nutrition, psychological, social work, and parent involvement services. (42 U.S.C. § 9861(a); 34 C.F.R. 215.1; H.R. Rep. No. 866, 90th Cong., 1st Sess., reprinted in [1967] U.S.Code Cong. & Ad. News 2428, 2477; S.Rep. No. 453, 91st Cong., 1st Sess., reprinted in [1969] U.S. Code Cong. & Ad.News 2628, 2646).

820. Congress has authorized declining appropriations for the Follow Through Program over the past several years, specifically $19,400,000 for fiscal years 1982 and 1983, $14,767,000 for fiscal year 1984, $10,-000,000 for fiscal year 1985, $7,500,000 for fiscal year 1986, and zero thereafter. See 42 U.S.C. § 9862(a)(1) (West Supp.1985). The Executive Branch had requested zero funding for this program. See, e.g., S.Rep. No. 680, 97th Cong. 2d Sess. 107 (1982).

821. For the past ten years, the Department has funded only noncompeting continuation projects on a pro rata basis. This practice is authorized by § 215.13 of the Follow Through regulations, which states: "In order to provide the necessary continuity for evaluation ... grants will be given only to applicants who are successfully conducting Follow Through projects during the current fiscal year and who demonstrate the capability to continue to so operate projects...." However, given the declining appropriations over the last several years, these continuation projects must have, on average, received smaller grants each year. (Inference). The Board's annual Follow Through grants, including its fiscal year 1984 grant, have been such continuation grants.

B. *Conclusions of Law*

8.1 In passing the ECIA, Congress intended that the States consider the needs of desegregating school districts in allocating Chapter 2 funds:

At least 80% of the funds under this subpart are to be allocated directly to local educational agencies on a needs basis as described in the legislation. Since funds previously earmarked by school desegregation assistance have been consolidated into this subpart, the committee expects that recognition of the additional costs incurred by the efforts to alleviate the isolation of minority group children where appropriate will be included among the needs factors considered in

the allocation of funds to local educational agencies.

(S.Rep. No. 139, 97th Cong., 1st Sess. 896 [1981]), U.S.Code Cong. & Admin.News 1981, pp. 396, 920. Despite clear expression of intent like this, Illinois failed to factor desegregation costs into its allocation formula and the Secretary approved this formula.

■ 8.2 The failure of the Illinois Board to consider the significant cost of the Chicago Board's Desegregation Plan necessarily caused an inequitable distribution of Chapter 2 funds under § 3815(a) criteria. Under §§ 3815(a), (b), 3871, 3872 the Secretary could have and should have adhered to Congressional intent and disapproved the State's criteria until it considered the cost of the Board's plan in creating its formula. Alternatively, he could have issued regulations requiring that the additional costs of desegregation programs be considered by the State. By not using these statutory powers, the Secretary violated ¶ 15.1. Merely urging the Illinois Board change its formula voluntarily was arguably a valid first step, but insufficient by itself.

■ 8.3 The same conclusions apply to the remaining 20%, *i.e.*, the "Discretionary Portion" of the State's Chapter 2 block grant. Congress also intended that part of these funds be used to help pay for desegregation plans.[81] Under 20 U.S.C. §§ 3871 & 3872 the Secretary could have and should have fulfilled this expression of Congressional intent by requiring that Illinois give a priority to desegregation in distributing its 20% funds and/or by withholding funds if Illinois failed to do so. By not using these statutory powers, the Secretary violated ¶ 15.1.

8.4 The parties do not dispute that desegregation *per se* is not an explicit congressional purpose of the Follow Through statute. However, because projects in the Board's Desegregation Plan qualify for Follow Through funding under statutory program criteria, they are subject to the ¶ 15.1 priority regardless of whether Congress specifically intended that the funds be spent on "desegregation." *See* above at 14–27 (resolution of scope issue). The failure of the Secretary to give any priority consideration at all to the Board's Plan in allocating Follow Through funds, while not actual bad faith, constitutes a violation of his affirmative obligations under ¶ 15.1.

8.5 Nothing in the Follow Through statute, nor in the Congressional history precludes application of the ¶ 15.1 priority to the Follow Through program. True, Congress has been aware of the Secretary's policy of funding only continuation projects. In the House Report accompanying the 1984 appropriations for Follow Through, for example, the Committee on Appropriations noted that "[o]ver the past years, the program's focus has shifted from developing, testing, and validating new approaches in early elementary education to one of providing continued services for existing projects." H.R.Rep. No. 357, 98th Cong., 1st Sess. 110 (1983). *See also, e.g.,* H.R.Rep. No. 894, 97th Cong.2d Sess. 99 (1982); H.R.Rep. No. 251, 97th Cong., 1st Sess. 94 (1981). In recognition of the Department's past practice, the Senate Committee on Appropriations noted that the 1984 Follow Through funds "will be directed toward the continuation of existing projects in local school districts, along with ongoing support for sponsoring institutions and resource centers." S.Rep. No. 247, 98th Cong., 1st Sess. 130 (1983). *See also* S.Rep. No. 680, 97th Cong., 2d Sess. 107 (1982). But the language in these reports does not indicate Congressional intent that the Secretary *must* fund all continuation projects on a rigid pro rata

---

**81.** In its report accompanying the fiscal year 1985 Department of Education appropriation bill, the House appropriation Committee directed the Secretary to tell the States that when they allocate their 20% set aside, they should give a priority to local school districts which had previously received ESAA funding. Although this directive applied to fiscal year *1985*, it reflected the Committee's view that the States had violated "the clear intent of the block grant legislation" by failing to help desegregating school districts from the 20% set aside. *See* H.R.Rep. 911, 98th Cong. 2d Sess. (1984).

basis without regard to any other policies or priorities. At most, these reports recognize the Secretary's practice, and note, without disapproval, that he will continue it. These Reports do not suggest that the Secretary lacks authority to modify his practices modestly to provide some extra priority treatment to the Board.

8.6 As we emphasized in other parts of this opinion, the fact that the Board is entitled to ¶ 15.1 priority does not mean the Secretary cannot set other priorities, follow old priorities, or that the Board must necessarily get a huge chunk of available funds. Thus, the Secretary is free to adhere generally to his principle of funding continuation projects. However, the Secretary can and should modestly alter his policy to provide additional priority funding to the Board. In other words, the Secretary can decide to fund only continuing grantees, but reduce each grant modestly to reflect priority consideration of the Board's projects. Such a practice would fulfill the "top of the list priority" and "maximum funding available" standards of the Second Opinion. By adhering rigidly to the strict pro rata funding of continuing projects, the Secretary implicitly indicates that all other projects have "top of the list priority", but not the Board's. While not bad faith, this practice—which means that the Consent Decree can have no impact on Follow-Through funding—did not give the Board "top of the list priority." Our later discussion of the share issue suggests a proper level for the "equitable fair share" of Follow Through funds to which the Board is entitled.

■ 8.7 The $482,000 in 1983 funds present different issues than the restrained 1984 funds. They were "carryover funds" not used or needed by fiscal year 1982 grantees and were thus "carried over" for redistribution in fiscal year 1983. This amount was apparently included pro rata in the grantee's fiscal year 1983 budgets, in addition to their full 1983 grants. (Staehle Affidavit, ¶ 5). This funding was *in excess* of what the grantees would have normally received in 1983, because the grantees re-

ceived their full allocations of 1983 funding that Congress had appropriated. We agree with the Board that it is entitled to all of these funds, though for slightly different reasons than it advances.

8.8 Funds appropriated to the Department of Education are available for obligation for two fiscal years. 20 U.S.C. § 1225(b); 34 C.F.R. § 76.705. Funds which are not spent in the initial year for which they were appropriated are available for expenditure in the succeeding fiscal year. Hence, excess 1982 Follow Through funds could lawfully have been provided to Follow Through grantees in fiscal year 1983. At the same time, these "excess" funds could have been provided to the Board. Although because they are contingently obligated these funds are not "pure" excess funds like those considered in Chapter 4 of this opinion, the logic of the Conclusions in that Chapter applies to these quasi-excess funds. *See* Conclusions 4.10–4.10A. The only reason these funds were available in fiscal year 1983 to provide excess funding was that the Secretary had not spent them in fiscal year 1982. At the end of that fiscal year, these were "unencumbered funds" available to the Board under the analysis we set forth in Chapter 4. Had he exercised his discretion to give the Board even a bottom of the list priority, some or all of these leftover funds could have been provided to the Board to be used exclusively on qualifying projects in its Desegregation Plan. Because 1983 grantees received their full statutory funding, such a "bottom of the list priority" would have worked little harm on other grantees, while providing substantial assistance to the Board. The decision to let the funds "carry over" was tantamount to a decision (though not an intentional one in this case) to not provide unneeded fiscal year 1982 funds to the Board. We think it proper and equitable to place the Board in the position it would have been in had the Secretary given the Board at least this "bottom of the list" priority as to unencumbered fiscal year 1982 funds. Since the Board has projects which qualify for these

funds, we think they should be provided immediately.

8.9 We do not think that the Secretary has shown that other grantees have a competing claim to these funds such that the amount awarded to the Board should be reduced. The Secretary claims that these funds would be used to reimburse grantees for out-of-pocket expenses they made because of this Court's restraining orders. However, no evidence suggests these expenses are now unreimbursed. Since May, 1985, we released funds in three increments totalling about $10 million. These releases allowed grantees to be funded beyond September 30, 1985. We fail to see that anything remains to be reimbursed. This fact buttresses our conclusion that these leftover fiscal year 1982 funds, which became 1983 funds, should be treated like the other "excess funds."

IX. *The Share Issue and Remedial Matters*

A. *The Share of Funds to Which the Board is Entitled*

We reach, finally, the most difficult major issue in the case, the "share issue," which asks, in effect, how big a slice of the pie of "available" funds the Board should receive. So far we have decided the scope issue, thereby defining generally *which* programs contain available funds. We have decided the pipeline issue, thereby defining *when* those funds become available and subject to priority consideration. We have also reviewed the United States' conduct in fiscal year 1984 with respect to several pools of available funds, deciding that its misconception of the scope and pipeline issues have caused it to violate the Consent Decree several times over. We

now decide the questions of how to give the Board its fair expectancy under the Consent Decree and how to express that in a remedial order.

In arriving at this point, we reach new terrain in this lawsuit. Up until now we have had to deal with ruins left by the past, bitter battles between the parties. Judge Shadur had taken one approach to resolving the dispute, which the Court of Appeals, in a broad but general opinion, had rejected in favor of a new approach. While this new approach fundamentally shifted the battlefield from the pre-appropriation to the post-appropriation landscape, it left much debris behind in the form of unanswered questions. Until now we struggled to resolve these many new issues.[82]

Unfortunately, only the Board has given us some guidance in resolving these new matters. Clinging to its position that it has done no wrong, the United States, although implicitly raising several share issues in its brief, did not squarely address these issues. There is language in the United States' brief which supports each of these conclusions with respect to what "top of the list priority" and "equitable fair share" mean:

(1) that the Board must merely be funded first, without regard to the amount of funding;

(2) that the Board must receive as much as any other applicant (although it is unclear if or how comparative needs factor into this analysis);

(3) that the Board should receive twice as much as it would otherwise receive. Although this was done with Title IV, the government disclaims that this result was necessary.

82. These issues were never reached in 1983 because, up to the time the Notice of Appeal was filed, the District Court had made only a very preliminary determination of the level of the Board's needs, and had scheduled a further hearing on that subject. The June 30 Order, requiring the United States to fashion a remedial plan drawing on various resources then viewed as available, was stayed and then vacated. Ultimately, due to the passage of time, the

enactment of the Yates bill and other factors, the Board received none of the available 1983 funds.

In 1984, no share determination was made because the District Court concluded that the history of bad faith violations it had found justified an order that the Board receive all funds then available (some $29 million). This determination, of course, was vacated by the Court of Appeals.

We do not think that any of these implicit positions is consistent with what ¶ 15.1 or the Consent Decree requires. Nor can we accept the Board's position as the following conclusions will show.

Having made these preliminary remarks, we enter the following conclusions of law on the share issue.

9.1 The Second Opinion provides some general guidance, but no hard answers on how to resolve the share issue.

(a) It is clear that the Board cannot get all or close to all available funds without regard to other grantees or policies.[83] Such a result is "unreasonable." 744 F.2d at 1307–08. While the court said this in the context of defining proper remedies for bad faith, we think (and the Board concedes) that this language applies as well to the United States' affirmative duties under ¶ 15.1.

 (b) What the Board can get is the "equitable fair share" or "maximum level" of available funding. "Equitable fair share" is a troubling phrase. As one panel member recognized at oral argument, the Board would presumably get its "equitable fair share" *without* the Consent Decree. *See* Transcript of Oral Argument at 10. Since the Consent Decree must alter the relationship between the parties *somehow,* we think "equitable fair share" must be a broader concept than the fair share of funding the Board would receive as a normal applicant. The court's use of the words "maximum level" and "substantial obligation" bolsters such a conclusion. It must receive its "equitable fair share," an amount which accounts for its enormous needs under the Consent Decree against the needs of other grantees and other interests. The outcome of this balance must yield "maximum funding", that is, the most funding possible without unduly harming other grantees or crippling the Secretary's discretion. Where statutory criteria set a maximum for any one grant (e.g., the new magnet schools programs sets such a maxi-

mum at $4 million), the Board should receive this "maximum" level of available funding. Where there is no statutory maximum, our resolution of the pipeline issue demands that the Board be considered from the beginning of the funding process as a significant priority among others.

 (c) The Consent Decree is also a "guarantee" that the Board will receive available funding. The Board cannot be frozen out of any programs whose statutory criteria permit funding of Board projects.

9.2 As the phrase "equitable fair share" suggests, resolution of the share issue is a matter within this Court's sound equitable discretion. Indeed, we think the Court of Appeals remanded this case so that this Court could apply its broad standards in the first instance in the context of a well-developed factual record. Since this is a desegregation case, albeit a unique one, we may turn to other desegregation cases for guidance. *See Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971); *Brown v. Board of Education,* 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955). *Swann* teaches that we must be flexible, and carefully weigh the competing and conflicting interests at stake:

> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims.

402 U.S. at 15, *quoting Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944). Where Courts have had to apportion competing rights, in the special context where a treaty with the

---

**83.** The excess funds provide an exception to this rule, as discussed in Chapter 4 and below in

Conclusion 9.10.

government gives one competitor superior or prior rights, they have exercised great discretion. *See, e.g., United States v. State of Washington*, 520 F.2d 676, 687 (9th Cir.1975) (reviewing district court's apportionment of fishing rights which federal government had promised to Indians in treaties), *cert. denied*, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). In apportioning rights, the Court must "protect the interests of all parties, as well as those of the public." *Id.*

9.3 (a) It is clear that the consent decree envisioned *mutual* funding of the Board's Plan. *See, e.g.*, Findings 101–110. Even after the Second Opinion, the Executive Branch bears "a continuing, shared and special responsibility for its ultimate outcome ..." 744 F.2d at 1308, and it must fulfill its "substantial obligation to provide available funding." As we note elsewhere, both parties knew that the Board's Plan would contain extensive and expensive compensatory educational programs targeted to schools which remain racially isolated despite the Consent Decree. All of these children deserve to participate in the Decree's remedies.[84]

(b) In 1980, the parties also contemplated that the United States would provide substantial operating support to the Board. For several years before 1980, the ESAA and other programs had funded other cities with up to $150 per pupil for desegregation purposes. *See* Board's Merits Memorandum at 160. As applied to Chicago, this translates to some $60 million of annual support. The Board has provided this level of funding annually, despite severe budgetary constraints.

(c) Thus, if the Consent Decree were *strictly* mutual, the United States would be expected to pay the Board a sum of this order of magnitude. But of course it is not. ESAA has been repealed (or, more accurately, reduced and folded into block grants). Congress has made much fewer funds available now than in 1980, and the Second Opinion is clear that Congress determines availability. Nevertheless, we may consider the loosely mutual nature of the Consent Decree, the enormous nature of the Board's needs, and the Board's own huge funding efforts in order to decide what amount of funding is "equitable."

9.4 Against the Board's enormous need and the United States' promise to help meet those needs, we must weigh the needs of competing grantees, and the duty of the Secretary to set other policy priorities. As we have emphasized, the Board is just one priority out of many (although the United States did not treat it as one). And, it is one grantee out of many. We agree with the United States that Congress intended programs such as Title IV or Follow-Through to be national in scope. Thus, in providing "maximum funding" to the Board, the United States (or this Court as a remedial matter) cannot be expected to decimate the national character of these programs. This will be a difficult, though not impossible, task.

9.5 While working to reduce the share of funds to which the Board is entitled, the "national" character of the programs at issue also works to brake this reduction to a level which is still meaningful to the Board. Because these programs are national, the Secretary has made small grants to many applicants. Thus, to the extent the Board's share is increased, the loss to other grantees is spread such that each one loses only a fraction of its funding. Hypothetically, then, if 100 grantees (including the Board) exist in a program, one dollar's increase to the Board produces an average

---

**84.** At this point, it is time to issue a reminder to the parties. The constitutionality of the Board's Plan hinged on the provision of these costly compensatory remedies. The remedy must reach all of Chicago's children, especially those who continue to attend "isolated" schools. If these remedies cannot be substantially provided, it is possible that the Plan would lose its constitutional status. As Judge Shadur stated in approving the Plan:

> Were the paper promise of the Plan to be broken in its performance, it would not pass constitutional muster despite its nominal adherence to the standards of law..

554 F.Supp. at 915. We are hopeful that we will never have to resolve this troubling issue.

decrease of about only one penny to other grantees.

9.6 With these general concerns in mind, we turn to individual programs. However, we will not dictate any firm figures below. Because of the Court of Appeals' instruction in its First Opinion that we allow the United States first crack at proposing remedies, *see* 717 F.2d at 384, we think it best to give it a chance to respond to the rest of the opinion first. We also would like the Board to digest and respond to the many issues we have resolved, and to our general approach to the share issue. Still, our guidance will be useful to the parties, and we express our tentative thoughts below.

9.7 *Title IV*

(a) The Secretary had discretion over $24 million of Title IV funds. As Conclusions 6.2—6.12 make clear, he had very broad discretion to allocate a significant part of these funds to the Board in various ways.

(b) Even under his regulations the Secretary should have, but did not, *see* Findings in Chapter 6, evaluate the Board's Title IV needs as against the needs of other districts. His failure to do so makes our task more difficult, though not impossible.

(c) The Board's 1984 Title IV eligible needs amounted to at least $12 million. *See* Finding 682. The NODAC and SEA have requested such amounts for the coming school year. Given the failure of the United States to provide substantial operating costs to the Board, its violations of the Decree which have delayed funding, and the failure to renew the Yates Bill, the Board's need for Title IV funding is acute.

(d) Title IV is a national program with some 146 grantees nationwide. While an increased grant to the Board ought not degrade the national scope of Title IV, the impact of such a grant will be diffused over all of these grantees.

(e) We reject the Board's claim that $8 million of DAC/SEA grants is its fair share of Title IV funding. This amount is excessive. Funnelling ⅓ of Title IV's funds to one school district would seriously diminish the national scope of Title IV and harm other grantees too much. The Board employs a false balance to arrive at this figure. It points out that a grant of $8 million would satisfy ⅔ of its *needs*, leaving ⅔ of other grantees' *awards* intact. Such a comparison is misleading since we do not know the extent of other grantees' *needs*. Ideally, we would want to balance needs against needs.

(f) Of course, our ignorance of other grantees' needs stems from the Secretary's failure to assess them. The Board should not suffer because of that inaction. It is clear, however, that the Secretary did divert Title IV funds to districts with relatively *weaker* needs than the Board's, and was content to give the Board his conception of "adequate" rather than "maximum" funding. *See* Findings 699.3–699.4A. Thus, the Secretary has implicitly admitted that more funds are available to the Board under needs-related criteria in a "maximum" rather than "adequate" funding scheme.

(g) Although we order no firm amount, we express the following thoughts on the Board's "equitable fair share." An award in the neighborhood of $2.5–$3.0 million would balance the above factors. Amounting to only 10–12% of the total Title IV pool, this amount preserves the national character of the program, while giving the Board far more than any other district. This amount is consistent with concepts such as "priority" and "maximum level." Moreover, it harms other grantees far less than the Board's proposal would do. On average they would receive about 90% of their original grants. The Secretary could spread this decrease *pro rata*, or could target it to those districts with the least pressing needs, as he should have done originally. Finally, while the Board would not be able to come close to meeting its Title IV needs, it would receive substantial help, and about 500% more than the Secretary has awarded.

(h) The amount suggested in paragraph (g) could be reduced substantially if the Secretary were willing (we already know

he is able) to provide the Board a *direct* grant of Title IV moneys, which is more efficient. Perhaps $1.5 million would suffice under a direct grant, leaving 94% of the balance for other grantees. Thus, if the Secretary cared as much about other grantees as he claims,[85] he could have more money available to them by giving the Board a more efficient direct grant. We only suggest this possibility for the parties to consider.

### 9.8 *The Discretionary Fund*

(a) The Secretary had about $17 million of fiscal year 1984 funds subject to his discretion. *See* Finding 509(f). Even if we defer to his discretionary decision to follow certain non-binding Committee Report language, he had $5.8 million left in "truly discretionary" funds. Even after funding other priorities, he had $3.38 million left over for the Unsolicited Grants Competition. We have found earlier that this program was not a high priority for the Secretary, but rather collected and distributed merely residual funds which remained after the Secretary had set and funded other priorities. We have held that the Secretary should have considered the Board's Plan as a comparable priority.

(b) The Secretary originally intended to allocate only about a third to half of the residual funds. His original notice in the Federal Register set an average award of $100,000, to be granted to about 10–15 applicants. *See* U.S. Ex. 3, 49 Fed.Reg. 7550, 7551 (Feb. 29, 1984). Thus, if he had considered the Board a priority at all, he could have awarded it all or part of the rest of the residual funds.

(c) He ultimately decided to fund 40 grantees with the residual funds, but then reduce the grants to provide $885,840 for Technology Demonstration Projects. As with all his decisions, he did this without considering the Consent Decree at all.

(d) As with Title IV, the Discretionary Fund is clearly a program of national scope. We should not resolve the share issue in a way which would turn this Fund into a special appropriation for one school district. At the same time, as the United States has conceded in the past, the Board's Plan contains many model programs of national significance. Thus, funding such programs would not frustrate the national purposes of the Discretionary Fund

(e) With all of the above considerations in mind, we think that if the Secretary had given the Board the priority consideration it is entitled to, its "equitable fair share" or "maximum level" of available funds would have been in the neighborhood of $1.25–$1.5 million directed to model programs of national significance. Such an amount would have placed the Board roughly on par with such discretionary priorities as the Teacher Incentive Planning Grants Program, *see* Finding 509(1) or the belated Technology Demonstration Program, *see* Finding 538. It also would have allowed the Secretary to just about meet his original intention of funding 10–15 grantees via his lowest priority—the Unsolicited Grant Competition. Most importantly, *it would have allowed the Secretary to meet fully all of his other priorities.* And the grant would have been small enough to preserve the national character of the Discretionary Fund as a whole. In sum, a grant of about $1.25–$1.5 million strikes a sensible balance between the competing interests—the Board's dire need for substantial funding, the Secretary's desire and right to set national priorities, and the needs of other grantees, especially those in the NDN program, which would not be affected by this award.

(f) While we suggest a grant of about $1.25–1.5 million, we reject the Board's excessive claim to $5 million. Though the Secretary could have lawfully decided to provide such an amount, we do not think that ¶ 15.1 affirmatively compels him to provide such an amount. If it would, he would have little flexibility to set other

---

**85.** We have found the government's claims about the plights these grantees somewhat disingenuous throughout these remand proceedings, since the administration has worked yearly to reduce or eliminate many of the programs at issue, including Title IV. Nevertheless, the grantees do have real needs, which we must factor into our equitable balancing act.

priorities after deciding to follow most Committee Report language.[86] We think our proposal more sensibly balances all of the competing interests, including the Secretary's desire to set national educational priorities.

### 9.9 Follow-Through

(a) Congress appropriated $14.767 million for the Follow-Through program in fiscal year 1984. Of this amount, all but $4 million has been released from the Court's restraint in increments. Because the Secretary used $10 million of fiscal year 1985 funds for 1984 grantees, all 1984 grantees have been fully funded and 1985 grantees have been funded to date. To the extent funds are released, they will be spent on 1985 grantees. Follow-Through is being phased out, and will be discontinued after fiscal year 1986.

(b) Like Title IV and the Discretionary Fund, Follow-Through is primarily a program of national scope. But the United States has admitted that Follow-Through funds may properly be spent on the Board's Desegregation Plan. *See* Finding 816.

(c) The Board's 1984 Follow-Through needs amounted to at least $3.4 million. *See* Finding 815.

(d) after considering all of the competing interests, we propose that the Board's total "equitable fair share" or "maximum level" of available 1984 Follow-Through funds be in the neighborhood of $1 million, which is about $750,000 more than it actually received. Such a result (1) preserves the national character of the program; (2) spreads the approximate 5–10% decrease over many grantees; (3) quadruples the Board's 1984 grant, thereby going a long way toward meeting its needs; and (4) allows the Secretary to adhere generally to his policy of providing only continuation grants, while making an exception under ¶ 15.1 for the Board.

(e) We therefore reject the Board's excessive claim to $3 million of the Follow-Through funds. Such a grant would frustrate the essential national character of the program and unduly cut into the continuation grant policy. Our proposition more fairly accounts for all of the vying interests at stake.

### 9.10 The Excess Funds and Others

(a) We have already determined that the Board's appropriate share of the excess funds is 100%, *see* Conclusions 4.21—4.22, so long as the Board's projects satisfy existing statutory criteria and the method of allocation set forth in Conclusions 4.24—4.-25. This is because, by definition, no other grantees or priorities are competing for the funds. No interests other than the Board's need affect our equitable balancing process. These are perfect examples of what the Court of Appeals meant by "unencumbered funds."

(b) Except for certain 1985 Bilingual Education funds discussed in Conclusion 9.22, we have no restraint on other programs to which the ¶ 15.1 priority should apply (such as, e.g., vocational education). Thus, no share analysis can be done. However, the analysis we have provided throughout this opinion should guide the Secretary in future years when he makes his funding decisions.

### B. Remedial Matters

We will not now enter a formal remedial order. Given the magnitude of this opinion, the parties should digest and respond to it before we set a formal order in stone. Moreover, the United States should have a chance to propose its own remedy in response to our various Conclusions that its conduct has violated the Consent Decree.

---

**86.** It appears from the record that language in Committee Reports, rather than expressing "congressional intent" in the first instance, sometimes merely parrots information provided by the Secretary in his requests for funding. Through this process the Secretary could try to evade his obligations under ¶ 15.1 by informally making his discretionary decisions *before* funds are appropriated, including these decisions in budget recommendations, and then ostensibly "relying" on Committee Report language in formally setting his priorities. We are prepared to enter appropriate remedies if the Secretary intentionally tries to evade ¶ 15.1 through such activity.

*See First Opinion,* 717 F.2d at 384; *1984 District Court Opinion,* Conclusion of Law 158, 588 F.Supp. at 245. Nevertheless, we think it proper to suggest tentatively and in broad terms what a valid Remedial Order should contain.

9.11 In our various Conclusions of Law above we have already declared that the United States has violated the Consent Decree. A remedial order would formally declare, *inter alia,* that the United States violated the Decree by:

(a) failing to consider the Consent Decree in formulating its allocation decisions with respect to the full amount of available fudns appropriated by Congress for Title IV, the Discretionary Fund, Follow-Through and other programs through which funds for desegregation can be disbursed.

(b) providing in 1984 zero funding in the Discretionary Fund, $230,000 in Follow-Through funds, and $428,000 in Title IV funds.

(c) failing to provide the Board in 1984 the amounts now estimated to represent its substantial share and the maximum level of available funding from Title IV, the Discretionary Fund and Follow-Through.

(d) failing to take any step to provide the Board in 1984 the restrained Excess Funds (except for certain Bilingual Education Funds) and failing to provide to the Board at least that portion of the Excess Funds (as discussed in Chapter 4) which, consistent with statutory criteria, could be used to advance the Board's Plan.

(e) failing entirely to conduct any affirmative search for funds that could be used to advance the Board's Plan in fiscal year 1984 and prior years, failing to provide any such funds, and conducting grossly deficient search activities in fiscal year 1985.

9.12 *Title IV*

(a) The Secretary should provide earmarked funds of about $2.5 million to the DAC/SEA's serving the Board, or less, if he chooses to provide funds directly to the Bcard. He should also provide the $647,-225 in excess 1983 Title IV funds, which he

has already agreed to provide. *See* February 1985 Report of the United States at 25.

(b) The Board should have the primary voice in determining how and to which eligible programs these funds are to be allocated. This will effect the most efficient use of the limited funds, since the Board can best assess its needs. In particular, without yet hearing any opposition from the United States, we tentatively agree with the Board that:

1. The Board should be allowed to designate which agencies among the DACs and SEA projects serving the Board receive the earmarked grants and in what amounts;

2. The Board should be allowed to determine the form in which the funds are provided, choosing, for example, among consulting services, on-site services and subcontracted activities. The Secretary should cooperate with the Board, to the full extent of his discretion, in implementing its decisions in this respect and thus enhancing the efficient use of the funds;

3. The Secretary should ensure that no overhead charges are made by the DACs and SEAs against the earmarked grants, and that the funds are used solely for the direct cost of supplemental (not supplanting) DAC/SEA activities;

4. As to the programmatic content of the activities for which the funds will be used, the Board should be allowed to design such activities, in consultation with its designated DAC/SEA agencies. The Secretary should cooperate with the Board to the full extent of his authority in implementing the Board's decisions in this respect;

5. The funds should in any event be obligated to the designated DAC/SEA agencies serving the Board immediately and payable to them within one month after the issuance of the formal remedial order.

9.13 *The Discretionary Fund*

(a) The Secretary should provide a grant of about $1.25–1.5 million to the Board.

(b) apart from the Secretary's determination that Discretionary Fund moneys should be used for research and demonstration purposes, and not for basic operating costs, the primary concern of the Executive Branch with respect to the Discretionary Fund has been and continues to be the amount of funds to be provided to the Board, rather than the particular activities for which the funds will be used. Accordingly, the Board should be allowed in the first instance to recommend the particular activities for which it will use the funds, and the Secretary should cooperate with the Board to the full extent of his authority in implementing the Board's decisions, so long as the funds are targeted to "model" programs of "national significance." This should be no problem, since the Secretary and others have lauded many of the Board's program as "model" and "significant."

(c) These funds should be obligated to the Board immediately, and payable to the Board not later than 30 days following the entry of a formal remedial order.

9.14 *Follow-Through*

(a) The Secretary should provide a supplemental grant to the Board of about $0.75 million from the restrained fiscal 1984 Follow-Through money.

(b) In addition, the Secretary should provide a supplemental grant to the Board in the amount of $440,300 from the restrained fiscal year 1983 Follow-Through money. *See* Conclusion 8.7.

(c) The Secretary should cooperate with the Board to the full extent of his discretion in enabling the Board to use the funds for any·aspect of the Desegregation Plan consistent with the statutory criteria of the Follow-Through program.

9.15 *Excess Funds*

(a) The Secretary and the Board should follow the allocation method specified in Conclusions 4.24–4.25.

(b) The Secretary should cooperate with the Board to the full extent of his discretion in fulfilling any formal procedures with respect to these funds, and in determining whether any additional amounts of Excess Funds can, under statutory criteria, be used to advance the Board's Desegregation Plan and should therefore be provided to the Board.

9.16 The funds allocated to the Board under the previous four Conclusions should be used in school year 1985–86. The parties should prepare to argue to the Court whether the balance of the restrained fiscal year 1984 funds should be released immediately or restrained because of the passage of fiscal year 1985, *see* Board's Reply Memorandum at 125, and the probable resulting failure of the United States to give the Board priority treatment to the Board in 1985. As of now, we are inclined to release the balance of the funds, give up on fiscal year 1985, and closely monitor the United States' conduct during fiscal year 1986 and future years. We can extend our oversight for one year more than we otherwise would have in order to make up for the "loss" of fiscal year 1985.

9.17 Judge Shadur's 1985 Conclusion of Law 159, 588 F.Supp. at 245, is still valid in the current context. Because the United States failed to comply with the Consent Decree in 1984 and prior years, and to a substantial extent has undoubtedly failed to comply in fiscal year 1985, the United States has not yet effectively begun to meet its funding obligations to the Board, and will do so for school year 1985–86 only in a partial fashion. This Court therefore tentatively determines that the duration of the United States' obligation under ¶ 15.1 begins with the 1985–86 school year, and extends for a period of at least five years, and that the duration of the obligation is subject to further determination by the Court in view of the United States' future course of compliance with the Consent Decree, the status of implementation of the Desegregation Plan, and such other factors as the Court deems relevant.

9.18 *Chapter 2 Block Grant Funds*

Consistent with our Conclusions the Secretary should, to the full extent of his discretion:

(a) ensure that the State's allocation formula for the 80% distributive share is ap-

propriately weighted to reflect desegregation activities as a high-cost factor;

(b) ensure that the Board receives "the maximum level of available funding" from the State's 20% discretionary share of the block grant funds; and

(c) cooperate and consult with the Board with respect to the foregoing matters.

9.19 *Search Activities*

The United States has virtually ignored its search obligations ordered by the Court of Appeals and this Court. *See* Conclusions in Chapter 7.

(a) The United States should immediately begin the strongest possible search effort in close consultation with the Board, both for excess fiscal year 1985 funds and fiscal year 1986 programs through which funds can be provided for desegregation activities to be implemented in school year 1986–87. The search should be organized from the Assistant Secretary level, as in 1980, with a statement of mission reflecting the full scope of the United States' obligations under the Consent Decree.

(b) For fiscal year 1986 and future years, the United States' Consent Decree obligations should be considered from the beginning of the process of determining how funds appropriated by Congress for that fiscal year will be allocated. The United States should consult with the Board in this process, and report to this Court and the Board on a quarterly basis during the fiscal year as to the manner and extent of its consideration and as to the general allocation decisions it has made.

9.20 *Pattern of Violations and Bad Faith*

(a) The pattern of failure to comply with the Consent Decree provides an additional basis for the proposed provisions of the remedial order described in Conclusions 9.11—9.19 above. Thus, each of the proposed elements of an order described above stands on its own, as reflecting the proper implementation of the Consent Decree in each instance, and is in addition supported as part of an overall remedy for the United States' historical pattern of failure to comply.

(b) In addition, this pattern of failure to comply arguably shows that the United States has made every effort to minimize and to avoid its obligations under the Consent Decree and the provision of funding to the Board. This pattern of conduct could constitute a bad faith violation of the Consent Decree under the standards discussed in Part II(B) of the Court of Appeals' 1984 Opinion. Accordingly, all of the proposed provisions of this Court's Order described above could, as a supplemental matter, be grounded upon these bad faith violations. Besides the overall pattern of conduct, certain particular actions could constitute bad faith, such as the Yates-Weicker Activities, the activities noted in footnote 12 of the Second Opinion, the conduct surrounding the excess funds, *see* Conclusions in Chapter 4, and the woeful lack of search activities. For now we express no firm opinion on the bad faith issue, since it has not been fully addressed by the parties. However, the parties should be prepared to discuss the issue at the next status conference.

9.21 *Stay Issues*

(a) Anticipating that the Board would likely prevail on several of its claims, this Court on June 18 ordered that the United States in its merits memorandum address ways that the Board can be paid promptly despite any appeal the United States might take. Such an appeal is likely, as well as a request to stay whatever remedial order this Court will soon enter. In its brief, the government not surprisingly said it could not now state whether it would appeal or request a stay. As for paying some funds to the Board pending appeal, it tentatively promised to pay only those funds which it has already conceded to give to the Board.

(b) The school year has begun, and the Board should get its funding as soon as possible. We think the Board's proposal for how to receive the funding is reasonable, and protects the interests of the United States on appeal. If the Board were to receive half of the funds, probably not all would be spent by the time of an appellate decision. If the Court of Appeals were to reduce the awards, adjustments, including

refunds, could be made, including, if necessary, an offset against the Board's entitlement in future years. The parties should be prepared to discuss this, or alternate, schemes at the next status conference. We note now, however, that we will not approve a funding scheme unless it provides immediate funding so that the new school year does not slip away.

9.22 *1985 Bilingual Transition Funds*

(a) On September 18, 1985, we granted the Board's motion for a temporary restraining order, which enjoined the Secretary from obligating or spending certain 1985 Bilingual Education funds earmarked for the "Bilingual Transition Program." On September 27, 1985, we released a portion of these funds, leaving about $8 million under restraint and extended the TRO for ten days under Fed.R.Civ.P. 65(b). The United States has since agreed to extend the TRO until October 16, 1985. On the basis of the record submitted for this merits hearing, as well as the papers submitted with the Board's motion for a TRO, we now conclude that the Board has satisfied the standards for preliminary injunctive relief warranting continued restraint of the funds pending a prompt hearing for a permanent injunction. The standards we apply are those set forth in our previous opinion, 610 F.Supp. at 704–05, where we affirmed a preliminary injunction concerning restrained funds pending this opinion on the merits. The Board's case is stronger with respect to the 1985 Bilingual Funds than we then thought its case was with respect to other restrained funds. In particular, the Board has already prevailed on the merits in several critical respects. Because of our resolution of the scope and pipeline issues, the Board has shown that it is entitled to a priority in this bilingual program and should receive the "maximum level of available funds" in this program. We express no opinion now on what the Board's "equitable fair share" of these funds would be. In light of our discussion of the share issue, it could well be that the Board has laid claim to an excessive share of available funds in this program, possibly warranting an interim release of funds, as has been done previously in this case. Nor

do we state now that the Board's proposed bilingual projects materially aid the overall success of the desegregation plan, contain reasonable costs or meet all applicable statutory criteria. These issues we leave for the hearing on the merits. But we conclude that the Board is extremely likely to succeed in showing it is entitled to at least a significant share of the restrained 1985 Bilingual Transition Funds. For substantially the same reasons as those spelled out in our June 4, 1985 opinion, 610 F.Supp. at 705–10, we also conclude that the Board has satisfied the other criteria for injunctive relief pending a prompt hearing on the merits.

(b) By the next status hearing, the parties should present an agreed order for scheduling a permanent injunction hearing and should attempt to resolve whether a portion of the restrained funds should be released pending such a hearing. In the meantime, the restraint shall continue as a preliminary injunction as to the full amount now restrained.

It is so ordered.

## X. *Conclusion*

The government and the Board freely and knowingly negotiated and entered into a contract for the benefit of the school children of the City of Chicago, which purportedly resolved this contentious litigation. The parties by submitting a Consent Decree asked the District Court to approve this contract, which was done. Unfortunately, for the beneficiaries of this Consent Decree, to date there is still no final resolution. While the parties have expended countless hours of lawyers' and court time, after five years of long and protracted litigation, including three district court opinions of more than 500 pages and two trips to the Court of Appeals with another one perhaps imminent, key issues remain to be settled.

It should be obvious, as documented in the body of this opinion, that although it "bears a continuing and special responsibility to this case," the government by stubbornly prolonging this dispute shoulders

the lion's share of blame for this situation. We trust that following this opinion, the government will rekindle its lost zeal for representing those whom it sought to protect in the first place when it filed this suit: Chicago's school children who are entitled to receive a quality and desegregated education. The government in executing the Consent Decree made both a binding contract with the Board and a legal commitment to this Court to perform as promised. It has no choice but to honor its contract and abide by the commitment it freely chose to make. It may not now rewrite the past. It is time for all concerned to look to the future.

To summarize: the Board has satisfied the requirements for permanent injunctive relief with respect to the Remedial Order we will ultimately sign. *See* 1984 Conclusions 161 and 162, 588 F.Supp. at 246. In particular, the Board has prevailed on the merits in showing entitlement to much of the funds under restraint. In addition, the Board has shown that the "balance of equities" and "public interest" favors injunctive relief. As concluded in the 1984 District Court Opinion, (1) the Board has no adequate remedy at law, (2) it faces irreparable injury without injunctive relief, (3) injunctive relief imposes no substantial hardship on the United States, and (4) the public interest favors an award of injunctive relief. *Id.* An injunction within the parameters spelled out in the previous chapter adequately balances the hardship to other grantees nationwide as against the Board's. Thus, the groundwork for an imminent Remedial Order is complete.

We hereby schedule a status hearing for Tuesday, October 29, 1985, at 10:30 a.m. The parties should meet *this week* and discuss the several issues we have flagged in the opinion with a view toward negotiating an agreed order defining these remaining issues and setting forth procedures for resolving them expeditiously. The parties shall submit their agreed order on or before Wednesday, October 23, 1985, at 5:00 p.m. Where there is no agreement as to definition of a particular issue or procedures to resolve it, the parties shall submit at the time of filing the agreed order their respective position papers as to the unresolved issue. The agreed order and/or position papers (of no more than 5 pages per issue) shall cover the following issues:

(a) *remedial order* —in the event of no agreement, the parties should indicate their positions on the form and content of the remedial order and propose a prompt date for issuance of such an order. The parties should also include proposals on resolving the mechanical issues remaining concerning the excess funds.

(b) *funding pending appeal* —the parties should specify exactly how the Board shall receive funding pending an appeal. This, of course, implies that the United States should try by that date to decide whether it will appeal.

(c) *injunctive hearing* —the parties should set a timetable for finishing preparation for a hearing on the 1985 Bilingual Transition Funds and a proposed hearing date. The parties should outline which issues remain to be resolved at such a hearing. We expect that the parties will ultimately prepare a joint pretrial order for this hearing. Finally, the parties should see if any stipulations are possible concerning an interim release of funds, or if no such releases are warranted.

(d) *bad faith* —the parties should outline when and how the Court should resolve the various allegations of bad faith mentioned through the opinion. This is not a request that briefs be filed at this time on whether bad faith occurred. Rather, the parties should inform the Court generally as to the issues to be resolved, whether discovery will be necessary for the parties to present the issues and a suggested briefing schedule.

Other pressing issues or administrative matters that need to be resolved also should be presented to the Court as part of the agreed order or as supplemental position papers. It is so ordered.